UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTO INDUSTRIES SUPPLIER EMPLOYEE
STOCK OWNERSHIP PLAN (ESOP),

     Plaintiff                               Hon. Avern Cohn
                                         Case No. 03-74357

vs.

SNAPP SYSTEMS, INC.,

     Defendant/Third Party Plaintiff         **Report and Recommendation of the
Special Master Regarding All Motions
Addressed to the Antitrust Claims
filed by SNAPP Systems, Inc. against
Ford Motor Company**

vs.

FORD MOTOR COMPANY, a Delaware Corporation,
SUSAN E. KOBET, individually,
DIANE SENDEK MARCHESE, individually,
CARMEN ZIRLES, individually,
JEFFREY D. COLLINS, individually,

     Third Party Defendants

_____/

E. Powell Miller (P39487)               Kenneth J. McIntyre (P17450)
David H. Fink (P28235)                 DICKINSON WRIGHT, PLLC
MILLER SHEA, P.C.                    Attorney for Third Party Defendant
950 West University Drive, Suite 300     500 Woodward, Suite 4000
Rochester MI 48703                    Detroit, MI 48226
248-841-2200                            313-223-3500

Jeffrey D. Stamper, Esq.
JEFFREY D. STAMPER PLLC
Co-Counsel for Third Party Plaintiff
9300 Shelbyville Road, Suite 402A
Louisville KY 40222
502-515-3343

**Report and Recommendation of the Special Master Regarding
All Motions Addressed to the Antitrust Claims
file by SNAPP Systems, Inc. against Ford Motor Company**

The antitrust counts in this dispute were referred to the undersigned as Special Master, pursuant to the Order of the Honorable Avern Cohn dated January 27, 2006. Briefs had already been filed and reviewed.  This Master heard oral argument twice, once in April to allow the parties to introduce their cases and once in July closer to the end of the process.  (Transcripts are cited as April tr. and July tr.)  At the suggestion of the parties, before the second argument the parties were given a list of issues about which this Master was especially interested in hearing argument, although the parties were allowed to address any issues they wished.

<u>Introduction</u>

At its core, this dispute is straightforward.  In 1991, SNAPP Systems, Inc. ("SNAPP") (then known as Dearborn Systems & Services, Inc. ("Dearborn")) began supplying "information technology procurement services"[1] to Ford Motor Company ("Ford").  SNAPP's First Amended Third Party Complaint and Jury Demand ("Complaint") ¶ 5.  In particular, SNAPP contracted to "provide to FORD services consisting primarily of purchasing certain computer software items used by FORD in the operations of its various business activities." 1991 Agreement among Dearborn, Ford, and another company with the same president as Dearborn, Ford Ex. 25, at ¶ 1.1.  SNAPP's role, as set out in subsequent agreements, remained the same except that it was extended to cover the purchasing of additional items.

---

[1] This useful wording is how Mr. Bhagwan Thacker, the sole stockholder of Dearborn/SNAPP during the entire time Ford was buying from SNAPP, SNAPP Boycott Brief at 6-7 n.9, referred to the business internally.  *See* Interoffice Memorandum from Bhagwan Thacker to DSSI, Oct. 1, 1999, SNAPP ex. 72, at 1 ("SNAPP's contractual agreement with Ford for the provision of information technology procurement services recently expired.  . . .  [Without a new agreement,] SNAPP cannot and will not provide additional information technology procurement services to Ford.").

1

*See* Frame Work Agreement Between Ford and SNAPP (Ford Ex. 37), at ¶ 1.1 ("SNAPP will provide to FORD services consisting primarily of purchasing, on FORD's behalf, certain computer hardware, software and other commodities and service items used by FORD in the operations of its various business activities."). These contracts were renewed from time to time, including for three years beginning August 12, 1996, after which Ford had the option to renew for additional one year periods. First Amendment to Frame Work Agreement Between Ford and SNAPP, Ford Ex. 44, at substitute ¶ 1.6. Ford chose not to exercise this right. On October 1, 1999, Ford entered into an agreement with SNAPP pursuant to which SNAPP would continue to provide services (primarily purchasing computers and software for Ford) through December 31, 1999, when SNAPP would "terminate promptly all work under this Agreement" and on January 3, 2000, "transfer title and deliver to Ford the finished work or the work in progress." Ford Ex. 45, at 2. Later that month Ford confirmed to SNAPP that it had made a "final" decision to end their business relationship at year end 1999. Letter to Mr. B.P. Thacker (Oct. 28, 1999), Ford Ex. 52.

Amidst the uncertainties between Ford and SNAPP's relationship, a new but related company, Direct Sourcing Solutions, Inc. ("DSSI"), was incorporated on March 23, 1999. Mr. Bhagwan Thacker, sole stockholder of SNAPP from 1991-99, was a stockholder and president of DSSI. SNAPP CSMF at 15; SNAPP Boycott Brief at 6-7 n.9. The "primary impetus" for DSSI's formation was the handling of work for General Motors. Dennis Buckley deposition, Ford corrected ex. 94, at 30. On January 3, 2000, Mr. Thacker announced to all employees that "all GM business will be done in the name of and through Direct Sourcing Solutions, Inc." Ford ex. 21, at 1. As of February 22, 2000, SNAPP had parted with virtually all of its assets and had stopped making sales, providing services, and earning revenue. April tr. 86-87; July tr. 28.

Unhappy about Ford's actions, SNAPP filed a lawsuit that included, among other

2

things, numerous antitrust claims under federal and state antitrust law. SNAPP's first filing against Ford (which did not include antitrust counts) was on August 19, 2002, as a third party petition after SNAPP had been sued in Texas state court. Before the Texas lawsuit was dismissed, Ford and SNAPP entered into a tolling agreement that is discussed below. SNAPP subsequently filed a third-party complaint against Ford in the Eastern District of Michigan. On March 17, 2005, SNAPP filed its First Amended Third Party Complaint and Jury Demand ("Complaint"), which is the complaint pending before this court. Third-Party Defendants' Statement of Material Facts ("Ford SMF") ¶ 17; SNAPP's Counter Statement of Material Facts ("SNAPP CSMF").

The Complaint's two antitrust counts (Counts VII and VIII) can be read liberally to reference the following alleged violations: (1) monopolization, (2) attempted monopolization, (3) tying, (4) reciprocity requirements, (5) horizontal price fixing, (6) exclusive dealing, and (7) group boycott. Complaint Count VII. (Count VIII alleges that everything in Count VII also violates the Michigan Antitrust Reform Act, M.C.L.A. 445.771 *et seq.* Because Michigan's antitrust act mirrors the federal antitrust act except with respect to the statute of limitations and the parties have not separately analyzed the substantive standards of the Michigan Act, this Court should apply the same analysis to both. *See, e.g., American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 323 F.3d 366, 368 n.1 (6th Cir. 2003).) This Report will not further discuss state law except with respect to the statute of limitations.

SNAPP's antitrust claims have led to the elaborate motions practice that has been referred to this Master. A rather straightforward business action has become the subject of elaborate discovery, briefing, and submission of evidence. Lawyers on both sides have worked strenuously to advocate their clients' interests. No client can complain about lack of energy or commitment.

3

The following motions are pending before this Master:[2]

• Ford's Motion for Partial Dismissal of Antitrust Counts as Barred by the Statute of Limitations, Dkt. 94 (filed April 19, 2005) (briefs are cited as Ford SOL Brief and SNAPP Corrected SOL Brief);

• Ford's Motion to Dismiss SNAPP's Antitrust Claims for Failure to State a Claim Under Rule 12(b)(6), Dkt. 121 (filed May 10, 2005) (briefs are cited as Ford 12(b)(6) Brief and SNAPP 12(b)(6) Response);

• Ford's Motion for Summary Judgment on SNAPP's Antitrust Claims, Dkt. 222 (filed Sept. 30, 2005) (briefs are cited as Ford SJ Brief and SNAPP SJ Response);

• SNAPP's Motion for Partial Summary Judgment that Ford Boycotted SNAPP from the Relevant Market, Dkt. 238 (filed Sept. 30, 2005) (briefs are cited as SNAPP Boycott Brief; Ford Boycott Response; and SNAPP Boycott Reply).

For the reasons set forth below, this Master recommends that Ford's motion for summary judgment be granted in its entirety and that SNAPP's be denied. Ford's merits motion to dismiss is subsumed by the treatment of its motion for summary judgment, so it will not be separately addressed. In addition, Ford's motion to dismiss on statute of limitations grounds should be converted into a motion for summary judgment, and the claims would be barred in part on this ground were they not otherwise ended.

SNAPP's various antitrust charges are addressed below, allegation by allegation. Central to SNAPP's claim, however, is an entity called Covisint, which began functioning after Ford had terminated relations with SNAPP. SNAPP's counsel explained, "It is exceedingly rare that you have a conspiracy where the conspirators actually named the

---

[2] In addition to the listed motions, the parties objected to various submissions of each other. Since this whole dispute can be resolved without addressing these disagreements, this Master does not make recommendations on this skirmishing.

conspiracy. That name is Covisint. Covisint is a conspiracy consisting of the Big 3 as founding partners." July tr. 5. (The "Big Three" is a common way of referring to General Motors ("GM"), Ford, and DaimlerChrysler ("DCX"), even though Toyota sells more vehicles in the U.S. than one or two of these firms.) Covisint is described and discussed in a law review article to which this Court's careful attention was drawn by SNAPP: Thomas J. Horton & Stefan Schmitz, *The Lessons of Covisint: Regulating B2Bs under European and American Competition Laws*, 47 WAYNE L. REV. 1231 (2001); *see* April tr. 48 ("In many ways, what the professors wrote about Covisint is a road map to our case." It is "one article that we strongly urge you to take a look at.").

On February 25, 2000, GM, Ford, and DCX jointly announced plans to form Covisint, which was to be "a single global business-to-business supplier exchange." Covisint Facts, SNAPP ex. 62. Renault and Nissan joined in April 2000, and PSA Peugeot Citroen in May 2001. *Id.* More than 20 industry participants (firms like BASF, Dana, Delphi) were soon added. 47 WAYNE L. REV. at 1233. Ford initially held 27% of Covisint's shares. *Id.* at 1285[3] Covisint was incorporated on December 8, 2000, officially began providing services in the U.S. on January 1, 2001, elected its Board of Directors on January 24, 2001, named its first chairman on April 18, 2001, and officially began providing services in Europe, Asia-Pacific, and Latin America in July 2001. Covisint Facts, *supra.*

According to Horton & Schmitz, Covisint at least initially had a "procompetitive electronic platform mission." 47 WAYNE L. REV. at 1235. They explain that B2B's "provide a platform which can be used by different market participants in communicating and

---

[3] Covisint's intial Memorandum of Understanding included a schedule indicating that the Big Three (including Ford) each would have 32% equity participation, SNAPP ex. 58, at LT000035, but since that chart included neither founder Renault-Nissan nor PSA Peugeot Citroen which subsequently joined, Covisint Facts, SNAPP ex. 62, at 2, it has been superceded.

trading" and "generally are competitively benign."  *Id.* at 1244-45.  "[J]oint purchasing is generally not part of a B2B's original objective and the notifying parties [citing Covisint] usually give assurances to the competition authorities that no joint purchasing will occur."  *Id.* at 1267.  Risks arise, they say, "when they [B2B's] start competing in the product or service markets traded through the B2B, or serve as a mechanism for the participants to collaborate in making such sales or purchases."  *Id.* at 1245.

