UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTO INDUSTRIES SUPPLIER
EMPLOYEE STOCK OWNERSHIP
PLAN (ESOP),

    Plaintiff,

v.                                                  Case No. 03-74357

SNAPP SYSTEMS, INC.,              HONORABLE AVERN COHN

    Defendant/Third-Party Plaintiff,

v.

FORD MOTOR COMPANY,

    Third-Party Defendant.

_____/

## **ORDER GRANTING FORD'S MOTION RELATING TO SNAPP'S MARK-UP CLAIM**

       This is a complex commercial dispute. SNAPP is a Delaware corporation with its principle place of business in Texas, engaged in the business of providing IP Services. SNAPP is suing Ford for acts arising out of their business relationship.

       After extensive motion practice, the only claim in the case is one for breach of contract. Three contracts are at issue:

-     The 1995 Frame Work Agreement as Amended in 1996 (the Frame Work Agreement)
-     The Master Equipment and Lease Agreement
-     The 1999 Transition Agreement

Before the Court are two Ford motions relating to SNAPP's damages. They are:

- Ford's Motion for Contempt and to Strike SNAPP's Damage Claims and Evidence; and

- Ford's Motion to Strike SNAPP's Attempt to Assert a New and Previously Unplead Mark-Up Claim and Attempt to Revive its Previously Dismissed Accounting Claim and Petition that the Court Re-Examine Bifurcation.[1]

The motions were heard on August 1, 2007. At the hearing, the Court stated that Ford's motion relating to mark-up was granted. This Memorandum and Order further explains the reasons for the ruling.[2]

II.

The nature of SNAPP's breach of contract claim, particularly as to its claimed damages, may be generously described as a work in progress. What follows is a brief history.

The source of the claim for a mark-up is, according to SNAPP, paragraph 4.1 of the 1995 Frame Work Agreement as Amended in 1996 which reads:

> Pricing: SNAPP's North American and European Pricing shall be based on a 5.5% (uncapped) mark-up on all products and services. In Europe, SNAPP Shall receive an incremental 3.5% mark-up (a total mark-up of 9.0%) on all products and services (uncapped). Special pricing may be mutually agreed to by both parties, which agreement will not be unreasonably withheld, as exceptions to this standard mark-up provision.
> The standard mark-up price structure is intended to return to SNAPP a target of 1.75% net profit before tax and cost savings. Ford and SNAPP agree to manage SNAPP's standard mark-up to achieve an ongoing 1.75% net profit target before cost savings. SNAPP's ability to obtain a net profit before tax greater than the

---

[1] The bifurcation request is MOOT in light of the Court's Order Vacating the Order of Bifurcation and Requiring Additional Proffers, filed May 21, 2007.

[2] As to SNAPP's claims for damages as reflected in the Third Amended Verdict Form, exclusive of the mark-up claim, the Court directed SNAPP to file detailed damage studies within thirty (30) days.

2

targeted 1.75% is dependent on SNAPP and Ford's ability to obtain and share in cost savings as described in Section 4.3 of this Agreement.

Both parties agreed that the standard mark-up prices will be reviewed quarterly to measure whether the 1.75% profit ongoing total net profit marking (before tax and cost savings) is being achieved. Standard mark-up prices may be adjusted for the following quarter, either up or down as mutually agreed to manage the standard return to 1.75% total net profit before tax and cost savings. It is agreed that the total profit target is 2% before taxes and the remaining .25% coming from the achievement of cost savings. It is further agreed that the over-achievement of cost savings will not result in a lowering of the standard return percentage until the normalized average cost savings exceeds 5% per year.

Both parties agree to use best efforts and to work together to target total cost savings of 5% on revenue.

On November 14, 2003, SNAPP filed its complaint against Ford. Count II, entitled Breach of Contract, reads in relevant part:

. . .

65. Beginning in 1999, Ford and SNAPP entered into a series of contracts relating to SNAPP's provision of IP Services and other services in conjunction with the SNAPP Ventures.
. . .
67. SNAPP adhered to the terms of the various contracts, and in doing so; it provided the IP Services and other services to Ford.
68. Ford breached the various agreements with SNAPP and violated its duty of good faith and fair dealing to SNAPP.
69. Throughout the SNAPP Ventures and continuing to the present, Ford knowingly, and in bad faith, breached the various contracts by, among other things, failing to timely and fully pay SNAPP pursuant to the terms of the contracts and otherwise failing to abide by the material terms of the contract.
70. . . . SNAPP suffered significant damages, including, but not limited to lost profits which the parties reasonably contemplated at the time of the origination of the relationship and/or contracts and throughout the relationship, increased labor and administrative costs, loss of capital, and consequential, incidental, and other damages.

