UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AUTO INDUSTRIES SUPPLIER
EMPLOYEE STOCK OWNERSHIP
PLAN (ESOP),

    Plaintiff,

v.                                               Case No. 03-74357

SNAPP SYSTEMS, INC.,                  HONORABLE AVERN COHN

    Defendant/Third-Party Plaintiff,

v.

FORD MOTOR COMPANY, SUSAN E.
KOBET, DIANE SENDEK MARCHESE,
CARMEN ZIRLES, and JEFFREY D.
COLLINS,

    Third-Party Defendants.
_____/

**ORDER GRANTING FORD'S MOTION TO STRIKE SNAPP'S DAMAGE ANALYSIS
AND RELATED TESTIMONY**

I.  Introduction

This is a breach of contract case. Three contracts are at issue: (1) the 1995 Framework Agreement, as amended in 1996, (2) the Master Lease Agreement, and (3) the 1999 Transition Agreement. SNAPP seeks approximately 1.3 billion dollars in damages.

Before the Court is Ford's motion to strike SNAPP's damages analysis and

related testimony.[1]  For the reasons that follow, the motion will be granted.

## II.  Background

As the Court has commented earlier in this case, ascertaining SNAPP's damages has been elusive at best.  Rather than repeat the long history of discovery requests, orders from the special master and the Court, and the parties' various responses, the focus now is on SNAPP's expert report and related testimony.

On September 10, 2007, SNAPP filed an Expert Report Prepared By Thomas A. Frazee (Frazee Report) on damages (Dkt. 513).  The Frazee Report calculated SNAPP's damages to be approximately 3.9 billion dollars, broken down into several categories.[2]  See Exhibit 1 - Exhibit B to Frazee Report.  On October 5, 2007, Ford's filed a Motion to Strike SNAPP's Final Damages Report.  Ford argued that the expert report falls short in several respects in properly identifying and supporting SNAPP's claimed damages.  On October 19, 2007, the Court entered an order styled:

> Order Staying Proceedings on Snapp's Motion to Supplement the Joint Final Pretrial Order and Directing Snapp to File a Response to Ford's Motion to Strike Snapp's Final Damage Report and Setting a Hearing on Ford's Motion to Strike

On December 5, 2007, the Court held a hearing on Ford's Motion to Strike.  At the hearing, the Court noted that "whether Frazee is competent to express an opinion

---

[1]Ford also moved for partial summary judgment with respect to specific components of SNAPP's damages, arguing they lacked evidentiary support, and also sought partial summary judgment on the grounds of the statute of limitations.  This memorandum deals solely with SNAPP's damages expert, Thomas Frazee, and whether his report and testimony and the related testimony of the other witnesses is admissible.

[2]Previously, on July 29, 2005, Frazee prepared a report entitled Expert Report Prepared by Thomas A. Frazee.  This report was incomplete as to many of the categories of damages and was never filed with the Court.

as to each of [the claimed items of damages] based upon his report is problematic."
12/2/07 Tr. at p. 2. To that end, the Court ordered an evidentiary hearing in which
Frazee could be examined regarding his report; in essence, a Daubert[3] hearing. The
hearing, in which Frazee, Douglas Vetter and Bhagwan Thacker testified, extended over
five days. At the conclusion, the Court stated:

> I think that's the crucial question here, whether there is a factual predicate
> for the opinions expressed by Mr. Frazee or whether – and that can be supported
> by Mr. Vetter or [Mr. Thacker]'s testimony. I have a considerable concern that
> there is an inadequate factual predicate for much of the opinions expressed by
> Mr. Frazee even as supplemented by the data from Mr. Vetter, and I think . . .
> that's the crucial issue the Court has to decide.

5/5/2008 Tr. at p. 204. The Court also afforded SNAPP the opportunity to decide
whether to file an amended damages report in light of the testimony at the hearing. On
May 6, 2008, the Court entered an order setting forth time limits pertaining to whether or
not SNAPP elected to file an amended report. In either instance, Ford was directed to
file an amended motion to strike. SNAPP chose to submit an amended report. A
Supplemental Expert Report Prepared by Thomas A. Frazee (Supplemental Report)
was filed on July 3, 2008 (Dkt. 542). In the Supplemental Report, SNAPP omitted some
of the items of damages.[4] Frazee now calculates SNAPP's damages to be
approximately $1.3 billion dollars. See Exhibit 2 - Exhibit B of Supplemental Report.