Covisint received extensive scrutiny by antitrust enforcers at the FTC, Germany's Bundeskartellamt, and the European Union, and responded by crafting a supplemental Memorandum of Understanding ("MOU") issued August 30, 2000.  *Id.* at 1284; Covisint Facts, SNAPP ex. 62; Supplemental MOU, Ford ex. 102.  Among other things, the supplemental MOU prevented Covisint from facilitating joint purchasing by OEMs, 47 WAYNE L. REV. at 1284; Ford ex. 102, at LT000041 ("Each Party further agrees that it will not engage in any aggregate purchases of products or services with any other OEM through the use of Covisint."); Ford ex. 102, at LT000052.  The supplemental MOU also specified that the OEMs "shall hold less than a majority of the seats on the Covisint Board of Directors."  Ford ex. 102, at LT000042.  Covisint and each of the OEMs promised that they would "not enter into any oral or written agreement with any actual or prospective Covisint customer . . . where the terms of such agreement (i) obligate such customer to use Covisint as its 'exclusive' or 'primary' exchange; , , , [or] (iii) otherwise restrict or limit the customer's choice to access, use, participate in, organize or establish an electronic exchange other than Covisint . . . ."  Ford ex. 102, at LT000045.  On September 11, 2000, the FTC closed its investigation of the proposed formation of Covisint.  *FTC Terminates HSR Waiting Period for Covisint B2B Venture* (FTC Press Release Sept. 11, 2000).  Germany's Bundekartellamt approved Covisint on September 23, 2000, and the European Commission approved it in July 2001.  Covisint Facts, *supra.*

6

Covisint was never much of a success.  By May 2001 Business Week observed that it "'hasn't lived up to all the hype;'" in August 2001 Information Week Daily reported that "'slow adoption of the exchange by automakers . . . has hampered its success,'" and in February 2002 an analyst wrote that "'we can safely assume that Covisint, with large fixed costs and insufficient business volume is losing its shirt.'"  47 WAYNE L. REV. at 1294 (quoting documents).  Although the record contains only limited information about Covisint's fate after February 2002, the parties are in agreement that the Covisint vision was never realized.  In particular, SNAPP stated that Covisint "failed to accomplish its purpose," "ultimately collapsed of its own weight," and "could not survive."  SNAPP SJ Response at 5; SNAPP 12(b)(6) Response at 17-18; *see also* Ford ex. 100 at 5 ("I think it's pretty well established that Covisint was not ultimately successful.") (statement of SNAPP's counsel).  On February 5, 2004, Compuware Corporation and Covisint announced that Compuware would acquire Covisint's assets, effective in 30 days.  Press Release, http://www.covisint.com/res/pr/2004/2004.FEB.05.shtml.[4]

Writing in 2002, however, Horton and Schmitz worried that "Covisint could be headed in the direction of anticompetitive activities that fall outside the scope of its original planned stated objectives."  47 WAYNE L. REV. at 1295.  They pointed to Covisint's announcing "a series of 'exclusive provider agreements' with companies offering supply chain, document, workflow, and routing management software and services," *id.* at 1295 (citing March and September 2001 Covisint press releases), and to media reports that Ford and Delphi would each require suppliers to join Covisint, *id.* at 1297 (citing August 21, 2001, and September 3, 2001, news stories, *see* SNAPP ex. 59 (Delphi); ex. 141 ("Ford Motor Co. suppliers must joint Covisint if they want to do business with the automaker

---

[4]  SNAPP urged consultation of the Covisint web site (July tr. 16), and Ford did not object.

online, starting next year.")).  They warned that "[r]equiring suppliers to purchase Covisint's 'best-of-breed' solutions looms as a possible next step."  47 WAYNE L. REV. at 1297.  These worries are at the core of the "road map" to SNAPP's case that those authors provided. Within two years, however, Covisint had been abandoned by its auto company founders.

## I.  <u>Standard for Granting Summary Judgment</u>

Only the disposition of these motions stands in the way of the trial of this lawsuit. The parties have conducted extensive discovery; they have submitted many affidavits (including of expert witnesses, although those witnesses have not been deposed); and they have thoroughly briefed these issues and twice presented argument.  With the possible exception of deposition of experts, which is not scheduled, discovery is over.

We are on the verge of trial—as Snapp's counsel said, "We anticipate going to trial in September, so we are definitely in the eighth inning."  April tr. 17-18.

The familiar standards for summary judgment must be read in light of this context. Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The fundamental question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

8

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met this burden,

> the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*"  Fed. Rule Civ. Proc. 56(e) (emphasis added).  See also Advisory Committee Note to 1963 Amendment of Fed. Rule Civ. Proc. 56(e) (purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial").  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).  The evidence must be viewed in the light most favorable to the non-moving party, of course.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  But "the non-moving party must present 'significant probative evidence' to show that 'there is [more than] some metaphysical doubt as to the material facts.'"  *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002) (citation omitted).  "Rather, there must be evidence on which the jury could reasonably find for the non-moving party."  *Brighton Optical, Inc. v. Vision Service Plan*, 422 F. Supp. 2d 792, 801 (E.D. Mich. 2006) (citing cases).

A court considering a motion for summary judgment in an antitrust case does not function with blinders.  In particular, "if the factual context renders respondents' claim implausible -- if the claim is one that simply makes no economic sense -- respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary."  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Spectators' Communication Network Inc. v. Colonial Country Club*, 253 F.3d 215, 219-20 (5th Cir. 2001) ("courts will not draw inferences to support a claim that makes no economic sense; such a claim will require unusually persuasive evidence to withstand summary judgment").  In the end, this requires only that the nonmoving parties's inferences

9

be reasonable, *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 931 (6th Cir. 2005)—but a court should consider the nature of the claim in evaluating reasonableness.

Here, in spite of the heroic efforts of SNAPP's counsel, the proffered antitrust account strains credulity. The Complaint alleges that the computer purchasing services SNAPP contracted to provide to Ford are part of a market consisting of something called "IP Services." SNAPP's counsel defined these as "integrated purchasing services which involves the acquisition of goods and services and the management of a large supply base." April tr. 41. The closest the Complaint comes to defining this market is in Paragraph 9:

> The IP Services provided by SNAPP involved performing the functions associated with the worldwide acquisition process of computer hardware, software, Maintenance, Repairs and Operating supplies ("MRO"), raw materials, certain production parts, and other products, which included, but was not limited to: assisting in the selection of suppliers and products; becoming a party to contracts between Ford and suppliers of goods and services; receiving, verifying and, when necessary, correcting orders; facilitating the ultimate delivery of products; negotiating the prices, terms and conditions with suppliers; communicating with suppliers; placing and transmitting orders with suppliers; tracking and communicating order status and supplier returns; tracking supplier quality and performance; assisting suppliers in their cost containment; handling financial and tax settlements with suppliers globally; reconciling financial statements; engaging in lease negotiations and administration; facilitating Ford's accounting and global standardization; managing multiple currency transactions in tax jurisdictions around the world; developing new business processes to support the SNAPP Ventures business needs; and engaging in continuous improvement and training.

Complaint ¶ 9. According to the Complaint, Ford engaged in a variety of anticompetitive actions that succeeded in lessening competition in the alleged "IP Services" market, resulting in higher prices and lower quality. Complaint ¶ 91. Since Ford is one of the leading *customers* in that alleged market, the central charge is that Ford set out to and succeeded in causing itself substantial harm. (The Complaint also alleged an "Automobile Parts and Components Market" in which the "Big Three OEM's are primary buyers."

10

Complaint ¶ 80.)[5]   "Rational economic actors do not ordinarily conspire to injure themselves." *Spectators' Communication Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001).   Accordingly, a court must expect greater evidence before allowing claims like these to proceed to trial.   Even without heightened scrutiny, however, these claims would fail.

## II. **Monopolization**

The classic test of monopolization is set out in *United States v. Grinnell Corp.*, 384 U.S. 563 (1966):

> The offense of monopoly under § 2 of the Sherman Act has two elements:
> (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from grown or development as a consequence of a superior product, business acumen, or historic accident.

*Id.* at 570-71.   It continues to be good law.   *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 932 (6th Cir. 2005); *American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 323 F.3d 366, 370 (6th Cir. 2003).

The Complaint can be read to suggest a charge of monopolization.   Allegations include the following:

(a) Ford "leveraged its monopsony power in the Automobile Parts and Components Market to drive potential competitors our of the IP Services Market."   Complaint ¶ 74.

(b) "Ford abused its monopsony power by forcing SNAPP to accept exclusivity provisions as a condition to continuing its business relationship with Ford . . . in violation

---

[5]   In response to Ford's argument that SNAPP was claiming that the Big Three had "'irrationally harmed themselves,'" SNAPP 12(b)(6) Response at 17 (quoting Ford's brief), SNAPP argued that Covisint's failure "supports SNAPP's claims," *id.*   SNAPP's argument seems to be that Ford took various anticompetitive actions in order to aid Covisint.   SNAPP SJ Response at 2-4.   Left unexplained is why Ford would take the lead in driving up its own costs (all of which it paid) in the vain hope that eventually Covisint (in which it owned a distinctly minority interest) would become profitable.

of Section 2." Complaint ¶ 75. "Ford, with others, used Covisint, used reciprocity requirements . . . to obtain and abuse its Covisint-derived monopoly power in the IP Services Market." Complaint ¶ 88.

(c) "In an effort to increase Ford's monopsony power, Ford successfully demanded that SNAPP produce increased amounts of Ford-specific products, services, and investments, in violation of Sections 1 and 2." Complaint ¶ 76.

With respect to the relevant markets, the Complaint alleges that "IP Services" is the "relevant product" in the "IP Services Market," and "automobile parts and components" are the "relevant products" in the "Automobile Parts and Components Market." Complaint Paragraph 80. The geographic market is alleged to be "Michigan and the surrounding states." Complaint ¶ 82.

The Complaint alleges power as follows: "Ford, alone, and along with GM and DCX, as they combined their buying power leverage in forming Covisint, possess vast monopsony and oligopsony power in the IP Services Market and the Automobile Pars and Components Market." Complaint ¶ 83. "Barriers to entry" are alleged for the "IP Services Market." Complaint ¶ 86. Covisint is alleged to be "an industry-led marketplace that controls a substantial segment of the IP Services Market." Complaint ¶ 87.

Harm to competition is alleged to be found in SNAPP's being driven out of business. Complaint ¶ 89. In addition, Ford is alleged to have worked to reduce the number of its suppliers, which allegedly reduces competition in automobile parts and components. Complaint ¶ 90. In addition, Ford's actions are said to have resulted in higher prices, reduced quality, and substitution of less efficient alternative services and products" in "IP Services." Complaint ¶ 91. (Ford and Covisint are here referred to as an "IP Services Market providers," but no fact suggests that Ford ever provided "IP Services" or any related services to any third party.)

12

Missing from the above allegations is the usual stuff of monopolization claims. Although the Complaint, carefully parsed, can be read to allege that Ford has "vast monopsony . . . power," Complaint ¶ 83, the clear emphasis is on the power allegedly enjoyed by Covisint—not by Ford. Nowhere is Ford alleged to have a monopoly-sized market share. SNAPP cited a secondary source saying that Ford's 1999 share of U.S. auto production was 24.7%. SNAPP SJ Response at 9. The court is pointed to no fact supporting any assertion that Ford charged monopoly prices (or paid monopsonistic low prices).

In response to Ford's motion for summary judgment, which pointed out that "there is no evidence to support any alleged market share," Ford's SJ Brief at 6, SNAPP argued that "a detailed study of market share is not necessary in this case as the market share of The Big Three is frequently publicized and discussed." SNAPP's SJ Response at 9. SNAPP cited public documents that show that the Big Three's share of 1999 U.S. production was 70.8%, with Ford's share being 24.7%. *Id.* (citing David Bailey, *Antitrust Implications of B2Bs: Covisint—A Competitive Collaboration?,* at 11 n.49 (May 2001), SNAPP ex. 74. (SNAPP also accurately quoted the Horton & Schmitz article as saying that "Covisint's principals account for approximately 80% of the automobile sales market in the United States," 47 WAYNE L. REV. at 1267, but Horton & Schmitz were including as "principals" Renault/Nissan, *see* Julian Miezitis & Bill Batchelor, *Issues for B2B Exchanges Under EU Competition Law*, 15 ANTITRUST 39, 40 (fall 2000) (article cited 47 WAYNE L. REV. at 1267 n.181), and their cited sources give those four firms a combined share of only 72%, *see id.* (no data other than world-wide shares); William B. Slowey, *The Case*, 15 ANTITRUST 6, 6 (fall 2000) (article cited 47 WAYNE L. REV. at 1267 n.181) ("stylized version" of Covisint facts lists U.S. market shares of 30%, 25%, 12%, and 5%)—so the 80% figure, even for all four firms, was just an unsupported mistake.) In addition, SNAPP pointed to two actions:

13

(1)  Covisint's demanding that suppliers do business exclusively with Covisint, and (2) a chart that Ford used in connection with AutoXchange, which SNAPP describes as "the predecessor to Covisint").  SNAPP SJ Response at 8.

A market share of 24.7%, even if Ford possessed it in 1999,[6] is not close to sufficient to support a finding of monopoly power.[7]  "[C]ourts virtually never find monopoly power when market share is less than about 50 percent."  I ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS 236 (5th ed. 2002) (citing cases).  The Antitrust Agencies' Merger Guidelines express concern about a merged firm's have excessive market power only after its post-merger market share would be at least 35%.  DOJ-FTC Merger Guidelines §§ 2.211, 2.22.  Although not necessary to our decision, were we to accept SNAPP's invitation to consider the frequently publicized and discussed Big Three market shares, SNAPP SJ Response at 9, we would note that whatever entry barriers might exist have proven ineffectual at preventing Ford's share from plummeting in the succeeding years.  And although a declining market share is not fatal to a monopoly charge, courts may consider whether a decline suggests lack of power.  *See Forro Precision, Inc. v. IBM Corp.*, 673 F.2d

_____

   [6]  Ford's share of purchases of "IP Services" would have been much less than its production of autos in the U.S., because the market included purchases by the major auto suppliers as well by all the automobile companies, see note 8 below.  Moreover, the proper geographic market could well be North America or worldwide.  SNAPP's Complaint said that the market is limited to the "upper Midwest" (so perhaps SNAPP might suggest that Ford's share should thus be considered larger than 24.7%), but the Court should reject any such regional market as lacking factual support (and perhaps as abandoned by SNAPP).  Moreover, it is the eve of trial and the 24.7% (national) market share is the only data offered by SNAPP.