In March of 2004, Ford attempted to discover SNAPP's damages for its breach of contract claim through interrogatories, specifically Interrogatories No. 15 and 16. SNAPP, for various reasons, objected to the interrogatories and Ford filed a motion to

compel.

Meanwhile, on March 17, 2005, SNAPP filed a First Amended Third Party Complaint and Jury Demand. This is the governing complaint. Count II, entitled Breach of Contract, reads in full:

> 32. Ford and SNAPP entered into a series of written and oral contracts with each other and/or third parties, relating to the Ford/SNAPP's relationship, which are known to Ford and are in its possession.
> 33. SNAPP adhered to the terms of the contracts, made hundreds of millions of dollars in investments for the benefit of the Ford/SNAPP relationship, and in doing so, it provided the IP Services and other services to Ford.
> 34. Ford breached the agreements with SNAPP and violated its duty of good faith and fair dealing to SNAPP, including but not limited to: the 1991 Agreement, and amendments to the 1991 Agreement, including, Master Equipment Lease Agreement and Amendments, Lease Program Agreement, GRI Agreement, Midwest Settlement Agreement, Subcontract Services Agreements, 1992 Amendment to the Frame Work Agreement, 1994 Frame Work Agreement, 1996 First Amendment to Frame Work Agreement, 1999 Transition Agreement, and IMPACT Partners in Order Processing.

Ford's motion to compel regarding Interrogatory Nos. 15 and 16 was referred to a Special Master. At the hearing before the Special Master, Ford says it agreed to withdraw the motion on SNAPP's assurance that information was forthcoming in its expert report. SNAPP, however, contends that it made no such representation that its damages would come through an expert report. The expert report did not discuss damages. At this point, Ford says it learned that SNAPP would largely rely on lay testimony for its damages. Ford filed a second motion to compel answers to Interrogatory Nos. 15 and 16. The Special Master issued a report and recommendation R&R that the motion be granted and SNAPP be ordered to supply its damage information. SNAPP thereafter supplied information; however, Ford believed SNAPP's submissions were inadequate and therefore returned to the Special Master.

Meanwhile, the parties filed several dispositive motions relating to SNAPP's various claims. As to the breach of contract claim, the motions focused on whether the 1.75% net profit target (sometimes referred to as the 2% net profit) was a contractual obligation or simply a goal. There are no motions relating to mark-up.

On September 12, 2007 issued a very specific R&R which set forth exactly the level of detail with which SNAPP was expected to answer Interrogatories Nos. 15 and 16. SNAPP objected. The Court denied the objection and ordered SNAPP to respond in the manner set forth in the R&R.

On April 2, 2007, Ford received SNAPP's "Supplemental Response" to Interrogatories No. 15 and 16 in which SNAPP claimed more than $22 billion in alleged contract damages. The answer was wholly deficient. It did not provide any calculations, failed to list documents supporting the calculations, or the basis of witnesses' testimony. It also did not link any of its claimed damages to alleged actions by Ford. The Court indicated as much at a hearing on April 6, 2007. At the April 6 hearing, the Court ordered SNAPP to produce a damages tabulation with a computation of damages.

On April 9, 2007, the Court ordered SNAPP to file "a description of the damages claimed in tabular form." On April 30, 2007, SNAPP submitted a "Damages Table" identifying more than $ 7 billion in alleged damages. In a footnote, SNAPP explained that "If the Court were to find against SNAPP's profit commitment claim, then SNAPP would alternatively seek the standard mark-ups per the relationship agreement that it forebore in anticipation of receiving the agreed guaranteed profit. This amount has not been determined." This appears to be the first time SNAPP mentions a mark-up as part

5

of its breach of contract claim as to the Frame Work Agreement.