    Ford then filed the instant motion.

---

[3]Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

[4]The parties agree that the Supplemental Report is largely duplicative of the September 2007 report. The only substantive differences being the elimination of damages relating to MRO items and reduced damages for I-RaMMP. Thus, Frazee's testimony from the hearings is applicable to the Supplemental Report.

3

III. Analysis

A. Frazee as an Expert Witness

1.

The law regarding expert testimony is well-known.[5] Rule 702 of the Federal Rules of Evidence, as discussed and interpreted by the Supreme Court in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), controls the admissibility of expert testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Thus, expert testimony may only be admitted into evidence if: (1) the witness qualifies as an expert; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact to understand the evidence or determine a fact in issue. <u>Id</u>.; <u>Daubert</u>, 509 U.S. at 589-91.

In <u>Daubert</u>, the Supreme Court held that Rule 702 imposes a "gatekeeping" obligation on the trial court to ensure expert testimony "is not only relevant, but reliable."

---

[5]SNAPP's contention that the in-court depositions of Frazee, Thacker, and Vetter did not amount to a <u>Daubert</u> hearing and therefore Ford's motion is somehow premature is not well-taken. The Court, and parties, understood that the purpose of the testimony was for Ford to examine Frazee about his report in order to determine whether his opinion passes muster under <u>Daubert</u>. Although Ford began the examinations, SNAPP was afforded an opportunity to examine each witness and provide exhibits, which it did. Notably, SNAPP did not re-direct Frazee.

4

Daubert, 509 U.S. at 589.  This "gatekeeping" function applies not only to scientific testimony but also to testimony regarding technical or other specialized knowledge. Kumho, 526 U.S. at 141.

Daubert sets forth five factors the court may consider to determine reliability: (1) whether the expert's technique or theory can be and has been tested, (2) whether the technique or theory has been subjected to peer review and publication, (3) the known or potential rate of error of the technique when applied, (4) the existence and maintenance of standards and controls, and (5) whether the technique or theory is generally accepted in the scientific community.  Id. at 593-94.  The court's inquiry under Daubert is flexible. Id. at 594. These factors are not a definitive test or checklist but are merely instructive. Id. at 593; Kumho, 526 U.S. at 150.

> As one district court has explained:
>
> Essentially, Daubert and Kumho require a two-step inquiry that involves an analysis of the "relevance and the reliability" of an expert's opinion.  Greenwell v. Boatwright, 184 F.3d 492, 496 (6th Cir. 1999).  The relevance step of the inquiry is designed to ensure that "there is a 'fit' between the testimony and the issue to be resolved by the trial."  Id. (citing United States v. Bonds, 12 F.3d 540, 555 (6th Cir.1993)). The reliability step focuses on the "methodology and principles" that form the basis for the testimony.  Id.  A trial court must inquire as to whether the methodology underlying the proffered expert testimony is valid and whether the methodology may be properly applied to the facts at issue in a particular case. Daubert, 509 U.S. at 592-93.

Ellipsis Inc. v. The Color Works, Inc., 428 F. Supp. 2d 752, 757 (W.D. Tenn. 2006)

2.

Ford argues that SNAPP cannot meet the threshold requirement of Daubert and Rule 702 with respect to Frazee's opinions and testimony essentially because Frazee's testimony made clear that he had little, if any, personal knowledge of the underlying

5

data used to created the opinions contained in his report. The Court agrees. As was born out at the hearing, Frazee accepted summaries of data supplied to him by Vetter wholesale and simply used that data, often in the same format sometimes reformatting the data, to prepare his report. Frazee had no personal involvement in the preparation of the data. The Court indicated as much at the hearing:

>The Court: Mr. McIntyre, I think it's clear that [Frazee] has no personal familiarity with any specific item on H-1 [cost-savings] so I don't know why you continue to examine him. He testified he got this from SNAPP and reformatted it into tabular form from a spreadsheet.
>. . .
>
>The Court: Is anything inaccurate from what I just said?
>
>Frazee: I think that's a pretty fair summarization

1/17/08 Hearing Transcript at p. 116.

>The Court: . . . he's gotten a lot of this data from somebody else and what he's done is simply plugged in the figures in a matrix.