   [7]  It is telling that SNAPP's expert asserted merely that "Ford, General Motors, and DCX *together* possess sufficient monopsony or oligopsony power to engage in anticompetitive reciprocal dealing and group boycotts."  SNAPP ex. 60, at 7 (emphasis added).  At oral argument, SNAPP's counsel spoke consistently with this view:  when asked to confirm that he was "not arguing that Ford has power in buying auto parts," he agreed.  July tr. 106.

14

1045, 1058-59 (9th Cir. 1982) ("In the absence of further information about the market, a 35% market share, and particularly a declining 35% market share, provides little or no support to a claim of market power."); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 841 (2d Cir. 1980) (not monopolization where share declined from 48.3% to 33%).

Whatever power Ford had is of somewhat less concern because it is alleged to be monopsony (buying) power, not monopoly (selling) power. Although in economic theory the two are mirror opposites of each other, courts and agencies are more reluctant to condemn alleged monopsony power and case law contains vew examples of successful challenges. *See, e.g., Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922, 924 (1st Cir. 1984) (Breyer, J.) (lawful for monopsonist to pay low prices); *see also Balmoral Cinema v. Allied Artists Pictures Corp.,* 885 F.2d 313, 317 (6th Cir. 1989); *Westchester Radiological Associates P.C. v. Empire Blue Cross & Blue Shield, Inc.,* 707 F. Supp. 708 (S.D.N.Y. 1989). For instance, the Antitrust Agencies Health Care Guidelines provide a "safety zone" for collective purchases of "less than 35% of the total sales of the purchased product or service in the relevant market," Statement 7.A, which is a threshold the Antitrust Division has applied in non-health care cases as well, *see* Janet McDavid, *Antitrust Issues in Health Care Reform,* 43 DePaul L. Rev. 1045, 1060 n.104 (1994) (citing Department of Justice Business Review Letter).

SNAPP claimed that "entry barriers" protect the claimed "monopsony power." SNAPP SJ Response at 8-9. Much of what is mentioned does not address entry into of *buying* goods and services, which is the monopsony power issue. To the extent to which the concern is with the *selling* of "IP Services," its discussion does not address the ease with which customers can effectively enter by self-providing, as Ford did before and after it engaged SNAPP, Ford ex. 24 (Ford internal memorandum dated

15

Oct. 25, 1999).  And, in any event, entry barriers, even if they existed, are not a concern when market shares are low.[8]

Nor is either action highlighted by SNAPP sufficient to serve as a "specific fact" making alleged monopolization an issue deserving of trial.  With respect to the first (Covisint allegedly demanding exclusivity), nowhere does SNAPP show that Covisint should be regarded, for antitrust purposes, as part of Ford for purposes of measuring Ford's market power (or any other purpose).  SNAPP's counsel argued that Ford was responsible for Covisint's actions "because Ford is a founding partner of Covisint" and Covisint operated by consensus.  April tr. 52.  The inevitable conclusion of this logic would be that each of GM, Ford, DCX, and probably Renault-Nissan controlled Covisint, was responsible for its actions, and must be charged with its market power—yet that would make no sense.  As noted above, Ford had only 27% of Covisint's shares, and the OEMs together were not allowed to hold a majority of its board of directors.

The antitrust laws carefully distinguish between unilateral and concerted action, *Fisher v. Berkeley*, 475 U.S. 260, 266 (1986) (it is "'of considerable importance' that independent activity of a single entity be distinguished from a concerted effort by more than

---

[8]  While addressing entry barriers, SNAPP also invokes the "lock-in" theory plaintiffs successfully invoked in Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 464 & 467 (1992); *see* SNAPP SJ Response at 8-9.  SNAPP supports this argument by pointing to a 2001 Covisint planning document in which it is stated that "once purchasing has been successfully outsourced to Covisint, customers will not want to set up the infrastructure to take it back or resource it," SNAPP Ex. 130, at 7509, and to an unidentified page in which it is apparently assumed that Covisint will receive a 3% commission, SNAPP Ex. 137.  None of this points to facts needed to support a *Kodak* lock-in theory, which requires a detailed showing of special circumstances often involving an aftermarket policy change.  *See* Harrison Aire, Inc. v. Aerostar Int'l, 423 F.3d 374, 383-84 (3d Cir. 2005) (citing cases); PSI Repair Services, Inc. v. Honeywell, Inc., 104 F.3d 811, 820 (6th Cir. 1997) ("We likewise agree that the change in policy in *Kodak* was the crucial factor in the Court's decision.").  Argument about the power of "lock-in" is also undermined by Covisint's failure to achieve much success.

one entity to fix prices or otherwise restraint trade") (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 763 (1984)), and adopting an approach such as this would threaten to wreak havoc with that distinction.  If Covisint were controlled by or part of each of Ford, GM, DCX, and Renault-Nissan, then presumably there could be no Sherman Act "agreements" between Covisint and Ford, or GM, or DCX, or Renault-Nissan.  This might benefit Ford in defending against the Sherman Act Section 1 charges in this litigation, but it would do mischief to antitrust law.  If every joint venture allegedly operated by consensus (an easy claim to make) were fully chargeable to each of its parents, serious harm would be done to the law of mergers, monopoly, and agreement.  Previous courts have rejected plaintiffs' attempts to aggregate competitor market shares in Section 2 cases not alleging a conspiracy to monopolize, *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F. 2d 1413, 1432 (6th Cir. 1990), and this court should as well.

SNAPP's second claimed direct proof of Ford's monopoly power is as follows: "Another clear measure of Ford's market power, and its ready desire to leverage it, can be seen in the chart that Ford used to demonstrate its ability to cause most of its top suppliers to join AutoXchange (the predecessor to Covisint)."  SNAPP's SJ Response at 8.  But that chart, at SNAPP ex. 132, merely arrays auto suppliers on two axes:  "Relationship with Ford" and "Importance to Auto-Xchange," and identifies 20 of them; the chart is captioned, "20 Prioritized Suppliers Total $162B in Sales to OEMs" with a sub-heading, "Represents 54% Of Automotive News Global 100 Sales."  In no way does the existence of the chart demonstrate Ford monopoly power.

SNAPP relied on *Re/Max International, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999), for the proposition that market power may be "proven directly by evidence of the control of prices or the exclusion of competition."  SNAPP SJ Response at 7.  In *Re/Max*, however, the court pointed to the defendant's successful imposition of "adverse-splits"

17

commission policies for more than ten years in the allegedly monopolized market, when those policies had failed in other markets, and to these policies' having driven out of business at least eight franchises and the regional subfranchisor, and deterred several potential entrants.  173 F.3d at 1020.  SNAPP points to nothing comparable.

In the absence of any specific facts showing monopoly power, Ford should be granted summary judgment on this issue.[9]

---

[9]  In addition to arguing that it lacked market power, Ford argued that SNAPP had failed to define a proper relevant market.  Ford 12(b)(6) Brief at 11-18; Ford SJ Brief at 2-6.  Given that Ford lacked market power regardless, the question of definition does not have to be resolved, but Ford has some basis for complaining about SNAPP's attempted market definition.

As an initial matter, any court must be skeptical of an alleged market of which no one in the business has heard.  As SNAPP notes, the Supreme Court, writing with respect to submarkets, held that market boundaries "may be determined by examining [among other things] such practical indicia as industry or public recognition of the submarket as a separate economic entity."  Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); see SNAPP SJ Response at 5.  Here there is no such recognition. See Thacker deposition, Ford corrected ex. 91, at 137-38 (can't recall term being used); 571-72 (term was not used and Mr. Thacker did not know what "IP" stood for); Buckley deposition, Ford Corrected ex. 94, at 42 ("I don't know what IP services are.").

SNAPP's definition of the "IP Services" market can charitably be described as "fluid."  The Complaint defined the market as providing services to Ford.  Complaint ¶ 9.  Since the Complaint also alleged that customers included other OEMs and "certain Tier One parts manufacturers," id. ¶ 81, the reference to Ford was just a mistake.  In fact, customers or potential customers include all automobile companies and the major auto parts suppliers, April tr. 45-46.  SNAPP's expert concluded, albeit extremely tentatively, that there is a market for "IP Services" provided to "buyers and sellers in the market for materials and parts leading to automobile manufacture."  SNAPP ex. 60, at 8-9.

The definition of "IP Services" offered by SNAPP's counsel at oral argument emphasized procurement services, see part I above, which is consistent with how Mr. Thacker described his business internally (see supra note 1) and is reasonably consistent with the lengthy definition in the Complaint.  On the other hand, in a brief, SNAPP said that the "IP Service Market is a 'vertical exchange . . . for the automotive industry to create value through efficiency, lowering the cost of doing business . . . [and] include[s] core offerings in procurement."  SNAPP Boycott Brief at 8; see also SNAPP 12(b)(6) Response at 3.  This lifted text from a Covisint preliminary business plan's

18

description of what Covisint was expected to do.  (The unexpurgated quote from the plan is set out below.)  If fair emphasis is given to the word "exchange," however, this definition is inconsistent with other ones, and it would mean that SNAPP was not a participant in the market it claims is at issue in its litigation, see part VIII below—which makes no sense.  Accordingly, this Report will use the definition of "IP Services" suggested by SNAPP's counsel, by Mr. Thacker, and by the Complaint.

(The unexpurgated quotation follows:

Covisint will offer traditional procurement-oriented e-market services, but it will be more than a procurement exchange.  Covisint will focus on creating a global vertical exchange (that is, an exchange that focuses on a particular industry) for the automotive industry to create value through efficiency, lowering the cost of doing business for those who choose to use it.  It will include core offerings in supply chain management and product development, as well as procurement.

SNAPP ex. 61, at 3.)

Although SNAPP alleged that the geographic market for both of its alleged product markets is "Michigan and the surrounding states," Complaint ¶ 82, this is unreasonably vague and without meaningful support.  Indeed, SNAPP defined "IP Services" as "functions associated with the worldwide acquisition process of computer hardware [etc.]," Complaint ¶ 9, which belies a local market.  Although SNAPP's expert dutifully opined that the market is limited to "those providing IP or B2B Services to customers dealing in materials and parts for automobile manufacture in the three to five state area on Michigan [sic]," SNAPP ex. 60, at 9, he noted that a B2B provider could establish its business "virtually anywhere," and, except for citing an article or two on the importance of proximity, devoted most of his reasoning to why the market should be limited to North America, *id.; see also id. at 6.*  Moreover, the principal piece of data on which SNAPP's expert relied was his assertion that "the location of assembly plants remains concentrated in the upper Midwest," *id.* at 6.  Since the "IP Services" market apparently includes selling to Toyota, Honda, Nissan, BMW, etc., it seems probable that he was not addressing the "IP Services" business as defined by the plaintiff.  Indeed, since that definition apparently includes providing services to all of the major automotive suppliers, as well as the OEMs, merely claiming that auto assembly plants are located in the upper Midwest is insufficient support for a regional market.  And in oral argument SNAPP's counsel said that is "talking about the North American automobile market." July tr. 102.

SNAPP's other alleged market, "Automobile Parts and Components," Complaint ¶ 80, may be adequately pled, and a court cannot be confident that it does not exist. SNAPP's expert includes all automobile manufacturers as buyers in this market.

19

## III. <u>Attempted Monopolization</u>

SNAPP invoked the attempted monopolization offense in Complaint paragraph 93: "In the alternative, Ford, along with Covisint, intentionally and willfully attempted to monopolize the IP Services Market through the Covisint monopoly such that to the extend that Ford and Covisint's attempts to sustain their monopoly power did not succeed, there was a dangerous probability that its attempts would succeed in violation of Section 2."

The offense of attempted monopolization requires proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *see also Tarrant Service Agency, Inc. v. American Standard, Inc.*, 12 F.3d 609, 615 (6th Cir. 1993) (requiring "(1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success").

Ford argued that SNAPP had failed to point to facts showing the necessary "dangerous probability of success." Ford SJ Brief at 5. It quoted *Acme Markets, Inc. v. Wharton Hardware & Supply Corp.*, 890 F. Supp. 1230, 1241 (D.N.J. 1995), which declared, "Where a defendant has a market share in the range of 30-50%, attempt claims should be rejected unless the defendant's conduct strongly suggests an ability to garner monopoly power." Ford slightly mischaracterized this passage, which was the *Acme*

SNAPP ex. 60, at 6.