Also on April 30, 2007, the parties filed a Joint Final Pretrial Order. Plaintiff's Statement of Claims reads in relevant part:

> SNAPP and Ford entered into a relationship with the purpose of profitting from leveraging Ford's resources and SNAPP's expertise and technology. . . . Ford and SNAPP agreed that SNAPP would retain one-half of cost savings, and pursuant to the 1996 Amendment, both parties agreed in writing to use best efforts and to work together to target total cost savings of at least 5% on revenue and to share equally without attribution of credit for the cost savings achieved.
> . . . [t]he parties agreed to reconcile their mutual obligations through periodic accounting relating to all the transactions and agreements. **One innovative approach that Ford used to compensate SNAPP was to have SNAPP levy a surcharge via a mark-up on all of Ford's purchases and the surcharge would be adjusted as one of the means to help achieve an operating profit for SNAPP equal to 2% of its revenues**. . .
> . . .
> Ford's breaches include the following:
>
> 1. Whether Ford failed to properly account for outstanding money owed to SNAPP;
> 2. to account for and acknowledge its obligations pursuant to the guaranteed minimum 2% Profit target;
> 3. to account for and acknowledge its obligations to reimburse SNAPP the $10 million that SNAPP paid to the Midwest Plaintiffs on behalf of Ford, as Ford agreed in writing to in the 1996 Amendment as part of the overall minimum 2% profit accounting
> 4. to account for and acknowledge its obligations regarding SNAPP's 50% share of the contractually committed cost savings;
> 5. to perform best efforts to achieve total cost savings;
> 6. to engage in good faith negotiations in 1999 to renew the Relationship Agreements . . . as it committed to in the 1996 Amendment;
> 7. to honor its written agreement not to desourced commodities purchased by SNAPP
> 8. to acknowledge its obligation to compensate SNAPP for additional services performed by SNAPP and as contemplated by the Relationship Agreements. . .;
> 9. to acknowledge its obligation to compensate SNAPP for its investment in the IMPACT program pursuant to its agreements including the Relationship Agreements;

6

10. to acknowledge its obligation to compensate SNAPP for its investment in the I-RaMPP program pursuant to its agreements including the Relationship Agreements; and
11. to acknowlege its obligation to pay SNAPP for [Type I, Type II, Type III, and Type IV Transactions]

(Emphasis added).

The mark-up claim is displayed in the proposed verdict form under Section I.A.1. as follows:

> b. *If you answered Question 1 [relating to the 1.75% profit target], "No":* Did Ford breach its contractual obligation under the Frame Work Agreement, by not paying SNAPP a 5.5% mark-up on all purchases in North America and a 9% mark-up on all purchases in Europe?
>
> Yes_____     No_____
>
> *If you answered subpart 1(b) "Yes".* How much of a credit is SNAPP entitled to?
>
> $_____

### III.

As can be seen from above, there is no mention of a free-standing mark-up claim anywhere in SNAPP's complaint or in the Joint Final Pretrial Statement. Indeed, as the emphasized language in the Joint Final Pretrial Statement shows, SNAPP describes the mark-up as a pricing mechanism "to help achieve" the 1.75% net profit target.

SNAPP argues that if the jury does not find Ford breached it's obligation to provide SNAPP with a 1.75% net profit target, then it may alternatively find for SNAPP on the basis of the mark-up. This alternative claim of an across the board mark-up simply does not hold up. If the jury finds against SNAPP on the 1.75% profit on the work for Ford, then that is the end of the breach of contract claim regarding the Frame

7

Work Agreement. The 5% mark-up on domestic products and services and the 9% mark-up on European products and services was a price mechanism applicable to individual transactions/invoices. As the Court noted at the hearing, there is no contractual obligation under the Frame Work Agreement to accumulate the pricing to see whether overall Ford paid a 5% mark-up on the aggregate of domestic invoices and a 9% mark-up on the aggregate foreign invoices.

In reading paragraph 4.1 in the context of the entire Frame Work Agreement, it is clear that (1) the mark-up was "intended" to return the 1.75% net profit target, (2) the parties would "manage" the mark-up to achieve the 1.75% net profit target, and (3) that mark-up would be reviewed quarterly and could be adjusted "up or down as mutually agreed."

Moreover, as Ford correctly notes, to the extent that SNAPP argues that it would not have agreed to accept a reduced mark-up had it known that the 1.75% target net profit was actually a "target" and not a "commitment," the latter of which forms the basis for the breach of contract claim relating to the Frame Work Agreement, such an argument is nothing more than a oral promise and/or the basis of a fraud claim. Claims relating to oral promises and fraud have been dismissed.

Ford's motion relating to the mark-up claim is GRANTED.

SO ORDERED.

Dated: August 2, 2007        s/Avern Cohn  
    AVERN COHN  
    UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, August 2, 2007, by electronic and/or ordinary mail.

                                              s/Julie Owens
                                              Case Manager, (313) 234-5160