2/27/08 Hearing Transcript at p. 145.

For instance, Frazee testified that he did not prepare Exhibit Q to his Expert Report (attached as Exhibit 5), which is also Exhibit Q to the Supplemental Report. Exhibit Q purports to delineate documents allegedly reviewed and relied upon in formulating SNAPP's cost-savings claim.[6] Frazee testified he did not know who prepared it. 2/27/08 Hearing Transcript at p. 76. At the hearing, counsel for SNAPP said that Exhibit H-1 to the Frazee Report and Supplemental Report (portions of which are attached as Exhibits 3 and 4, respectively) clearly sets forth the parameters of

---

[6]The exhibits purporting to substantiate SNAPP's cost savings claim, Exhibits H-1, Exhibit Q and Hearing Exhibit 23, are discussed more fully in Part III.C., infra.

SNAPP's cost savings claim. However, Frazee testified that Exhibit H-1 was derived directly from data supplied by Vetter and mirrors Exhibit 14 at the hearing, which was an e-mail and attachment from Vetter to Frazee with the subject heading "revised cost savings schedule." Thus, with respect to SNAPP's cost savings claim, Frazee performed no independent analysis but rather simply took figures supplied by Vetter.

Ford further notes that Frazee admitted a similar lack of involvement and/or knowledge with respect to every component of his damage analysis:

> • Frazee admitted that he did no analysis to determine whether SNAPP's cost savings claim related to the Midwest settlement was appropriate and that he did not know anything about the Midwest item other than the fact that it was on Vetter's papers that were given to him. 02/27/08 Tr. at 63:12-15; 63:21, 64:3-5.
>
> • Frazee admitted that he accepted SNAPP's calculation of "leaked revenue" without any analysis beyond "talk[ing] to SNAPP about the document." 1/17/08 Tr. at 75:21-77:24.
>
> • Frazee admitted that all of the cost savings information on Exhibit H-1 was provided to him by SNAPP and incorporated into his report with little more than mere formatting changes. Id. at 96:1-12. Frazee had no idea who at SNAPP actually derived the numbers used for Exhibit H-1. Id. at 13-16. Further, Frazee admitted that he had no personal familiarity with any specific item on H-1. Id. at 116:15-25. See also Defendant's Hearing Ex. 14.
>
> • Frazee admitted that he obtained all of the contemporaneous relationship documents used in his Report from SNAPP business people. Ex. 3, 01/17/08 Hr'g Tr. at 117:9-15.
>
> • Frazee admitted that he did not personally prepare Exhibit Q to his Report and did not know who specifically prepared it other than someone at SNAPP. 2/27/08 Tr. at 76:9-24; 78:8-15.
>
> • Frazee admitted that he just incorporated the alleged savings percentage of 38.39 percent in a Nasser memo sent to him by SNAPP into his Report. Id. at 124:3-125:4. Frazee did not undertake any analysis or due diligence to verify this percentage other than just talking to Thacker about Thacker's commodity experience. Id. at 125:6-17.

7

• Frazee admitted that he incorporated most of the spreadsheet Vetter sent him entitled "Good Faith Renewal Damages" into his Report without doing any analysis of the information other than cross-referencing the numbers for accuracy with other documents provided to him by SNAPP. Id. at 153:16-154:7; see also 01/17/08 Tr. at 158:13-159:9. Compare Defendant's Hearing Ex. 10 with Exhibit O to Supplemental Report, lines 1-3.

• Frazee lifted and accepted the numbers from Vetter's email entitled "Damages Related to Past Due Payments Under the MLA" without further change or analysis to create Exhibit J to the Report. Compare Defendant's Hearing Ex. 15 with Ex. J to Supplemental Report.

• Frazee adopted the total from Vetter's email entitled "Interest benefit under the LPA" without further change or analysis to create Exhibit K to the Report. Compare Defendant's Hearing Ex. 16 with Ex. K to Supplemental Report.

• Frazee admitted that his Exhibit N "summarizes" the contents of Vetter's email entitled "1999 agreement claim - open A/R." 02/27/08 Tr. at 59:22. In fact, other than rounding a few numbers, Exhibit N is identical to the information provided by Vetter, and merely was reformatted. Compare Defendant's Hearing Ex. 17 with Ex. N to Supplemental Report.