Although doubts exist, there is some evidence that there is a market for providing "IP Services," meaning the kinds of information technology procurement services that SNAPP provided. There is even greater doubt that it can be limited to assisting automotive companies and major parts suppliers, although the more prudent course may be to postpone a decision on that issue. There may also be a market for supplying automobile parts and components. SNAPP has pointed to no facts, however, that would justify limiting either of these markets to some vague combination of states near Michigan.

20

*Markets* court's paraphrasing of the view found in 3 PHILIP AREEDA & DONALD F. TURNER, ANTITRUST LAW ¶ 820 (1978), but the opinion described the Areeda-Turner view as "a useful framework" and relied upon that in part to hold as a matter of law that a firm with a 40% market share enforcing a restrictive covenant did not "attempt to monopolize."

In its response, SNAPP failed to cite *Acme Markets* or *Spectrum Sports* and, indeed, failed to discuss the requirement of showing a dangerous probability of success. *See* SNAPP SJ Response at v (table of authorities); *see also* SNAPP 12(b)(6) Response at iii-iv (neither case cited). Presumably SNAPP intended to rely on the same argument it made with respect to monopoly power—and for the reasons given above it fails.[10] Courts "rarely find market shares between 30 percent and 50 percent sufficient" to support a dangerous probability of success in achieving monopoly, and "they virtually never find shares of less than 30% sufficient." ANTITRUST LAW DEVELOPMENTS, *supra*, at 304-05; *see also Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F. 2d 1413, 1432 (6th Cir. 1990) ("it would be rare indeed to find that a firm with only 25 percent or 50 percent of the market could control price over any significant period of time"); *Tdata Inc. v. Aircraft Technical Publishers*, 2006-1 TRADE CAS. (CCH) ¶ 75,226 (S.D. Ohio Apr. 26, 2006) (less than 35% insufficient, citing cases). Although, as SNAPP noted, the issue is monopoly power and/or dangerous probability of achieving it as of the time of the alleged violation, *Multiflex v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983), courts regularly point to declining market shares and recent competitive vitality to conclude that plaintiffs have not sustained their burden. *See, e.g., Gordon v. Lewistown Hospital*, 423 F.3d 184, 213 (3d Cir. 2005) (summary judgment in attempt case where defendant's market share declined subsequent to challenged

---

[10]   SNAPP's expert claimed merely that "it is my opinion that there was a dangerous probability that Covisint [not Ford] would monopolize the automobile production B2B services market. SNAPP ex. 60, at 20.

activity); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982) (no dangerous probability of success where share declined from 40% to 30%), *followed*, *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1431 (6th Cir. 1990); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 841 (2d Cir. 1980). No reasonable jury could find a dangerous probability of Ford's achieving monopoly power in any alleged market. (SNAPP also failed to allege "specific intent" to monopolize, which is an essential element of the offense, although it is not clear whether Ford sufficiently raised this issue.)

For the reasons given above, Ford should be granted summary judgment on this issue.

## IV. <u>Tying</u>

SNAPP's tying allegations are found in Complaint paragraph 77:

> Ford's *per se* illegal tying requirements in violation of Section 1 include wrongfully tying its (i) purchase of SNAPP's IP Services to the requirement that SNAPP accept and use American Express cards and (ii) further participation in the I-RaMPP program on SNAPP's acquiescence to the 80% fee reduction in other services that SNAPP was providing to Ford; and (iii) requiring that SNAPP, its shareholder, and its employees purchase Ford vehicles.

Ford's motion for summary judgment makes several arguments, including that illegal tying occurs only when the sale of one product is conditioned on the sale of another, and, further, only when the seller possessed "'sufficient economic power in the market for the tying product so that competition in the market for the tied product is appreciably restrained.'" Ford SJ Brief at 9-10 (quoting *3 P.M., Inc. v. Basic Four Corp.*, 591 F. Supp. 1350, 1355-56 (E.D. Mich. 1984)). Ford argued that there was no tie of the sale of two Ford products and there was no market power.

SNAPP replied that "*[p]er se* prohibition of a tying arrangement is appropriate where antitrust forcing is likely, such as here where Ford along with its co-conspirators, has

22

monopsony power in the IP Services Market (tying market).  Jefferson Parish, 466 U.S. at 16."  SNAPP SJ Response at 11.  SNAPP argued that it did not need to show that it had been forced to purchase two products.

SNAPP is mistaken.  Although *Jefferson Parish* said that "*per se* prohibition is appropriate if anticompetitive forcing is likely," 466 U.S. at 16, it qualified this as applicable only once a "threshold" had been "surmounted."  *Id.*  That threshold requires proof that a purchaser of one product had been forced to buy another product that it otherwise would have bought from another seller.  *Id.*  "[T]he essential characteristic of an invalid tying arrangement lies in the *seller's* exploitation of its control over the tying product to force the *buyer* into the *purchase* of a tied product . . . .  'By conditioning his *sale* of on commodity on the *purchase* of another, a *seller* coerces the abdication of *buyers'* independent judgment . . . . .'"  *Id.* at 12-13 (emphasis added) (quoting *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 605 (1953).[11]

Here, in contrast, Ford is not alleged to have sold any tying product and SNAPP is not alleged to have purchased any tying product.  SNAPP alleges that Ford engaged in "wrongfully tying its . . . *purchase* of SNAPP's IP Services," Complaint at ¶ 77 (emphasis added), and in "exploitation of its monopsony [buying] power," SNAPP SJ Response at 12; *see also* SNAPP 12(b)(6) Response at 19 ("Ford's monopsony power as a Buyer of IP

---

[11]  Ford quoted PSI Repair Serv., Inc. v. Honeywell, Inc., 104 F.3d 811, 815 (6th Cir. 1997) to the same effect, but omitted a portion of the quoted phrase and did not note that the Sixth Circuit was quoting the Supreme Court.  *See* Ford SJ Brief at 9.  The full quotation is as follows:  "'A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'"  *PSI Repair*, 104 F.3d at 815 (quoting Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 461 (1992), which quoted Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958)).  (Ford omitted the reference to agreeing not to purchase the product from another supplier.  Even were that sufficient, however, it would not eliminate the fundamental requirement that the tying transaction be a sale.)

23

Services provides it the power to force illegal tying . . . ."). Regardless whether it is moral, ethical, or otherwise lawful to impose a condition on purchasing, or to exploit monopsony power, it is not per se illegal tying under Sherman Act Section 1. Nor, especially given that the Supreme Court has evinced less concern about tying than it once did, *Illinois Tool Works Inc. v. Independent Ink, Inc.,* 126 S. Ct. 1281, 1286 (2006) ("Over the years, however, this Court's strong disapproval of tying arrangements has substantially diminished."), would it be appropriate for a lower court to consider expanding tying law to cover SNAPP's allegations.

None of the alleged tying arrangements to which SNAPP points pass muster. If Ford required SNAPP and other suppliers to accept payment by the American Express card, SNAPP SJ Response at 12-13, this did not link two sales. SNAPP cited *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978), but there the defendant franchiser conceded that requiring franchisees to purchase particular products tied two sales; the only question was whether the franchiser could be liable when the tied products were those of a third party that paid it secret rebates. SNAPP argued that linking Ford's purchases to a fee reduction and making SNAPP employees buy Ford vehicles "are classic examples of tying," citing *Jefferson Parish*, 466 U.S. at 12. SNAPP SJ Response at 13. But at the cited page the Court explained that "the essential characteristic of an invalid tying arrangement lies in the *seller's* exploitation of its control over the tying product to force the buyer into the purchase or a tied product." *Jefferson Parish*, 466 U.S. at 12 (emphasis added). Here, Ford was not a seller of any tying product and fee reductions are not tied products. Similarly, even if Ford required its suppliers to make "Ford relationship-specific investments," SNAPP SJ Response at 14, that is not the tying of one sale to another.

Finally, SNAPP addressed Ford's argument that it lacked the requisite market power

24

only by cross-referencing its claims that Ford had monopsony power "leveraged by its ability to institute horizontal boycotts."  SNAPP SJ Brief at 11.  But the Supreme Court has found that a 30 percent market share, even of sales, is not sufficient to confer the market power needed to sustain a tying violation.  *Jefferson Parish*, 466 U.S. at 26-27.  Indeed, the Sixth Circuit has noted that courts have "repeatedly held that a 30% market share is insufficient to confer the market power without which a tie cannot be illegal *per se*."  *Valley Products Co. v. Landmark*, 128 F.3d 398, 402 n.3 (6th Cir. 1997).  Here, in contrast (and as noted before), Ford's share was under 25% and declining, which is a factor that courts consider in evaluating market power under Section 1, *see, e.g., Commercial Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50, 67 (S.D.N.Y. 2003) ("The fact that IBM's share was declining . . . is further evidence that IBM did not possess market power."), as is the fact that this claim involves an allegation of buyer power rather than seller power.  And no more for tying purposes than for Section 2 purposes can one attribute Covisint's power, such as it was, to Ford (or GM, or DCX, or Renault-Nissan).

The court should grant summary judgment against SNAPP's tying claim.

## V. <u>Reciprocity Requirements</u>

SNAPP alleged that Ford "imposed *per se* unlawful reciprocity requirements on its Tier One parts suppliers to purchase their IP Services through Covisint, a monopoly IP Services provider."  Complaint ¶ 72; *see also id.* ¶ 88 ("Ford, with others, used Covisint [sic], used reciprocity requirements in their parts suppliers to obtain and abuse its Covisint-derived monopoly power in IP Services Market.  It is in this regard that the second market of Sellers and Buyers of Automobile Parts and Components is crucial.").

Ford argued that (a) there is no evidence of reciprocal dealing, and (b) reciprocal dealing cannot be unlawful unless done pursuant to an agreement by a firm with market power.  Ford SJ Brief at 19 (quoting *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d

25

532, 537 (7th Cir. 1986)).  SNAPP responded in part by relying on *Betaseed, Inc. v. U&I, Inc.*, 681 F.2d 1203, 1216-17 (9th Cir. 1982).  SNAPP SJ Response at 19.

As an initial matter, we note that neither party cited a Sixth Circuit reciprocity case, and we are aware of none.  In truth, findings of reciprocity violations "have been rare." ANTITRUST LAW DEVELOPMENTS, *supra*, at 227.  Several circuits have followed the example of *Great Escape* and *Betaseed* and analogized reciprocity to tying, including by saying that it could be judged as per se illegal.  *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998).  The Supreme Court has never required this, however, and the better approach is to apply a structured rule of reason.  *See* X PHILLIP E. AREEDA et al., ANTITRUST LAW ¶ 1778 (2d ed. 2004).  Now that the Supreme Court has expressed ambivalence about the purported evils of tying, *see Independent Ink*, there is no reason to extend the per se tying rule beyond the boundaries established by the Supreme Court.

Rejection of any application of the per se rule in reciprocity cases is not, however, necessary to the granting of summary judgment in this part of the case.  Summary judgment is appropriate for the two reasons suggested by Ford.

First, the per se rule against reciprocity applies, if at all, only where the defendant has market power sufficient to support a tying case.  *See Brokerage Concepts,* 140 F.3d at 212.  Thus, the *Betaseed* case on which SNAPP relied adopts the test set forth in *Spartan Grain & Mill Co. v. Ayers*, 581 F.2d 419 (5th Cir. 1978)—a case in which the court rejected per se liability because "the producers had failed to show that Spartan Grain had sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product."  *Betaseed*, 681 F.2d at 1218.  For the reasons set out in the tying discussion above, SNAPP has not adequately pointed to facts showing that Ford had market power.

Second, there has not been a sufficient showing of reciprocity.  Reciprocity requires

26

"that the defendant . . . conditioned its purchase of product #1 . . . from the other party . . . on the latter's purchase of product #2 . . . from the defendant such that the defendant 'coerces' the other into reciprocity."  X AREEDA, *supra,* at 433; *see also Betaseed*, 681 F.2d at 1216 (reciprocal dealing is "a dealing in which two parties face each other as both buyer and seller and one party agrees to buy the other party's goods on condition that the second party buys other goods from it").  Here, SNAPP's charge is that Ford required its suppliers to use Covisint.  Complaint ¶ 72.  Since Covisint was not part of Ford, which owned only a distinctly minority stake and lacked corporate control, this would not qualify for treatment as unlawful reciprocity.  It could be condemned only by extending the reciprocity cases to include situations with partial economic interests—which, given the questions about the viability of reciprocity law discussed above, a court should be loath to do.[12]

The court should grant summary judgment against SNAPP's reciprocity claim.