• Frazee admitted that the $5.5 million in alleged damages in Exhibit L, pertaining to the Transition Agreement, is based upon Exhibit N, which in turn was created wholesale from an email attachment from Vetter. 02/27/08 Tr. at 120:16-121:7. Frazee also admitted that he did no independent review or analysis of the underlying purchase orders from which the data in Exhibit N allegedly was compiled. Id. at 121:8-14.

• Frazee admitted that Exhibit M was based on data that was forwarded to him by Vetter entitled "Incompleted' Type II Transactions." 02/27/08 Tr. at 135:10-136:6. Frazee did not change any of the substantive data provided by Vetter, nor did he do any independent verification of the numbers by reviewing the underlying purchase orders. Id. at 136:7-15. Frazee only changed the title of the spreadsheet and the title of the last column, and otherwise incorporated the attachment wholesale as Exhibit M to his Report. Compare Defendant's Hearing Ex. 19 with Ex. M to Supplemental Report.

SNAPP, however, says that these alleged deficiencies go to the weight of Frazee report which is a question of fact for the jury, and the weakness of the report should not result in its exclusion. This argument overlooks that:

When determining whether an expert's testimony is reliable, the court may

8

consider the <u>factual basis for the expert's opinion. Indeed, Rule 702 specifically states that an expert may only testify if the testimony is based upon sufficient facts and data and the witness has applied the principles and methods reliably to the facts of the case</u>. Courts may also review the factual basis for an expert's testimony under Rule 703 of the Federal Rules of Evidence.... Under Rule 703, courts have held that <u>if the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded</u>.

Ellipsis, Inc. v. Color Works, Inc., 428 F. Supp. 2d 752, 760 (W.D. Tenn. 2006) (internal quotations and citations omitted) (emphasis added).

Frazee was, as Ford aptly states, a "mere conduit for information prepared by others." Frazee's acceptance of other's work and incorporating it into a report simply does not meet the reliability component necessary for expert testimony. SNAPP contends that the fact that Frazee had no personal knowledge of the underlying business records is not grounds for exclusion of his report. This argument misses the point. It is not the fact that Frazee did not have personal knowledge of the business records which is important. Rather, it is the fact that Frazee failed to perform any intellectual analysis or review of the underlying source documents (which SNAPP says are its business records) sufficient to qualify him as an expert. As demonstrated above, Frazee testified that he did not perform any such analysis or review. In reality, Frazee had no actual involvement in the calculations of SNAPP's damages components. Instead, he either did no analysis or accepted the analysis supplied by others, particularly Vetter. Although SNAPP points to Frazee's testimony in which he stated he spent some time looking at the calculations in the summaries provided by Vetter to see if they were consistent with SNAPP documents and other summaries, he did not testify that he actually did the analysis for SNAPP's damage calculations, as opposed to

9

merely "double checking" SNAPP's math and sources at some level. Under these circumstances, there is no way to determine whether the data relied upon and methodologies Frazee used, which were given to him by others, are reliable under Rule 702.

B. Summary Witnesses

1. Frazee

SNAPP also argues that Ford is "mixing up issues" by failing to distinguish between Frazee's role as an expert witness and a summary witness under Rule 1006.[7] It would appear that SNAPP, when faced with the deficiences in Frazee's testimony and report, says that Frazee is also to be a summary witness. Frazee himself described this rather amorphous role as "evolved . . . from providing expert testimony and opinions" "to encompassing a role as a summarizer or summarization of some of the facts." 1/17/08 Tr. at p. 10. SNAPP, however, has not identified where Frazee is offered as an expert and where he is offered as a summary witness. Moreover, despite Frazee's testimony mentioning his role as a summary witness, at no point in his Supplemental Report does he refer to himself as such.

Moreover, Frazee is relying on summaries prepared by Vetter, not himself. Where a summary witness does not personally prepare the summaries testified to, the

---

[7]Rule 1006 states:
The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place.
Fed. R. Evid. 1006.

summary witness must at least have "carefully reviewed the charts and ensured that the refelct[] information contained in documents already in evidence." United States v. Lemire, 720 F.2d 1327, 1349 (D.C. Cir. 1983). The summary witness must also be able to "identify the source of all of the information on the chart" and "explain how all the dollar figures were derived." Id. As noted above, Frazee does not meet these requirements. Indeed, the only witness who purports to have knowledge of the information contained in the summaries and underlying documents is Vetter, not Frazee. Frazee would essentially be a summary witness of a summary witness, a role that is not helpful to the litigation. At most, he would be cumulative of Vetter. Thus, Frazee is not a proper summary witness.