VI. <u>Horizontal Price Fixing</u>

SNAPP's horizontal price fixing claim is in Complaint paragraph 78:

---

[12]  Ford cited the Covisint August 30, 2000, Supplemental MOU, Ford ex. 102, at 5, which prohibits Covisint and OEMs from entering into any agreement obligating a supplier to use Covisint "as its 'exclusive' or 'primary' exchange."  Ford SJ Brief at 19.  SNAPP cited a June 15, 2000, Covisint document reporting feedback from sessions with suppliers that indicates a need for "clarification of 'exclusive use' of Covisint exchange," SNAPP ex. 155, at 2, some optimistic 2000 planning documents prepared before Covisint began functioning, and a September 2001 press report stating that Ford will require its suppliers to join Covisint, SNAPP ex. 141; *see* SNAPP SJ Response at 19 (also citing less relevant documents).  Even if a valid complaint would be supported had Ford conditioned its purchasing on use of Covisint, a complaint filed in March 2005, with full discovery conducted thereafter, should be supported by more indication that such an arrangement–purchases by Ford and coerced use of Covisint–had actually occurred.  Given the SNAPP-acknowledged failure of Covisint to succeed, there is reason to doubt that Ford (and other OEM's) caused substantial, profitable use of Covisint.  Any reciprocity charge alleging that Ford coerced its suppliers into buying from Covisint services offered by SNAPP is also undermined because, as discussed below, Covisent never provided the services provided by SNAPP.

Ford engaged in a *per se* horizontal price fixing conspiracy with its competitors in violation of Section 1 when it (i) required SNAPP to give fee [sic] and other economic concessions greater than 80% from negotiated fair economic return based on fees which were accompanied by Ford's threats that it would cease doing business with SNAPP and cause the rest of the automobile industry to boycott SNAPP; (ii) required that the fees that SNAPP charged to its other customers be higher than those charged to Ford and further required that SNAPP use the margins generated from other customers to reduce the fees that Ford would otherwise owe to SNAPP; and (iii) used coercive threats to influence other aspects of SNAPP's economic arrangements, including prices paid by SNAPP to its suppliers, which made SNAPP less competitive in the IP Services Market and reduced overall competition in the market place.

Ford moved for summary judgment on the ground that "there is no allegation that Ford conspired with a competitor - a necessary element." Ford SJ Brief at 11. SNAPP responded by pointing to the words of the Complaint, which allege that Ford conspired "with its competitors." SNAPP SJ Response at 14 (quoting Complaint ¶ 78). SNAPP also properly cited *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 234 (1948), for the proposition that price fixing agreements by purchasers can be unlawful.

Since Ford's motion is for summary judgment (not to dismiss), however, SNAPP cannot merely rely on those three words in the Complaint. This Court is required to go further.

In particular, SNAPP points to Covisint as the conspiracy about which it complains. SNAPP SJ Response at 14. "Ford, leveraging Covisint agreements . . . demanded substantially lower prices." *Id.* at 15. The focus on Covisint is fatal to this claim of SNAPP because the Complaint alleges that "*[i]n 1999*, Ford demanded an 80% price reduction in one of SNAPP's primary services to Ford and if SNAPP did not make this concession, Ford would stop using other SNAPP services." Complaint ¶ 15 (emphasis added). Yet as noted above, Covisint was not incorporated until December 8, 2000, and the Covisint agreements about which SNAPP complains are all dated February 20, 2000, and later, SNAPP SJ Response at 15. Indeed, by the end of 1999 Ford had required SNAPP to terminate its

28

work for Ford.  SNAPP points to no fact supporting its claim that Ford and any competitor, through Covisint or otherwise, entered into any agreement on the prices Ford would pay SNAPP.

Also as part of its response, SNAPP argued that "SNAPP . . . had to charge higher fees to its other customers than those charged to Ford and the other OEMs and use the margins generated from other customers to reduce the fees that Ford and the other OEMs would otherwise owe to SNAPP."  SNAPP SJ Response at 15.  SNAPP also complained that Ford insisted that suppliers charge higher prices to SNAPP's other customers.  *Id.*  The support for this claim is in an identical paragraph included in each of two affidavits signed November 30, 2005, where SNAPP witnesses stated the following:

> After Ford allowed SNAPP to have other customers, SNAPP had to charge its non-Ford customers more in order to keep the Ford prices lower.  Also, I know that Ford caused some SNAPP suppliers, such as Dell, IBM, Hewlett Packard and Math Works, to charge higher prices to some of SNAPP's other customers.

SNAPP exs. 84, at ¶ 32 and  85, at ¶ 42.  Nothing in that paragraph, or the SNAPP discussion in its Response, points to facts that support the claim of horizontal price fixing.

Accordingly, the court should grant summary judgment on the claim of horizontal price fixing.

## VII.  Exclusive Dealing

SNAPP alleged that Ford "imposed anticompetitive exclusive dealing requirements on SNAPP for years."  Complaint ¶ 72.  In a related charge, SNAPP said that "[i]n an effort to increase Ford's monopsony power, Ford successfully demanded that SNAPP produce increased amounts of Ford-specific products, services, and investments, in violation of Sections 1 and 2.  The effect was to 'lock in' SNAPP rendering it less capable of to compete in the IP Services Market more generally and harming competition in the IP Services Market."  Complaint ¶ 76.

29

Ford argued that exclusive dealing should be judged by the rule of reason and that SNAPP had made an insufficient showing for several different reasons.  Ford SJ Brief at 7-9 (referring to market power, percent of foreclosure, length of contracts, etc.).  Ford cited a half dozen cases.  Without referencing any of those cases, *see* SNAPP SJ Response at v (table of cases), SNAPP responded by describing certain practices and declaring that "[t]hese exclusive dealing requirements and horizontal market division aspects of Ford's conduct, in concert with its competitors and others in the industry, is a *per se* violation of antitrust laws."  SNAPP SJ Response at 11.  SNAPP cited only two cases, both of which are classic horizontal price fixing cases.  *Id.* (citing *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)).

In truth, exclusive dealing is always judged under the rule of reason.  *See, e.g., J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.,* 2005 U.S. Dist. LEXIS 11676 (S.D. Ohio 2005); *B & H Medical, L.L.C. v. ABP Administration, Inc.*, 354 F. Supp. 2d 746 (E.D. Mich. 2005) (citing *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*, 373 F.3d 57 (1st Cir. 2004)).  Courts find violations only after examining such factors as market power, the amount of foreclosure, competitive effect, and procompetitive benefits.  SNAPP did not even try to make such a showing with respect to exclusive dealing.

Accordingly, the court should grant summary judgment on SNAPP's charge of exclusive dealing.

## VIII.  <u>Group Boycott</u>

SNAPP's strongest count, it believes, is group boycott.  SNAPP alleged that Ford "(a) resorted to illegal boycotts or threats of boycotts to achieve its anticompetitive goals; [and] (b) used *per se* illegal boycotts or threats of boycotts, in concert with its 'Big Three' competitors to reduced competition in the IP Services Market . . . ."  Complaint ¶ 72.  "In *per se* violation of Section 1, Ford, by causing Covisint and GM to boycott SNAPP, and by

30

other anticompetitive means, eliminated most of the remaining competitors from the IP Services Market."  Complaint ¶ 74.

Ford argued that there was never any agreement not to deal with SNAPP and that, in any event, any agreements by or related to Covisint must be judged under the rule of reason and should be upheld.  Ford SJ Brief at 17-18.  SNAPP argued to the contrary.  To complicate matters, the issues were also discussed in briefs on SNAPP's motion for summary judgment.

### a. *Legal Standards*

Certain group boycotts are per se illegal.  *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 134 (1998).  However, as the Court made clear in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985), "the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power[13] boycott suppliers or customers in order to discourage them from doing business with a competitor."  *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 458 (1986) (describing holding in *Northwest Wholesale*); *see also Nynex*, 525 U.S. at 135-36 ("precedent limits the *per se* rule in the boycott context to cases involving "horizontal agreements among direct competitors," while

---

[13]  Ford and SNAPP vigorously disagree about whether *Hassan v. Independent Practice Associates, P.C.*, 698 F. Supp. 679, 693 (E.D. Mich. 1998), misinterpreted *Northwest Wholesale Stationers* by ruling that a plaintiff must show both market power *and* "exclusive access to an element essential to effective competition," *id.* at 693 (quoting 472 U.S. at 296); *see*, e.g., SNAPP boycott brief at 14-15.  Although support can be found in *Northwest Wholesale Stationers* for that reading, the Court's twice saying that power *or* access is required, 472 U.S. at 296 & 298, and subsequent Court references to the requirement of market power make clear at least that market power (without "access") is sufficient for this purpose.  SNAPP appears to rely on the market power prong of *Northwest Wholesale Stationers.  See, e.g.,* SNAPP boycott brief at 2 ("*per se* antitrust violations if Ford and the other participants in the boycott possess market power").

"what may be called a group boycott in the strongest sense" occurred in *Fashion Originators' Guild of America, Inc. v. FTC,* 312 U.S. 457 (1941), where "[a] group of competitors threatened to withhold business from third parties unless those third parties would help them injure their directly competing rivals") (citing secondary sources). *Northwest Wholesale* also observed that practices condemned as per se group boycotts "were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." 472 U.S. at 294.[14]  The result of all these qualifications is, as Professor Hovenkamp has explained, that "most concerted refusals to deal, even those involving competitors, are evaluated under the rule of reason. . . . The *per se* rule is reserved for so-called *naked* boycotts—that is concerted refusals of competitors to deal with another competitor, customer or supplier when no case can be made that the refusal is ancillary to any legitimate joint activity." HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY 221 (3d ed. 2005).

### b. *Factual Overview*

To put SNAPP's boycott claims in context, it is important to understand that Ford's actions in 1999, when it terminated SNAPP, were unilateral.  When Ford initiated work in fall 1999 to create something called AutoXchange, which SNAPP has labeled "the known starting point of . . . SNAPP's boycott from the IP Services Market," SNAPP Boycott Reply at 2 (see also SNAPP SJ Response at 15 (claiming the "group boycott" of SNAPP "started in 1999 not 2000")), Ford's actions were entirely unilateral.  During oral argument, the Special Master asked Snapp's counsel whether he disagreed with this factual depiction,

---

[14]  The court in *Hassan* read *Northwest Wholesale* as requiring an initial showing of the absence of a plausible efficiency justification, but it went on to quote the Court as saying that not every per se prohibited boycott would possess all of the listed traits.  698 F.  Supp. at 693.

and he did not.  July tr. 118-19.  Hence there is no serious claim of a group boycott starting before fall 2000.

The heart of SNAPP's boycott complaint is a discussion that took place in September 2000 between Raymond Pollard and Alice Miles.  *See* SNAPP Boycott Brief at 2-5 (quoting deposition testimony about that discussion); *see also* July tr. 61:11; 119:12-13 (counsel for SNAPP) (Mr. Pollard "is the key guy on our boycott evidence"); Email from SNAPP's counsel, E. Powell Miller, to Stephen Calkins (copy to opposing counsel), July 24, 2006 ("Ford and SNAPP are in general agreement as to the time frame of Mr. Pollard's discussions with Ms. Miles").  Mr. Pollard was "a GM Executive Director World Wide Purchasing, assigned to a corporation that became known as Covisint, LLC."  Declaration of Raymond Pollard, Ford ex. 38, at ¶ 2.  Ms. Miles was described by Mr. Pollard as someone then within Covisint who was "the lead from Ford Motor Company" and "Senior Executive from Ford."  Pollard deposition, SNAPP ex. 63, at 53.[15]

Much of the evidence of this discussion is from a deposition taken in connection with an employment lawsuit captioned *Ledbetter v. Thacker*.  The questioning was directed at the performance of Mr. Ledbetter and the firm he had been representing, DSSI (in context clearly meaning Direct Sourcing Solutions, Inc.).  DSSI is referenced at least nine times.  Pollard deposition, Ford ex. 168, at 49-52.  When Mr. Pollard suggested that Covisint consider using DSSI "to aggregate volumes in the auto industry," *id.* at 52, the proposal "was flatly rejected from the lead from Ford Motor Company, " namely, "Alice Miles, Senior Executive from Ford," *id.* at 53.  Mr. Pollard explained that Ms. Miles said she was opposed

---

[15]  The parties submitted different excerpts from various depositions, some of which were resubmitted in corrected form when this Master pointed out that cited pages had not been included, and this Report will cite one or another exhibit as convenient without worrying about whether the cited deposition pages were also included in another submission.