### 2. Vetter

SNAPP has filed an affidavit of Vetter, its consultant, who testified at the hearing in an effort to bolster Frazee's report. At the hearing, Vetter testified that he was SNAPP's consultant and created almost all of the attachments to the Frazee report. However, he explained that his role at SNAPP was limited to "high-level agreements and projects and new contracts" and that he did not interact with Ford employees. 4/23/08 Tr. at p. 7. Vetter was never a direct employee of SNAPP, only a consultant. Significantly, he testified that he did not review any of the data underlying SNAPP's summaries or any of the 961 boxes of documents SNAPP listed as the underlying basis for the summaries. 4/22/08 Tr. at p. 28.

In his affidavit, however, Vetter confirms that he, not Frazee, performed the damages work for SNAPP. The Vetter affidavit supports that Frazee relied upon documents and data to support his testimony and Report, that document only confirms

that it was not "the witness," i.e. Frazee, who applied principles and methodology to create damages calculations as required by Fed. R. Evid. 702(3). As Ford points out, the fact that SNAPP chose to submit an affidavit of Vetter to attempt to prove a factual and intellectual predicate for Frazee's Report, as opposed to an affidavit from Frazee, stating that he performed the work expected of an expert witness pursuant to the <u>Daubert</u> standards it telling. Equally telling is that after Frazee's cross-examination, SNAPP made the "determination" that it would not recall Frazee for redirect examination to rebut his admissions.

Vetter's affidavit purports to highlight his involvement. Vetter first states that "I was substantially involved in all damages submissions to the Court," and lists five of SNAPP's damages submissions in illustration. <u>See</u> 10/03/08 Vetter Affidavit - Ex. 6 to SNAPP's Response at ¶ 7. Only the final two damages submissions listed are the "Frazee Studies," which shows that Vetter performed SNAPP's damage calculations well before Frazee's involvement. <u>Id</u>. Vetter concedes that he not only did all the calculations for the pre-Frazee damages submissions, but also for the Frazee Reports, as he states that "I also adjusted those computations already performed by SNAPP for its previous Damages submissions based on Mr. Frazee's input and advice, particularly as to the application of Ford's historical payments," <u>id</u>. at ¶ 8, and "I performed similar functions in assisting Mr. Frazee in connection with his July 3, 2008, Supplemental Expert Report ("Frazee Study"). <u>Id</u>. at ¶ 9. Vetter also "worked extensively with [Frazee] to bring him up to speed on the previous damage submissions and the events that had occurred since Mr. Frazee had issued his previous report in August 2005." <u>Id</u>. at ¶ 10. Continuing, Vetter states that "Mr. Frazee quickly understood SNAPP's

12

calculations, as they were based in large part on the methodology proposed by Mr. Frazee in his August 2005 report." Id. Ford accurately describes Vetter's affidavit relative to Frazee as follows:

> Vetter's statement contains two important admissions. First, that someone other than Frazee performed SNAPP's calculations, and Frazee simply was "brought up to speed" on them. Second, that those calculations were based, in part, on methodology other than that suggested by Frazee. While Vetter now claims that SNAPP's calculations were based "in large part" on a methodology developed by Frazee, Frazee's original 2005 Expert Report contains only one calculation - for the "Estimated Profit Margin of 2% Revenue." See Ex. 2, 07/29/05 Expert Report Prepared by Thomas A. Frazee at 9. To the extent that Frazee describes any "methodologies" in his 2005 Report, such descriptions are broad and general and do not reflect what documents and data would be used to calculate any of SNAPP's now listed categories of damages. Id. at 4. Moreover, the "damages perspectives and methodologies" are limited to (a) Benefit Received by Customer; (b) Seller's Profits; and (c) Cost-Plus Pricing, rather than tailored to the categories of damages now claimed by SNAPP in its current damage Report. Id.
> Further, even though Vetter claims in his latest Affidavit that Frazee also determined a new methodology consistent with the Court's orders for the Frazee Reports, he then admits that "I emailed the final calculations to Mr. Frazee." Ex. 6 to Resp., Vetter Aff. at ¶ 10-11. Vetter also admits that Frazee (and his team's) involvement with the damages calculations was limited to applying tests for reasonableness and accuracy to the summaries previously calculated and forwarded by Vetter, which again, amounts to little more than "double checking" Vetter's submissions as opposed to taking an active role in their production as required of an expert. Id. at ¶ 11. Vetter's Affidavit also contains several other admissions showing that Vetter was the primary, if not sole, preparer of the damages calculations that are contained in the Frazee Supplemental Report, including: "I examined the underlying data supporting the calculations that I performed to assist Mr. Frazee," id. at ¶ 13; "the damages calculations that I prepared in my collaboration with Mr. Frazee," id. at ¶ 14; and "I prepared a spreadsheet for Mr. Frazee that summarized the calculations." Id. at ¶ 28 (emphasis added).