"because there were several lawsuits or pending lawsuits between Ford and DSSI or SNAPP, *you'll have to help me there." Id.* (emphasis added). When asked whether Ms. Miles had said DSSI or SNAPP, Pollard responded, "I don't – again, to me it was all the companies that Thack owned, so I don't – I didn't differentiate. . . . She said, there is no way Ford would ever support us doing any business with any company owned by Thack, Bhagwan Thacker." *Id.* at 54. Later in the deposition, Mr. Pollard was asked whether Ms. Miles had "veto power over the selection" and answered "Yes"—but he subsequently explained that at Covisint "decisions were made by consensus" and "objection by any of the three companies was sufficient reason not to pursue a business relationship." Pollard deposition, SNAPP ex. 63, at 61-64.

Alice Miles was deposed in this lawsuit (SNAPP v. Ford). She testified that Raymond Pollard had suggested to her that Covisint engage "DSSI," which was "providing services to GM," as a "purchased service provider." Ford corrected ex. 100, at 59-60. Ms. Miles said that she told Mr. Pollard "that I thought there might be some issues with a related company." *Id.* at 62. When SNAPP's counsel asked whether she gave Mr. Pollard "any idea of what those issues were with respect to a related company to DSSI," she answered, "I believe I said that I thought I had heard there were issues with SNAPP and the service providing to Ford, even potential litigation." *Id.*

This record contains evidence showing that Mr. Pollard and Ms. Miles agreed that Covisint should reject the proposal to work with DSSI. Although Mr. Pollard's declaration states that "[t]here was no decision by Covisint" and that "[r]ather, I personally decided not to further pursue the matter of Covisint using DSSI after speaking with Ms. Miles," Ford ex. 38, at ¶ 9, obviously Covisint *did* make a decision (it did not do business with DSSI) and the depositions suggest that Ms. Miles played an important role in this decision. The only proposal under consideration was for DSSI to do work, and that is the only one that was

34

rejected.  On the other hand, Mr. Pollard surely knew that the same objections raised against DSSI would have been raised even more strongly against SNAPP.  Had anyone proposed doing business with SNAPP, Ms. Miles would have opposed this, probably successfully—but no one proposed doing business with SNAPP (and SNAPP did not submit a meaningful proposal).

More problematic is whether the agreement between Ms. Miles and Mr. Pollard was an agreement between competitors.  Ms. Miles and Mr. Pollard had each been assigned to and were presumably working for Covisint.  Were Covisint decisions (such as not to buy from DSSI) those of a single entity (and not subject to Sherman Act Section 1)?  Or were some or all of them decisions among some or all of the Big Three or all Covisint auto companies (or all Covisint-affiliated entities).  At this point the record is insufficiently clear to resolve this issue.

Also important is the relationship of SNAPP and Covisint.  SNAPP and Covisint were never competitors.  More than a year before Covisint was incorporated, Ford had informed SNAPP that it would not be renewing the contract between them.  Well before the Miles-Pollard discussion, SNAPP had gone into a "dormant" state, not engaged in doing any significant business activity.  *See, e.g.,* July tr. 27.[16]  So before Covisint began its existence, SNAPP had ceased to compete with anyone.  At the very most, SNAPP could be considered a firm with the potential to begin competing again.

Nor did Covisint ever engage in the kind of information technology procurement

---

[16]  Although Mr. Thacker testified that SNAPP's "relationship at Ford was, as I understand it, was [sic] quite substantial during year 2000, and if I'm not mistaken, there was still some work being done in 2001 and 2002 for Ford," Thacker deposition, SNAPP corrected ex. 67, at 82, Mr. Thacker had left SNAPP by then and apparently mistook collecting outstanding bills for doing new work.  Similarly, SNAPP is simply incorrect when it states that "Ford and SNAPP did over $190 million in business throughout 2000 and beyond," SNAPP Boycott Reply at 1.

services in which SNAPP had engaged when actively in business (and as is described at the beginning of this Report). Recall, in this connection, that SNAPP's complaint about the Miles-Pollard discussions is the complaint of a supplier that a customer would not buy from it. Covisint considered expanding into SNAPP's business, *see, e.g.,* SNAPP ex. 130, at 1 (document for Aug. 2, 2001, Covisint meeting on "outsourced purchasing" proposing a strategy to "launch full service procurement with Ford as the OEM anchor"), but it did not. This is clear from the Alice Miles deposition from which SNAPP quotes at length, SNAPP Boycott Brief at 3-5. Ray Pollard had come to Miles "with a suggestion for a purchased service provider," DSSI. Miles deposition, Ford corrected ex. 100, at 60; *id.* at 67 ("He brought a proposal that we should look at DSSI to provide purchased services."). When asked, Ms. Miles explained that she understood "that purchased services could be a service, Internet-base service, provided for procurement of nonproduction products." *Id.* at 58. When SNAPP's counsel asked Alice Miles to name Covisint's competitors in "purchasing-related services," she replied, "Covisint didn't end up offering purchasing-related services. . . . It was studied as a potential product, but it wasn't offered." Alice Miles deposition, Ford ex. 100, at 56-57; *see also id.* at 61 ("At that time we were studying the possibility of purchased services . . . ."); Deposition of Dennis Buckley, Ford corrected ex. 94, at 43-44 (DSSI provided "IT purchasing services" to GM, meaning "they contracted with us to buy IT," doing work that was "similar" to what SNAPP had been doing for Ford); 85 ("To your knowledge what services was DSSI attempting to sell to Covisint? A: Purchasing services certainly. That was the main impetus of what we did."); Declaration of Raymond Pollard, Ford ex. 38, at ¶ 10 ("Covisint decided to not include e-procurement services as part of its customer offerings."); Declaration of Harold Kutner, Ford ex. 39, at ¶ 8 ("Covisint never entered the business of providing third-party procurement purchasing

36

services.").[17]  Thus, Covisint never competed in actually selling the same service offered

by DSSI and that had been offered by SNAPP.

In its SJ Response, SNAPP included a subsection directly on point entitled "Covisint

Participated in the IP Services Market."  SNAPP SJ Response at 6-7.  The text, however,

fails to deliver as promised.  Principal reliance is placed on CSMF ¶ 18.c, *see* SNAPP SJ

Response at 6, but that paragraph, although declaring that "[t]he Covisint/AutoXchange

market definition was IP Services," supports this only by criticizing Ford's expert.  Nor does

the rest of the subsection support the heading.[18]

Covisint never engaged in the same business in which SNAPP had engaged.[19]

Indeed, the "Covisint Facts" brochure describes Covisint's business as including "Covisint

---

[17]  *See also* Ford ex. 3, at 2 (June 1999 DSSI presentation on its business boasts that DSSI provides "product acquisition, supply base management, logistics, accounting" and is "organized to manage customer relationships, commodity strategy, procurement process")

[18]  SNAPP also devoted much attention to a venture called e-STEEL, in which Ford and/or Covisint could have had a financial interest, and alleged encouragement of GM to prefer e-STEEL to DSSI.  *See* SNAPP CSMF at 101-03; July tr. 19.  It appears that the questioned transaction never occurred.  *See* Ford ex. 199 (June 27, 2001, email re "Reworded esteel update" recommending "shelving the deal at this time").  In any event, there are not facts showing that e-STEEL put Covisint in the same business SNAPP had been or that made SNAPP's account of Ford's behavior significantly more plausible.

[19]  A related question is whether, if there is an "IP Services Market," Covisint competed in it.  See discussion of market definition in note 8 above, which explained why this Report employs a definition based on the Complaint, counsel's statement, and Mr. Thacker's description.  When in its brief SNAPP defined "IP Services" by lifting text from a Covisint preliminary business plan (see note 8 above), it would seem that (except for confusion from the excerpting) by definition Covisint intended to engage in "IP Services."  In part since the Covisint formulation, fairly read, would exclude SNAPP from the market, this Report does not use that definition.  Using the more appropriate definition (and the one in the Complaint), Ford was a purchaser of "IP Services" and an entity that earlier and later self-supplied them, and Covisint considered offering them for sale, but neither Ford nor Covisint in fact offered them for sale.

Communicate," "Covisint Connect," and "Covisint Collaborate," SNAPP ex. 62—but the kind
of procurement in which SNAPP engaged is conspicuously absent.

There is no doubt that there was tension between the dream that was Covisint and
the business expectations of firms offering procurement services.  A preliminary Covisint
business plan dated June 12, 2000, boldly declared that "[a]ll goods and services procured
in the automotive supply chain eventually could be purchased using one or more Covisint
tools."  SNAPP ex. 61, at 10 (also saying, at 3, that Covisint expected to "offer traditional
procurement-oriented e-market services" and "include core offerings in . . . procurement").
An October 23, 2000, Covisint report, "The Story of the E-Heroes," complained that current
arrangements were "not deterring OEM competing initiatives," and listed, among other
entries, e-Steel for Ford and DSSI for GM.  SNAPP ex. 152, at 19.[20]  There was at least a
potential overlap between DSSI and Covisint.

But while there may have been some issues relating to the extent to which OEMs
were encouraged to funnel work to Covisint, there was no OEM boycott of DSSI, let alone
SNAPP.  In particular, GM continued to give business to DSSI long after SNAPP had gone
"dormant."  *See, e.g.,* Pollard Declaration, Ford ex. 38, at ¶ 3 (DSSI procured products for
GM from 1998 to 2003); Dennis Buckley deposition, Ford corrected ex. 94, at 43 ("I think
DSSI did business with GM through 2003.").

---

[20]  *See also id.* at 22:

> GM is discussing a relationship with DSSI to handle (1) steel resale
> program development (2) steel resale program administration outsourcing
> and (3) indirect materials procurement (outsourcing?).  What Covisint
> needs:  GM can have DSSI behind the firewall, but Covisint to pick the
> right steel resale functionality (DSSI/e-Steel) outside the firewall (POs,
> invoices, claims processing, inventaory tracking, ASNs, etc.).  GM to defer
> to Covisint for indirect materials procurement.

### c. *Snapp Lacks Standing*

Wholly apart from antitrust injury, which is discussed below, standing is a concept of particular importance in antitrust law, which employs it in part to make sure that the antitrust laws are not "trivialized." *Indeck Energy Services, Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000). The leading case is *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983). *Indeck* explains that *Associated General* directs attention at five factors:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Indeck Energy,* 250 F.3d at 975 (quoting *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983)).

Application of those factors makes clear that SNAPP lacks standing to challenge the boycott claim. Elsewhere in this opinion are discussions of doubts about SNAPP's (or DSSI's) status as competitors. The key point for purposes of standing is that it was DSSI that sought to do business with Covisint and it was DSSI that was turned down (or boycotted, in the view of the plaintiff). Ford probably would have discouraged Covisint from doing business with SNAPP had SNAPP sought a contract—but SNAPP did not. When SNAPP points to a Covisint document to suggest ill-will, the references are to DSSI, not SNAPP. *See Covisint eMarketplace: "The Story of the E-Heroes,"* SNAPP ex. 152, at 12, 19, 22; SNAPP ex. 153 (email referencing as sixth among the "next big opportunities," "Outsourced Purchasing (ICGCommerce/DSSI)").

39

SNAPP offered the following argument in support of its standing:

> Through its sister companies, SNAPP continued to compete in the IP Services Market. Direct Sourcing Solutions essentially acted as SNAPP's sales agent in the IP Services Market only because SNAPP was the subject of boycotts by Ford and its competitors. SNAPP and Direct Solutions are related companies.

SNAPP SJ Response at 17 (citations omitted). Although this point is not developed, presumably the reference to being "related companies" is to the fact that DSSI was founded by Mr. Thacker, SNAPP's sole stockholder for most of its existence. But barring extraordinary circumstances antitrust law routinely denies standing to shareholders, officers, and employees, who are the classic indirect victims, *see, e.g., Tal v. Hogan,* 2006-1 Trade Cas. (CCH) ¶ 75,319 (10th Cir. 2006), *Peck v. General Motors Corp.*, 894 F.2d 844, 847 (6th Cir. 1990), and there is less reason to grant a sister corporation standing than a sole shareholder. Moreover, Mr. Thacker no longer has any ownership interest in SNAPP and is no longer an officer, so if the firms were once related, they are no more.[21] As for the claim that DSSI "essentially acted as SNAPP's sales agent," SNAPP SJ Response at 17, it is belied by the acknowledged fact that SNAPP has no significant employees and is engaged in no significant business activities. Ever since 1999 or early 2000, SNAPP has made no sales and done no new business, see Introduction above—and no sales agent has been working for it.