Ford's Reply at p. 7-8.

Ford goes on to say:

> The fact that the Frazee Supplemental Damages Report purports to explain how various damages components were calculated does not mean that Frazee actually performed the calculations or determined the methodologies for

13

>doing so. The bulk of the evidence, including SNAPP's own admissions via the Vetter Affidavit, irrefutably shows that Vetter, and not Frazee, was the individual, if any, who applied any alleged principles or methodology to the facts of the case, as required of an expert witness pursuant to F.R.E. 702 and Daubert. Thus, "the expert witness" proposed by SNAPP, Frazee, has not met the basic requirements expected of an expert pursuant to the Federal Rule governing expert testimony, and his report and any related testimony should be stricken.

Id. at p. 8.

Moreover, to the extent that SNAPP says that Vetter may testify as a summary witness and/or lay the foundation for Frazee's report, SNAPP is misguided. While Vetter may have made the calculations, there is no evidence that he can lay a foundation for the data underlying the analysis because (1) he was not involved in the day-to-day operations of SNAPP, (2) did not create the underlying documents, (3) is not the custodian of the documents, and (4) testified at the hearing that he did not review the underlying documents. Indeed, Vetter's primary role at SNAPP largely did not occur until 1999 and was limited to discrete issues such as the 1999 Agreement, summarizing 1999 audited financial statements, negotiation of the Lease Program Agreement, and the I-RaMPP program. Documents allegedly supporting SNAPP's damage claims date back prior to 1999 and involve issues in which Vetter had no direct involvement, such as cost savings processes and documentation and the parties' understanding of the profit target.

### 3. Thacker

Thacker's testimony at the hearing was very limited. The only input he testified to as to SNAPP's damage analysis was support for "SNAPP's industry knowledge indicating 19% savings" on claims relating to IMPACT and MRO commodities - claims

14

which have since been dismissed from the case. As the Court noted at the hearing, Thacker was not competent to lay a foundation for SNAPP's damage claims:

> The Court: [Thacker] does not know that much about the details of the Frazee Report and the items in it to testify to it completely. He was removed from it. He knows generally, he knows generally, but he doesn't know the details, to justify it, and that's why I stopped you. I'm not saying he's not a believable person. I'm not saying he's not an honest person. I'm not saying he's not a successful person. But a witness who doesn't have knowledge to support the factual predicate or the expert testimony is not credible.

5/5/08 Tr. at p. 211. Thus, Thacker cannot lay the foundation for SNAPP's damages.

### 4. Other Witnesses

In its response, SNAPP says it will produce additional fact witnesses and damages proofs at trial to "present foundational testimony . . . to Mr. Thacker and Mr. Vetter." SNAPP's Response at p. 29. This statement does not save Frazee's report. Clearly, SNAPP's statement shows that it implicitly concedes that it has failed to provide an adequate foundation for the Frazee report. At no time at the hearing did SNAPP indicate that other witnesses were necessary to fill in the factual predicate and did not take the position that other witnesses must be examined.

### C. Identifying the Source Documents

Finally, and not insignificantly, despite its protestations to the contrary, SNAPP has not provided Ford with meaningful access to the documents which SNAPP says underlay the damage calculations, i.e. the source documents. This is important because even if SNAPP was able to use Frazee, Vetter, or Thacker as a summary witness, Rule 1006 requires that the proponent of the documentation made the documents available. This availability requires more than just "passive availability."