Where the direct target of an alleged boycott so clearly exists, a bystander such as SNAPP, whose injuries would be a combination of derivative, duplicative, and speculative,

---

[21]  SNAPP's brief cited four affidavits that include the sentence, "SNAPP was often referred to as 'DSSI' or 'Dearborn' by Ford and others, which was an abbreviation for 'Dearborn Systems & Services, Inc.,' which was SNAPP's corporate name at that time." See SNAPP ex 1, at ¶ 14; ex. 2, at ¶ 14; ex. 3, at ¶ 4; ex. 5, at ¶ 9. Regardless of this, there is no significant evidence suggesting that SNAPP or Dearborn Systems & Services, Inc. had sought to do business with Covisint or had been denied that opportunity by Covisint.

cannot bring an antitrust case.[22]

### d. *The Rule of Reason Applies*

In *Texaco Inc. v. Dagher*, 126 S. Ct. 1276 (2006), the Supreme Court addressed the question "whether it is *per se* illegal . . . for a lawful, economically integrated joint venture to set the prices at which the joint venture sells its products." *Id.* at 1278.  The Court unanimously held that it is not.  "[T]his Court presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Id.* at 1279.  More specifically, "it would be inconsistent with this Court's antitrust precedents to condemn the internal pricing decisions of a legitimate joint venture as *per se* unlawful." *Id.* at 1280 (footnote omitted).

Although this Report will discuss boycott law in more detail below, *Dagher* essentially explains why the rule of reason is appropriate.  In *Dagher*, the Court recoiled from the prospect of a legitimate, non-sham joint venture's every pricing decision being condemned as per se illegal.  After all, a business entity must charge *some* price.  Similarly, a court should recoil from the prospect of a legitimate, non-sham joint venture's every purchasing decision being condemned as per se illegal.  After all, a business entity must buy from *someone*—and buying from someone means not buying from someone else.  Covisint, although not much of a business success, certainly was a legitimate, non-sham venture, and, as in *Dagher*, one whose formation was scrutinized by multiple antitrust officials.  It cannot be that its every decision not to patronize a supplier was a per se illegal group boycott.

---

[22]  Although this analysis of standing is written with respect to SNAPP's boycott charge, it is equally applicable to the extent that SNAPP relies on the alleged Covisint boycott to bolster its other claims.

41

SNAPP would respond that it is not asking that every purchasing decision be condemned as per se illegal—only the decision not to deal with DSSI. Even assuming that SNAPP has standing to raise this issue, one would have to identify what makes DSSI manageably special. SNAPP has suggested that the decision was made not for good business reasons but because Ford vindictively sought to block Covisint from doing business with any firm associated with Mr. Thacker—and there is evidence to suggest an unusual interest by Ford. Ford has suggested that its interest was based on concerns about performance—and there is evidence to support this. The problem for SNAPP is that an antitrust court cannot conduct a trial on whether every business decision to charge a certain price or buy from a certain supplier was made for bad reasons or good, with the outcome of that trial determining whether to apply the per se rule. Per se liability is reserved for categories of agreements that are "plainly anticompetitive" and whose "economic impact" is "immediately obvious." *Dagher*, 126 S. Ct. at 1279 (quoting multiple cases).

SNAPP argued that Ford engaged in a horizontal refusal to deal that "'unquestionably' constituted a 'naked restraint on price or output.'" SNAPP Boycott Brief at 14 (quoting *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422-23 (1990)). But *Superior Court Trial Lawyers* merely held that when horizontal competitors join together to withhold their services for the sole purpose of increasing prices, that is unlawful price fixing. It does not speak to our situation.

SNAPP's most serious charge is its claim that Ford and the other Covisint Founding Partners "entered into agreements that prevented purchasers of IP Services from making purchases from SNAPP." SNAPP Boycott Reply at 3. More precisely, SNAPP's expert witness rather creatively interpreted the Complaint to allege that "Ford, with the agreement of DaimlerChrysler and General Motors refused to deal or threatened to refuse to deal with

2:03-cv-74357-AC   Doc # 379   Filed 08/08/06   Pg 44 of 56   Pg ID 18347

suppliers that made use of SNAPP's services." SNAPP ex. 60, at 3. If, for example, the Covisint automobile companies had agreed to boycott suppliers who failed to give their business exclusively or principally to Covisint, a cause of action might well be stated by a Covisint competitor who was thereby harmed (assuming necessary showings of market power, etc.). Having identified SNAPP's strongest argument, however, it will be seen that the conclusion—that the rule of reason applies—remains the same.

(i) *Is there a sufficient showing of market power?* SNAPP cited obviously inflated figures of the share of automotive parts purchased by the Covisint auto companies, but there is sufficient evidence of their having power to withstand summary judgment—if, in fact, all those firms actually entered into a boycott agreement to exercise this power. On the other hand, the case has not been made sufficiently to withstand summary judgment that Covisint, itself, had market power. No evidence shows that Covisint, by itself, ever controlled a large share of any market or exercised market power. One notes, in this regard, that it is very rare (barring some explanation not provided here) for firms with market power to prove so ineffectual as to be sold off as a failure within a couple of years.

(ii) *Was there an agreement to boycott?* There is evidence that Ford encouraged Covisint not to work with DSSI, as discussed above. On the other hand, there was no agreement among the auto companies not to do business with DSSI, we know because GM continued to do business with it. Ford entered into an agreement with Oracle, *see* SNAPP ex. 133 (letter of intent, Feb. 4, 2000, between Ford and Oracle), but that agreement was vertical. SNAPP puts great emphasis on the Covisint May 4, 2000, Memorandum of Understanding, *see* SNAPP Boycott Brief at 9-10. Among other things, that document provides as follows:

> For a period of three (3) years following execution of definitive agreements, the FPs, OEM Partners and Supplier Partners and their respective controlled affiliates will agree to engage in activities designed to maximize the revenues

43

> of Newco [Covisint], including by using the Exchange for all required
> transactions related services ("RTTS") and, where the Exchange is
> competitive . . . in terms of price, quality, technology, service and deliver, by
> using the Exchange for all other services of the Exchange . . . .

SNAPP ex. 58, at LT000026. However, the August 30, 2000, Supplemental MOU required

open, non-discriminatory access, and prohibited Covisint and the OEMs from entering into

agreements with suppliers that make Covisint the suppliers' "'exclusive' or 'primary'

exchange" or that "restrict or limit" suppliers' "choice to access, use, participate in, organize

or establish an electronic exchange other than Covisint." Ford ex. 102, at 5.

SNAPP is not able to point to sufficient facts showing an OEM/Covisint boycott of

suppliers who did business with Covisint rivals. It is noteworthy, in this regard, that such

evidence as SNAPP marshals relates principally to the year 2000, and a little to 2001. *See*

SNAPP CSMF ¶¶ 14-15 (cited, SNAPP Boycott Reply at 3). Much of that evidence (in

particular, the MOU), was reviewed without alarm by antitrust agencies that signed off on

Covisint in September 2000 and July 2001.[23] Authors Horton and Schmitz, who authored

a "road map" to SNAPP's case, describe Covisint as having been launched in January

2001 with a "procompetitive electronic platform mission." 47 WAYNE L. REV. at 1235. Their

concern, when writing in 2002, was that Covisint could change and head in a wrong

direction.

In fact, of course, the direction Covisint headed was towards failure of its original

mission, and within two years it had been sold off. Failure does not prove an absence of

an anticompetitive agreement—a firm may fail for entirely unrelated reasons. But where

the controlling documents prohibit an illegal boycott, so the only question is whether one

occurred in spite of that language, it is proper for a court to note that, far from achieving any

kind of monopoly power, whatever occurred led to no power at all. Under these

---

[23] The Court is not, of course, bound by the views of any antitrust agency.

circumstances, SNAPP simply has not pointed to sufficient facts to support a claim of per se illegal boycott.

(iii) *Was there an efficiency justification?*  It is obvious that Covisint had substantial efficiency justifications.  Its failure to be a great success raises doubts about whether those were as overwhelming as some people thought, but that does not mean that it should be condemned as per se illegal.  Of course, the justifications need to attach to the questioned conduct, not the entire enterprise.  Here the answer is the same.  Even if Covisint's founders had pressured suppliers to use Covisint, per an agreement, in the context of a new and obviously risky venture this would have had plausible justifications.  Those justifications might not have carried the day under a rule of reason analysis, but they were sufficiently great that they should not be ignored (assuming, that is, that efficiency may be considered as part of the calculus, which is the better but not only view of the law).

(iv) *Was DSSI a competitor?*  There is a substantial argument that DSSI was not a competitor of Covisint for purposes of group boycott law.  See factual discussion above. In its initial, February 2000 MOU, Covisint defined a "competing business" (in which OEMs were prohibited in investing for three years) as "any entity whose primary activity is an online business-to-business exchange for the procurement by the FPs [parties to the MOU] and/or their suppliers of automotive . . . parts and supplies and . . . [perhaps] services." SNAPP ex. 58, at LT000008.  In contrast, DSSI engaged in selling information technology procurement services.[24]  Covisint considered selling in competition with DSSI, but it did not.

_____

[24]  In response to Ford's assertion that DSSI never provided on-line auction services (supported only by citing a deposition question, Ford SMF at 7), SNAPP claimed that Mr. "Thacker testified that DSSI did provide services obtaining multiple on-line quotations from multiple suppliers and tabulating and announcing results of such bids," SNAPP CSMF at 16, but it cited a transcript page not submitted by either party even in corrected exhibits, *see* SNAPP corrected ex. 67 (no page 143); Ford corrected ex. 91 (same).  Even if true, moreover, this would not put DSSI in Covisint's business.

On the other hand, there is evidence of concern within Covisint about DSSI and its activities. DSSI and Covisint are probably most accurately considered to have been potential competitors—which means that the legal question is whether group boycott law should be extended to cover potential competitors.

(v) *Was SNAPP a competitor?* The Court should hold that SNAPP does not have standing, as explained above. If it does not, however, there then occurs the legal question of whether any arguable Covisint boycotting, with respect to SNAPP, was directed at a Covisint competitor. If DSSI is properly regarded as a potential competitor of Covisint, SNAPP would be only a dormant potential competitor, even further removed.

(vi) *Conclusion.* For the reasons given above, this is an inappropriate case for per se treatment. "The Supreme Court has stated that the per se rule is a 'demanding' standard that should be applied only in clear cut cases." *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003). A legitimate, integrated joint venture chose with whom to do business. Efficiency justifications were very plausible. If one looks at the auto companies, they would have sufficient market power to satisfy that requirement—but Covisint would not. The alleged boycott of DSSI by OEMs did not occur, and there is no substantial evidence that the OEMs in fact boycotted firms that did not devote themselves to Covisint. DSSI was best regarded as a potential competitor of Covisint, and SNAPP was even more distant and lacked standing. To apply the per se rule here would be to extend it at the very time that the Supreme Court is instructing us to apply it with great restraint. And it would be particularly inappropriate to apply the per se rule to an alleged agreement among purchasers of a service to reduce competition in the provision of that service, thus hurting themselves. *See Balmoral Cinema v. Allied Artists Pictures Corp.,* 885 F.2d 313, 317 (6th Cir. 1989) ("Finally, we are hard pressed to apply a *per se* standard to an alleged conspiracy which may be of little or nor benefit to those accused of

46

conspiring—namely the defendant distributors."), *followed, General Aviation, Inc. v. Garrett Corp.*, 743 F. Supp. 515, 520-21 (W.D. Mi. 1990).

e.  *Applying the Rule of Reason.*  Largely for the reasons given above, summary judgment for Ford is appropriate when applying the rule of reason.  SNAPP does not really attempt to prove a rule of reason violation.   Under that approach, a plaintiff must "demonstrate that a particular contract or combination is in a fact unreasonable and anticompetitive."  *Texaco v. Dagher*, 126 S. Ct. at 1279.  Harm to competition usually means that prices are up and output down, but while the Complaint contains such allegations, Complaint ¶ 91, SNAPP pointed to no such facts.  SNAPP has no evidence that output was harmed, or that prices are higher today, or that competition is not thriving. July tr. 110-11, 123.  SNAPP argued that it provided the same services to Ford as Covisint for less money, July tr. 110, which arguably proves that Ford wasted money; but that is not the same as competition being harmed and, in any event, we have previously found that Covisint and SNAPP did not provide the same services at all.[25]    SNAPP's counsel

_____

[25]  SNAPP's principal argument is that it does not have to point to facts suggesting that prices rose, output fell, and competition is not thriving because "that issue has not been appropriately teed up, [or] framed, and nothing has been done to trigger an obligation for us to prove that specific issue now or we would have done so." July tr. 111.  Although Ford's summary judgment argument does not dwell on this issue as much as it might have, Ford twice argued that SNAPP has not sufficiently shown harm to competition, Ford SJ Brief at 7 (referring to "the complete absence of any factual evidence of harm to competition"); Ford SJ Reply at 2 ("SNAPP has only plead that it was harmed and driven out of business by Ford, not any harm to competition.") (footnote omitted).  Indeed, SNAPP must have thought this issue in play because one of the principal sections of its brief is headed, "Ford's Harm to Competition in the Market and SNAPP," SNAPP SJ Response at 9.  In addition, Ford's lengthy briefing on its motion to dismiss for want of antitrust injury focused on Ford's argument that "SNAPP only avers how it was harmed, not how Ford's alleged acts violated the antitrust laws and harmed competition."  Ford 12(b)(6) Brief at 4.  With trial looming in September, it is entirely appropriate for a court to consider whether there is evidence of harm to competition.