15

See Maris Equip. Co., Inc. v. Morganti, Inc., 163 F. Supp. 2d 174, 201-202 (E.D.N.Y. 2001). Likewise, in order for Ford to be able to understand SNAPP's damages in the Rule 702 context, Ford must be given the source documents. Thus, SNAPP's contention that the source documents have been produced to Ford at various points in the litigation, are contained in the 961 boxes of documents in a warehouse, and that many are Ford documents, falls short. As Ford states:

> While it is possible that Ford "saw" the documents at some point in the litigation or business relationship among the hundreds of documents exchanged, this is not the functional equivalent of being made specifically aware, by the party proposing the summary, that a particular document or documents will be used in support of a damages analysis. Simply claiming that all documents were always available to Ford is not sufficient, because the "availability" contemplated by F.R.E. 1006 only is meaningful if Ford is able to understand the underlying data in the relevant damage analysis context of the Frazee Report and attached summaries. Thus, Ford's actual objection is to SNAPP's insistence that the documents on which its summaries allegedly are based were "made available," even though SNAPP has never, at any point, identified and segregated precisely which documents support each individual summarization of a damages component.

Reply brief at p. 15-16.

At oral argument, counsel for Ford tracked SNAPP's documentation which purports to support its cost savings claim which illustrates the problematic nature of SNAPP's proofs. As noted above, Frazee testified that the documentation for the in costs savings was derived from Exhibit H-1 to Expert Report which we now know was prepared by Vetter. Exhibit H-1 of the Expert Report (a portion of which is attached here as Exhibit 3) is listing of suppliers and savings numbers. Exhibit H-1 of the Supplemental Report (a portion of which is attached here as Exhibit 4) is also a listing of what appears to be the same suppliers; however, the cost savings are broken down into

16

intervals and the numbers are significantly lower.[8] Frazee testified that the documents supporting H-1 were contained in Exhibit Q (attached here at Exhibit 5) to the report and supplemental report.[9] Exhibit Q consists of seven pages and each page has two columns headed "Description" and "Citation." The description column contains entries like supplier reports, supplier invoices, and various other entries. The citation column contains reference entries such as SNAPP trial exhibit numbers, SNAPP summary judgment exhibit numbers, and notably, SNAPP documents in boxes identified only by box number. According to counsel for Ford, the number of boxes of documents referenced in Exhibit Q totals approximately 720. Exhibit Q does not provide any meaningful insight into how SNAPP derived the cost savings figures; rather, it is simply a listing of a description of a document or documents and where it may be located. During the course of the hearings, SNAPP produced Exhibit 23, asserting that the document provided further support for its cost savings claim. Putting aside that Exhibit 23 was never produced during discovery or designated as a trial exhibit, Exhibit 23 (attached here as Exhibit 6), much like Exhibit H-1, lists thousands of suppliers and numbers with no underlying analytical detail, no underlying information. None of this information is meaningful document information from which the figures supporting SNAPP's cost savings damages of 242 million dollars can be ascertained.

    SNAPP has been directed from the very early stages of this case to articulate

---

[8]SNAPP initially sought 1.3 billion dollars in cost savings. It now seeks 242 million dollars. The reduced amount is due to the removal of SNAPP's claim for cost savings damages based on MRO commodities.

[9]Exhibit Q to the Expert Report and Supplemental Report are identical.

and explain its damages. While a lot of paper has been filed, SNAPP has simply failed to provide a coherent explanation of its damages. Frazee's reports and related testimony fall short.

IV. Conclusion

In the end, the Court's observation at the hearing that the Frazee report rests on a "foundation of sand" has held true. Frazee's report, as evidenced by his testimony, does not satisfy Rule 702. Neither Vetter nor Thacker's testimony nor Vetter's affidavit alter this conclusion.

Ford's motion to strike damage analysis and related testimony is GRANTED.

Ford shall within ten (10) days amend its motion for partial summary judgment filed in conjunction with the instant motion.

SO ORDERED.

      s/Avern Cohn
      AVERN COHN
      UNITED STATES DISTRICT JUDGE

Dated: December 23, 2008

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, December 23, 2008, by electronic and/or ordinary mail.

      s/Julie Owens
      Case Manager, (313) 234-5160