47

described its theory as alleging a boycott among the founding partners of Covisint "[t]o create a monopoly in the selling of IP services."  April tr. 59.  But Covisint never engaged in selling "IP services," and it never achieved any substantial business success, let alone economic power.  SNAPP claimed that although DSSI remains in the business, other firms have left it, *see* SNAPP SJ Response at 9-10; July tr. 12—but SNAPP pointed to no facts showing when and why these firms left, whether firms that did not leave started to thrive after Covisint was sold off, or that indicate the competitive vitality over time of the alleged market as a whole.

To be candid, the factual record is such that SNAPP has always faced something of an uphill battle in the antitrust part of this litigation, and its counsel has struggled mightily.  SNAPP's story was that Ford chose to shoot itself in the foot, driving up its costs and harming its quality, by conspiring to deprive the auto industry of a low-cost, high-quality provider of information technology procurement services.  Why would Ford do that?  SNAPP sought the answer in the story of Covisint, although that story inconveniently began after SNAPP had been terminated.  With energy and imagination, SNAPP sought to depict a venture that may have started benignly but that arguably changed its stripes.  The problem for SNAPP is that any harm was suffered by DSSI, not it; more fundamentally, the story of Covisint is a complicated matter that may have been worth exploring but that did not hold up under scrutiny.

The Court should grant summary judgment on the boycott claims.

### IX. <u>Antitrust Injury</u>

Antitrust injury is a very simple yet very confusing concept.  "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).  Under its facts, *Brunswick* was easy:

48

a rival should not be able to complain when a merger preserves competition.  But courts have struggled with how far to take the doctrine because, as a matter of logic taken to the extreme, a plaintiff could show antitrust injury only by proving both a violation and harm or threatened harm to competition—which can funnel an entire antitrust dispute into the antitrust injury concept and create tension with per se rules as well.

The Sixth Circuit is among the most aggressive in using the antitrust injury to weed out unmeritorious cases.  *See, e.g., Expert Masonry, Inc. v. Boone County, Kentucky, Fiscal Court*, 440 F.3d 336 (2006); *Indeck Energy Services, Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000) ("'the Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of antitrust laws, flows directly from conduct that is not itself an antitrust violation.'") (quoting *Valley Products Co. v. Landmark, A Div. of Hospitality Franchise Sys., Inc.*, 128 F.3d 398, 403 (1977)).

Although this Report recommends that the Court grant summary judgment for the reasons stated previously, many of those same reasons could, within Sixth Circuit jurisprudence, support a finding of no antitrust injury.  Particularly with respect to the boycott issue, a court could easily note that SNAPP's principal harm flows from its termination, which was entirely lawful under antitrust law.  Nor is there any claim that any antitrust violation has caused SNAPP (or DSSI, for that matter) to pay higher prices or receive lower ones, or to suffer from reduced output—indeed, SNAPP can point to no fact supporting any serious allegation of higher prices, reduced output, or harm to competition. This lack of competitive harm could well be contrasted with what would be an unfortunate chilling effect were routine purchasing decisions regularly subjected to antitrust review.  *Cf. Expert Masonry*, 440 F.3d at 347 ("Moreover, there is no economic rationale to restrict, as a violation of Section 1, a buyer's latitude in selecting the entity from whom it will purchase

49

products or services."). It would not be surprising were a court, in these circumstances, to conclude that summary judgment should be granted for want of antitrust injury.

## X.  Statute of Limitations

Ford moved for partial dismissal of, among other things, the federal and state antitrust counts, on April 19, 2005.  Dkt 94.  Since with the passage of time and after substantial discovery, matters outside the pleading have been presented, the Court should treat the motion as one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(b); *see, e.g., Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420-21 (6th Cir. 2000).

The statute of limitations bars recovery at least of damages for injuries occurring on or before November 14, 1999, for the federal antitrust claim, and September 23, 1998, for the state antitrust claim.[26]  This disposes of most if not all of the federal antitrust claims other than boycott.  In part for reasons stated below, the statute of limitations probably bars non-boycott claims in their entirety, but this Master does not believe that the parties would benefit from his spending the time necessary to work through this issue in the detail required to make a recommendation.  (Also, for instance, SNAPP alleges that activity that it (wrongly) characterizes as price fixing occurred "[i]n 1999."  Complaint ¶ 15.  It does not seem worth trying to review the record to determine whether the challenged activity

---

[26]  Special Master Levy has already recommended that the "discovery rule" be found not to apply to fraud cases, based on Boyle v. General Motors Corp., 468 Mich. 226 (2003).  Nor would it apply to antitrust claims.  Fraudulent concealment does prevent running of the statute of limitations on federal and presumably state antitrust claims, but it requires more than mere failure to discover a cause of action.  I ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS 901 (5th ed. 2002).  It is not clear whether SNAPP argued that the antitrust claims were fraudulently concealed, but in any event SNAPP has pointed to no facts to support a valid claim of fraudulent concealment.  It is insufficient to argue that SNAPP would not have been injured had Ford not "stopped accounting" in 2002.  SNAPP Corrected SOL Brief at 23.

Special Master Levy also recommended that the Court find the "standstill agreement" to have no effect, so this Master will not address that issue.

occurred during the last month and a half (or to study legal authorities without benefit of briefing to determine the legal consequences of SNAPP's failure to be more specific.)

Ford argued that the applicable statutes of limitation bar claims for damages for injuries occurring after November 14, 1999, for the federal antitrust claim, and September 23, 1998, for the state antitrust claim.  SNAPP argued that the relevant date is September 23, 1998, for both (putting aside a "continuing violation" argument).  July tr. 82 (Ford) & 114 (SNAPP).  Both parties agree that state and federal antitrust law, including on this issue, should be interpreted the same.  July tr. 83 (Ford); SNAPP's Corrected SOL Brief at 28 n.18.

### a.  *Tolling Agreement*

The difference between November 14, 1999, and September 23, 1998, turns on an interpretation of a Statute of Limitations Tolling Agreement entered into by Ford and SNAPP (Joint Index of Exhibits ex. 2).  Filed in a Texas state district court, it provided "that of any legal action or proceeding brought in the State of Michigan, the running of any limitations period applicable to any claim, cause of action, or counterclaim related to the relationship between Ford and SNAPP, if any, *that were or could have been brought in the Lawsuit* shall be and is hereby tolled from August 19, 2002 until the entry in the Lawsuit of a final order or judgment of a Texas court and the expiration of the time for any appeal . . . ."  Joint Ex. 2 at ¶ 1 (emphasis added).  The parties agree that the Texas district court could properly hear a Michigan state antitrust claim but could not properly hear a federal antitrust claim.  SNAPP argued nonetheless that it could have "brought" the federal claim in Texas because a plaintiff "can file its claims where it chooses and the case could be removed to federal court."  SNAPP Corrected SOL Brief at 33.  It also argued that the intention of the parties had been to stop the clock "as to everything," and it would have made no sense to stop the clock on state but not federal claims.  July tr. 115-17.

The Court should rule that the tolling agreement means what it says. Perhaps it was not sensible for SNAPP to agree to stop some claims but not others—but perhaps Ford would not have entered into a broader agreement. The words "could have been brought in the Lawsuit" must have some meaning, and the Court should neither ignore them and conclude that the parties really meant to toll all claims, nor effectively ignore them by reading them to mean "could have been filed even if improperly." Accordingly, the relevant dates are November 14, 1999, for the federal antitrust claims, and September 23, 1998, for the state antitrust claims.

### b. *Speculative Damages*

The "speculative damages" exception is of no assistance to SNAPP. As the case on which it relies (SNAPP Corrected SOL Brief at 33) explains, "uncertainty as to the extent of damages does not alone prevent accrual of a cause of action and the subsequent running of the statute of limitations." *Camotex, S.R.I. v. Hunt*, 741 F. Supp. 1086, 1090 (S.D.N.Y. 1990). The holding of *Camotex* is consistent with the position that Areeda describes as both correct and very widely adopted: The limitation period starts running whenever "present or future damages become definite enough to support a recovery." II AREEDA, *supra* at ¶ 320d. Had Ford engaged in unlawful tying, exclusive dealing, price fixing, refusal to deal, or whatever, such that SNAPP had a legitimate cause of action, damages would have been sufficiently definite to support a cause of action when the unlawful acts occurred—antitrust injury, had it occurred, did not have to wait for Ford to repudiate any contractual obligations, as SNAPP suggests, SNAPP Corrected SOL Brief at 34.

### c. *Continuing Violation*

SNAPP placed principal reliance on what it calls the "continuing wrong doctrine." SNAPP Corrected SOL Brief at 28-33. The applicable law is set out in *DXS, Inc. v.*

*Siemens Med. Sys., Inc.,* 100 F.3d 462 (6th Cir. 1996):

> A continuing antitrust violation is one in which the plaintiff's interests are repeatedly invaded. When a continuing antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants. Even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act.

*Id.* at 467 (quoting other cases; citations omitted).

Even if applicable, however, the continuing violation doctrine does little for SNAPP. If, for instance, the tying violation that SNAPP alleged is a "continuing violation" and SNAPP was injured by an "overt act" during the limitations period, SNAPP may recover for damages caused by that but not, as SNAPP argued, for damages suffered earlier, *see* SNAPP Corrected SOL Brief at 29-30 (arguing that it is entitled to damages as far back as 1991). In particular, SNAPP may not recover for injuries occurring on or before November 14, 1999, for the federal antitrust claim, and September 23, 1998, for the state antitrust claim.

SNAPP's position is the result of understandable confusion flowing from *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), which was issued at a time when the Court was much more casual about these sort of questions. *See* II PHILLIP E. AREEDA ET AL., ANTITRUST LAW ¶ 320a (2d ed. 2000). The applicable modern approach, however, is set out in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997):

> Antitrust law provides that, in the case of a "continuing violation," say a price fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," *e.g.*, each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." 2 Areeda, P338b, at 145 (footnote omitted). *But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.*
>
> *[T]he plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that*

53

*took place outside the limitations period.*

(citations omitted; emphasis added); *see also id.* at  *see also* II AREEDA, *supra*, ¶ 320c7 ("the plaintiff's damage claim will be limited to those acts . . . that both damaged the plaintiff and occurred within the four years prior to suit").

With damages limited to injuries after November 14, 1999 (September 23, 1998, for the state antitrust claim[27]), and given that the Ford-SNAPP agreement for SNAPP to terminate Ford work by the end of 1999 was dated October 1, 1999, there is little stake in deciding whether any of SNAPP's antitrust causes of action (other than for a boycott), if meritorious, would survive the statute of limitations such that SNAPP could recover for damages caused during that last month and a half of 1999.  The issue would be whether these are continuing violations with new overt acts after November 14, 1999.   They probably are not.  SNAPP has not pointed to acts occurring specifically during that time period (although it has made sweeping claims that wrongs continued).   Moreover, the better view of the law (if not the only one) is that where a plaintiff is injured by a long-term tying contract or exclusive dealing contract into which it entered, it cannot recover damages for injuries therefrom after the contract has been in effect for the limitations period.  *See* I AREEDA, *supra* at ¶ 320c3.  Given how little turns on this decision, however, and how challenging is parsing the claims about the various dates, this Master will not without further direction analyze the extent to which the continuing violation doctrine allows recover for damages (if any) suffered during the very end of 1999.

## XI. Conclusion

For the reasons given above, the Court should grant summary judgment to Ford on Snapp's federal and state antitrust claims.  Discovery is virtually over and we are on the

---

[27]  For simplicity, the text will discuss only the federal claim.  The analysis is the same for the state claim, although the date is different.

eve of trial; indeed, both parties have filed motions for summary judgment.  In response to Ford's broad motions to dismiss and for summary judgment, and in support of its own motion for summary judgment, SNAPP has failed to point to specific facts showing that there is a genuine issue for trial; based on the record taken as a whole, a jury could not reasonably find for SNAPP.  And were the Court not to grant Ford's motion for summary judgment (or to dismiss for failure to state a claim), it should hold that SNAPP can recover damages only for injuries occurring after November 14, 1999 for the federal antitrust claims, and September 23, 1998, for the state antitrust claims.

Respectfully submitted,

s/ Stephen Calkins

Stephen Calkins
Special Master

Dated:  August 7, 2006