UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**SNAPP SYSTEMS, INCORPORATED,**

        Plaintiff,            **HONORABLE AVERN COHN**

   v.

                    **No. 03-74357**

**FORD MOTOR COMPANY, et al.,**

        Defendants.
_____/


**DEPOSITION OF THOMAS FRAZEE**
**IN OPEN COURT REGARDING**
**FORD'S MOTION TO STRIKE SNAPP'S FINAL DAMAGE REPORT**

**Wednesday, February 27, 2008, Volume 2**

-   -   -

Appearances:

| | |
|---|---|
| E. Powell Miller | Kenneth J. McIntyre |
| David H. Fink | Michelle Alamo |
| Melissa Raycraft | L. Pahl Zinn |
| The Miller Law Firm | Dickinson Wright, PLLC |
| 950 W. University Drive | 500 Woodward Avenue, #4000 |
| Rochester, Michigan 48307 | Detroit, Michigan 48226 |
| (248) 841-2200 | (313) 223-3500 |
| Attorneys for Plaintiff | Attorneys for Defendants |


-   -   -

*To Obtain a Certified Transcript, Contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan  48226*
*(313) 965-4401*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

*Deposition of Thomas Frazee*
*Wednesday, February 27, 2008, Volume 2*

# I N D E X

Deposition                                                    Page   Vol.

     Cross-Examination By Mr. McIntyre: (Cont'd) 4      2

     Cross-Examination By Ms. Alamo:              116      2

Certification of Reporter .....................156

- - -

Exhibits

     Number                              Referred Vol.

       14       ................................28      2

       14a      ................................30      2

       15       ................................51      2

       16       ................................56      2

       17       ................................58      2

       18       ...............................106      2

       19       ...............................116      2

       20       ...............................117      2

       21       ...............................135      2

       22       ...............................139      2

- - -

*Deposition of Thomas Frazee*
*Wednesday, February 27, 2008, Volume 2*                    3

1                                    Detroit, Michigan

2                                    Wednesday, February 27, 2008

3                                    10:08 a.m.

4                              -    -    -

5          **THE CLERK:**  Case Number 03-74357, *SNAPP v. Ford*.

6          **THE COURT:**  Be seated.

7          Okay.  Is the witness here?

8          **MR. FINK:**  Yes, Your Honor.

9          **THE COURT:**  Would you have him take the stand.

10   You have already been sworn.  I believe when we recessed the

11   witness was under cross-examination?

12          **MR. McINTYRE:**  Correct, Your Honor.

13          **THE COURT:**  And the cross-examination was not

14   complete?

15          **MR. McINTYRE:**  Correct, Your Honor.

16          **THE COURT:**  So the cross-examination is to be

17   continued?

18          **MR. McINTYRE:**  Yes, Your Honor.

19          **THE COURT:**  Go ahead.

20          **MR. FINK:**  Your Honor, may I ask one quick

21   question at the outset?

22          **THE COURT:**  Go ahead.

23          **MR. FINK:**  I just wanted to know if the Court has

24   a particular schedule in mind today for the time for cross

25   and the time for redirect.

1          **THE COURT:**  No.

2          **MR. FINK:**  Thank you, Your Honor.

3          **THE COURT:**  I didn't previously set a schedule,

4    did I?

5          **MR. McINTYRE:**  No.

6          **THE COURT:**  No.

7          **MR. McINTYRE:**  May I commerce examining the

8    witness, Your Honor?

9          **THE COURT:**  Go ahead.

10                        **-   -   -**

11                   **CROSS-EXAMINATION**

12          (Continued from Thursday, January 17, 2008)

13   **BY MR. McINTYRE:**

14   **Q.**   Good morning, Mr. Frazee.

15   **A.**   Good morning.

16   **Q.**   For the record we were previously introduced.  My name

17   is Ken McIntyre.  I'm one of the lawyers for the defendant,

18   Ford Motor Company.

19          **MR. FINK:**  Your Honor, I know Mr. McIntyre doesn't

20   mean to do it, but he is standing right between me and the

21   witness.

22          **MR. McINTYRE:**  I'd be happy to move.

23          **THE COURT:**  Move it flush against the jury box.

24          **MR. FINK:**  Thank you, Your Honor.

25          **MR. McINTYRE:**  Can you see, David?

1          **MR. FINK:**  Yes, I can see fine.  Thank you.

2          **MR. McINTYRE:**  One bit of housekeeping,

3    Your Honor.  In order to move along with respect to using

4    exhibits, I have provided counsel, the Court and the witness

5    with a black three-ring binder with tabs.  You will notice

6    that the exhibits are in the binder for Tabs 1 through 13,

7    which were the exhibits marked at our first installment of

8    this disposition.  My plan is to introduce further documents

9    which have been three-hole punched and then counsel, the

10   witness and the Court, if it's amind to, can just slip them

11   behind the tab in the binder.

12         **THE COURT:**  Is this my book?

13         **MR. McINTYRE:**  I gave it to your clerk,

14   Your Honor.  You can see it contains the first 13 exhibits.

15         **THE COURT:**  Go ahead.

16         **MR. McINTYRE:**  Okay.

17   **BY MR. McINTYRE:**

18   **Q.**   Mr. Frazee, I want to refer you -- I'm going to ask

19   some questions about component 2 of your damage study, which

20   is the component relating to cost savings and that component

21   is described at Page 10.

22         **THE COURT:**  Hold on one second.

23         Go ahead.

24   **BY MR. McINTYRE:**

25   **Q.**   I draw your attention to --

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    6

1          **THE COURT:**  Where is it?

2          **MR. McINTYRE:**  I'm referencing Mr. Frazee's

3    report, Page 10, which starts out Component 2, Savings

4    Sharing, and I believe that's Exhibit 1 that was introduced

5    by Mr. Fink.

6    **BY MR. McINTYRE:**

7    **Q.**   Do you have that before you, Mr. Frazee?

8    **A.**   I do.

9          **MR. McINTYRE:**  Does the Court and everybody else

10   have it for purposes of reference?

11   **BY MR. McINTYRE:**

12   **Q.**   You state there, and correct me if I'm wrong, you say

13   the mechanism for calculating savings under the contract is

14   to basically take, i.e., base price less SNAPP's cost.  Is

15   that the basic mechanism that we're talking about?

16   **A.**   That's how the report reads.  That's the language of

17   the contract.

18   **Q.**   Now, in that regard --

19         **THE COURT:**  Wait a minute.

20        (Discussion held off the record.)

21         **THE COURT:**  What section are you referring to?

22         **MR. McINTYRE:**  I just referred to Page 10 of his

23   report, Component 2, Savings Sharing.

24         **THE COURT:**  I've got that.  Then you referenced

25   what?

1          **MR. McINTYRE:**  We just referenced the top

2    paragraph under basis for claim, and I was reiterating that

3    the basic mechanism for determining cost savings was a

4    simple formula of finding the base price for the commodity

5    and subtracting SNAPP's cost for the commodity, which

6    results in the total savings, which, according to the paper,

7    is divided by 50 percent and SNAPP is entitled to 50 percent

8    of the total savings.

9    **BY MR. McINTYRE:**

10   **Q.**   Is that a fair summary, Mr. Frazee?

11   **A.**   I'm sorry, I thought you were talking to the judge.

12   **Q.**   I was.  I don't know if you were listening, but I was

13   wondering if you thought my rendition to the judge was

14   basically correct.

15   **A.**   The contract basically describes savings to be the

16   difference between the base price and SNAPP's cost.

17   **Q.**   Exactly.

18   **A.**   And then the contact also says that the savings are to

19   be divided equally.

20   **Q.**   And then the total cost savings claimed by SNAPP is set

21   forth in Exhibit H to your report, correct?

22   **A.**   No.

23   **Q.**   H-1?

24   **A.**   No, that's an element of the cost savings.

25   **Q.**   That sets forth actual cost savings by supplier?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*

8

1    **A.**   For a certain period of time and for a certain type of

2    commodity, IT commodities.

3    **Q.**   Does this include all of the savings to which SNAPP is

4    claiming for the IT commodities, Exhibit H-1?

5    **A.**   No.  Just to be clear, Exhibit H-1 covers a certain

6    period of time, which is roughly 1991 through

7    September 30th of 1999, and it covers only those commodities

8    that were actually purchased.  So it doesn't include

9    commodities that I have classified as leaked revenue, which

10   are other schedules within the report.

11            **THE COURT:**  What are the other commodities?

12            **THE WITNESS:**  There are commodities -- in terms of

13   leaked revenue there were additional IT commodities that

14   SNAPP was not able to procure.  They did acquire some but

15   not all, and then there were additional commodities that I

16   have referred to in the past as MRO commodities, which

17   stands for maintenance, repair and operating supplies.

18   Mr. McIntyre described that in the last hearing as being

19   things like brooms and goggles, those kinds of commodities.

20   So damages or savings associated with those commodities that

21   SNAPP was unable to purchase are not included in

22   Exhibit H-1.  They are included elsewhere.

23            **THE COURT:**  Well, if SNAPP was unable to purchase

24   them, how is it entitled to a cost saving on them?  Who

25   purchased them?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*

9

1          **THE WITNESS:**  My understanding is that Ford

2     purchased them, and the reason for their inclusion, the

3     reason for inclusion of damages associated with those

4     purchases is that SNAPP believes it has a contractual right

5     to have purchased those commodities.

6          **THE COURT:**  But you just said those are

7     commodities that SNAPP could not purchase.

8          **THE WITNESS:**  If I did say that, I misspoke,

9     Your Honor.  I meant to say that SNAPP did not purchase, not

10    that it could not, it just did not.

11         **THE COURT:**  Pardon?

12         **THE WITNESS:**  What I meant to say if I wasn't

13    clear was not that SNAPP couldn't purchase these

14    commodities.  The fact is that SNAPP didn't purchase the

15    commodities.

16         **THE COURT:**  Well, what's the difference between

17    those commodities and the leaked commodities?  I thought the

18    leaked commodities were those that Ford went out on its own

19    and bought that it should have allowed SNAPP to buy.

20         **THE WITNESS:**  You are correct.  I am also speaking

21    about leaked commodity purchases.  That's what I've been

22    referring to.

23         **THE COURT:**  Well, you just said there were

24    two different classes, one leaked and the other these

25    maintenance commodities.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                10

1          **THE WITNESS:**  No, I'm sorry.  Let me be clear.

2    The leaked, the leaked volumes can be broken down into

3    two subcomponents.  One is the MRO commodity, which I just

4    referred to, and the second is additional IT commodities

5    that SNAPP didn't purchase for Ford.

6          **THE COURT:**  But it should have purchased for Ford?

7          **THE WITNESS:**  Correct.

8          **THE COURT:**  In other words, it's SNAPP's theory

9    that it had an exclusive right to buy this stuff and Ford

10   had no right on its own to buy the commodity, et cetera,

11   covered by the contract?  That Ford didn't reserve the right

12   to independently purchase something?

13         **THE WITNESS:**  My understanding is that SNAPP's

14   position is that the contract provided for SNAPP to be the

15   exclusive acquirer of certain commodities and that Ford did

16   not --

17         **THE COURT:**  Had no right on its own to buy

18   anything within this framework?

19         **THE WITNESS:**  Without a violation of the contract,

20   that's my understanding.

21         **THE COURT:**  Well, Ford signed a contract that

22   disabled it from making direct purchases?  That's your

23   understanding?

24         **THE WITNESS:**  Yes.  My understanding is that

25   Ford --

1      **THE COURT:**  And if you are wrong, if you are wrong

2  on that understanding, how does that effect your report?

3      **THE WITNESS:**  Well, Your Honor, I have prepared

4  specific calculations and specific schedules that lay out

5  the effects of that assumption, and the conclusions of

6  damages would decline if that is not found to be a

7  contractual right that SNAPP has.  That's my assumption.

8      **THE COURT:**  Just one more question.  I don't want

9  to interrupt you, but I'm trying to -- you may get to this.

10  When you say there's a base price and SNAPP's cost, how did

11  you arrive at the base price?

12      **THE WITNESS:**  That the base price -- are you

13  asking me in a mathematical sense or in a descriptive sense?

14      **THE COURT:**  Descriptive sense.

15      **THE WITNESS:**  Okay.  The base price is a defined

16  term in the contract that describes how it's -- how the

17  number is to be determined.  So, for example, if you look at

18  the bottom of Page 10 of my report in the last paragraph on

19  that page the first sentence is right from the contract and

20  it defines the base price as the base price shall be defined

21  as the estimated cost for an item or service as provided by

22  the Ford requisitioner, which is essentially a buyer or a

23  buyer type within the Ford organization, or it shall be the

24  first official quote from a supplier where the estimated

25  cost is not provided by Ford.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    12

1                  And later on there is an additional sentence in

2      this paragraph again still on Page 10 of my report that

3      notices that there may be situations where the Ford buyer

4      establishes what's called a target price, and again, there

5      is a definition for that.  So that's how the base price is

6      determined.

7                  **THE COURT:**  So you have cumulated all of these

8      base prices and all of these purchases for a nine-year

9      period, right?

10                 **THE WITNESS:**  Exhibit H-1 cumulates those

11     transactions between 1991 and September of '99.

12                 **THE COURT:**  Wasn't there in the contract something

13     that each year there was to be an accounting and computation

14     as to what SNAPP was entitled to from Ford?

15                 **THE WITNESS:**  I don't believe so, Your Honor.

16                 **THE COURT:**  So, so this, this savings amount was

17     sort of like a running amount that kept accumulating, and

18     all of a sudden at the end of the nine years SNAPP presents

19     a bill for it?  Eight years?  Is that what happened?

20                 **THE WITNESS:**  Well, I think that the -- I mean

21     there's a couple of parts to your question.  Number one, was

22     the cost savings number accumulating?  The answer is at some

23     level, yes.  There were certain cost savings that were paid

24     by Ford.  There were certain that were --

25                 **THE COURT:**  No, wait.  Just how much was the total

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    13

 1    that you say they are entitled to for cost savings?  How

 2    much is the aggregate that you are going to testify to that

 3    SNAPP is entitled to as a consequence of Ford's failure to

 4    compensate them for its 50 percent of the cost savings?

 5              **THE WITNESS:**  If you just give me a minute, I will

 6    give you an answer on that.

 7              The answer to that is broken into two parts that

 8    total up to approximately 2.7 billion.

 9              **THE COURT:**  2.7 billion?

10              **THE WITNESS:**  Yes.  And the two parts that make up

11    that total are found on the bottom of Exhibit G, which

12    covers the --

13              **THE COURT:**  I don't care.  Just the figure.

14    $2.7 billion?

15              **THE WITNESS:**  Yes, but, Your Honor --

16              **THE COURT:**  That Ford owes SNAPP $2.7 billion on

17    this cost savings element?

18              **THE WITNESS:**  Yes.

19              **THE COURT:**  That's your position?

20              **THE WITNESS:**  That's my opinion.

21              **THE COURT:**  Okay.  Did periodically SNAPP ever

22    bill Ford for this?

23              So your opinion is that Ford has an accrued

24    liability of $2.7 billion that it owes, so Ford was

25    understating either its losses, if those were loss years, or

1    understating -- or overstating its profits because in fact

2    Ford had all of these liabilities to SNAPP each of these

3    years and this amount kept increasing?

4              **THE WITNESS:**  The simple answer is --

5              **THE COURT:**  Is that your position?

6              **THE WITNESS:**  The simple answer is for some years

7    yes, for other years no, and here is why.  Part of the

8    damages that we are talking about that are incorporated into

9    that 2.7 billion relate to the element of this damage claim

10   that relates to good faith renewal.  In other words, the --

11             **THE COURT:**  Well, no, I'm just -- I'm going to

12   stop.

13             You continue, Mr. McIntyre.  I'm going to stop

14   asking any questions because if I keep going I'll take it

15   over and I shouldn't.  No, you just keep going and we'll see

16   where this all goes.

17   **BY MR. McINTYRE:**

18   **Q.**   Looking at Page 10 of your report, Component 2, Savings

19   Sharing, you cite to Section 4.3 of the Framework Agreement

20   in the middle of the page, correct?

21   **A.**   Yes.

22   **Q.**   And you cite the section entitled Savings Due to Price

23   Negotiations.  Is that what you were citing to when you were

24   telling the Court about the mechanism for defining the base

25   and the cost?

1    **A.**    Yes, I was reading the contractual language.

2    **Q.**    Now, it is the position in your report that SNAPP is

3    entitled to cost savings of several types, and I would draw

4    your attention to Page 11 of your report, and at Page 11 of

5    your report down toward the bottom of your calculation you

6    say, and I quote:

7                    "Reported IT commodities and actual

8                    IMPACT activity, as is indicated in

9                    Exhibit H, SNAPP's analysis indicates

10                   that a generated savings equal to

11                   approximately 41.5 percent of SNAPP's

12                   costs.  While this percent varied by

13                   supplier, the savings were generated

14                   from a combination of specific supplier

15                   negotiations, investments made by SNAPP,

16                   and the reduction in Ford's

17                   administrative costs due to SNAPP."

18                   It's true, isn't it, that in connection with the

19   first component of the combination you cite there, the

20   "specific supplier negotiations," there was a protocol and

21   there were forms for the submission of cost savings claims

22   in connection with savings resulting from specific supplier

23   negotiations; isn't that true?

24   **A.**    There were, as I testified last time, there were a

25   series of protocols.  It wasn't a singular, it was a plural,

1    and there were multiple forms.

2    **Q.**   But you would agree with me that there were a number of

3    protocols and a number of different types of forms, but as

4    you say at the beginning of your discussion at Page 10,

5    SNAPP would submit claims to Ford for the savings

6    attributable to savings due to price negotiations.  They

7    would submit a claim form through a protocol, although the

8    type of claim form and protocol would vary; do you agree

9    with me on that?

10   **A.**   Yes, but with the caveat also that they would only be

11   able to submit claims for savings that there were aware of.

12   So if there was information that SNAPP didn't have, it would

13   be unable to submit it under the protocol.

14   **Q.**   Well, what information was unavailable to SNAPP and

15   they were unavailable or unable to submit a claim under the

16   protocol?

17   **A.**   Well, for example, there are transactions which -- and

18   purchases that Ford made directly with suppliers that SNAPP

19   wasn't aware of during the course of the relationship and so

20   wouldn't have been able to submit savings claims related to

21   those because they were never given the opportunity to

22   purchase the commodity in the first place.

23   **Q.**   Aren't those leaked revenues?

24   **A.**   That would relate to leaked revenue.

25   **Q.**   We are not talking about leaked revenues at Page 11 of

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    17

1    your report.  Those are entitled reported IT commodities and

2    actual IMPACT activity.  That's what you are referencing

3    there, correct?

4    **A.**   Well, again, Page 11 --

5    **Q.**   And then down below you say IT commodities included as

6    leaked revenue, correct?

7    **A.**   Well, you are reading my report accurately.

8    **Q.**   Yeah.

9    **A.**   I am trying to answer the question you posed, which is

10   what are the situations where SNAPP would be unable to

11   submit a claim for savings.  I gave you one example --

12   **Q.**   And my question was in the context of Page 11 (1),

13   Reported IT Commodities and Actual IMPACT Commodities.  I'm

14   talking about the reported IT and the actual IMPACT.  I'm

15   not talking about leaked.

16   **A.**   That's fine.  Your question wasn't clear in that aspect

17   so I apologize.

18   **Q.**   But in the context of reported IT and actual IMPACT, to

19   the extent that there were savings due to specific price

20   negotiations, claims were made due to a series of protocols

21   and a series of forms, correct?

22   **A.**   As I understand it.

23   **Q.**   My next question is, well, was there a protocol and

24   claim forms used where there was investments made by SNAPP?

25          Your report seems to suggest -- and why don't you

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                18

1    start out correcting me if I'm wrong on this.  In connection

2    with the claim for cost savings it is clear, and I assume

3    you would agree with me, that SNAPP is claiming cost savings

4    which it was entitled to that it didn't get in connection

5    with specific negotiated transactions.  That's one element,

6    correct?

7    **A.**   Yes.

8    **Q.**   Now, as to that element are you aware of any particular

9    claim for cost savings that was submitted and denied?  Can

10   you name a single transaction where that occurred?  Can you

11   identify a single specific transaction?

12   **A.**   Just so I'm clear, are you asking me are there

13   transactions where SNAPP submitted a claim and it was

14   denied?

15   **Q.**   Yes.

16   **A.**   Yes.

17   **Q.**   Do you have an analysis, a study, a list of those

18   transactions where they claimed savings of X and they were

19   only granted savings of part of X or X was totally denied?

20   Is there some analysis somewhere so that I can go and look

21   and see what are the specific claims they say they submitted

22   and they were denied?

23   **A.**   Well, I think you can go to documents that are

24   described in my report, but I'll refer you to

25   one specifically.  The parties prepared something that was

 1     regularly exchanged.  It summarized all of the submissions

 2     or many of the submissions that SNAPP made with regard to

 3     cost savings.  These kinds of reports are referred to as an

 4     EBEL, E-B-E-L, report, and that type of document would give

 5     you the type of information that you are asking about.

 6     **Q.**   My question is in connection with the computation of

 7     damages have you or SNAPP prepared a summary that sets forth

 8     the specific item transactions where a claim was made for

 9     savings and either was denied or denied in part and you list

10     them and add them up?

11     **A.**   Again, the document I'm referring to as --

12     **Q.**   I'm not talking about going into some original

13     documents.  I'm asking, you have got a dollar number here in

14     your report of 1.46 billion for reported IT commodities and

15     actual IMPACT activity savings that you are entitled to, and

16     one of the aspects of that is, as you say in your report at

17     Page 11, "specific supplier negotiations" where they weren't

18     paid what they were entitled to get for specific supplier

19     negotiations.

20          Now, I want to know has there been a summary

21     prepared listing the specific supplier negotiations and/or

22     the claims that were made and denied in part or denied in

23     full.  Is there some document, some analysis done in

24     connection with your report?

25     **A.**   I want to make sure you are understanding my report so

1    I can answer.

2            **THE COURT:**  No, sir, that calls for a yes or no

3    answer or I can't answer it yes or no or I don't understand

4    the question.

5            **THE WITNESS:**  I can't answer it yes or no.

6    **BY MR. McINTYRE:**

7    **Q.**   Okay.  Let me ask it this way.  On Page 11 of 19 you

8    are claiming $1.46 billion for failure to pay cost savings

9    to which SNAPP is entitled for reported IT and actual

10   IMPACT.  How many dollars of the 1.46 billion are

11   attributable to instances in which SNAPP made claims for

12   savings due to price negotiations and that claim was denied

13   in full or denied in part?  What dollar amount relates to

14   not paying claims that were submitted?

15   **A.**   I can't, I can't tell you that as I sit here right now.

16   I don't know the answer to that.

17   **Q.**   Let me ask you this.  The next category you have is you

18   are saying there were these savings that were attributable

19   to specific cost savings, and then you are saying and then

20   there were these other savings that are attributable to

21   "investments made by SNAPP."  Of the $1.416 billion, what

22   percentage or what dollar amount is attributable to

23   "investments made by SNAPP" for which SNAPP wasn't to be

24   paid?

25   **A.**   There is not a specific dollar amount for each of the

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*

1   clauses here that are separated my commas in my report.  The

2   point of the language in the report was to describe those

3   things that drive cost savings, and just to let me finish my

4   answer, those three things are listed here and they operate

5   in combination to generate the cost savings.  So it is not a

6   situation where there were three separate calculations that

7   are then added together to equal 1.416 billion.  These are

8   being provided to help provide background and context for

9   the calculation.

10  **Q.**   These are just background and context?

11  **A.**   It's there in this format with commas between them to

12  assist the reader in understanding why this number is

13  relevant.

14  **Q.**   Well, what are the investments made by SNAPP that SNAPP

15  claims are really cost savings?

16  **A.**   If you read the full sentence, it says the savings were

17  generated from.  It doesn't say that those investments are

18  cost savings.  It says that they were generated from.

19  **Q.**   What are the investments made by SNAPP that savings

20  were generated from?  What are these investments that

21  supposedly SNAPP made that somehow caused savings that

22  somehow caused SNAPP to be entitled to money that Ford

23  didn't pay?  What are the investments that were made?

24  **A.**   I'll give you examples.  One example is that SNAPP

25  invests in the things, the software, the people, the

1    processes necessary to support Ford's purchasing activities

2    in Europe, and specifically with regard to, for example,

3    some of the things that Ford was doing, purchasing from

4    Wang, purchasing of PC's and other software.  That's just an

5    example.  It's one of the types of investments that SNAPP

6    makes.

7    **Q.**    Using your example, where, if anywhere, in Section 4.3

8    entitled Savings Due to Price Negotiation does it include

9    the type of activity that you have just described as a cost

10   savings?

11   **A.**    Well, again, you are misquoting me because I just

12   corrected that misapprehension that the point of this

13   sentence was the savings were generated from these things,

14   not that they are equivalent to cost savings.  So your

15   question is implying that each of these items has to be in

16   Paragraph 4.3.  The reality is is that these things effect

17   SNAPP's cost, which is a contractual element shown in

18   Paragraph 4.3.  That's the point.

19   **Q.**    You are saying that if they purchase something and that

20   effects their costs that that could be a savings that comes

21   within the ambit of 4.3 entitled Savings Due to Price

22   Negotiations?

23           How does a savings attributable to "investments

24   made by SNAPP" come to be included as a "savings due to

25   price negotiations"?

1          My question is:  What's it have to do with price

2     negotiations and the savings attributable thereto?

3          **THE COURT:**  Hold on to that question.  Come on up

4     here.

5          (Recess from 10:38 a.m. until 10:40 a.m.)

6          **THE COURT:**  Go back, Mr. McIntyre.  I'm sorry I

7     interrupted you.

8          Do you know what your question was?

9          **MR. McINTYRE:**  I do.  I'm going to re-ask it.

10    **BY MR. McINTYRE:**

11    **Q.**   I understand your point that investments made by SNAPP

12    somehow translate into savings.  Was that the point you were

13    making?

14    **A.**   Yes.  Ultimately that's --

15    **Q.**   My question is:  Is it your position that those types

16    of savings attributable to investments come within the ambit

17    of Section 4.3 that on its face is limited to "savings due

18    to price negotiations"?

19    **A.**   Well, you have two questions there.  Is 4.3 limited to

20    savings due to price negotiations or is it a heading that's

21    not -- that has no bearing in terms of legal construction,

22    but --

23    **Q.**   That's a great question.  Why don't you answer that

24    one?

25    **A.**   Well, I can't, and that's my point, but the question

1    that you are posing is:  Does SNAPP's activities, its

2    investments, allow it to generate savings for Ford?  The

3    answer is yes because investments are the things that allow

4    SNAPP to reduce base, I'm sorry, to reduce its cost of

5    acquisition.  It can buy things for less because it has made

6    investments, and that benefit inures to Ford as a result,

7    i.e., it is a cost savings.

8    **Q.**   During the course of the relationship between the

9    parties are you aware of any claim or request for approval

10   that was submitted to Ford by SNAPP for savings attributable

11   to investments by SNAPP?

12   **A.**   I think the answer to that is yes.  Again, I don't --

13   you have to understand that the protocol and the forms, you

14   wouldn't have put on the form SNAPP made an investment,

15   please share that savings.  Again, the investment causes a

16   savings.  That savings is put on to the form and then

17   submitted to Ford.  It's a, for lack of a better term,

18   two-step process.

19   **Q.**   Well, isn't it true that things like the cost of

20   investment were to be covered in the 5.5 percent markup?

21   Isn't that the purpose of the markup, to cover their

22   investment and their cost?

23   **A.**   I don't know that that's factually true at all.

24   **Q.**   You mentioned earlier that, in response to the judge's

25   question, that if SNAPP did not prevail on its theory that

1    SNAPP was entitled to recover on IMPACT going into the

2    future for the good faith nonrenewal that certain parts of

3    the claims would not survive.  Do you remember that

4    testimony?

5    **A.**   I think it was a little different.  I thought the

6    judge's question was if it is found that SNAPP didn't have

7    some sort of exclusive right to acquire the leaked

8    commodities, whether they be MRO commodities or IT

9    commodities, if SNAPP doesn't have that right would that

10   effect my calculation.  The answer is absolutely yes, it

11   would.

12   **Q.**   Would it effect your entire calculation or just

13   portions of it?

14   **A.**   It would affect portions of it.

15   **Q.**   Which portions?

16   **A.**   I would have to think probably through that fully, but

17   if leaked revenues are not an element of SNAPP's damages, I

18   would expect that it would effect the categories of this

19   calculation that deal with leaked revenue, which includes

20   both leaked revenue that has been measured between 1991 and

21   1999 and leaked revenue that was measured for the period

22   between, well, the three-year period following the

23   expiration of the Framework Agreement.

24   **Q.**   Looking at Page 11 of your report that we have

25   discussed before under Reported IT Commodities and Actual

1    IMPACT Activity, you have got a parenthetical figure of

2    1.46 billion?

3    **A.**    1.416.

4    **Q.**    Yeah, billion.  And then I draw your attention to

5    Exhibit H-1 entitled Actual Savings by Supplier.  Is this

6    the actual savings by supplier for reported IT commodities

7    alone or does it also include actual IMPACT activity?

8              **THE COURT:**  You know, I keep losing the glossary.

9    Define again for me IT commodities.

10             **THE WITNESS:**  Is that question directed to me?

11             **THE COURT:**  Anybody can answer it.

12             **MR. McINTYRE:**  Go ahead, Mr. Frazee.

13             **THE WITNESS:**  The IT stands for information

14   technology.

15             **THE COURT:**  What's that, software?

16             **THE WITNESS:**  Yeah, and the types of things that

17   would be under that would include software, licenses,

18   hardware so, in other words, an actual computer, services

19   that are associated with, for example, maintenance.  When

20   you buy the software, you expect to be able to call

21   technical support, and there is a service there.  Those are

22   just examples.

23             **THE COURT:**  Wait a minute.  And what are IMPACT

24   activities?

25             **THE WITNESS:**  IMPACT, Your Honor, is the name of a

1    program that covers essentially what I have referred to as

2    MRO commodities.  MRO stands for maintenance, repair and

3    operating.

4            **THE COURT:**  You just said there was maintenance

5    under IT.  What's the difference?

6            **THE WITNESS:**  I'm sorry?

7            **THE COURT:**  Never mind.

8            Go ahead.  Okay.  Go ahead.

9    **BY MR. McINTYRE:**

10   **Q.**  My question is can you explain --

11           **THE COURT:**  Oh, wait a minute.  Leaked revenue is

12   where Ford did it and shouldn't have, right?

13           **THE WITNESS:**  That's correct.

14           **THE COURT:**  Ford acted directly in contravention

15   of its contractual obligation to SNAPP as the exclusive

16   buyer, right?  Is that a fair statement?

17           **THE WITNESS:**  Yes, that's my understanding.

18           **THE COURT:**  Okay.

19   **BY MR. McINTYRE:**

20   **Q.**  Turning to Exhibit H to your report, H-1 entitled

21   Actual Savings by Buyer, you will note on the last page, 9,

22   it has a total of 1,243,603,596.  Does that figure include

23   reported IT commodities?

24   **A.**  Just give me a minute, please.

25   **Q.**  My question is:  Do you know whether or not that figure

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    28

1    includes reported IT commodities?

2    **A.**    Exhibit H-1 certainly includes IT commodities.

3    **Q.**    Does it include IT commodities in the 1,243,603,598?

4         **MR. FINK:**  I'm sorry, Your Honor.  He rattled a

5    number off.  I don't know what number.

6         **THE COURT:**  Which number?

7         **MR. McINTYRE:**  The total cost savings reflected on

8    Page 9.

9         **THE WITNESS:**  That total cost savings, again, does

10   reflect savings associated with IT commodities.

11   **BY MR. McINTYRE:**

12   **Q.**    Well, can you tell me why the number there is

13   1,243,000,000 and then the number you have at Page 11 is

14   1.46 billion?  Recognizing the one on Page 11 says IT

15   commodities and actual IMPACT activity.

16   **A.**    Yeah, the difference is that Exhibit H-1 doesn't

17   contain the cost savings associated with IMPACT.

18   **Q.**    Where are the IMPACT cost savings reported?

19   **A.**    Those are calculated on Exhibit G.

20         **THE COURT:**  Where?

21         **THE WITNESS:**  Exhibit G to my report.

22         **THE COURT:**  G?

23         **THE WITNESS:**  G, as in George.

24   **BY MR. McINTYRE:**

25   **Q.**    I would like to turn your attention to Exhibit H-1

1    entitled Actual Savings by Supplier, and then I want to draw

2    your attention to a new exhibit we are going to mark,

3    Exhibit 14, which I will hand to counsel and to the Court's

4    clerk and to the witness.

5           Now, you will note that Exhibit 14 is somewhat

6    similar to Exhibit 9.  It is more complete than 9; is that

7    correct?

8    **A.**   It's definitely longer than Exhibit 9.  It looks to be

9    the same email.

10   **Q.**   Okay.  Now --

11          **THE COURT:**  Wait a minute.  It's not the same as

12   Exhibit 9.

13          **MR. McINTYRE:**  Well, the first two pages were in

14   9, Your Honor, and then I'll represent that we received a CD

15   with Excel sheets on it and we then matched up Excel sheets

16   with the email and we found additional attachments to it.

17          **THE COURT:**  Go ahead.

18          **MR. McINTYRE:**  And, Your Honor, I have the actual

19   CD that Mr. Fink provided to me.

20          David, could we stipulate that this could be a

21   stipulated exhibit?

22          **MR. FINK:**  Your Honor, while obviously we can't

23   look at the CV and know if it's the right one, we certainly

24   did provide a CD and we stipulate to its admission.

25          **THE COURT:**  Go ahead.  You are representing

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                     30

1    that --

2              **MR. McINTYRE:**  So I'm going to give this to the

3    Court's clerk and submit it as a stipulated exhibit.

4              **THE COURT:**  What number?

5              **MR. McINTYRE:**  Let's call it 14A.

6              **THE COURT:**  Go ahead.

7    **BY MR. McINTYRE:**

8    **Q.**   Did you receive Exhibit 14 from Mr. Vetter?

9    **A.**   From Mr. Vetter, yes.

10   **Q.**   And did you receive it on or about its date of

11   Wednesday, September 5?

12   **A.**   I would assume so.

13   **Q.**   And that's about five days before you submitted your

14   final report in this matter dated September 10th?

15   **A.**   Is that a question?

16   **Q.**   Correct?

17   **A.**   Yes.

18   **Q.**   In the second sentence on the first page of Exhibit 14

19   Mr. Vetter says, "The change is to incorporate the

20   administrative savings into the amounts by supplier so that

21   it does not need to be shown separately."  What are the

22   administrative savings, if you know, that he's referencing

23   there?

24   **A.**   I think his reference is to the savings that, just so

25   I'm clear, this is my characterization of it, but it's

1    basically the savings that Ford realizes as a result of not

2    having to administer the number of suppliers that Ford was

3    passing off to SNAPP, not having to process as many purchase

4    orders or releases, which are the accounting documents that

5    would be now handled by SNAPP, and there are costs that Ford

6    avoids and that Ford saves as a result of having SNAPP

7    handle those issues.  That's in a nutshell what

8    administrative savings are.

9    **Q.**   Is it your position in your study and that of SNAPP

10   that those types of costs are cost savings that are in the

11   nature of "savings due to price negotiations" that are

12   claimable under Section 4.3 of the contract?

13   **A.**   It is my opinion that those types of amounts are

14   appropriately considered under Section 4.3.

15   **Q.**   And in your review of the protocols and claim forms did

16   you see any line items or provisions that those types of

17   administrative costs were claimable as a specific portion of

18   costs due to price negotiations?

19   **A.**   Just so that the record is clear on this, you keep

20   referring to savings associated with price negotiations.  I

21   think the better characterization is to use the definition

22   that's in Paragraph 4.3, and what that says is when

23   calculating cost savings you take Ford's base price and you

24   subtract SNAPP's cost.  To the extent that Ford's base price

25   should appropriately include the administrative costs of

1    handling the orders and handling the suppliers, then that's

2    an appropriate consideration to implement or to consider

3    when calculating the cost savings.

4    **Q.**   Do you know of any provision contained in the Framework

5    Agreement that specifically provides that including

6    administrative cost savings is appropriate under the

7    agreement?

8    **A.**   Again, with, with my --

9              **THE COURT:**  Yes or no.

10             **THE WITNESS:**  With my example here --

11             **THE COURT:**  Yes or no.  Witness, I'm becoming

12    impatient with you.  Answer the question yes, no, I can't

13    answer yes or no, or I don't understand the question.

14             Repeat your question, Mr. McIntyre.

15    **BY MR. McINTYRE:**

16    **Q.**   My point is this.  Do you know of any specific

17    provision contained in the Framework Agreement or the first

18    amendment to the Framework Agreement that says

19    administrative cost savings are retrievable as cost savings

20    under the formula in 4.3 of the agreement?

21    **A.**   That language is not in those agreements.

22    **Q.**   Now, for purposes of 4.3 it's true, isn't it, that the

23    base price and SNAPP's costs are different?

24             **THE COURT:**  Are presumed to be different.

25             **MR. McINTYRE:**  Yeah, and in fact are different.

1          **THE COURT:**  Were.

2     **BY MR. McINTYRE:**

3     **Q.**    Okay.  They are presumed to be different under the

4     contract, correct?

5     **A.**    I think so.

6     **Q.**    Okay.  Now, in this memo do you know why Mr. Vetter is

7     telling you to use this revised attachment instead of the

8     one from earlier today, and then he goes on, "The change is

9     to incorporate administrative savings in the amount by

10    supplier so that it does not need to be shown separately."

11          Do you have any personal knowledge as to why

12    Mr. Vetter didn't want to show the amount claimed by SNAPP

13    for administrative cost savings separately?

14    **A.**    I don't remember what that earlier version looked like,

15    in other words, the one that's referred to here in this

16    exhibit, so I can't really answer your question.

17    **Q.**    Okay.  Now, attached to his email at Page 2 he has a

18    document entitled Summary, and this is page two of

19    Exhibit 14.  Are you with me?

20    **A.**    Yes.

21    **Q.**    And you will note it says, "Damages from Breach of

22    Savings Sharing," and then "I. IMPACT," and then down at the

23    bottom of the discussion it says, "Administrative savings

24    per the attached spreadsheet 61,806,735," correct?

25    **A.**    Yes.

1    **Q.**   That's what it says.

2           **THE COURT:**  Is the difference between Exhibits 9

3    and 14 the attachments to 14?

4           **MR. McINTYRE:**  Yes, Your Honor.

5           **THE COURT:**  Thank you.

6    **BY MR. McINTYRE:**

7    **Q.**   Do you know of your own knowledge if this

8    administrative savings per the attached spreadsheet

9    61,806,735 is contained in Exhibit H-1, and if so, where and

10   how?

11   **A.**   My understanding is that it is not included in

12   Exhibit H-1.

13   **Q.**   And is that because it's cost savings for IMPACT?

14   **A.**   That's correct.  These are the -- this is the

15   50 percent share for SNAPP of these cost savings from that

16   IMPACT program.

17   **Q.**   And that would appear either in that amount or another

18   amount in Exhibit G, correct?

19   **A.**   Essentially, yes.

20   **Q.**   Okay.  Now, let's look at the attachment Mr. Vetter

21   gave you entitled actual IT Transaction Savings, Actual

22   Savings by Vender.  Do you have that in front of you?

23   **A.**   Yes.

24   **Q.**   And down at the bottom it says Cost Savings Damages

25   Calculation rev --

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*

1           Does that mean revision, do you think?

2   **A.**   Possibly.

3   **Q.**   -- 9-5, 2:00 p.m.  And if you compare the document

4   Mr. Vetter gives you entitled Actual Savings by Vender, it

5   is, for all practical purposes, identical to the document

6   you included as H-1 in your report.  Is that fair?

7   **A.**   Yes.  I think we talked about that at length in the

8   first part of this deposition.

9   **Q.**   But we didn't have Mr. Vetter's earlier version that he

10  gave you when we talked about H-1 before, did we?

11  **A.**   No, you didn't.  You had that CD in advance of the

12  first hearing.

13  **Q.**   But I hadn't reviewed it yet, had I, to your knowledge?

14  **A.**   I don't know.

15  **Q.**   But I want to know, other than some cosmetic changes,

16  did you make any changes that involve your own intellectual

17  analysis to change the Actual Savings by Vender that

18  Mr. Vetter gave you compared to Exhibit H-1 included in your

19  report?

20  **A.**   I think I testified about this the last time.  The

21  answer is that H-1 is based on Mr. Vetter's spreadsheet, and

22  I put it into my report in a little different format.

23  **Q.**   I want to talk about one change in the format.  If you

24  will note, Mr. Vetter in the last page of his that he sent

25  to you, he has the last line is "All other suppliers -

 1    administrative savings $1,362,207,978" for base price?

 2              **THE COURT:**  Where are you reading?

 3              **MR. McINTYRE:**  The last page of Mr. Vetter's

 4    document entitled Actual Savings by Vender.

 5              **THE COURT:**  What line?

 6              **MR. McINTYRE:**  The last line under All Other

 7    Suppliers Administrative Savings.

 8              **THE COURT:**  Wait.  What page?  Wait.  Oh, I see.

 9    All right.  That's the third-to-the-last page.

10              **MR. McINTYRE:**  Yes.  I'm sorry, Your Honor.  It's

11    the last page in the portion entitled Actual IT Transaction

12    Savings.

13    **BY MR. McINTYRE:**

14    **Q.**   Now I draw your attention to that page and then I'll

15    draw your attention to Page 6 of your Exhibit H, which --

16              **THE COURT:**  Page 6?

17              **MR. McINTYRE:**  Yes.

18              **THE COURT:**  H-1, right?

19              **MR. McINTYRE:**  H-1.

20    **BY MR. McINTYRE:**

21    **Q.**   You will note in your H-1 there is a reference to other

22    suppliers?

23              **THE COURT:**  Wait a minute.

24              Go ahead.

25

1    **BY MR. McINTYRE:**

2    **Q.**   And you have the same numbers that Mr. Vetter has in

3    his last line, all other suppliers?

4           **THE COURT:**  No, they are not the same numbers.

5           **MR. McINTYRE:**  Well, there is 1,352,894,568.

6    Slightly different.

7           **THE COURT:**  Under Vetter's it's 1362.

8           **MR. McINTYRE:**  Yeah, you are right.

9    **BY MR. McINTYRE:**

10   **Q.**   The final number for cost savings, 112,205,447, that's

11   the same, correct?

12          **THE COURT:**  Yep.

13   **BY MR. McINTYRE:**

14   **Q.**   My question is why, if you know, did you delete the

15   reference that he has in his All Other Suppliers to, dash,

16   administrative savings.  It's not in your reference to other

17   suppliers.

18   **A.**   Are you asking me why I deleted those three words?

19   **Q.**   Yes.

20   **A.**   I don't remember.  I don't know that it was -- I used

21   assistance to help prepare this document so I don't --

22   **Q.**   You are saying it was just maybe a clerical slipup?

23   **A.**   No, I'm not saying it's a slipup at all.  I just don't

24   have an answer.

25   **Q.**   Well, does the other suppliers reference in your

1    Exhibit H-1, Page 6, is that where the administrative cost

2    savings were included in H-1?

3    **A.**   I'm sorry, say that again for me.

4    **Q.**   Well, is that the line where the administrative cost

5    savings are included?  Are they included under the rubric

6    other suppliers?

7    **A.**   No.  Some of them are, but not all of them.

8    **Q.**   You are saying this is merely a reference to other

9    suppliers that aren't named by name?

10   **A.**   Yes.  Exhibit H-1, the line that says other suppliers

11   reflects those suppliers that are not listed elsewhere in

12   Exhibit H-1.

13   **Q.**   Okay.  I'll give you an example.  Immediately above it

14   in H-1 is -- well, I'll go to this.  Page 7, you list

15   Sausage Software.

16          **THE COURT:**  Who?

17   **BY MR. McINTYRE:**

18   **Q.**   Sausage Software at Page 7 of H-1, and it's listed for

19   total cost savings of $1,242.  So, as I understand it, you

20   will list an individual supplier for as little as $1,242,

21   but then we lump a whole bunch together for a 1,352,694,568

22   base price and a total cost savings of 112 million.  How

23   many other suppliers are under the rubric other suppliers?

24   **A.**   I don't know the answer to that.

25   **Q.**   Do you know who any of them are?

**A.**    I don't have, I don't have the names.  I mean there is

a significant number of them.

**Q.**    Well, are we talking 100?

**A.**    I don't know how many, but there is -- it's not three.

**Q.**    Do you have a schedule that breaks down their

individual base price cost and total cost savings?

**A.**    No.  I don't.

**Q.**    How is administrative cost savings included in

Exhibit H, to your knowledge?  Do you know?

**A.**    I think I do.

**Q.**    Well, wait a minute.  Did you do it?  Did you calculate

the administrative cost savings for inclusion in Exhibit H

or did Mr. Vetter?

**A.**    Let me be clear because there's an issue here that you

are I think blending together.  The calculation of the

administrative cost savings, as you can see, is presented in

Exhibit 14.  That analysis was prepared by Mr. Vetter.  That

administrative savings element is included in Exhibit H-1 in

the far right column, and I understand how it's included,

but I didn't independently calculate those administrative

savings.  I'm familiar with the calculations.  I understood

them when I issued the report.  I asked about them.  We went

through some of the issues.  You will see that there are

some slight differences between Exhibit H-1 and Exhibit 14.

My point is that there is a distinction there that I don't

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*

40

1     want to have glossed over.

2     **Q.**   My question is this.  So you are telling us that all

3     cost savings claimed by SNAPP for actual savings by supplier

4     for IT commodities are in H-1?  All of the cost savings of

5     any type whatsoever claimed; is that correct?

6     **A.**   All of the cost savings for IT commodities for a period

7     of time between 1991 and September of '99 for the volume

8     that was actually processed by SNAPP.  It doesn't include

9     leaked.

10    **Q.**   I'm not talking about leaked.

11    **A.**   I just want to be clear.

12    **Q.**   The word actual IT means the actual purchases as

13    contrasted to leaked, correct?

14    **A.**   That's fair.

15    **Q.**   That's what it says.  So my question is:  Who

16    calculated the portion of total cost savings attributable to

17    administrative cost savings that's in there?  Did Mr. Vetter

18    do that?

19    **A.**   As I said, Exhibit 14 contains that calculation, which

20    Mr. Vetter provided to me.  I reviewed the underlying

21    documents that support the calculation.  I concur with the

22    calculation.

23    **Q.**   Where did Mr. Vetter do it?  Where is his calculation?

24    Is it in your work papers that were produced?

25    **A.**   Yes.  It's part of Exhibit 14.

1     **Q.**   All right.  Let's look then.  Are you now talking about

2     the last two pages of Exhibit 14?

3     **A.**   It's actually the second-to-the-last page, which deals

4     with the administrative savings on the IT buys, which is an

5     apples-to-apples comparison with Exhibit H-1.

6     **Q.**   And this is entitled IT Administrative Savings?

7              **THE COURT:**  Which page are you looking at now?

8              **MR. McINTYRE:**  The second-to-the-last page of

9     Exhibit 14.

10             **THE COURT:**  The second-to-the-last page.

11             **MR. McINTYRE:**  Yes.  It's entitled up at the top,

12    Your Honor, IT Administrative Savings.

13             **THE COURT:**  Wait a minute.  On 14?  Ah, yeah.

14    Okay.

15             Go ahead.

16    **BY MR. McINTYRE:**

17    **Q.**   Down at the bottom it says Cost Savings Damages

18    Calculation revised 9-5, 2:00 p.m., correct?

19    **A.**   Right.

20    **Q.**   And this was prepared by Mr. Vetter; is that correct?

21    **A.**   This --

22    **Q.**   Can you answer the my question yes or no, sir?

23             Was it prepared by Mr. Vetter?

24    **A.**   I don't know.

25    **Q.**   Did Mr. Vetter give it to you?

1    **A.**   That was what I was trying to answer.  Yes, he did.  He

2    emailed it to me.

3    **Q.**   Did Mr. Vetter provide you with copies of any

4    underlying data or information he analyzed, if any, in

5    connection with the preparation of this IT Administrative

6    Savings report?

7    **A.**   Yes.

8    **Q.**   What documentation did he give you?

9    **A.**   He provided me documentation that was produced by Ford

10   that described the costs that Ford calculated related to its

11   cost to process suppliers, cost to process purchase orders,

12   and cost to handle blanket versus spot releases.

13   **Q.**   Okay.  Now, the report suggests, if I'm reading it

14   correctly, that the total IT Administrative Savings is

15   $137,212,789 down at the bottom, correct?

16   **A.**   That is the share, the 50 percent, that goes to SNAPP.

17   **Q.**   Okay.  Did Mr. Vetter tell you how he included that

18   amount, if he did, in the Actual Savings by Vender included

19   in Exhibit 14?

20   **A.**   Yes.

21   **Q.**   How did he say he did it?

22   **A.**   Let me try to describe it.

23   **Q.**   Well, just tell me what he said, if you recollect.

24   **A.**   I can't, I can't tell you exactly what he said.  This

25   is the gist of what he said though.  There is an amount

1    that's calculated for administrative savings in aggregate

2    that is $274 million.  That savings is included in each line

3    in Exhibit H-1 in the column that says total cost savings

4    based on the relative size of the supplier as measured by

5    the column that says SNAPP's cost.  So if you have a

6    supplier that buys 10 times as much as another, then the

7    administrative savings attributable to that supplier is

8    10 times the amount that would be attributable to a smaller

9    supplier.

10   **Q.**   Are there work papers that you saw where he did this

11   calculation and allocated administrative cost savings to the

12   individual suppliers?

13   **A.**   I don't remember.  There might have been, but if it, if

14   it was, I have produced it to you or it's been produced to

15   you.

16   **Q.**   Let's take a look at this.  Maybe we can do it by way

17   of examining perhaps one of the suppliers to give us an

18   example.  Look at the first page of Mr. Vetter's work

19   product entitled Actual IT Transaction Savings.

20          **THE COURT:**  You are looking at Exhibit 14?

21          **MR. McINTYRE:**  I am, Your Honor, under Actual

22   Savings by Vender.

23   **BY MR. McINTYRE:**

24   **Q.**   And then, for example, it says ABB Robotics.  Can you

25   tell me, sitting here today, how much money was allocated to

1    ABB Robotics for administrative cost savings?

2    **A.**    I can't tell you exactly.    I think it might be around

3    $600.

4    **Q.**    Well, do you have work papers that show that?

5    **A.**    I don't here.    I'm sitting on the stand.

6    **Q.**    Okay.    By like token, do you know how many transactions

7    are reflected in the actual savings by vender for

8    ABB Robotics?    How many individual transactions did

9    ABB Robotics do with SNAPP for which SNAPP claimed cost

10   savings?

11   **A.**    I think, I think there was a single item associated

12   with ABB.    The number of actual transactions that underlie

13   that single event, I don't know the answer on that off the

14   top of my head.

15   **Q.**    Is there a schedule that takes this exhibit, Actual

16   Savings by Vender, and breaks it down further into actual

17   savings by vender by transaction?

18   **A.**    I don't know.

19   **Q.**    To your knowledge can the database which Mr. Vetter

20   used to do these calculations by vender, can that database

21   be used to do it by vender and by individual transaction?

22   Do you know one way or the other?

23   **A.**    Well, I think, I think the answer is no.    I think you

24   are also assuming that a database exists, which I also don't

25   know to be the fact.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                45

1    **Q.**   So you don't know whether Mr. Vetter obtained the

2    information that he used on Exhibit 14 from an

3    electronically kept database or not, do you?

4    **A.**   I don't.  Again, because you are using some phrases

5    there, this is an electronic document that was sent to me so

6    Mr. Vetter has the contents of Exhibit 14 in an electronic

7    form, a spreadsheet, because that's how it's being produced.

8    The underlying information that supports this exhibit and

9    also which supports Exhibit H-1 to my report is based on the

10   documents and summaries that have been exchanged by the

11   parties during the course of their relationship.  It is --

12   it's in that form as well.  So I don't know if there is an

13   electronic "database," but these are certainly supported by

14   other summaries that have already been produced.

15   **Q.**   This is in the 900 boxes of documents kept in the

16   warehouse that's reflected on your Exhibit O?

17   **A.**   The 9 --

18   **Q.**   Is that what you are referring to when you say --

19   **A.**   Well, yes, in a sense, but the 900 boxes roll into

20   summaries.  Those summaries have been produced.  So you can

21   go back to the 900 and spend lots and lots and lots of time

22   wading through those documents.  You can also look at the

23   summaries of those documents, which again are included in

24   the 900 boxes and probably even a smaller subset of those,

25   but that's the underlying basis for this information.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*

1   **Q.**   Have you looked at those summaries?

2   **A.**   I have looked at some of them, yes.

3   **Q.**   Don't those summaries generically list what is in a

4   box?

5   **A.**   Are you saying the summaries of boxes?

6   **Q.**   Yeah, yeah.  The summaries of the boxes say Box 1 and

7   then it breaks it down maybe into 15 items.  Isn't that what

8   those summaries do?

9   **A.**   Yeah.  I was actually talking about a different type of

10  summary.  I was talking about a summary of the financial

11  numbers that are making up and summarizing the other

12  contents of the 900 boxes.

13  **Q.**   Have you seen the actual summaries or the actual hard

14  data that Mr. Vetter used in connection with the preparation

15  of this Actual Savings By Vender?  Do you know where they

16  are and where he's got them?

17  **A.**   I have seen some of them.  That's what I can tell you.

18  **Q.**   If we were to ask Mr. Vetter, Mr. Vetter we want to see

19  all of the backup, summaries, data and information you have

20  for analyzing the total cost savings that are due SNAPP on

21  the ABB Robotics account, what would you ask him for?

22  **A.**   I haven't asked him that.  I don't know what I would

23  ask him for.

24  **Q.**   Now, assume that I were to ask him and say Mr. Vetter,

25  I appreciate your report entitled Actual Savings by Vender,

1    but I would like to look at the underlying data, information

2    that you constructed this from, what would I ask him for?

3    What would you advise me to ask for?

4    **A.**   I would advise you to ask for the summaries that were

5    already prepared and that were provided to you.  That's what

6    I would ask him for.

7    **Q.**   And these were provided to me, what, during the

8    nine-year course of the relationship between Ford and SNAPP?

9    **A.**   My understanding is that they were submitted to Ford

10   during that period of time and that post litigation they

11   have been provided again or access has been provided again,

12   and I believe SNAPP has also indicated in various lists the

13   specific summaries that it's utilizing.

14   **Q.**   Can you tell me or did Mr. Vetter tell you how many

15   claims were, for example, as to ABB Robotics, is there a way

16   to tell how many claims for costs were submitted by SNAPP

17   relating to ABB Robotics and which ones, if any, were denied

18   by Ford?  Do you know that?

19   **A.**   Yeah, I do.  The claim, there was one claim submitted.

20   It was not denied by Ford.  I don't remember how many

21   transactions were associated with the underlying claim, but

22   it was one, as far as I recall.

23   **Q.**   My question isn't limited just to ABB Robotics, but

24   looking at each of these individual suppliers, do you know

25   how many claims were submitted in totality and how many were

1    denied in full or in part?

2    **A.**   Off the top of my head, no.

3    **Q.**   Do you know how many of the claims, if any, made any

4    reference to claims for administrative cost savings?

5    **A.**   I don't off the top of my head.

6    **Q.**   Do you know how many claims, if any, made any reference

7    to investments made by SNAPP that somehow led to further

8    cost savings?

9    **A.**   The answer is I don't know off the top of my head, but

10    as I testified about earlier, I think you are mixing the

11    issue again.  The investments by -- or the investments by

12    SNAPP drive the ability of SNAPP to generate cost savings.

13    It's not a specific claim that's being made.

14    **Q.**   Looking at the second-to-the-last page of Exhibit 14

15    entitled IT Administrative Savings, as to the first one,

16    Lower Costs for Processing Purchase Orders, Mr. Vetter says

17    in his note, Note 1:

18            "Each core order to SNAPP designated if

19            it was -- each core order to SNAPP

20            designated if it was a release against a

21            blanket order.  All others are

22            nonreleases that are the equivalent to a

23            spot buy.  In effect, SNAPP turned SNAPP

24            spot buys into releases.  Ford studies

25            show that it costs $569 to process a

1              spot buy versus 128 per blanket release.

2              While SNAPP believes that its cost to

3              process a transaction was less than 128,

4              the benefit from this is the above

5              calculation."

6          **MR. FINK:**  Your Honor, I'm sorry, I'm looking, I

7    think I'm looking at the same exhibit and every number he

8    said is different.

9          **THE COURT:**  Mr. McIntyre, you said while SNAPP

10   believes that its, while SNAPP believes that its costs to

11   process a transaction was less than $128 no benefit from

12   this --

13         **MR. McINTYRE:**  The benefit.

14         **THE COURT:**  No benefit.

15         **MR. McINTYRE:**  Does it say no benefit?

16         **THE COURT:**  No benefit.

17         **MR. McINTYRE:**  I thought mine looked like the.

18   I'm sorry.

19         **THE COURT:**  The benefit from this.

20         **MR. FINK:**  Your Honor, I apologize.  I just need

21   to know what page we are looking at because the page I'm

22   looking at has different numbers.

23         **THE COURT:**  No, I'm looking at the page.  It says

24   IT Administrative Savings, and it's footnote 1 to the first

25   table.  I'm sorry, it's footnote 2 to the first table.

1          **MR. FINK:**  The footnotes on the next page were

2      very similar but had different numbers.

3          **THE COURT:**  The least we can do in all of this

4      confusion is all read from the same page.  That's not too

5      much.

6          **MR. FINK:**  With that, Your Honor, I apologize, but

7      I'm going to have to ask that he ask the question again

8      because I was looking at the wrong footnote.

9          **MR. McINTYRE:**  Well, it's my fault.  I would ask

10     us all to just read footnote 1.

11         **THE COURT:**  Footnote 2.

12         **MR. McINTYRE:**  Footnote 2, correct.  Well, I read

13     from both.

14         **THE COURT:**  All right.  What's the pending

15     question?

16     **BY MR. McINTYRE:**

17     **Q.**   The pending question is this:  In order for us to

18     understand, as I understand this, Mr. Vetter is making the

19     point that Ford used to make spot buys, but now under SNAPP

20     they are making blanket buys, blanket buys are cheaper than

21     spot buys so that creates a savings.  Is that basically what

22     we are talking about?

23     **A.**   Two elements.  Spot buys are in fact less expensive for

24     Ford.  Therefore, they are a savings.  Point 2, SNAPP is now

25     handling much of this activity, and Ford is simply able to

1    contract directly with SNAPP, doesn't have to deal with all

2    of these other suppliers, and so there's a savings that is

3    generated from that.

4    **Q.**   Did he factor in the cost in employing SNAPP?  Do you

5    know whether or not that's in there?

6    **A.**   That's the point of Footnote 2.

7    **Q.**   That's where he factors that in?

8    **A.**   That there is a credit being given to Ford for the fact

9    that there is an expense associated with SNAPP, and as long

10   as that doesn't exceed $128, damages are being understated.

11   **Q.**   It's fair to say that if the Court or the finder of

12   fact concludes that the alleged savings on spot buys versus

13   blanket orders is not the type of savings included within

14   Section 4.3, then the damages sought in this analysis

15   likewise aren't recovered; is that correct?

16   **A.**   I don't know that I would say that they were

17   recoverable or not.  If the trier of fact were to find a

18   difference in terms of the way that this, this concept was

19   interpreted or that paragraph was interpreted, it could very

20   well change my conclusion.

21   **Q.**   I want to turn your attention to what is Exhibit J to

22   your report.

23           **MR. McINTYRE:**  Could I have Exhibit 15, please.

24           **THE COURT:**  Okay.  This is Exhibit 15?

25

1      **BY MR. McINTYRE:**

2      **Q.**   Exhibit 15, Mr. Frazee, is a Friday, August 17, 2007

3      email from Mr. Vetter to you entitled, "Subject:  Damages

4      Related to Past Due Payments under the MLA;" is that

5      correct?

6      **A.**   Yes.

7      **Q.**   I want to look at first --

8              **THE COURT:**  Wait a minute.  The MLA is the --

9              **MR. McINTYRE:**  Master Equipment Lease, isn't it?

10             **THE COURT:**  That's MELA.

11             **THE WITNESS:**  This is the Master Lease Agreement.

12             **THE COURT:**  MLA is Master Lease Agreement.

13     Briefly remind me what that is.

14             **THE WITNESS:**  It's an agreement that covered some

15     of the leasing activity that SNAPP was doing for Ford's

16     benefit for certain types of commodities.

17             **THE COURT:**  SNAPP was leasing --

18             **THE WITNESS:**  I think it was, I think it was

19     personal computers.  I would have to double-check, but

20     basically SNAPP was entered into leases for equipment that

21     was then being utilized by Ford.

22             **THE COURT:**  So SNAPP leased this equipment and

23     gave it to Ford for Ford's use?

24             **THE WITNESS:**  Well, didn't give it to them.

25             **THE COURT:**  I mean made it available physically,

1     right?

2                    **THE WITNESS:**  Yes.

3                    **THE COURT:**  Okay.

4     **BY MR. McINTYRE:**

5     **Q.**   Now, looking at --

6                    **THE COURT:**  Now, this is an $879,408 item of

7     damages, Mr. McIntyre?

8                    **MR. McINTYRE:**  It is, Your Honor, and I'm going to

9     be brief on this.

10                   **THE COURT:**  I don't want you to trivialize this

11    case, Mr. McIntyre.

12                   **MR. McINTYRE:**  I assure you, Your Honor, we are

13    not doing that.

14                   **THE COURT:**  We are going from billions to this.

15    It's like me going from this case to issuing a bench warrant

16    for a witness who won't show up.

17                   **MR. McINTYRE:**  All right.  Well, the reason I'm

18    showing this to the witness is not necessarily for the

19    amount, but this.

20                   **THE COURT:**  I know.  Go ahead.

21    **BY MR. McINTYRE:**

22    **Q.**   It's true, isn't it, that if you look at Exhibit J to

23    your report you have utilized the numbers in Mr. Vetter's

24    report as to North America and Europe, the 312,060, the

25    567,068; you lifted those out of Vetter's report and put

1    them right into your Exhibit J, correct?

2    **A.**   Well, that would be a rather broad oversimplification.

3    They are the same numbers.

4    **Q.**   Okay.  So you have extracted the same numbers from

5    Mr. Vetter's report and put them right in your own exhibit?

6    **A.**   Mr. Vetter emailed me something which you have marked

7    as Exhibit 15.  The last four or five pages of that document

8    contain pieces of a very large spreadsheet, which was also a

9    part of that attachment, which I reviewed and asked

10   questions on, verified numbers, and again, made sure that it

11   was being calculated in a manner consistent with the

12   contract.  So it wasn't as simple as just lifting a number

13   and putting it into another document.

14   **Q.**   Did you actually ask him for any of the underlying Ford

15   purchase orders that he references?  Did you go into the

16   document base and analyze them and look at them to see if

17   they actually reflected the numbers he has on his schedule?

18   **A.**   I did look at purchase orders.  Let me make sure I'm

19   understanding your question.

20   **Q.**   My question is:  Did you test all of the numbers that

21   are on his attachment?  Did you go in and have somebody

22   verify them?

23   **A.**   I did not test all of his numbers.  That would, that

24   would be a waste of time.

25   **Q.**   Looking at your Exhibit K, this relates to lease

1    payments.  Again, it's a relatively --

2              **THE COURT:**  What's the LPA?

3              **THE WITNESS:**  The LPA, Your Honor, stands for the

4    Lease Program Agreement.

5              **THE COURT:**  Lease what?

6              **THE WITNESS:**  A Lease Program Agreement.

7              **THE COURT:**  And what equipment did this cover?

8              **THE WITNESS:**  It was basically the same type of

9    equipment, a little different contractual relationship, and

10   the damages here really relate to the fact that SNAPP had

11   negotiated and was to receive certain benefits that arise

12   really as a result of Ford paying the bill, let's say, on

13   the 5th of the month and SNAPP didn't have to turn around

14   and pay the supplier for, let's say, another 25 days or so.

15   So it arises from the same underlying commodities.

16   **BY MR. McINTYRE:**

17   **Q.**   The numbers that you --

18              **MR. McINTYRE:**  Am I interrupting the Court?  I'm

19   sorry.

20              **THE COURT:**  No.

21   **BY MR. McINTYRE:**

22   **Q.**   The numbers, as modest as they are on Exhibit K, total

23   254,796, correct?

24   **A.**   Yes.

25   **Q.**   And, again, like with Exhibit J, you received an email

1    with calculations from Mr. Vetter and you accepted his

2    calculations and included those numbers in this report based

3    on Mr. Vetter's calculation; isn't that true?

4    **A.**    Could you show me the email you are referring to?

5    **Q.**    Yes, I can.  I was trying to short-circuit this.

6              **THE COURT:**  Well, you didn't calculate this

7    independently, did you?

8              **THE WITNESS:**  I received a spreadsheet with the

9    detail, and I verified the numbers and --

10             **THE COURT:**  Okay.  Let's go forward unless you

11   want it as an exhibit.

12             **MR. McINTYRE:**  Well, I've got it.  Here is 16.

13   **BY MR. McINTYRE:**

14   **Q.**   Is this the email of which you speak, Exhibit 16,

15   Mr. Frazee?

16             **THE COURT:**  This correlates to Exhibit K, right?

17             **MR. McINTYRE:**  Correct.

18             **THE WITNESS:**  Yes, this is the email I was

19   referring to.

20   **BY MR. McINTYRE:**

21   **Q.**   But the point is, again, with respect to Exhibit K, you

22   didn't do any original analytical or intellectual work, you

23   relied upon the schedules received from Mr. Vetter, correct?

24   **A.**    Again, I'm going to disagree with you.  The point is

25   that documents are provided in electronic form and contain

1    detail.  That's part of every expert engagement.  I am going

2    to receive those things, and then I have a process of asking

3    questions or validating the calculations or looking to see

4    if, for example, the way the calculation is performed is

5    consistent with the contract.  Those are the processes I

6    followed both with Exhibit 15 and 16.  So while I didn't

7    audit the underlying transaction detail, that's, that's not

8    necessary or practical in this situation.

9    **Q.**  Well, I'm not sure your answer was responsive, but I

10   will merely ask you this.  Did you --

11            **THE COURT:**  Excuse me.  Let's go ahead.

12            **MR. McINTYRE:**  Very good, Your Honor.

13            **THE COURT:**  There's nothing pending.

14   **BY MR. McINTYRE:**

15   **Q.**  Take a look at Exhibit N to your report.

16            **THE WITNESS:**  Your Honor, could I just ask for a

17   brief interruption for three minutes or so?

18            **THE COURT:**  We'll take a short, ten-minute recess.

19            **THE WITNESS:**  Thank you.

20       (Recess from 11:28 a.m. until 11:42 a.m.)

21   **BY MR. McINTYRE:**

22   **Q.**  Mr. Frazee, between our last meeting when you testified

23   and today, did you examine any additional documents since we

24   met last time?

25   **A.**  Yes.

1    **Q.**   What did you examine in the interim?

2    **A.**   You know, I'm not going to be able to give you a

3    comprehensive list.  I can tell you that I looked at some

4    emails that Ford and SNAPP had exchanged during their

5    relationship.  I think I read a brief that was filed fairly

6    recently, I want to say maybe even this week, related to the

7    integration clauses in the contracts and some of the

8    arguments that Ford had made previously about the absence

9    of, I'm sorry, the absence of oral agreements.  I looked

10   over some of the notes that or some of the documents that

11   had been produced prior to my first deposition.  That's all

12   I can think of at the moment.

13   **Q.**   Let me show you what we have marked as Exhibit 17, and

14   I am submitting that to you in conjunction with your

15   Exhibit N, as in Nancy, to your report.  This is another

16   email from Mr. Vetter dated September 5, 2007, about

17   five days before your final report was done?

18              **THE COURT:**  Wait a second.

19              Go ahead.

20              **THE WITNESS:**  Just to be clear, there is a page in

21   here, the third page, is that one of your notes or is this

22   another page --

23              **MR. McINTYRE:**  That is one of my notes, but we

24   have no secrets.

25              Why don't you give it back to me.  I don't want to

1    unduly influence you.

2              Your Honor, I wonder if I inadvertently included

3    it in yours as well.

4              **THE COURT:**  I'll have Kim look so I don't see it.

5              **MS. ALAMO:**  I have a -- we can substitute a clean

6    one.

7              **MR. McINTYRE:**  I have never asked a question David

8    hasn't anticipated.

9              **MR. FINK:**  I had reviewed those previously when

10   going through his office, Your Honor.

11             **THE COURT:**  Go ahead.

12   **BY MR. McINTYRE:**

13   **Q.**   Looking at your Exhibit N, as in Nancy, to your report,

14   SNAPP is claiming $5.5 million net accounts receivable due

15   in connection with what?

16   **A.**   The 5.5 million relates to the transition agreement and

17   specifically to two types of transactions, which are

18   described, which are described in that agreement as Type I

19   transactions and Type II transactions.

20   **Q.**   And basically this is the same document that you

21   received from Mr. Vetter, Exhibit 17?

22   **A.**   Exhibit N summarizes the contents of Exhibit 17.

23   **Q.**   Now, looking at the PN/PO reference numbers on

24   Exhibit N, did you obtain copies of any of those PN/PO's and

25   review the actual PN/PO summarized thereon?

1          **THE COURT:**  What are TNTO's?

2          **MR. McINTYRE:**  PN/PO reference number in the

3     backup to Exhibit --

4          **THE COURT:**  I know.  What does PN/PO stand for?

5     That's all I want.  What does it stand for?

6          **THE WITNESS:**  My understanding is PN is purchase

7     notice.

8          **THE COURT:**  What?

9          **THE WITNESS:**  Purchase notice or notification, and

10    the PO meaning a purchase order, if I recall correctly.

11    It's basically Ford saying they want something.

12         **THE COURT:**  Okay.

13    **BY MR. McINTYRE:**

14    **Q.**   My question is you didn't actually go behind the

15    information Mr. Vetter gave you and obtain copies of the

16    PN/PO's and examine them, did you?

17    **A.**   I didn't review the PN/PO's.  I don't think it's

18    necessary or important at all, frankly.

19    **Q.**   The point is you didn't do it.  You agree with me you

20    didn't do it?

21    **A.**   I didn't do it.

22    **Q.**   Did you at any time in connection with any of the

23    spreadsheets and summaries Mr. Vetter provided to you go

24    behind his work product and sit down and review actual PN's,

25    purchase orders, or for that matter any of the claims data

1    submitted by SNAPP to Ford?

2              Let's start out --

3    **A.**   Yes and yes.

4    **Q.**   It was a multiple question.  Did you actually review

5    hard copies of PN's and PO's?

6    **A.**   Not the ones that would be specifically listed in this

7    exhibit, for example, or Exhibit J, et cetera, but more the

8    overarching purchase orders that Ford would have signed,

9    again, with SNAPP that cover --

10   **Q.**   But these, these would be the blanket --

11             **MR. FINK:**  Your Honor, I'm sorry.  He's

12   interrupted the witness, and I don't know what the rest of

13   the answer was.

14   **BY MR. McINTYRE:**

15   **Q.**   Did I cut you off?

16   **A.**   Yeah.

17   **Q.**   Go ahead.

18   **A.**   In other words, the documents I reviewed would have

19   been those that would be more classified as a blanket order

20   or blanket purchase order that covers the bigger picture

21   transactions, not individual releases.  Sometimes, just to

22   be clear, the individual release or PN that you have been

23   referring to is an electronic thing that doesn't actually

24   exist in a paper form, so -- it certainly can be printed,

25   but it doesn't necessarily always exist through paper.

1    **Q.**   I gather these electronic things are, to your knowledge

2    are they kept my SNAPP?

3    **A.**   I assume so.  I don't know.

4    **Q.**   I wanted to go back and ask you a question pertaining

5    to the Exhibit 14 and your Exhibit H-1.  There is something

6    I failed to ask earlier.

7    **A.**   Okay.

8    **Q.**   Looking at Exhibit H-1, at Page 6 of H-1, you will see

9    the reference to Midwest Business?

10   **A.**   Yes.

11   **Q.**   And can you -- do you know what the calculation was of

12   any administrative cost savings attributable to SNAPP's

13   dealings with Midwest's business?

14   **A.**   Not beyond what I described for you earlier.  I don't

15   have specific knowledge on that one.

16   **Q.**   Well, your knowledge is there was a lawsuit that

17   apparently SNAPP valued at 56,926,605 and it was settled at

18   10 million, so they viewed the total cost savings as

19   46,926,605?

20           **THE COURT:**  Did you know that, sir?

21           **THE WITNESS:**  No.  That's actually contradictory

22   to my testimony last time, Your Honor.

23   **BY MR. McINTYRE:**

24   **Q.**   Let me ask you this.  What is your understanding as to

25   why Midwest Systems is included on H-1 as a cost savings?

1    **A.**   I don't have specific knowledge as to the transactions

2    or items that would relate to its inclusion here on

3    Exhibit H-1.  The reason it's included, I understand, is

4    because SNAPP is claiming cost savings.  Beyond that, I

5    don't know specifically how that number was calculated.

6    **Q.**   Do you have any knowledge as to whether or not SNAPP is

7    claiming any "administrative cost savings" attributable to

8    the Midwest business?  Are there administrative cost savings

9    included therein?

10   **A.**   I don't know for certain.  I believe there are though.

11   **Q.**   Do you know, are there investment cost savings?

12           **THE COURT:**  Do you know anything more about this

13   item other than the fact that it was on Vetter's papers that

14   he submitted to you, yes or no?

15           **THE WITNESS:**  Not on that specific line item.

16           **THE COURT:**  Okay.  Let's move on.

17           **MR. McINTYRE:**  I will, Your Honor.

18           **THE COURT:**  Let me ask you this, sir.  When you

19   saw a cost savings of $46 million between base price and the

20   cost to SNAPP that SNAPP was charging Ford for, did it pique

21   your interest in any way?

22           **THE WITNESS:**  Not in this context, Your Honor.

23           **THE COURT:**  Thank you.

24   **BY MR. McINTYRE:**

25   **Q.**   Would you take a look, please, at Exhibit 2 that was

1    previously identified and marked by Mr. Fink.

2             **THE COURT:**  Is this in the notebook?

3             **MR. McINTYRE:**  It is, Your Honor.

4             **THE COURT:**  It's Exhibit 2 in this notebook?

5             **MR. McINTYRE:**  Yes.

6             **THE COURT:**  You know, it would be helpful at some

7    point to have a table of contents of the exhibits.

8             **MR. McINTYRE:**  We will do that, Your Honor.

9             **THE COURT:**  Okay.

10   **BY MR. McINTYRE:**

11   **Q.**   Do you see Exhibit 2 there, sir?

12   **A.**   Yes.

13   **Q.**   And that's entitled, is it not, Index Documents

14   Relating To -- and then it changes from the initial page.

15   The first page says Index Documents Relating to Exhibit B,

16   Line 1 - 1.75 percent Profit Agreement.  That's what the

17   first page says, correct?

18   **A.**   Yes.

19   **Q.**   And this consists of a number of pages.  Did you

20   personally prepare this document, Exhibit 2?

21   **A.**   No, I didn't.

22   **Q.**   Who, to your knowledge, prepared Exhibit 2?

23   **A.**   I don't know specifically.  It would have been someone

24   at SNAPP or working for SNAPP.

25   **Q.**   Do you know whether Exhibit 2 was done by Mr. Vetter?

1    **A.**   I don't.

2    **Q.**   The same question for the CD, which we marked as 14A,

3    which is in the record by stipulation.  Do you know who

4    physically went in to some hard drive, if they did, and

5    burned this down or took it off the hard drive?

6            Burned down is probably not the right word, is it?

7    **A.**   I don't.  I mean it's a -- I haven't seen it.

8    **Q.**   Was the information kept on Exhibit 14 that's reflected

9    on 14A, did that come from your company's computer database

10   or from SNAPP's?

11   **A.**   As I understand Exhibit 14A, it reflects documents that

12   I provided to counsel for SNAPP.  I don't know exactly

13   what's on there, but that's my understanding.

14   **Q.**   Do you know where this information was kept and who

15   kept it that's reflected on Exhibit 14A?

16   **A.**   You mean to the extent it was in my control?

17   **Q.**   No, to the extent it's on somebody's computer database.

18   Whose computer database?

19   **A.**   I'm not understanding your question.  If there is

20   anything on there that relates to my opinions, I would have

21   had a document.  I would have emailed it or somehow provided

22   it to SNAPP's attorneys, and then they would have produced

23   it.  Is that your question?

24   **Q.**   No.  My understanding is that this CD mostly has copies

25   of Excel spreadsheets that were sent by Mr. Vetter to you.

1     **A.**   Okay.

2     **Q.**   Where did the Excel spreadsheets come from that are

3     reflected on 14A.  Did they come off of Mr. Vetter's

4     computer or off of yours?

5     **A.**   My understanding is that they came off my computer.

6     **Q.**   Who ran it off, if you know?

7     **A.**   I don't.

8           Let me make sure I'm being clear.  I received

9     certain documents or emails.  I would have had those in my,

10    on my computer, if you will.  When the point came when they

11    were requested, I produced those to SNAPP's counsel.

12          Does that answer your question?

13    **Q.**   I don't think it does, but I really don't think we are

14    making much headway here and I'll turn to another topic.

15    **A.**   Okay.

16    **Q.**   Looking at your report, Page 2, I draw your attention

17    to where you are talking about SNAPP's components of

18    damages, and you have a footnote, Footnote 2, where you say.

19              "True revenue is defined as:  One, the

20              actual amount of Ford's transactions

21              processed through SNAPP plus, two, those

22              transactions which SNAPP was to have

23              handled and/or for which SNAPP provided

24              certain services."

25    What I want to key in on is the reference to the word

1    services.  Is it your position in your report that SNAPP is

2    claiming compensation not only for the commodities it

3    provided to Ford but also for services?

4    **A.**   The simple answer to your question is that the services

5    are what allows for the purchasing function to occur.  So,

6    in other words, a service is rendered, someone picks up a

7    phone call or requests that a supplier make a -- you know,

8    respond to a request for quotation.  As a result of those

9    services, SNAPP then does something, and that something,

10   whatever it does, generates, you know, it generates an

11   activity that is compensable under the contract.

12   **Q.**   Have you in anywhere broken out in your report where

13   you have computed the amounts owing for services?

14   **A.**   Again, it's that same point I was trying to describe to

15   you earlier, that there are certain things SNAPP does to

16   execute its duties.  Those things that it does, including

17   the services that it is providing, are the underlying --

18   that's how it does business.  It provides a service which

19   results in a purchase or in some other sort of cost savings.

20   So it's not, again, an explicit claim for services.  It's

21   the fact that services are being provided.

22   **Q.**   Under which of the components of damages described in

23   your report are monies sought for services performed by

24   SNAPP?  What I'm driving at is are you including

25   compensation for services within the component that seeks

1    compensation for cost savings that SNAPP wasn't paid for?

2         **THE COURT:**  Wait a minute, Mr. McIntyre.  Is your

3    question where in your report is there an item that covers

4    a, a discrete item that covers services.  Isn't that what

5    you are asking?

6         **MR. McINTYRE:**  That's a better question than mine.

7    I'll ask him that.

8         **THE COURT:**  I know it is, but that's what you

9    really want to know.

10        **MR. McINTYRE:**  Yes.

11   **BY MR. McINTYRE:**

12   **Q.**   Answer that one.

13   **A.**   I think the answer is there is not a discrete area

14   where services are -- there is a damage from services.

15   **Q.**   I'll turn your attention to Page 3 of your report where

16   you have a discussion entitled Ford's Position.  Under

17   Ford's Position you delineate eight things that you say Ford

18   disputes, correct?

19   **A.**   That's what it shows, yeah, a list of eight items.

20   **Q.**   And the first thing is "The $10 million Midwest

21   Business Systems Settlement Payment."  Do you have any facts

22   over and above those few facts that you have said that you

23   don't know as it relates to the Midwest business settlement?

24   **A.**   Would you try that question again.

25   **Q.**   My question is what facts, if any, do you know of that

1  substantiate or relate to your point one, that there is an

2  obligation to pay the full amount due for the $10 million

3  Midwest Business Systems settlement?

4  **A.**  You have got to read this in context.  The context of

5  including that item in this list is that Ford disputes its

6  obligation to pay the full amount so that's why it's

7  included there.  In terms of the understanding that I have

8  related to this issue in a general sense is that, number

9  one, there was a settlement agreement that was entered into

10  prior to the execution of the amendment or right around that

11  same time.  I understand that it related to an underlying

12  lawsuit which involved Ford and SNAPP and I believe some

13  other, other defendants as well.  I understand that it was

14  achieved through a mediated process, and I have read some

15  correspondence between Ford and SNAPP on that issue.

16  **Q.**  Are you aware that the first amendment to the Framework

17  Agreement provides that the term of that agreement was

18  extended from one year to three years as an aspect of

19  settling the Midwest lawsuit?

20  **A.**  I'm aware that the amendment covered a three-year

21  period.  I'm aware also that the amendment contained

22  language in it that referenced the Midwest settlement.

23  **Q.**  Is this the language that you are aware of, and I'll

24  show you the document, "Whereas the parties have agreed as

25  part of a settlement of a lawsuit filed against them by

1    Midwest Systems, Inc. (the Midwest lawsuit) to extend the

2    Framework Agreement term, resolve pricing issues and execute

3    a promissory note."

4            You are aware of the language that they were

5    extending the term to carry out the settlement in the

6    Midwest lawsuit?

7    **A.**   I have read that language.

8    **Q.**   Now, did that language saying that they were extending

9    the term from one year to three years to settle the Midwest

10   lawsuit impact your analysis as to the duty to renew the

11   contract or extend it that it would be a three-year term?

12   Did that impact your three-year term conclusion?

13   **A.**   If I'm understanding your question correctly, the fact

14   that the Framework Agreement resulted or the amendment to

15   the agreement resulted in a three-year term, that is a

16   relevant fact that I would have considered when evaluating

17   the term of a renewal in 1999.

18   **Q.**   And how would it be relevant?

19   **A.**   I think it's relevant to consider the agreement that

20   was expiring and its duration and some of the other language

21   in that amendment when trying to establish the term for a

22   new contract.  I think it's certainly relevant.  As

23   one expires, a new one or -- a new one.

24   **Q.**   And obviously as they are entering into a hypothetical

25   new agreement there is no necessity to have a three-year

1    agreement in order to pay off the Midwest settlement, is

2    there?

3    **A.**    I don't know.

4    **Q.**    You don't know.  Did you see, in connection with your

5    analysis on the good faith duty to renew and your opinion

6    that any new agreement would have had a three-year term, did

7    you review the correspondence and emails between the parties

8    when they were carrying on their negotiations in an attempt

9    to negotiate a new agreement?

10   **A.**    I did review some of it.  I don't recall the specifics.

11   **Q.**    Did you see anything in there that there was a need for

12   a three-year term?

13   **A.**    That there was a need for a three-year term?

14   **Q.**    Yeah.  Particularly a need for a three-year term

15   attributable to settling the Midwest lawsuit.  Did that need

16   continue as they went forward?

17   **A.**    You are talking about in September or roughly mid '99,

18   that's the time frame?

19   **Q.**    Yeah.

20   **A.**    I don't remember that specifically.

21   **Q.**    So you didn't see any discussion about Midwest and the

22   need to have a three year term to continue the ability to

23   pay off the Midwest lawsuit?

24   **A.**    I don't recall that, but . . .

25   **Q.**    Now, on Page 3 of your agreement where you list the

1   Ford disputes and what it disputes, you list point two, PCS

2   consulting fees.

3           **THE COURT:**  What does PCS stand for, Witness?

4           **THE WITNESS:**  Your Honor, I'm not sure that it

5   actually stands for anything.  It is a company that was

6   providing some services to SNAPP during the '91 through '99

7   time frame.

8           **THE COURT:**  PCS was a third party?

9           **THE WITNESS:**  It's a, it's a -- yes, it is a third

10  party.  It's an actual entity.  I believe it was owned by

11  Mr. Thacker, who at least in some periods was also the owner

12  of SNAPP.

13          **THE COURT:**  So it was a third-party providing

14  services to SNAPP?

15          **THE WITNESS:**  Services and a few other things as

16  well that I cover in my report.

17          **THE COURT:**  Okay.

18  **BY MR. McINTYRE:**

19  **Q.**   It's true, isn't it, you examined SNAPP's year-end

20  financial statements that reflected the amounts of monies

21  paid out to PCS, correct?

22  **A.**   Yes.

23  **Q.**   And it's true, isn't it, that SNAPP paid out

24  approximately, what, $70 million to PCS?

25  **A.**   In a very round number, ostensibly that's accurate over

1    the --

2    **Q.**   And it's true, isn't it, that your counterpart working

3    for Ford, Mr. Conway, my expert, in his report has opined to

4    the effect that he thought that the advances by SNAPP to PCS

5    were inappropriate, correct?  You are aware of that, aren't

6    you?

7    **A.**   Well, I think his statement was a little more narrow

8    than you are making it.

9    **Q.**   Okay.  But, on balance, there is a dispute as to

10   whether or not the payments made by SNAPP to PCS were

11   legitimate or not; is that fair in a general sense?

12           **THE COURT:**  Legitimate in the sense that Ford is

13   obligated for them or just generically?

14           **MR. McINTYRE:**  Legitimate in the sense,

15   Your Honor, that there were no services rendered and really

16   it was income or profit to SNAPP, and if that is included in

17   SNAPP's books and records, Ford more than covered the

18   so-called "gap" of what it owed as of the end of the

19   relationship if you back those monies back in.  That's a

20   speech kind of my opinion.

21           **THE COURT:**  All right.  Let's go ahead.

22   **BY MR. McINTYRE:**

23   **Q.**   In any event, my question is, in looking at the PCS

24   consulting fee issue, did you discover any invoices from,

25   specific invoices for specific work done by PCS for SNAPP?

1     **A.**   No.

2                    **THE COURT:**  Yes or no?

3                    **THE WITNESS:**  No.

4     **BY MR. McINTYRE:**

5     **Q.**   Did you find any statement for services whereby

6     specific services were identified and PCS asked that those

7     specific services be paid for?

8     **A.**   Yes, to the extent that those specific services were

9     described specifically in the contract between the two.

10    **Q.**   I'm not asking about the three contracts that describe

11    the type of services that they are to render.  My question

12    is -- you have produced in this case your statement for

13    services rendered to SNAPP, and in yours you have line items

14    identifying the date, the service performed, who did it and

15    the time expended, and when I say statement, did you see any

16    statement where PCS rendered a statement to, a specific

17    statement to SNAPP saying here are the services we rendered,

18    when we rendered them, who rendered them, and how much?

19    **A.**   So to understand what you are saying, like an invoice,

20    that type of thing?

21    **Q.**   Yeah, like an invoice.

22    **A.**   No, I haven't reviewed a document like that.

23    **Q.**   Let's turn to your report at Page 4.

24                    **THE COURT:**  By the way, what's the MELA?

25                    **THE WITNESS:**  It stands for the Master Equipment

1    Lease Agreement.

2            **THE COURT:**  Is that the same as MLA?

3            **THE WITNESS:**  They are very close in terms of

4    relationship.  They are not --

5            **THE COURT:**  It's a separate agreement?

6            **THE WITNESS:**  Yes.

7        **MR. McINTYRE:**  I want to --

8            **THE WITNESS:**  I believe so, Your Honor.  Let me

9    just double-check on that.

10           **THE COURT:**  What is the LPA?  I've got that.

11   That's the Lease Program Agreement.

12           **THE WITNESS:**  Your Honor, I misspoke.

13           **THE COURT:**  All right.  Never mind.  Go ahead.

14   Page 4.

15       **MR. McINTYRE:**  I actually want to go to a

16   different page that ties into something we spoke about.

17       **MR. FINK:**  Your Honor, just to avoid the record

18   being unclear, the witness had indicated he misspoke and I

19   just would like him to clarify what he said wrong.  It's not

20   a long thing.

21           **THE COURT:**  What did you say wrong?

22           **THE WITNESS:**  You had asked me if there was a

23   difference between the MELA and the MLA, and I incorrectly

24   stated that there were a difference.  Those in fact are the

25   same document.

1          **THE COURT:**  Well, they are differently referenced

2    in the record because I got MLA earlier.  So MELA and MLA

3    are the same thing?

4          **THE WITNESS:**  Yes.  There is -- and if I said it

5    wrong, I apologize.  There is an MELA and then there is an

6    LPA.

7          **THE COURT:**  I understand.  Okay.  All right.

8    **BY MR. McINTYRE:**

9    **Q.**   I want to go forward to something that relates to our

10   discussion about cost savings and would draw your attention

11   to Page 11 of your report.  And this relates to Component 2,

12   Cost Sharing, that we spoke about this morning, and at

13   Page 11 after your discussion but before your calculation

14   under supporting documents you say, "The primary documents

15   supporting this component of damages are listed in

16   Exhibit Q, and I would like to turn your attention to

17   Exhibit Q.  Did you personally prepare Exhibit Q?

18   **A.**   I don't believe so.

19   **Q.**   Who prepared it to the best of your knowledge?

20   **A.**   This might have been prepared, I guess the primary

21   preparer would have been someone with SNAPP or its counsel,

22   and there might have been some additional work done by

23   one of my staff, but the primary work in terms of compiling

24   this list was done by SNAPP.

25   **Q.**   So the list of primary documents that support the cost

1    savings component of your damage study were prepared by

2    Mr. Vetter or someone else at SNAPP?

3    **A.**   That's my recollection, that this list was prepared by

4    SNAPP.

5    **Q.**   You know, I note that some of the exhibits to your

6    report bear a -- oh, I'll give you an example here.  Let's

7    go to Exhibit J.  A good number of the exhibits like

8    Exhibit J at the top have a kind of a little caption that

9    says off to the left UHY Advisors MI, Inc. SNAPP v. Ford

10   Motor Company and then the topic.

11           Do you have Exhibit J there?

12   **A.**   Yes, I do.

13   **Q.**   And do you see where it has that little caption on it?

14   **A.**   Yes, I do.

15   **Q.**   Now, is it typical for your company to put that caption

16   on an exhibit or a summary that your company has prepared?

17   **A.**   Most of the time, yes.  Not all of the time though.  It

18   depends in part on the nature of the exhibit.

19   **Q.**   All right.  Because the one -- Exhibit Q doesn't have

20   that caption on it, does it?

21           **THE COURT:**  Which one?

22   **BY MR. McINTYRE:**

23   **Q.**   Exhibit Q that we were talking about that he said was

24   done by Mr. Vetter or his people doesn't have the UHY

25   caption on it, does it?

1    **A.**   Right.  If you look at Exhibit P, for example, these

2    big long lists with lots of points in them, they don't

3    typically have that header.  I prepared Exhibit P.  It

4    doesn't have the header there.  It just, it depends on the

5    nature of the exhibit as to whether we would include that

6    header.

7    **BY MR. McINTYRE:**

8    **Q.**   Looking at Exhibit Q, is it your understanding that

9    Mr. Vetter prepared this to give you a list of the documents

10   that support SNAPP's claims for cost savings?

11   **A.**   Again, I don't know that it was Mr. Vetter that

12   prepared Exhibit Q.  SNAPP was the primary author of this

13   document.

14   **Q.**   Do you know who at SNAPP specifically?

15   **A.**   I don't recall.

16   **Q.**   Do you know what databases, if any, SNAPP looked at or

17   used to retrieve the descriptions of this information on

18   Exhibit Q?

19   **A.**   No, I don't.

20   **Q.**   Do you know when it was prepared?

21   **A.**   I don't.

22   **Q.**   Were you involved in the preparation of SNAPP's earlier

23   damage studies that preceded your September 10 damage study?

24        **MR. FINK:**  Your Honor, I'm sorry, when he

25   references earlier damage studies, I don't know what he's

1    referencing and I don't know --

2              MR. McINTYRE:  I think that's a good point, and

3    I'll clarify it.

4              THE COURT:  Well, you can ask it slightly

5    differently, Mr. McIntyre.

6              MR. McINTYRE:  I'm sorry, Your Honor?

7              THE COURT:  You can ask it in a slightly different

8    fashion.

9              Is it fair to say that the only work that you have

10   done for SNAPP is reflected in your expert report?

11             Do you understand my question?

12             THE WITNESS:  I'm sorry, were you directing that

13   to me?

14             THE COURT:  Yeah.

15             THE WITNESS:  The answer is, no, it's not.

16             THE COURT:  So you did additional work for SNAPP

17   prior to beginning the preparation of this expert report?

18             THE WITNESS:  Yes.  I authored an expert report,

19   for example, that was I believe back in September of '05.

20             THE COURT:  Okay.  Go ahead, Mr. McIntyre.

21   BY MR. McINTYRE:

22   Q.   Are you aware that on April 30 of 2007 SNAPP submitted

23   to the Court a description of damages in tabular form which

24   was Docket Number 480?

25   A.   I think I am, but would you mind sharing the document

1    with me?

2    **Q.**   I don't have it.  That's not what I'm reading.  This is

3    just something that had the number on it.

4    **A.**   Yeah, I believe I'm familiar with it.  I don't remember

5    the numbers, but . . .

6    **Q.**   Were you also a participant in the July 10, 2007

7    verdict form that they worked up and submitted to the Court?

8            **MR. FINK:**  Your Honor, objection.

9            **THE WITNESS:**  Just so my answer is clear --

10           **THE COURT:**  Wait a second, wait a second, wait a

11   second.

12           **MR. FINK:**  My objection is --

13           **THE COURT:**  Wait a minute.  What's the objection

14   to the question?

15           **MR. FINK:**  Your Honor, the objection assumes a

16   fact that's not in evidence and is contrary to the testimony

17   the witness just gave.  The witness didn't say that he

18   participated in the preparation of the previous submission,

19   and then counsel said did you also participate in the

20   preparation of the July submission.  I don't know if he

21   intended to be misleading or if he misunderstood what the

22   witness said.  The witness didn't say that he was involved

23   in the preparation of the --

24           **MR. McINTYRE:**  May I respond, Your Honor?

25           **THE COURT:**  Wait, no, let's go back.  Ask him the

1    question about the 2005 report.

2          **MR. McINTYRE:**  I didn't mean to include the word

3    also, if I did.

4          **THE COURT:**  No, I just want to get --

5    **BY MR. McINTYRE:**

6    **Q.**   My question was --

7          **THE COURT:**  Wait a second, please.  Just go back

8    and read the question about the 2005 report.

9          **MR. McINTYRE:**  They are all 2007.

10         **THE COURT:**  No, he said something about a 2005

11   report.

12         **MR. McINTYRE:**  Then I misspoke.

13         **THE COURT:**  No, the witness did.

14         **MR. McINTYRE:**  Oh.

15      (The following record was then read:

16              "THE COURT:  So you did additional work

17         for SNAPP prior to beginning the preparation of

18         this expert report?

19              "THE WITNESS:  Yes.  I authored an

20         expert report, for example, that was I believe

21         back in September of '05.

22              "THE COURT:  Okay.  Go ahead,

23         Mr. McIntyre.)

24         **THE COURT:**  So he said something about an '05

25   report.

1          **MR. McINTYRE:**  That was his report number one that

2     was submitted in this case by this witness.

3          **THE COURT:**  I don't know anything about that, sir.

4     All I know is he said he submitted a report in '05 so your

5     words did you also are quite okay.

6          **MR. McINTYRE:**  Oh, okay.

7          **MR. FINK:**  Your Honor, if I may, the next

8     question, which I'm sure will be reflected, is that he asked

9     the witness if he was aware of a 2007 submission regarding

10    tabular, a tabular depiction of damages.  The witness said

11    he was aware of it.  He didn't say he participated in it.

12         **THE COURT:**  I know, I know, I know.  I'm

13    overruling your objection.

14         **MR. FINK:**  Thank you, Your Honor.

15         **THE COURT:**  So the question is, sir, do you know

16    that in July 2007 SNAPP prepared a draft of a verdict?

17         **THE WITNESS:**  Yes, I'm aware of that, also.

18         **THE COURT:**  Did you have anything -- did you

19    participate in that in any way?

20         **THE WITNESS:**  I don't think so.

21         **THE COURT:**  Okay.  That's the answer to your

22    question.

23    **BY MR. McINTYRE:**

24    **Q.**   What were the elements of damages in your 2005 report

25    if you can generally tell us?

1    **A.**   I'm going to have to see a document on it.  I know it

2    was marked before.  Not in this deposition, but a different

3    one.

4    **Q.**   There was no claim for administrative cost savings in

5    that report, was there?

6    **A.**   There was a claim for cost savings in that report.

7    **Q.**   Did it include administrative cost savings in the claim

8    for cost savings?

9    **A.**   Yes.

10   **Q.**   Looking again at Exhibit Q, if I wanted to get this

11   information --

12            **THE COURT:**  Wait a minute.  Exhibit 2?

13            **MR. McINTYRE:**  Q, as in --

14            **THE COURT:**  Q?

15            **MR. McINTYRE:**  Q, Q.

16            **THE COURT:**  Q, okay.

17   **BY MR. McINTYRE:**

18   **Q.**   This is the list of exhibits that support your analysis

19   for the cost savings, correct?

20   **A.**   This, yeah, these are the supporting, the primary

21   supporting documents for the cost savings calculations.

22   **Q.**   Let me just by way of example ask you to look at

23   Page -- Q, Exhibit Q, Page 5.  The type of documents that

24   reflect your cost savings analysis on Page 5 include

25   Ford-SNAPP accounting supplier invoices, and then you list

1    or Mr. Vetter lists --

2              **THE COURT:**  There are listed.

3    BY MR. McINTYRE:

4    **Q.**   -- SNAPP documents contained in boxes.  Did you go

5    through personally any of these boxes that are listed here?

6    **A.**   I did not physically go through the boxes.

7    **Q.**   Did you go to the warehouse where all of these boxes

8    are kept?

9    **A.**   No.

10   **Q.**   Do you have any idea of what document in any one of

11   these boxes somehow supports your cost savings analysis?

12   **A.**   I haven't personally gone into the boxes and examined

13   the contents of each, but the contents which are invoices

14   are relevant to the definition of SNAPP's cost, which is

15   part of the contractual language in Paragraph 4.3, which

16   determines cost savings.

17   **Q.**   How do you know that?

18   **A.**   Because that's the type of information that would be

19   summarized by SNAPP regularly and --

20             **THE COURT:**  Witness, you don't know whether these

21   boxes are full of paper or empty of paper, do you?

22             **THE WITNESS:**  I don't, Your Honor.  I have not --

23             **THE COURT:**  Let's go forward, Mr. McIntyre.

24   BY MR. McINTYRE:

25   **Q.**   I would like to turn your attention back to your

1   report, and turn your attention to Exhibit R, as in Roger.

2   How is Exhibit R used in connection with your report, if you

3   could educate us on that point?

4   **A.**   Exhibit R contains a list of the commodity codes or the

5   commodities that SNAPP was purchasing for Ford or acquiring

6   for Ford back in the June '96 time frame, which is right

7   around the time of the amendment.  The commodities that are

8   listed here, some of these commodities were purchased

9   directly by Ford from a supplier so Ford went direct

10  resulting in leaked revenue.  Some of these commodities were

11  purchased by Ford through SNAPP per the contract.  The piece

12  that relates to leaked revenue is included in the damages

13  analysis that relates to leaked revenue primarily, for

14  example, on Exhibit G.

15  **Q.**   Now, Exhibit R is what you rely upon for Footnote A of

16  your Exhibit F, which calculates leaked revenues, correct?

17          **THE COURT:**  Leased or leaked?

18          **MR. McINTYRE:**  Leaked, l-e-a-k-e-d.

19          **THE WITNESS:**  Yes, Exhibit R, and also some of the

20  commodities that are listed on Exhibit S are the basis for

21  the analysis on Exhibit F in Footnote A.

22  **BY MR. McINTYRE:**

23  **Q.**   Yeah.  So what the analysis does, correct me if I'm

24  wrong, you take the commodities code numbers off of

25  Exhibit R and also to some extent Exhibit S --

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*

86

1          THE COURT:  S?

2          MR. McINTYRE:  Yes, S as in Sam.

3     BY MR. McINTYRE:

4     Q.   -- and you use those to represent the commodity code

5     classifications that SNAPP should have purchased; is that

6     correct?

7     A.   No, those are the commodity codes Ford was purchasing

8     via SNAPP.  That's the point of the Exhibit R subset.

9     Q.   And they should have all of the purchases under those

10    numbers, correct?

11    A.   That's the assumption.

12    Q.   Yes.  And now the point I make is that under --

13         THE COURT:  You are not making points.  You are

14    asking questions.

15    BY MR. McINTYRE:

16    Q.   The question I am about to ask is under Exhibit F in

17    Footnote A --

18         THE COURT:  Wait a minute.  F?

19         MR. McINTYRE:  F, Footnote A.

20         THE COURT:  Wait, I have got to get to the

21    footnote.

22    BY MR. McINTYRE:

23    Q.   You do not take into consideration -- or let me ask you

24    it this way.

25         In Exhibit F, Footnote A do you take into

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*

1    consideration that in Exhibit R a portion of the commodity

2    codes are noted as being sourced on a case-by-case basis?

3    Do you take into consideration that a portion of those were

4    to be sourced on a case-by-case basis?

5              **THE COURT:**  No, they are sourced.  They are soured

6    on a case-by-case basis, Mr. McIntyre.

7              **MR. McINTYRE:**  Soured.

8    **BY MR. McINTYRE:**

9    **Q.**   Did you consider the case-by-case aspect in Exhibit R

10   in connection with your computation contained in Exhibit F,

11   Footnote A?

12   **A.**   I believe the answer to that is yes.

13   **Q.**   How so?  Because isn't it true when you read it doesn't

14   it appear to suggest that SNAPP is entitled to all of the

15   commodity codes on Exhibit R all the time and not on a

16   case-by-case basis?

17   **A.**   No, I think, again, like I said earlier, you have to

18   view Exhibit R in conjunction with Exhibit S.  Exhibit S is

19   a document that was prepared three years later that looks

20   back over the shoulder and says these were the commodities

21   that Ford was to be acquiring through SNAPP.  So we kind of

22   look at it on both ends of when the contract began and when

23   it finished to determine the case-by-case question that you

24   are talking about.

25   **Q.**   Where in Exhibit S does it note that you are --

1          **THE COURT:**  Which Exhibit?

2          **MR. McINTYRE:**  Exhibit F.

3    **BY MR. McINTYRE:**

4    **Q.**   Where on Exhibit F is it somehow noted that a portion

5    of the commodities are being examined only on a case-by-case

6    basis?

7    **A.**   It doesn't note that on Exhibit F.

8          **THE COURT:**  Is it fair to say, sir, that

9    commodities which are sourced to SNAPP on a case-by-case

10   basis cannot be reflected in leaked revenue?

11         **THE WITNESS:**  I'm not 100 percent certain on the

12   answer to that question, but what I remember, Your Honor, is

13   that when we determined the commodities to include on

14   Exhibit F we considered this issue that Mr. McIntyre is

15   bringing up and adjusted for it.

16   **BY MR. McINTYRE:**

17   **Q.**   How?

18   **A.**   By considering only the commodity codes where Ford

19   agreed that SNAPP was the sole source, and in situations

20   where it was unclear, for example, where it says, I'm just

21   using this phrase "soured [or sourced] to SNAPP on a

22   case-by-case basis," we looked at other evidence, including

23   what is on Exhibit S, to determine whether or not to include

24   that specific commodity in the calculations on Exhibit F.

25   **Q.**   What other evidence?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                89

1    **A.**   I just gave you, for example, Exhibit S, as in Sam.

2    **Q.**   You said other evidence including Exhibit S.

3    **A.**   Right.

4    **Q.**   I'm saying what other evidence in addition to

5    Exhibit S.

6    **A.**   I talked with Mr. Vetter on this topic.  I don't

7    remember all that he referenced to me in that discussion,

8    but that was one, and he may have given me a couple of

9    documents, again, which would have been produced that would

10   deal with this question.

11   **Q.**   Was there any analysis done in connection with the

12   information Mr. Vetter provided to you?

13   **A.**   Yes, the analysis is what culminates in Exhibit F.

14   **Q.**   Well, the analysis is what Mr. Vetter told you, and you

15   relied on what he told you?

16   **A.**   No, I disagree with that.

17   **Q.**   Well, didn't you say you discussed this issue with

18   Mr. Vetter, and Mr. Vetter did what to resolve the issue, if

19   anything?

20   **A.**   Let me make sure my testimony was clear.  In doing the

21   analysis that you asked about, originally we looked at

22   two exhibits, Exhibit R and Exhibit S. I also, in addition

23   to that, discussed it with Mr. Vetter and he may have

24   provided me some additional information that satisfied me

25   that the analysis was being done correctly.

1   **Q.**   Well, my question is:  What is this additional

2   information he supplied to you that satisfied you that the

3   analysis was done correctly?

4   **A.**   I don't have that at the tip of my fingers.  Again, if

5   it would have -- anything I received from him was produced

6   to you, so . . .

7            **THE COURT:**  Sir, can you tell me how Exhibit S

8   relates to Exhibit R?

9            **THE WITNESS:**  Yes.  Exhibit S, Your Honor, was

10  prepared back in '96 right before the amendment was signed

11  and so it basically shows what Ford was doing at that time

12  with SNAPP.

13           **THE COURT:**  Okay.

14           **THE WITNESS:**  It relates to Exhibit S because

15  Exhibit S gives you the other end of the contract.  In other

16  words, as it was wrapping up Ford went to its buyers and

17  said here are the things that SNAPP has been buying for us,

18  and it lists commodity codes there.  So that's kind of the

19  look back.

20           **THE COURT:**  Where does it list commodity codes?

21           **THE WITNESS:**  If you look at Exhibit S, the

22  second page, for example, you can see in the fourth column

23  from the left its entitled Commodity Code.  That gives you

24  a --

25           **THE COURT:**  Wait, no, it's the fourth column from

 1    the left.  Okay.  So you cross-reference those commodity

 2    codes?

 3              **THE WITNESS:**  You can look at the commodity codes

 4    or you can look at the commodities description, which is the

 5    first column on the left.

 6    **BY MR. McINTYRE:**

 7    **Q.**   Does Exhibit S, to your knowledge, contain any

 8    indication as to whether any of those commodities contained

 9    therein were soured or sourced on a case-by-case basis?

10    Does it say anything about that?

11    **A.**   The document that's actually attached to my expert

12    report I don't believe does indicate, you know, what you are

13    asking for, but my recollection is that the entire document

14    does in fact talk about sourced commodities that are

15    exclusive versus not.  That's my recollection.  I don't have

16    it in front of me.

17    **Q.**   You saw a Ford Motor Company document that used the

18    words exclusive versus nonexclusive?

19    **A.**   Again, I don't know that it contains that language, but

20    my recollection is that the full document has some other

21    references that would go to your question.  I just don't

22    have it.

23    **Q.**   Where is the full document, if you know?

24    **A.**   Again, it would be among those produced to you.  I'm

25    just doing that from memory.  The piece that's attached to

1   my report is just a segment of the document.

2   **Q.**   So you attached a document to your report which you say

3   is incomplete?

4   **A.**   My recollection -- again, this has been some time since

5   this was prepared, but my recollection is that the document

6   attached as Exhibit S, as in Sam, was accompanied by some

7   other stuff which isn't in Exhibit S.  I just don't remember

8   what that was.

9   **Q.**   And the other stuff, according to your testimony, tends

10  to show that the things on Exhibit S were supplied, and the

11  word you used was exclusively, from SNAPP and you didn't

12  include that information?

13  **A.**   I'm trying to give you my answer based on my memory as

14  opposed to the specific document.  So that's the best I can

15  do right now.

16          You know what, Mr. McIntyre, let me help you out.

17  The second page of Exhibit S down towards the bottom it

18  shows telecommunications.

19          **THE COURT:**  Pardon?

20          **THE WITNESS:**  On the second page of Exhibit S.

21          **THE COURT:**  Yeah.

22          **THE WITNESS:**  Down towards the bottom about the

23  third line up from the bottom it says telecommunications

24  services.

25          **THE COURT:**  Wait a minute.

1    **BY MR. McINTYRE:**

2    **Q.**   Wait a minute.  The third page, which would be in the

3    kind of chart?

4    **A.**   Yeah, the second page of Exhibit S.

5    **Q.**   Yeah.

6              **THE COURT:**  S?

7              **THE WITNESS:**  It's S, as in Sam.

8              **THE COURT:**  Yeah.

9              **MR. McINTYRE:**  Yeah.

10             **THE WITNESS:**  The third row from the bottom.

11             **THE COURT:**  Yeah.

12   **BY MR. McINTYRE:**

13   **Q.**   Telecommunications.

14   **A.**   Yes.  It says Telecommunications Services in the first

15   column.  If you move one column to the right, it says

16   Portion.

17   **Q.**   Yeah.

18   **A.**   And the column heading for that is Previous SNAPP

19   Purchase?  Some of these rows have yeses, some have nos, and

20   some have portions.

21             **THE COURT:**  Yeah, but a previous SNAPP purchase

22   could have been a spot, so to speak, case by case, could it

23   not?

24             **THE WITNESS:**  I would, I would think then,

25   Your Honor, that there would be no need to include the word

 1    portion in any row because you either buy them or you don't.

 2              THE COURT:  That's all right.  That's okay.  I

 3    should stay out of this.

 4              Go ahead.

 5    BY MR. McINTYRE:

 6    Q.   I'll draw your attention to Attachment C to your

 7    report.

 8              THE COURT:  What?

 9              MR. McINTYRE:  C, as in Charlie.

10              THE COURT:  Exhibit C?

11              MR. McINTYRE:  Yes, Exhibit C.

12              THE COURT:  Go ahead.

13    BY MR. McINTYRE:

14    Q.   Down at the bottom under Expenses you see you included

15    expenses in contract, Line 19, contract agency fees?

16    A.   Yes.

17    Q.   What are the contract agency fees?  What is that?

18    A.   I don't remember specifically.  I think this was --

19    there were some situations where there may have been some

20    leased employees that SNAPP was, you know, using for

21    providing the Ford services, but I don't remember

22    specifically.

23    Q.   The same question.  The line item for rent expenses,

24    what were those for?

25    A.   Well, SNAPP rented space, real estate in various

1    locations, one in -- at least one in the southeastern

2    Michigan area.  They had offices in other countries as well,

3    and so those would be primarily I think expenses associated

4    with real estate leases.

5    **Q.**   What's the intercompany allocation line item?

6    **A.**   Row 25 is an allocation of the amounts shown in Row 24.

7    So specifically what I mean by that is there was a total

8    interest expense that was charged by PCS to SNAPP for the

9    capital that PCS was providing, and that total, which was

10   about $5.8 million, needs to be essentially allocated to the

11   different geographies.  So North America versus Europe

12   verses some of the other programs that were going on.  So

13   that's what that does, simply allocating it to the

14   appropriate cost center.

15   **Q.**   I would like to go to the cost section of your report

16   regarding good faith renewal, which is at Page 13 entitled

17   Component 4, Failure to Negotiate the Renewal of the

18   Amendment in Good Faith.  Now, at the bottom of Page 13 you

19   will see a discussion entitled duration of the contract.  Do

20   you see that, sir?

21   **A.**   Yes, I do.

22   **Q.**   And you indicate "Some of the relevant considerations

23   in determining the duration of the contract include," and

24   you note a number of things and one of them is "investment

25   horizon of the parties."  Do you see that?

1    **A.**    Yes, I do.

2    **Q.**    What is the investment horizon of the parties?

3              **THE COURT:**  Where is that?

4              **MR. McINTYRE:**  It's at Page 13.

5              **THE COURT:**  I see it.

6              **MR. McINTYRE:**  And it is in the third line under

7    point --

8              **THE COURT:**  Oh, yeah.

9    **BY MR. McINTYRE:**

10   **Q.**    Where you say one of the factors you considered was the

11   investment horizons of the parties, and my question is:

12   What is the investment horizon that you considered in

13   opining that three years was the proper length of a

14   prospective contractual relationship?

15   **A.**    What I mean is the, the concept that certain

16   transactions don't happen, well, most transactions don't

17   happen overnight.  So you have a process that requires

18   negotiations to occur, the signing of agreements with a

19   supplier, the provision of the actual good or service, and

20   that may all take place over a lengthy period of time.

21   There were several examples of that during the Ford-SNAPP

22   relationship where an initial investment by SNAPP wouldn't

23   result in any purchasing activity immediately, nor would it

24   result in the conclusion of the underlying transaction.

25              So when you look at investment horizon, it's the

1    concept that monies may be expended early and the benefits

2    not received until much, much later in the entire process.

3    That's the point.

4    **Q.**    Did you prepare any analytical document entitled

5    Analysis of Investment Horizon?

6    **A.**    No, I didn't.

7    **Q.**    Did Mr. Vetter prepared any analytical document

8    entitled Analysis of Investment Horizon?

9    **A.**    I don't know whether he has or hasn't.

10   **Q.**    Do you know whether or not there's any document to

11   compare the investment horizons for the contracts between

12   1991 through 1996 and what the investment horizons were in

13   those individual contracts?

14   **A.**    I'm not aware of anything like that.

15   **Q.**    On what did you base your opinion that the investment

16   horizon required a three-year contract?

17   **A.**    I think, again, it's the concept that the parties'

18   relationship over the prior eight or nine years had required

19   investments by SNAPP well in advance of the generation of

20   any revenue for SNAPP.  They would expend money regularly,

21   which would not formulaically or otherwise impact their

22   compensation, and it took time for some of those things to

23   mature.

24   **Q.**    But that was true, wasn't it, in 1999 when they entered

25   into the first contract?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*

98

1    **A.**   To the extent that the parties would have known at that

2    point about the length of the issues, I think, I think it

3    would have been relevant.  I don't know that they would have

4    had the same perspective in '91 that they would have had in

5    '99.

6    **Q.**   When they entered into the contract in '93, they would

7    have had the benefit of two prior contracts, and wouldn't

8    they know what the investment horizon was in 1993 based on

9    their prior experience?

10   **A.**   They might.

11   **Q.**   In 1993 the contract term was how long?

12   **A.**   If I remember, there wasn't a contract in '93.

13   **Q.**   Take '94 then.  What was the contract term?

14   **A.**   I think the '94 agreement was for a one-year term with

15   the evergreen clause that renewed it automatically.

16   **Q.**   Unless either party gave termination?

17   **A.**   Right.

18   **Q.**   I'm sorry, I didn't mean to interrupt you.  The same

19   question as to you considered the amount of fixed costs that

20   would need to be recovered via charges over time.  Is that

21   the same thing as the investment horizon?

22   **A.**   No, I think it's different.

23   **Q.**   How is it different?

24   **A.**   The concept of this is that there are certain

25   obligations that parties will take on.  For example, you

1    sign a lease.  It's a fixed cost no matter whether you are

2    doing $2 million a month or 20 million or 200 million, and

3    that fixed cost is there for the length of that lease.  If

4    you are going to enter into contracts that bind you to a

5    long-term obligation to a supplier, to a landlord or to

6    employees, you are going to want to make sure that your

7    business has the ability to produce enough money to cover

8    those costs.  So it's an analysis that looks at how much you

9    have as your basically fixed, fixed overhead or your fixed

10   charges and to make sure that you can cover those.

11   **Q.**   Did you prepare a written analysis of the amount of

12   fixed costs that would need to be recovered via charges over

13   time in connection with this opinion?

14   **A.**   Not, not specifically, but Exhibit C, if you look at

15   it, it really does contain a lot of the analysis that would

16   be relevant for a fixed cost --

17   **Q.**   Did Mr. Vetter prepare an analysis regarding fixed

18   cost?

19   **A.**   I don't know if he did or not.

20   **Q.**   Continuing on with the failure to renew, I draw your

21   attention to Page 14 where you do your actual calculation,

22   and in your calculation --

23          **THE COURT:**  Page 14?

24          **MR. McINTYRE:**  Page 14 entitled Damage

25   Calculation.  "I calculated profits under the prospective

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                100

1    contract:  One, to occur over a three-year term; two,

2    revenue was calculated based on SNAPP's actual 1999

3    purchases from suppliers assuming no growth in that volume

4    over the three-year term, plus MRO purchases of 3.3 billion

5    plus I-Ra-MPP purchases of 2.27 billion annually."

6              **THE COURT:**  Wait a second.  What is MRO?

7              **THE WITNESS:**  MRO stands for maintenance, repairs

8    and operations and, you know, very simple --

9              **THE COURT:**  Oh, I see.  IMPACT activity.

10   Maintenance, repair and operations.  That's the same as

11   IMPACT activity, right?

12             **THE WITNESS:**  The IMPACT program covered MRO

13   commodities primarily.

14             **THE COURT:**  Well, what was IMPACT?

15             **THE WITNESS:**  Just the name of a program.  Ford

16   says, hey, this new program is going to be called IMPACT,

17   and under this program you are going to provide MRO.

18             **THE COURT:**  Well, wait a minute.  You have a

19   phrase IMPACT and you have a phrase, an acronym MRO.  Are

20   they the same thing?

21             **THE WITNESS:**  Pretty much.

22             **THE COURT:**  Then why are you using two different

23   acronyms?

24             **THE WITNESS:**  Sometimes, Your Honor, Ford would

25   refer to MRO commodity purchases under the label IMPACT.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    101

1    Sometimes they would refer to it under the label IPAS.

2              **THE COURT:**  Huh?

3              **THE WITNESS:**  IPAS.

4              **THE COURT:**  Impasse or IPAS?

5              **THE WITNESS:**  I-P-A-S.  Sometimes it was just

6    plain old MRO.

7              **THE COURT:**  Okay.  And then what is I-Ra-MPP?

8    Wait a minute.  I'm only using the phrases that you used.

9    What do you mean by I-Ra-MPP?

10             **THE WITNESS:**  I-Ra-MPP is another Ford program.

11   This program covers the purchase of essentially raw

12   materials for cars.  So steel, plastic resin for use in car

13   interiors.

14             **THE COURT:**  Okay.

15             **THE WITNESS:**  That kind stuff.

16             **THE COURT:**  All right.  Go ahead.

17   **BY MR. McINTYRE:**

18   **Q.**   To your knowledge did SNAPP ever purchase any raw

19   materials under the I-Ra-MPP program for Ford?

20   **A.**   I, I think, I think the answer is no in part because

21   the I-Ra-MPP discussions were terminated essentially along

22   with the amendment to the Framework Agreement.  There was a

23   letter in October 1999 where Mr. Mazzorin I think indicated

24   that there were going to be no further discussions on

25   I-Ra-MPP unless they could solve things with the underlying

1    amendment agreement.

2    **Q.**   It's true, isn't it, that neither the first amendment

3    to the Framework Agreement nor the Framework Agreement

4    itself contained the phrase I-Ra-MPP?

5    **A.**   I agree with you.

6    **Q.**   It's true, isn't it, that neither the first amendment

7    to the Framework Agreement or the framework itself contained

8    the word IMPACT?

9    **A.**   I believe that's accurate.  I'm not 100 percent

10   positive on that one though.

11   **Q.**   Now, this goes to this question.  It's true, isn't it,

12   that the damages for I-Ra-MPP that you have calculated are

13   not going to be recoverable unless the finder of fact or the

14   Court find that SNAPP has a legitimate claim under I-Ra-MPP;

15   isn't that fair?

16   **A.**   I assume so.  Like all claims, if there's not a legal

17   basis for it.

18   **Q.**   Do you -- sitting here today and in your investigation

19   in connection with a good faith basis to seek damages for

20   I-Ra-MPP, can you tell us what is your basis as you

21   understand it for including these extensive claims for

22   I-Ra-MPP damages?

23   **A.**   Well, in a nutshell they are included under the

24   category of failure to renew in good faith.  So the concept

25   is that as a result of the alleged failure to act in good

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    103

1    faith, again, I'm not opining on that, but assuming that

2    that was the case, that the -- Ford's failure as it related

3    to the underlying Framework Agreement was very closely tied

4    to its decision to not proceed with the I-Ra-MPP program.

5    So they were being tied together by Ford, and as a result

6    that's my main reason for including it in this damage

7    calculation because they flow from the underlying failure to

8    negotiate in good faith.

9    **Q.**   How does it flow from a failure to renew the earlier

10   Framework Agreement if the Framework Agreement said nothing

11   in it and did not include I-Ra-MPP?

12   **A.**   The amendment to the Framework Agreement contained the

13   provision that required the parties to negotiate in; good

14   faith, and if that provision was breached -- again, I'm not

15   opining that it has or hasn't been breached, but if it's

16   found to have been breached -- then the question becomes

17   what flows from that breach, and the answer to that is there

18   is no new contract and, number two, there is no I-Ra-MPP

19   program because, at least from the documents I reviewed,

20   Ford connected those two in deciding to cancel the I-Ra-MPP

21   program with SNAPP.

22   **Q.**   Well, it's true, isn't it, in your review of the

23   agreements it says that there will be negotiations regarding

24   the possible renewal of this contract and this contract was

25   the Framework Agreement?  There is no reference to I-Ra-MPP

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    104

1    in that agreement, is there?

2    **A.**    Mr. McIntyre, I agree with you.  I-Ra-MPP is not

3    mentioned by name --

4              **THE COURT:**  Well, let's put it this way, then I'm

5    going to recess for lunch.  It's a fair statement that if

6    there was in fact an I-Ra-MPP agreement in this succeeding

7    period, it would be something brand new in the relationship

8    between the parties, right?

9              **THE WITNESS:**  Yes, but with one caveat,

10   Your Honor.

11             **THE COURT:**  What?

12             **THE WITNESS:**  And that is prior to the expiration

13   of the amendment SNAPP was providing and working with Ford

14   on the I-Ra-MPP program as early as 1998.

15             **THE COURT:**  If you take your view, they were

16   looking to it towards the future, right, but it would be

17   something brand new once it was implemented; is that a fair

18   statement?

19             **THE WITNESS:**  I think so.  I don't have the full

20   knowledge of that.

21             **THE COURT:**  Would it be a fair statement that

22   SNAPP had in fact never before purchased raw materials for

23   the automobile phase of Ford's business?

24             **THE WITNESS:**  I think that's accurate.  I don't

25   know.

1      **THE COURT:**  Okay.  And you predicted that once

2   they started they would do it for three years, although it

3   was something brand new and no one knew how it would work

4   out?

5      **THE WITNESS:**  I think I agree with you.

6      **THE COURT:**  Okay.  And that what -- was SNAPP to

7   be the exclusive purchaser of these raw materials or was

8   this a program, as you talked about it, you know, program --

9   purchase specific?

10      **THE WITNESS:**  My understanding is that it was

11   supposed to be an exclusive relationship, but I don't know

12   the full --

13      **THE COURT:**  So you are predicting your loss of

14   profit to SNAPP on the assumption that Ford would have ended

15   up agreeing that SNAPP implemented its whole raw material

16   purchases, steel, plastics, et cetera, et cetera, et cetera?

17      **THE WITNESS:**  Not all, Your Honor.  I just want to

18   be clear on this because Ford buys a lot of steel and a lot

19   of plastics, but only some portion of that was in this

20   I-Ra-MPP program.  Not all of it.

21      **THE COURT:**  Do you know what portion of it was?

22      **THE WITNESS:**  I don't know.  I have a number, a

23   dollar amount, but I don't know what percentage.

24      **THE COURT:**  Okay.  Thank you.  We'll resume at

25   2:00.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*          106

```
 1              (Recess from 1:02 p.m. until 2:08 p.m.)

 2                   THE COURT:  Be seated.

 3                   Go ahead.

 4    BY MR. McINTYRE:

 5    Q.   Mr. Frazee, in your testimony this morning you made

 6    reference to a report that you prepared in July of 2005.

 7    I'll show you and hand to counsel and the Court Exhibit 18.

 8    Is this the report of which you spoke?

 9    A.   Yes.

10    Q.   Take a look at Page 9 of your report.

11                   THE COURT:  Wait a second.

12    BY MR. McINTYRE:

13    Q.   Of July 2005, Exhibit 18.

14    A.   September 2005?

15    Q.   Well, I've got -- it's dated, the letter is dated

16    July 29, 2005.

17    A.   You are correct.  I was looking at the date on the

18    front.

19    Q.   And that exhibit number on the front was of the

20    deposition that we took of you on that date, correct?

21    A.   Yes.

22    Q.   And that was taken by my partner Ms. Alamo, correct?

23    A.   Yes.

24    Q.   Looking at Page 9, this is where you summarize the

25    calculation of lost profits as of the work you have done
```

1    July 29, 2005, correct?

2    **A.**   Yes.

3    **Q.**   And I note that you have on the bottom a summary

4    calculation of lost profits preliminary method two that does

5    not have any figures in it yet, correct?

6    **A.**   Correct.

7    **Q.**   Looking at the summary of calculation of lost

8    profits --

9               **THE COURT:**  What page are you looking at?

10              **MR. McINTYRE:**   Page 9, Your Honor, of Exhibit 18.

11              **THE COURT:**  Yeah.

12   **BY MR. McINTYRE:**

13   **Q.**   The revenue figure that you have in Line 1, 1992

14   through '99, 3,266,462,384, how did you calculate that

15   revenue figure at that time?

16   **A.**   My recollection at that date is that I had SNAPP's

17   audited financial statements for the years ending in

18   December '91 through '99, and so that would I think have

19   been the basis for this calculation in 2005 because some of

20   the information I have today I didn't have back then.

21   **Q.**   And I take it that at that time you weren't claiming

22   leaked revenue for I-Ra-MPP or IMPACT?

23   **A.**   The calculation shown on Page 9 only relates to lost

24   profits, which would be most similar to the claim for

25   1.75 percent that's being made in the '07 report.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    108

1   **Q.**   So you agree with me that the damage calculation you

2   did in 2005 didn't take into account the claims for I-Ra-MPP

3   and IMPACT?

4            **THE COURT:**  Well, let me ask you a question.  Was

5   the IMPACT activity in place during the years of the

6   Ford-SNAPP relationship?

7            **THE WITNESS:**  You said the IMPACT activity?

8            **THE COURT:**  Yeah.

9            **THE WITNESS:**  Yes.

10           **THE COURT:**  But the I-Ra-MPP was not?

11           **THE WITNESS:**  The I-Ra-MPP was getting rolling in

12   1998 and before --

13           **THE COURT:**  I mean there were discussions.

14           **THE WITNESS:**  No, there were pretty significant

15   investments that had been made by SNAPP.  There were draft

16   business plans that had been prepared.  There was ongoing

17   negotiation of a contract.  There was a lot more than just

18   discussions.

19           **THE COURT:**  Okay, all right.  Go ahead.

20           **THE WITNESS:**  I'm sorry, I don't know if I

21   answered your question.

22   **BY MR. McINTYRE:**

23   **Q.**   Does this damage calculation that you did in 2005

24   include anything for the failure to renew?

25   **A.**   That was the old question or the new question?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    109

1    **Q.**   This is this question.

2    **A.**   This question.

3              I don't think this report deals with failure to

4    renew.

5    **Q.**   How did you come to include failure to renew in this

6    report when it wasn't in the first one?

7    **A.**   The point in time that the 2005 report was prepared was

8    a very different factual scenario and legal scenario at that

9    point.  SNAPP had a number of claims that went beyond its

10   contract claim.  The 2007 report that has been prepared has

11   been prepared to reflect the Court's rulings in the interim

12   and the discovery of additional documents and production and

13   those kinds of things.  So there is a lot of water under

14   this bridge.

15   **Q.**   I would like to draw your attention to Page 6 of your

16   current report, Exhibit Number 1.  Specifically, the

17   second paragraph -- you see in the center of the page it

18   says "True revenue properly included in 1.75 profit and cost

19   savings calculation"?

20   **A.**   Yes.

21   **Q.**   And below that "background" and then below that the

22   second paragraph starting out with "these Ford schedules"?

23   **A.**   Yes.

24   **Q.**   And then you say in the second paragraph "additionally

25   Ford entered into leasing arrangements directly with

1    suppliers."  Are you claiming in your damage analysis that

2    the leaked revenues include not only revenues that were lost

3    because other suppliers bought product for resale to Ford

4    but that there were leasing arrangements that somehow

5    deprived your client of sales opportunities?

6              In other words, more simply, do leaked revenues

7    include leases?

8    **A.**   The simple answer to that is yes, although it has

9    nothing to do with the page you just pointed to.

10   **Q.**   Why don't I draw your attention to Exhibit E.  Maybe

11   that's where it does, under leaked revenues in Exhibit E.

12   **A.**   It's not really there either.

13   **Q.**   Well, I'll draw your attention -- this is what piqued

14   my interest.  Under this it says, "Summary of SNAPP's

15   damages under 1.75 percent profit agreement," and then below

16   that in a line under -- there is leaked revenue, and then it

17   says "Due to Ford's purchase and leasing of in scope IT

18   commodities."  Does that mean here you somehow applied the

19   1.75 profit ratio not only to lost leaked revenues but

20   leaked revenues attributable to leasing?

21   **A.**   The answer is yes, and it's laid out in Exhibit F.

22   That's where the delineation is shown between commodities

23   that were purchased and estimated commodities that were

24   leased by Ford.

25   **Q.**   And this is in Exhibit F, Line 4, where it says "SNAPP

1   lease-related volume"?

2   **A.**   Well, it's really, it's really Line 6.  Line 4 reflects

3   the actual lease-related volumes that SNAPP and Ford

4   accounted, and there was no dispute about it.  Line 6 is the

5   part that is leaked.

6   **Q.**   Okay.  Is there a schedule or summary prepared for

7   Line 6 that calculates the leaked lease volume?

8   **A.**   Yeah.  The calculation is at the bottom of the page.

9   It's Footnote C, and that shows how you would calculate the

10  dollar amount shown.

11  **Q.**   Who initially did this calculation reflected in

12  Footnote C?

13  **A.**   I think I did it.

14  **Q.**   And from what documents did you do it?

15  **A.**   Well, the documents are -- it's not really a document.

16  It's the preceding calculations.

17  **Q.**   Well, is there a list of leases that were somehow

18  leases that covered commodities to which SNAPP claimed that

19  it should have had the right to purchase those commodities

20  in lieu of a lease?

21  **A.**   The answer is yes, but I want to back up because it's

22  important to understand the process.  Ford produced a

23  document that showed its total purchases in a given

24  commodity.  Some of those purchases were leaked.  They

25  didn't produce a document that showed in addition to our

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                112

1    purchases here is a bunch of other stuff that we lease, and

2    so we had to estimate the amount that was leased based on

3    the documents that they did produce which related to their

4    purchases.  Does that make sense?

5    **Q.**   Where can I find the documents that did the analysis of

6    the estimated lease amount?

7    **A.**   It's an exhibit, and it's Footnote C.

8    **Q.**   Just this footnote?

9    **A.**   Which is based on the conclusions from Footnotes B and

10   A, and those in turn are based on Ford documents that were

11   produced by Ford that showed Ford's purchase -- actual

12   purchases of these commodity codes.

13   **Q.**   And is there a document reflecting the analytical work

14   product that led up to these footnotes other than just

15   what's in the schedule itself, Exhibit F?

16   **A.**   Yes.  To the extent that you want more detail on Ford's

17   commodity buys, there is a specific spreadsheet that's been

18   produced to you, and it has a whole bunch of numbers on it

19   that you can look at.

20   **Q.**   Is that on the CD that I was given?

21   **A.**   I don't know if it was on the CD, but it's a Ford

22   document.  You produced it.

23   **Q.**   Well, you would agree with me that during the course of

24   1991 through 1999 thousands and thousands of documents were

25   exchanged between the parties?  You would agree with that?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    113

1    **A.**    Yes.

2    **Q.**    And you would agree with me that in the warehouse where

3    they have the 900 boxes there are thousands and thousands

4    and thousands of documents?

5    **A.**    I would agree.

6    **Q.**    Now, I'm not asking -- you know, the answer that these

7    were documents exchanged by the parties doesn't help me much

8    because what I'm asking you is if I want to go find the

9    analytical work product that substantiates your numbers for

10   lost leased/leaked revenues, what is it you looked at, what

11   do I get to look at to verify that you did the math and the

12   analysis correctly?  What would you tell me to go look at?

13   **A.**    Okay.  I'll try to be as specific as I can.  There is

14   an Excel file.  It should be on that CD, but if it's not,

15   it's a document that Ford has produced.  It's a single Excel

16   spreadsheet.  It has on it about 47 or 50 rows or something

17   like that with individual commodity codes.  It has the

18   amount of purchases between 1995 and 2002, and it totals up

19   to $4.3 billion a year of purchases for these different

20   commodities.

21          So that is exactly the document.  I don't have a

22   Bates number, but that's what it is.

23   **Q.**    Does that document have a column for leases?

24   **A.**    No.

25   **Q.**    Now do I figure out what transactions on that document

1    are for leases?

2    **A.**    That -- I'm sorry if my earlier testimony wasn't clear.

3    That document shows purchases.  The purchases then are

4    summarized for you in this exhibit and in Footnote A.  The

5    analytic calculation to go from there is shown in Footnotes

6    B and C.  So it's all self-contained for you right here.

7    **Q.**    So you don't have copies of leases or identification of

8    specific leases, you have a calculation; is that correct?

9    **A.**    Yes, yeah.

10   **Q.**    During your earlier testimony I asked you something

11   about whether or not you had reviewed purchase orders, I

12   think maybe I said hard copies of purchase orders, and you

13   corrected me and pointed out that purchase orders were

14   typically kept electronically and communicated

15   electronically; is that correct?

16   **A.**    I was using that as an example, yes.

17   **Q.**    Did you inquire of SNAPP as to whether or not SNAPP

18   currently has electronic databases that include copies of

19   these electronic purchase orders?

20   **A.**    No, I didn't.

21   **Q.**    You didn't ask them?

22   **A.**    No.

23   **Q.**    Did you make any inquiry of SNAPP as to what types of

24   databases were available to it for purposes of retrieving

25   information relevant to this case?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    115

1    **A.**   I may have posed that question at one point.  I don't

2    remember an answer that meant anything to me.

3    **Q.**   Did you ask any questions about what financial

4    accounting systems that SNAPP had that would contain records

5    and information relevant to the damage analysis you have

6    done?

7    **A.**   You mean during the course of the Ford-SNAPP

8    relationship?

9    **Q.**   And/or now.  At all.  I'm looking for any kind of

10   databases they have.  Instead of going to the 900 boxes and

11   pawing through, I want to find out if SNAPP has a database

12   and can we, too, gain access to that database.  Did you ask

13   them that?

14   **A.**   Well, yes and no.  I mean I have some understanding

15   that back at the point in time when they were operating with

16   Ford they used some sort of a database.  If I remember

17   correctly, it was a Sequel database, but I don't remember a

18   whole lot more than that.  And in terms of the other part of

19   your question as to whether you can gain access to it if it

20   exists now, I don't have an answer for you on that.

21          **MR. McINTYRE:**  I don't have any further questions

22   for you at this time.  My partner, Ms. Alamo, will ask a few

23   questions relating primarily to the 1999 Transition

24   Agreement.

25          **THE WITNESS:**  Okay.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    116

1          **THE COURT:**  You can straighten out that lectern so

2     it faces him head on.   That's okay.

3                              **-   -   -**

4                          **CROSS-EXAMINATION**

5     **BY MS. ALAMO:**

6     **Q.**   Good afternoon, Mr. Frazee.  I know we have met before,

7     but just by way of introduction again, I'm Michelle Alamo

8     and I am counsel for Ford Motor Company or cocounsel for

9     Ford Motor Company in this matter.  I'm going to try and be

10    brief and focus specifically on SNAPP's claim for damages

11    under the Transition Agreement.

12          And when we refer to the Transition Agreement, can

13    we understand that that's the agreement between Ford and

14    SNAPP dated October 1st, 1999; is that correct?

15    **A.**   I think so.  I don't remember the date actually it was

16    executed, but I think we are speaking of the same agreement.

17    **Q.**   I'll tell you what, to make sure that we are all on the

18    same page, we'll go ahead and we'll mark a copy of it.  This

19    will become Exhibit 19, I believe.

20          Mr. Frazee, I have handed you Exhibit 19.  You can

21    take a couple of minutes to look at that, and I'm going to

22    ask you is that the Transition Agreement that you are

23    referring to in your report.

24          **MR. FINK:**  The document that I have, it looks like

25    I have a lot of highlighting on it.

1          **MS. ALAMO:**  I'm going to ask about that actually,

2     David.

3          **MR. FINK:**  Okay.

4          **THE WITNESS:**  Yes, this is the document?

5     **BY MS. ALAMO:**

6     **Q.**  And, as Mr. Fink just pointed out, Exhibit 19 actually

7     has a lot of highlighting on it; do you see that?

8     **A.**  I do.

9     **Q.**  Is that your highlighting, Mr. Frazee?

10    **A.**  I don't know.

11    **Q.**  Do you recall that Mr. Vetter forwarded you a copy of

12    the Transition Agreement?

13    **A.**  I don't remember if it was Mr. Vetter or someone else

14    from SNAPP, but I certainly did receive it from them.

15    **Q.**  Since we're on the issue of highlighting, I'm handing

16    you now what's been marked as Exhibit 20.  Exhibit 20 is an

17    email from Mr. Vetter to you including various documents

18    that SNAPP believed were relevant to the Transition

19    Agreement analysis, correct?

20    **A.**  I think so.  I mean you have correctly identified that

21    it's an email from him and contains a number of different

22    documents, and I guess the description speaks for itself.

23    **Q.**  Right.  The first document under Number 1 it says,

24    "JX06 agreement dated October 1, 1999.  The highlighted

25    sections are the most significant."

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                118

1            Does that refresh your recollection that the

2      highlighting in Exhibit 19 was actually done by SNAPP for

3      you?

4      **A.**   I, I don't know how you produced Exhibit 19 physically

5      so I'm not quibbling with that, but I just don't remember.

6      In other words, I don't know, did you print this off the CD?

7      **Q.**   Exhibit 19 I'll represent to the Court was produced to

8      us in hard copy by SNAPP's counsel.

9      **A.**   Okay.

10     **Q.**   Represented as being in your files.

11     **A.**   Yep.

12     **Q.**   And if you look at Exhibit 19, it does include the

13     number JX06, correct?

14     **A.**   Yes.

15     **Q.**   Looking at Exhibit 20, Mr. Vetter forwarded various

16     documents to you that SNAPP believed were relevant to the

17     Transition Agreement, correct?

18     **A.**   Yes.

19     **Q.**   I want to focus your attention on the last paragraph of

20     Mr. Vetter's email, and if you look at the bottom it's Bates

21     labeled Frazee 002525.  Do you see where Mr. Vetter informs

22     you in separate emails I will forward some of motion history

23     on these issues as well as detailed calculations of the

24     damages that SNAPP incurred.

25            Did Mr. Vetter forward you detailed calculations

1    related to the Transition Agreement?

2    **A.**    I think so.  I don't know if those would be different

3    from some of the things attached to Exhibit 20, but assuming

4    that they were, these would be things like the kinds of

5    information presented in Exhibit M to my report or maybe

6    Exhibit N, as in Nancy.

7            In other words, let me make sure I'm being clear.

8    The word calculations in that sentence is probably a little

9    bit of a misnomer because essentially what was being

10   forwarded to me were a series of documents that had been

11   provided to Ford back in the, you know, 2000 time frame, and

12   these would have been long lists of transactions covered

13   under the Transition Agreement.  It's that kind of stuff.  I

14   think that's what is referred to in that word calculation.

15   **Q.**    So you believe when Mr. Vetter referred to calculations

16   he was referring to documents that were exchanged previously

17   contemporaneously between the parties?

18   **A.**    That's my general understanding because, again, I don't

19   know what, what emails were attached to this.  I'm sorry,

20   what attachments were provided along with Exhibit 20 versus

21   maybe what was sent in some sort of subsequent email.

22   **Q.**    I'm getting back just to the general Transition

23   Agreement.  Your original report in July of 2005, which has

24   been marked as Exhibit 18 did not contain any opinion or

25   analysis regarding the Transition Agreement, correct?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    120

1    **A.**   In the quick review I had here a minute ago I didn't

2    see anything on that specifically.  I can read the whole

3    thing if you would like, but I just don't remember it

4    containing anything on the Transition Agreement.

5    **Q.**   Well, I can focus you even to Pages 1 to 2 of your

6    July 2005 report, and tell me, do you list the Transition

7    Agreement as one of the documents you even reviewed in

8    relation to your July 2005 report?

9    **A.**   No.  In reviewing Pages 1 and 2 as well as the rest of

10   it, it doesn't contain any description of damages associated

11   with the Transition Agreement.

12   **Q.**   When were you first asked by SNAPP to include an

13   analysis regarding the Transition Agreement in your report?

14   **A.**   I would only be guessing, but I want to say mid 2007.

15   I don't recall anything more specific.

16   **Q.**   Okay.  Now, looking at your report from September 2007,

17   Exhibit 1, I understand that damages related to the

18   Transition Agreement are set forth in Exhibit L, correct?

19   **A.**   Yes.

20   **Q.**   Looking at Exhibit L, the first what I would call

21   component of damages is for accounts receivable.  That's

22   Line 1 for 5.5 million, correct?

23   **A.**   Yes.

24   **Q.**   And you indicate that that, if I look at Footnote 1,

25   you indicate that the backup for that element of damages is

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    121

1    in Exhibit N, correct?

2    **A.**    Correct.

3    **Q.**    And Exhibit N was introduced as -- or Mr. McIntyre

4    earlier introduced Exhibit 17, which was a spreadsheet from

5    Mr. Vetter containing the data in Exhibit N, correct?

6              Do you recall Exhibit 17?

7    **A.**    Yes.  I'm just looking at it.

8    **Q.**    And I just want to confirm just to make sure it's

9    clear, you didn't do any independent review or analysis of

10   the underlying purchase orders from which the data in

11   Exhibit N was pulled, correct?

12   **A.**    I did not physically look at the underlying purchase

13   orders or purchase notifications that were underlying

14   Exhibit N.  Again, just so I'm clear because I said it

15   earlier, some of those things aren't in paper form, they are

16   typically electronic, and number two, as I said earlier

17   also, I didn't think it was a necessary process given that

18   SNAPP and Ford have gone back and forth on this specific

19   issue with a specific exchange of the list many times.  So

20   there has been a very thorough analysis by both sides of

21   what's contained within the 5 1/2 million.

22   **Q.**    Assuming that purchases were reflected in electronic

23   form, how would that prevent you from reviewing them?

24   **A.**    It doesn't necessarily prevent me.  I'm just saying to

25   you that it's not as simple as saying pick up a piece of

1    paper all the time.

2    **Q.**   So if the purchase orders were in electronic form, how,

3    if you know, would SNAPP obtain the data that's reflected in

4    Exhibit N?

5    **A.**   I, I can't speak to how it obtained the data, but my

6    point is that back in 2000 when this list was first

7    prepared, at that point in time the electronic information,

8    for example, that I was looking about earlier was certainly

9    available because it was --

10   **Q.**   Mr. Frazee, is your answer that you don't know?

11          **MR. FINK:**  Your Honor, I'm sorry, she's

12   interrupted the witness when he was explaining his answer.

13   He was right in the middle of his answer.

14          **MS. ALAMO:**  Your Honor, I asked him if he knew,

15   and he was going off on a diatribe about what he may have

16   assumed or speculated.

17          **THE COURT:**  Please, it wasn't a diatribe.  He

18   wasn't responsive to your question.

19          Ask the question again.

20   **BY MS. ALAMO:**

21   **Q.**   Mr. Frazee, do you know where SNAPP pulled the data

22   reflected in Exhibit N from?

23   **A.**   Where they pulled it from in 2007 or where this pulled

24   it from originally?  Which is your question?

25   **Q.**   Let's start with 2007.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    123

1    **A.**   I don't know the answer to that.

2    **Q.**   How about originally?

3    **A.**   They pulled it from the system that was operating at

4    that point in time in early 2000.

5    **Q.**   What system was that?

6    **A.**   The standard operating system that SNAPP was using to

7    run its business for Ford.

8    **Q.**   And how do you know that?

9    **A.**   Because that's based on my discussions with the parties

10   and I think some of the correspondence that's gone back and

11   forth that that's where that data came from.

12   **Q.**   That's something that SNAPP told you?

13   **A.**   And, again, the correspondence.  Remember, there were

14   three or four pieces of correspondence from SNAPP to Ford

15   describing these kinds of calculations and where that number

16   would have come from.  So either from the discussions or

17   from the documents it's pretty clear as to where that would

18   have come from.

19   **Q.**   I noticed on Exhibit N you include $153,000 for open

20   IMPACT orders, is that correct, on Line 3?

21   **A.**   Exhibit N?

22   **Q.**   Exhibit N.

23   **A.**   Line 3, yeah, 153,000.

24   **Q.**   What's your basis for including IMPACT accounts

25   receivables in your Transition Agreement analysis?

**A.**   The Transition Agreement defines the transactions.  It
says certain things are Type I transactions, certain things
are Type II transactions.  That determination is a
contractual, it's a contractual mechanism and it's a
contractual element that defines how to do that.  At the
point in time when the Transition Agreement expired, 12-31,
there were actual receivables related to the IMPACT program
that would fall under that agreement.

**Q.**   Well, I'm going to direct you to Exhibit 19, which is a
copy of the Transition Agreement and ask for you to identify
what in the Transition Agreement you rely on for including
open accounts receivable related to IMPACT in your
Transition Agreement analysis.

          **THE COURT:**  You are looking at 19?

          **MS. ALAMO:**  Exhibit 19, which should be a copy of
the Transition Agreement.  It's titled Agreement Between
Ford and SNAPP, dated 10-1-99.

          **THE WITNESS:**  The answer to that is this is a
contract between Ford and SNAPP.  SNAPP was providing
purchasing services relating to IMPACT.  If you go down to
the middle of the page, it says Type I transactions are
those which involve a situation under Type I where you have
a release issued by Ford, a P.O. issued by SNAPP, a product
or service received by Ford and SNAPP not paid by Ford, and
that would cover transactions that involve IMPACT as well as

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    125

1    anything else that SNAPP and Ford were contracting for at

2    that point.

3    **BY MS. ALAMO:**

4    **Q.**    Did you understand that at the time of SNAPP's

5    relationship with Ford in 1999 it was administering

6    two different purchasing programs, one for IT-related

7    commodities and one for MRO-related commodities?

8    **A.**    I think the answer to that is yes.

9    **Q.**    And MRO-related commodities were administered under the

10   IMPACT program, correct?

11   **A.**    Largely that's my understanding.

12   **Q.**    Okay.  Where in the Transition Agreement is the IMPACT

13   program referenced?

14   **A.**    Ford and SNAPP were administering or dealing with the

15   IMPACT program under some contract in 1997, 1998 and 1999,

16   and if I'm being -- I've been instructed that there are only

17   certain written agreements in this case that cover, that

18   govern the conduct of the parties.  So if there's an IMPACT

19   program that we agree exists, we agree that SNAPP was

20   administering it, then it can only be done under a contract,

21   as I understand it.  So it's either going to be under this

22   contract, or something that's unwritten or oral, my

23   understanding is we are not to consider those.  So my

24   assumption is that IMPACT is administered under this

25   contract because there can't be any other place where it's

1    administered.

2    **Q.**   Who told you not to look at any other contracts between

3    SNAPP and Ford?

4    **A.**   My understanding is that that was the Court's ruling,

5    that there are only written agreements.

6    **Q.**   Your understanding of the Court's ruling limiting this

7    action to a few specific agreements leads you to believe

8    that any other contract between Ford and SNAPP is

9    irrelevant?

10        **MR. FINK:**  Your Honor, I would object.  I don't

11   know what other contracts she's talking about.

12        **THE COURT:**  I don't understand, I don't understand

13   the question.

14        **MS. ALAMO:**  Okay.

15        **THE COURT:**  My recollection is that when SNAPP in

16   the course of the case was asserting claims on oral

17   agreements Ford objected and I ruled that the agreements

18   were integrated and, therefore, the contractual

19   relationships between Ford and SNAPP which form the

20   predicate for this case are all reflected in writings, and

21   we identified four agreements that, that constituted the

22   universe of the agreements which Ford had with SNAPP in

23   which Ford was alleged to have breached and I have a

24   notebook in chambers with those four agreements.

25        Now, that was Ford's, that was Ford's motion

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    127

1    activity which the Court responded to favorably.  So I don't

2    know what you are asking him.

3              **MS. ALAMO:**  I can go about it a different way,

4    Your Honor.

5              **THE COURT:**  Well, I think the question is that

6    IMPACT activity or MRO it's sometimes referred to is that

7    SNAPP was furnishing maintenance, repair and I don't know

8    what operations means, was furnishing services related to

9    maintenance, repair and operations, I guess it would be, of

10   IT commodities is my understanding and that --

11             **MS. ALAMO:**  For the IMPACT program, Your Honor?

12             **THE COURT:**  Well, the IMPACT program and MRO are

13   synonymous, I'm told.  Am I wrong?

14             **MS. ALAMO:**  That is correct, Your Honor.

15             **THE COURT:**  What?

16             **MS. ALAMO:**  IMPACT program, the IMPACT purchasing

17   program related to the purchase of maintenance, repair and

18   operations type of supplies.

19             **THE COURT:**  So it's an IMPACT program?

20             **MS. ALAMO:**  That was the name, and I believe these

21   were from Mr. Frazee's earlier testimony today also, the

22   name of the purchasing program for the MRO commodities.

23             **THE COURT:**  Okay.  So what's your question to the

24   witness?

25             **MS. ALAMO:**  I was going to come about it a

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                     128

1    different way.

2            **THE COURT:**  All right.  You ask whatever you want.

3    **BY MS. ALAMO:**

4    **Q.**   Are you assuming that the IMPACT program is subject to

5    the Transition Agreement?

6    **A.**   When you say subject to, do you mean underneath?  Is

7    that what you mean?

8    **Q.**   Underneath.  Does the Transition Agreement cover the

9    IMPACT program?

10           **THE COURT:**  Well, I think the question should be

11   different.

12           Ford and SNAPP had what was called a Transition

13   Agreement to provide for the year 1999?

14           **THE WITNESS:**  For just the fourth quarter of the

15   year.

16           **THE COURT:**  For the fourth quarter of the year

17   1999.

18           **THE WITNESS:**  Yes.

19           **THE COURT:**  And that was to govern the services or

20   whatever SNAPP was doing for Ford.

21           **THE WITNESS:**  Yes, for that time period.

22           **THE COURT:**  For that three-month period.  Part of

23   it was the continuation of the purchase of IT commodities,

24   right?

25           **THE WITNESS:**  Yes.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    129

1              THE COURT:  Was also part of it, as far as you

2      know, for IMPACT program activities?

3              THE WITNESS:  That's my understanding, and I'll

4      point you, Your Honor, to Paragraph 1.1 of the Transition

5      Agreement, which kind of describes what the scope is.

6              THE COURT:  Okay.  Go ahead.  What did it say?

7              THE WITNESS:  It says, "SNAPP will provide

8      services to Ford --

9              THE COURT:  Take your hand away from --

10             THE WITNESS:  I'm sorry.

11             "SNAPP will provide services to Ford at the level

12     as in place on September 30, 1999, which is the start of the

13     agreement, and Ford will procure through SNAPP the same

14     commodities as in place on September 30, 1999 except as

15     modified during the term of this agreement by a transition

16     plan, which is attached.  The services will consist

17     primarily of purchasing on Ford's behalf computer hardware,

18     software and other commodities and service items used by

19     Ford in the operation of its various business activities."

20             THE COURT:  Okay.

21     BY MS. ALAMO:

22     Q.   And you interpret that to cover the IMPACT program?

23     A.   Yes.

24             Well, to cover the types of materials that are

25     purchased under the IMPACT program.  Is that fair?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    130

1              THE COURT:  Well, materials aren't -- there is no

2      hardware purchased under the IMPACT agreement, right?

3              THE WITNESS:  You are correct.  What I'm saying is

4      the MRO commodities under the IMPACT title.

5              THE COURT:  The MRO commodities are all

6      intangibles.

7              THE WITNESS:  Intangibles?  No, they are tangible.

8      They are things like brooms or goggles, that kind of stuff.

9              THE COURT:  Oh, okay.  Miscellaneous.

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.  All right.  Go ahead.

12     BY MS. ALAMO:

13     Q.   Looking at Exhibit C to the Transition Agreement, which

14     is the transition plan, are any of those MRO commodities?

15             THE COURT:  What page is that?

16             MS. ALAMO:  It's the very last page of the

17     Transition Agreement, Exhibit 19, labeled Initial SNAPP

18     Commodity Transition Plan.

19             THE WITNESS:  None of those appear to be MRO

20     commodities.

21     BY MS. ALAMO:

22     Q.   Turning back to Exhibit N, which is your analysis of

23     accounts receivable.  There is a reserve recorded of

24     $659,000.  What was that reserve?

25     A.   You are asking like in a conceptual sense or?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    131

1    **Q.**   Yeah.  What was it?

2    **A.**   It's basically a situation where SNAPP is going to say

3    certain receivables are not collectible, certain specific

4    receivables are not collectible because of some issue, and

5    the issue might be inadequate documentation or a Ford buyer

6    disputing that they received something.  It could be a host

7    of reasons, but it's basically saying we don't expect to

8    collect these and we are not going to charge Ford for them.

9    **Q.**   Is there a list of those transactions someplace?

10   **A.**   I'm sure there is a list someplace.  I can't remember

11   if it's in the materials that I would have produced or not.

12   I just don't remember.

13   **Q.**   Would it be in Excel spreadsheet form?

14   **A.**   Most likely.

15   **Q.**   Looking at the actual purchases in Exhibit N.

16   **A.**   I'm sorry, the actual purchases?

17   **Q.**   The PO numbers, the PN/PO numbers referenced?

18   **A.**   Yes.

19   **Q.**   How many of those, if any, predate 1996?

20   **A.**   You know, I thought I had looked at that.  I don't

21   remember the answer off the top of my head though.

22   **Q.**   How did you look at that?

23   **A.**   I thought it was on this list.  There was another list

24   that maybe looked kind of like it that might have had dates

25   on it, too.  I'm not sure.  I would have to look at the

1    spreadsheet.

2    **Q.**   Do you know if any of the purchases in Exhibit N

3    predate 1996?

4    **A.**   I don't know off the top of my head.

5    **Q.**   Do you know if any of them predate the term of the

6    Transition Agreement?

7    **A.**   I think a few of them do.

8    **Q.**   What's your basis for including them in your analysis

9    if they predate the term of the Transition Agreement?

10   **A.**   The Transition Agreement defines what constitutes

11   Type I and Type II transactions, and it does not define

12   that -- it does not state that the transaction must have

13   arisen during the term, the three-month term of this

14   agreement in order to qualify here for inclusion on Exhibit

15   N.

16   **Q.**   What are you referring to in the Transition Agreement?

17   **A.**   If you look at Paragraph 1.7, Subpart B, the relevant

18   piece here says that, "Ford's sole and exclusive obligation

19   to SNAPP under this agreement shall be the amounts invoiced

20   by SNAPP to Ford for any unpaid Type I transaction.   Once

21   received, the product has been verified by Ford" and

22   continues on, but the point is that phrase doesn't require

23   the transaction to have occurred within the three-month

24   period.   It simply states here is how you are going to do it

25   and here is how the fees are determined.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    133

1    **Q.**   Paragraph 1.7B also has the qualifier that Type I and

2    Type II transactions should be included in the analysis only

3    once receipt of the products has been verified by Ford,

4    correct?

5    **A.**   Yes.  I mean other clauses, too, but yes, that one.

6    **Q.**   Did you do anything to verify whether receipt of the

7    products had been verified by Ford?

8            Did you personally do anything to verify whether

9    receipt of the products had been confirmed or acknowledged

10   or verified by Ford?

11   **A.**   I didn't personally.  I made sure that that element had

12   been met from SNAPP's perspective, but I didn't go back and

13   retest it.

14   **Q.**   What do you mean met from SNAPP's perspective?

15   **A.**   In other words, in order for them to have included an

16   item let's say in Exhibit N, my question of them is did you

17   meet this contractual term which says Ford has verified

18   receipt of the underlying item, and the answer was yes, that

19   that had been verified.  So I didn't go beyond that to test

20   it myself.

21   **Q.**   SNAPP indicated to you that receipt had been verified

22   by Ford for each of the purchases in Exhibit 9.  Is that

23   what you are telling me?

24   **A.**   Yes.

25           **THE COURT:**  We are going to recess at 3:25 today.

1    **BY MS. ALAMO:**

2    **Q.**   Turning back to Exhibit L, your compilation of damages

3    under the Transition Agreement.  The second component I see

4    is lost markup on certain Type II transactions for

5    $4.3 million, correct?

6    **A.**   Yes.

7    **Q.**   And the backup for that entry, if I read Footnote 2, is

8    set forward in Exhibit M?

9    **A.**   Correct.

10            **MR. McINTYRE:**  Excuse me, Ms. Alamo.  Your Honor,

11   you say recess at 3:25 to resume later today or at a later

12   day?

13            **THE COURT:**  Well, I hate to keep the reporter

14   afterwards.  I think we can resume tomorrow morning.

15            **MR. FINK:**  Your Honor, I am cognizant of the

16   shaking head of the witness.  I haven't talked to him

17   because I didn't anticipate needing him tomorrow.

18            **THE COURT:**  Well, then we will resume as soon as

19   we can.  You will talk to Ms. Owens about it.

20            **MR. McINTYRE:**  Could I speak with Ms. Alamo to

21   determine how much more time she has?

22            **THE COURT:**  Yeah.

23            Witness, what were Type II transactions?

24            **THE WITNESS:**  Type II transactions were -- how do

25   I explain it?  It's defined in the contact on Page 1,

1    Your Honor, of Exhibit 19 right in the middle there, but

2    basically it was a situation where SNAPP had to deliver --

3    they had already bought the item and all of the pricing had

4    been agreed, but they hadn't yet delivered it.  So it just

5    might have been scheduled to happen 20 days later or

6    something like that, but it hadn't been actually delivered.

7              **THE COURT:**  Okay, all right.

8              Go ahead, go ahead, go ahead.

9    **BY MS. ALAMO:**

10   **Q.**   Mr. Frazee, I have just handed you what's been marked

11   as Exhibit 21 for the record.  It's an August 27, 2007 email

12   from Mr. Vetter to you.

13   **A.**   Okay.

14             **MR. FINK:**  Your Honor, we are just trying to get a

15   copy.

16             **THE COURT:**  Go ahead.

17   **BY MS. ALAMO:**

18   **Q.**   If I look at this email and the attachment to it

19   labeled Canceled Orders, correct me if I'm wrong, this is

20   the data that Mr. Vetter forwarded you to be contained in

21   Exhibit M, correct?

22             I mean the only difference I see, looking between

23   Exhibit 21 and Exhibit M, are you changed the title of this

24   spreadsheet and the title of the last column, but all of the

25   data came from Mr. Vetter, correct?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                  136

1    **A.**   Yeah.  I mean Exhibit 21, just to be clear, you have

2    printed out the last seven pages of it, is one of the many

3    attachments to that email, but the point I think you are

4    trying to make is, is this spreadsheet information

5    incorporated into my report as Exhibit M, and the answer is

6    yes.

7    **Q.**   And you didn't change any of the substantive data from

8    Mr. Vetter to yourself in Exhibit M, correct?

9    **A.**   There would be no reason to.  These are old

10   transactions.  This is a list of the detail.  There's

11   nothing that I should be doing to change any of that.

12   **Q.**   You didn't do any independent verification, for

13   example, pulling the underlying purchase order to verify the

14   accuracy of the numbers in Exhibit M?

15   **A.**   No, I didn't.

16   **Q.**   Now, in your report you talk about Type II transactions

17   that were canceled by Ford, and you also refer to other

18   transactions that lapsed.  What do you mean by lapsed?

19   **A.**   Well, as I understand it, there would be, let's say,

20   for example, a situation where Ford agrees to buy or to

21   issue an order and says we'll take up to 100 computers and

22   they take delivery of 60 of them and then basically say,

23   well, we don't need the rest, the remaining 40, and we'll

24   just kind of let that purchase order expire and we won't

25   take the remaining 40.  So, in other words, the purchase

1    order has a time frame to it, and if you don't do anything,

2    then it essentially lapses and you don't have to buy under

3    that purchase order.  That's my understanding.

4    **Q.**    So those weren't purchase orders that SNAPP contends

5    were canceled and reissued directly by SNAPP?

6                **THE COURT:**  By Ford you mean?

7    **BY MS. ALAMO:**

8    **Q.**    Or directly by Ford to other suppliers?

9    **A.**    You know, I think that -- well, again, my recollection

10   on this issue is that SNAPP believes Ford still went out and

11   reissued those purchase orders.  The way that they avoided

12   paying SNAPP is that they allowed it to lapse, as opposed to

13   an overt cancellation.  Either way, I understand SNAPP's

14   position to be that Ford then went out and filled that need

15   for the remaining 40 PC's by issuing a new P.O.

16   **Q.**    Do you know how many of the entries on Exhibits M the

17   purchase order lapsed as opposed to being canceled?

18   **A.**    Excuse me.  I thought I had mentioned this at one point

19   maybe in my report.  I wanted to say it was like -- of the

20   $103 million included on the Exhibit M associated with

21   orders that either were lapsed or canceled, I want to say

22   68 million of it was canceled and the rest was lapsed or it

23   might have been vice versa.

24   **Q.**    How did you determine that?

25                **MR. FINK:**  Your Honor, I think the witness is

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                     138

1    trying to find this.

2              **THE COURT:**  She asked him a question.  If he can

3    answer, he answers it.  If he needs time, he'll ask for

4    time.

5              **THE WITNESS:**  Here it is.  It's on the bottom of

6    Page 17 of my report.  Ford canceled underlying purchase

7    orders totaling 68 million and 35 million additional were

8    allowed to lapse.

9    **BY MS. ALAMO:**

10   **Q.**  And I asked how did you determine the 35 million that

11   lapsed?

12   **A.**  I don't remember.  I'm sorry.

13   **Q.**  Is that a number that you determined or a number that

14   SNAPP determined?

15   **A.**  I don't remember.

16   **Q.**  Going back to Exhibit L, the next component you have

17   for the Transition Agreement are the operating costs

18   incurred during the term of the agreement --

19   **A.**  Yes.

20   **Q.**  -- on Line 4.  That's $8.9 million.  I'm looking at

21   your footnote.  You indicate that that came from a June 30,

22   2000 invoice from SNAPP to Ford, correct?

23   **A.**  I think that was one source for that, yes.

24   **Q.**  Well, it's the source that's identified in your

25   exhibit?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    139

1     **A.**   Right.

2     **Q.**   I just handed you Exhibit 22.  I'm going to ask is that

3     the June 30, 2000 invoice that you are referring to in your

4     report?

5     **A.**   Yes.

6     **Q.**   And if I look at Exhibit 22 on Line 4 in the first page

7     it includes the $8.9 million in operating costs, correct?

8     **A.**   Correct.

9     **Q.**   What did you do to independently verify that figure?

10    **A.**   There was another page that was actually part of 22.

11    Let me just look here.  Yeah.  There is a page Bates labeled

12    Frazee 004019 that shows some additional detail for the

13    operating expenses and that may have been actually the

14    better way to have footnoted my report, but there's more

15    detail there, and I think that's, I think that's also on the

16    following page, 4020.  There's even more kind of detail

17    showing what was -- what the operating costs were.

18    **Q.**   All right.  There's two pages.  018913 and 914 where

19    SNAPP further breaks down the $8.9 million in operating

20    costs, correct?

21    **A.**   Yes.

22    **Q.**   My question to you is what did you do, you personally,

23    to independently verify any of the numbers reflected in

24    Exhibit 22?

25    **A.**   On these two pages of Exhibit 22?

*03-74357; SNAPP v. Ford Motor, et al.*

1    **Q.**   Yes.

2    **A.**   The verification would not have included, for example,

3    auditing any of the underlying invoices or payroll records

4    for these two pages, but would have consisted of inquiries

5    as to the nature of some of these expenses.  I looked at

6    some specific adjusting journal entries that were prepared

7    that did the calculation for a given number.  For example,

8    on the Bates 018914 there is an item in there for impairment

9    losses, and I looked at an adjustment journal entry which

10   calculated it in detail.

11             Again, these were things -- the underlying numbers

12   here were analyzed, calculated, and the supporting

13   documentation was prepared back in 2000, and so I was

14   looking at things that had been prepared and in existence

15   for, you know, five or six years.

16   **Q.**   You were looking at numbers that SNAPP had prepared,

17   correct?

18   **A.**   Yes.

19   **Q.**   You didn't go back to the actual source documentation

20   to verify the accuracy of the numbers in Exhibit 22 relating

21   to operating costs, correct?

22   **A.**   Correct.  Beyond just the level I'm talking about,

23   there is not -- when you say source documents, you can make

24   that as simple as I want to see an underlying invoice.  If

25   you are asking that, I didn't look at invoices.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                    141

1    **Q.**   Right.  What I heard was you looked at some adjusting

2    journal entries related to impairment costs, correct?

3    **A.**   I gave you that as one example.

4    **Q.**   Well, what other ones did you look?

5    **A.**   I would have looked at another line in here on gain or

6    loss on sale of fixed assets.  I think there was some

7    analysis of the line that says from expense for Dell PC's.

8    I looked at the calculation of professional services.

9         I mean these are the bigger dollar items on the

10   page, so those would have been the ones I looked at.

11   **Q.**   How much of the operating cost reflected in Exhibit 22

12   was incurred by SNAPP after 12-31-99?

13   **A.**   It was all incurred by SNAPP in that three-month

14   period.

15   **Q.**   How do you know that?

16   **A.**   Because, to the extent I could, I reviewed the records

17   that show that there was an accrual being made or that there

18   was an expenditure.  Am I answering your question?

19   **Q.**   But those documents were all financial summaries that

20   SNAPP provided, correct?

21   **A.**   Yes.  Again, they are summaries, but they are not

22   summaries.  Some of them are, they are very specific journal

23   entries.  That's not a summary.

24   **Q.**   Accounting journal entries?

25   **A.**   Yes.

1    **Q.**   You didn't go back to the underlying documents to see

2    when SNAPP was actually charged for --

3              **THE COURT:**  You know, I don't know why you keep

4    asking that.  I don't think he went back to underlying

5    documents for anything.

6              **MS. ALAMO:**  I'll move on, Your Honor.  I agree.

7              **THE COURT:**  I mean that's the way I understand his

8    testimony.  He took documents that were provided by others.

9    **BY MS. ALAMO:**

10   **Q.**   Now, Mr. Frazee, on the first day of your testimony you

11   had indicated in discussing the actual 2 percent profit

12   calculation under the Transition Agreement --

13             Do you remember there is a dispute between Ford

14   and SNAPP on how you actually calculate the 2 percent profit

15   calculation?

16   **A.**   Yes, yes.

17   **Q.**   And you indicated during your testimony on direct

18   questioning by Mr. Fink that you thought SNAPP's

19   interpretation made a lot of sense to you.  Have you

20   actually specifically been asked to opine on the

21   reasonableness of SNAPP's interpretation of Paragraph 1.7B

22   of the Transition Agreement?

23   **A.**   I wouldn't characterize it as being asked to

24   specifically opine.  It, I guess, at some level enters into

25   my opinion, but it's not something specific.

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                143

1    **Q.**   Well, that's not reflected actually in your written

2    report, correct?

3    **A.**   Which is?

4    **Q.**   An opinion on the reasonableness of SNAPP's

5    interpretation.

6    **A.**   Right.

7    **Q.**   Your entire report, at least for the 2 percent profit

8    calculation, is based on the assumption that SNAPP's

9    interpretation prevails, correct?

10   **A.**   Let me just double-check there.

11         That would be fair.  My report I think

12   specifically says that if SNAPP's view of the formula is, is

13   ultimately determined to be accurate, that's the way I have

14   done the calculations.  Again, I think that was something

15   that I think was one of the special masters had already

16   decided on at some level, but I'm assuming that there

17   because I thought there was good grounds for it.

18   **Q.**   Do you intend to offer an opinion about the correct or

19   proper interpretation of 1.7B at trial?

20   **A.**   As I sit here today, I don't intend to.  I haven't been

21   asked to specifically.

22         **MS. ALAMO:**  I don't have anything further,

23   Your Honor.

24         **THE COURT:**  Mr. McIntyre, do you have anything

25   more?

*Thomas Frazee - Cross*
*Wednesday/February 27, 2008/Volume 2*                144

1            **MR. McINTYRE:**  We have nothing further at this

2    time, Your Honor.

3            **THE COURT:**  Do you have some redirect?

4            **MR. FINK:**  I do, Your Honor.

5            **THE COURT:**  How long?

6            **MR. FINK:**  I would say probably about an hour

7    and-a-half.  I mean I know we are not going to get that done

8    today.  It might be two, but in that range.

9            **THE COURT:**  Well, I think what we ought to do is

10   have one more session for your redirect rather than start

11   now.

12           **MR. FINK:**  As long as we know the cross is over

13   and we'll just come right in and do it, that would work fine

14   for us.

15           **THE COURT:**  All right.  I think that's the

16   preferable way.

17           I have a couple of questions.  First, this is the

18   witness who you are going to offer --

19           **MR. FINK:**  I'm sorry, I apologize.

20           **THE COURT:**  The witness can step down.

21           This is the witness that you are going to offer to

22   testify as to the damages suffered by SNAPP for Ford's

23   breach of various agreements; is that correct?

24           **MR. FINK:**  It is correct.  This is a witness and

25   the only expert witness, that's correct.

1        **THE COURT:**  All right.  Have you given Ford the

2   list of the factual witnesses that will testify in support

3   of damages and the nature of their testimony in relationship

4   to his report?

5        **MR. FINK:**  Yes, Your Honor.

6        **THE COURT:**  Do you have that, Mr. McIntyre?

7        **MR. McINTYRE:**  There is a witness list.  I'm not

8   sure I have it with me.  I don't agree with Mr. Fink's

9   characterization of it.

10       **MR. FINK:**  Well, Your Honor, we have submitted

11   more than a witness list.  We have also, among other things,

12   provided an exhibit that is entitled Comprehensive

13   Description of How SNAPP Intends to Present its Damages in

14   the context of the Frazee expert damages study, and we

15   describe in some detail the evidence that will be presented.

16   Obviously Mr. Frazee does not have the factual basis for a

17   lot of what he's been testifying to.

18       **THE COURT:**  I understand.

19       **MR. FINK:**  Yeah.

20       **THE COURT:**  Well, do you have that, Mr. McIntyre,

21   or does the Court have it?

22       **MR. McINTYRE:**  Yeah.

23       **THE COURT:**  Because he's testified as to the

24   components of his study and he's gotten a lot of this data

25   from somebody else and what he's done is simply plugged in

1    the figures in a matrix, and the question is do we know who

2    these other people are.

3              **MR. FINK:**  And, Your Honor, we have disclosed who

4    they are, and in fact Ford has taken the depositions of I

5    believe everybody --

6              **THE COURT:**  Well, Mr. McIntyre, do you have them?

7              **MR. McINTYRE:**  Your Honor, I have -- I took the

8    deposition, not personally, but we took the deposition of

9    Mr. Vetter, and at that time he said he was not involved in

10   the preparation of any damage study.  We took the deposition

11   of Mr. Thacker, and at that time he said there was a

12   forthcoming damage study and he was not involved in it.  We

13   took the deposition of Mr. Miller, and he, too, I believe

14   testified that he was not involved in any damage study.

15             We approached Mr. Sankbeil saying we wanted to

16   depose these gentlemen on damages, and we were told they

17   would give us an answer to interrogatory in lieu thereof and

18   that's the thing that's been the subject of many appearances

19   and motions to compel.  It is true that along with the final

20   pretrial order they gave us a list of witnesses, and it

21   summarily said things like Mr. Vetter will testify regarding

22   damages.  He will testify regarding the 2 percent savings.

23   He will testify regarding the 1.75 percent guaranteed profit

24   that they claim.  He will testify regarding the 50 percent

25   savings.  It doesn't indicate any documents he's relying on.

1    It doesn't indicate any specifics.  It doesn't indicate what

2    underlying information he is going to present, and it

3    doesn't what summaries he has prepared.

4           Yes, there is a witness list saying they are going

5    to testify to damages, but our point all along, it's been

6    very uninformative and you will recall when we filed our

7    motion to strike, which we were over here on two or

8    three times, one of the pieces of relief we asked for was

9    that we be able to depose Mr. Vetter and Mr. Thacker and the

10   others who amassed all of the information that they have

11   provided to Mr. Frazee.

12          So the answer from our point of view is they have

13   given us a small praisse [sp] that they are going to call

14   these people, but it's totally uninformative.

15          **MR. FINK:**  Your Honor, can I just clarify the

16   facts?

17          **THE COURT:**  Wait a second.  One can take

18   Mr. Frazee's testimony, and I believe he's been examined on

19   all of the elements of his report and the exhibits which

20   support it, and track back to his source of information,

21   discrete individuals.  The only one I have heard is

22   Mr. Frazee.

23          **MR. McINTYRE:**  You mean Mr. Vetter.

24          **THE COURT:**  Mr. Vetter, excuse me, Mr. Vetter.

25          **MR. McINTYRE:**  There were also some references in

1    the documents, Your Honor, to Mr. Thacker.

2             **THE COURT:**  How does he spell his name?

3             **MR. McINTYRE:**  T-h-a-c-k-e-r.

4             **THE COURT:**  Okay.  Mr. Thacker.

5             It seems to me that in order to complete this

6    *Daubert* hearing you are entitled to examine Mr. Thacker and

7    Mr. Vetter on the discrete portions of the report which they

8    furnished the data.

9             **MR. McINTYRE:**  And may I also ask that the data

10   they used to prepare the summary they gave to Mr. Frazee be

11   produced?

12            **THE COURT:**  Well, they have to be able to identify

13   that documentary trail.

14            **MR. McINTYRE:**  Okay.  So they come in and they

15   bring the summary with them and I examine them, and my

16   questions are going to be where did you get this

17   information, what did you look at?

18            **THE COURT:**  Yes.

19            **MR. McINTYRE:**  And I would suggest it would be

20   nice if I could --

21            **THE COURT:**  And that information has to be

22   available to you.

23            **MR. FINK:**  But, Your Honor, if I may, these

24   witnesses, both Mr. Thacker and Mr. Vetter, have both been

25   deposed.  Mr. Vetter was deposed twice.  They were disposed

1  at a time that they had the information.  What they didn't

2  have, Mr. McIntyre said correctly, that no damage study was

3  prepared by then.  They didn't prepare one.

4          **THE COURT:**  Well, now.  They were examined

5  prematurely.  They were examined prematurely.

6          **MR. FINK:**  Well, Your Honor, that was their

7  option.  In terms of discovery --

8          **THE COURT:**  Option or not, I'm not going to let

9  this case go to trial until they are examined and we have

10  the foundation for this report.  This report rests on a

11  foundation of Mr. Vetter and Mr. Thacker and documents which

12  they had available to them and documents which support the

13  documents they provided, documentary information they

14  provided Mr. Frazee.

15          **MR. FINK:**  Your Honor, if I may for a moment just

16  briefly argue the *Daubert* point because the issue of whether

17  in fact he --

18          **THE COURT:**  Well, I'll tell you, Mr. Fink, unless

19  that happens you don't have a case, and you can argue to

20  your heart's delight.  You do not have a case, and you will

21  not go to trial.  This report as it stands now rests on a

22  foundation of sand, and until that foundation is transformed

23  into concrete this case is not going to trial, period.  Now,

24  whatever mistakes have been made in the past, we are now on

25  a course taking it to trial, and the fact that wisdom comes

1   late is no reason to reject it.  I have allowed a good deal

2   of lateral movement.  I haven't commented on the motion I

3   got yesterday which I couldn't even understand, which played

4   no part in today's testimony.

5            You have the capacity to generate a great deal of

6   paper with numerous exhibits, but they all move the case

7   laterally.  This case is moving forward.

8            We now have the witness who is going to summarize

9   the damage calculations.  He's got all of these calculations

10  and he says he relies on information provided by third

11  parties.  Standing alone, he can't get this testimony in

12  because it has no factual foundation, and they are entitled

13  to test the factual foundation, particularly in light of the

14  fact that much of his testimony, for example, the testimony

15  on how administrative costs were built into, what is it,

16  Exhibit H-1, that the base price, for example, to Altair

17  includes administrative costs.  How that base price was

18  computed.

19           Also, my understanding is that if it's the base

20  price in year one and SNAPP negotiates down a savings in

21  year one, say the base price is $10, SNAPP gets it for $4 so

22  there's a $6 savings, in year two the base price is now $6,

23  not $10 any longer, that the base price transitions down as

24  a better deal is negotiated in the year previous.  Am I

25  correct in that, Mr. McIntyre?

1          **MR. McINTYRE:**  I believe you are, Your Honor.

2          **THE COURT:**  That's my understanding of how base

3    price works and savings work.

4          **MR. FINK:**  In fact, Your Honor, the contract

5    provides that they only get repeated savings by agreement.

6    In the absence of agreement, they don't get repeated

7    savings.

8          **THE COURT:**  I'm not so sure about that.  I'm not

9    so sure about that.  In any event, they are entitled to take

10   these witnesses.

11          Now, I have a more important question.  I'm going

12   to separate the breach of contract damages from the damages

13   for failure to negotiate in good faith.  Has that question,

14   what constitutes a failure to negotiate in good faith, been

15   briefed in this case?

16          **MR. McINTYRE:**  If it please the Court, my

17   colleague, Mr. Zinn, forwarded to Your Honor's clerk a

18   matrix that we thought responded to a request you made at

19   the last hearing to just delineate the procedural posture.

20          **THE COURT:**  No, I want to know if there's been a

21   substantive brief filed on the elements of a cause of action

22   for failure to negotiate in good faith.

23          **MR. FINK:**  Yes, it has, Your Honor.

24          **MR. McINTYRE:**  See, I -- my answer is this.  The

25   issue was one of a number that was raised.  It was not

1   definitively briefed.  One brief I think spent two or

2   three pages.  It was one topic in a shotgun motion, and it

3   really wasn't explored by either side in any depth.

4          **MR. FINK:**  Your Honor, we spent an entire day

5   arguing motions in here.  This wasn't just a passing thing,

6   and the fact is the Court did rule that we could go forward

7   with it.

8          **THE COURT:**  Well, I want you to recollect for me

9   the record proceedings relating to the cause of action on

10  breach of the duty -- obligation to negotiate in good faith,

11  what the elements of liability are.  Now, if it's already in

12  the record, all you have to do is give me a summary of where

13  I can look for it, and then I want to know the measure of

14  damages for a breach of the obligation to negotiate in good

15  faith, whether you get the expectation of damages or you get

16  the reliance damages.

17         **MR. McINTYRE:**  I don't think either of us -- I

18  certainly wasn't sophisticated enough at the time to address

19  it in that fashion, Your Honor.

20         **THE COURT:**  Because in my understanding, and I may

21  be wrong, and I could be wrong, there is a difference

22  between reliance damages and expectation damages.  That the

23  plaintiff in this case claims there was an obligation to

24  negotiate in good faith which was breached.  That's the

25  liability.  Then you have to determine the measure of

1     damages, and that can either be loss of profit for the

2     period in the future or the expenses incurred as a

3     consequence, which are simply the reliance damages.

4              **MR. McINTYRE:**  That we did not address.

5              **THE COURT:**  Okay.  Do you mind if I finish?

6              **MR. FINK:**  I'm trying.  I'm sorry.

7              **THE COURT:**  Try.  Really try hard.  I suffered

8     from the same thing.  That's why I became a judge, Mr. Fink.

9              Also, there is a considerable issue in this case

10    whether if the duty -- I can't say duty because it's an

11    obligation -- to negotiate in good faith was breached.  You

12    can claim a three-year contract, that's what they were

13    negotiating, and had an obligation to negotiate for a

14    three-year contract or a one-year contract renewal because

15    historically it was a one-year contract renewal and

16    apparently in 1996 a three-year contract was entered into,

17    but the record would apparently show that there were special

18    circumstances which called for three years.

19             Now, I will tell you -- now I'm reasoning

20    backwards -- it is a considerable position that you have

21    taken that a company would negotiate the net portion of its

22    operations with a third party to outsource for three years

23    operations of the scope that's involved here with an

24    exclusive right to provide those.  I'm simply reasoning

25    empirically because I cannot deny as a judge what I know as

1    a man.  I'm not expressing any opinion.  I'm telling you

2    that's the problem in this case, one of the problems, that

3    the claims of the plaintiff are so broad as to defy, come

4    close to defying common experience and common expectations.

5           But we have an hour and-a-half left of testimony.

6    I'll give you another hour and-a-half with this witness,

7    Mr. Frazee, then that will close the record, and then I

8    presume you will want to amend your *Daubert* motion.

9           **MR. McINTYRE:**  Yes, sir.

10          **THE COURT:**  What?

11          **MR. McINTYRE:**  Yes, Your Honor.

12          **THE COURT:**  That's the motion that's pending,

13   Ford's Motion to Strike SNAPP's Final Damage Report.  That's

14   what this hearing has been all about.

15          **MR. FINK:**  Your Honor, not intending to

16   interrupt --

17          **THE COURT:**  Go ahead.

18          **MR. FINK:**  All we want to know is the process.  I

19   presume this *Daubert* hearing continues when we're done with

20   Mr. Frazee with Mr. Vetter and Mr. Thacker, and so the

21   question is when we schedule that first day -- the next day

22   shall we ask for an entire day so that we can --

23          **THE COURT:**  Yes.  I'm going to sit this one out.

24   I'm not going to do this on a written record.  This is

25   taking their depositions in court before the judge.

1          **MR. McINTYRE:**  Just so I understand, we should

2    return before Your Honor to complete the Frazee examination?

3          **THE COURT:**  Yeah, and then you can go ahead with

4    Mr. Vetter and Mr. Frazee.

5          **MR. McINTYRE:**  And take those depositions outside

6    the presence of the Court?

7          **THE COURT:**  No.  Oh, no.  Oh, no.

8          **MR. FINK:**  No, the judge said sit out.  He meant

9    sit through.

10          **MR. McINTYRE:**  No, I thought you meant when you

11    said you were going to sit out, you were not going to sit

12    through.

13          **THE COURT:**  No, no, no.  I'm in this for the

14    duration, however painful it may be.

15          **MR. FINK:**  How much time is the Court prepared to

16    sit through or sit for Mr. Vetter and Mr. Thacker?

17          **THE COURT:**  As long as it takes for Mr. McIntyre

18    to examine them and for you to examine them.  I assume we

19    should give four hours to each of them.  You get one hour

20    and he gets three hours.

21          Now, I assume that each of them will have an

22    exhibit book in advance with the supporting data because all

23    I'm asking for is to test the evidentiary basis for

24    Mr. Frazee's report.

25          **MR. McINTYRE:**  I'm wondering in that regard it may

1    be worthwhile for me to issue, as I did for Mr. Frazee, a

2    deposition notice duces tecum indicating what exhibits we

3    think they should bring with them.

4          **THE COURT:**  Yeah, but the basis is Mr. Frazee's

5    report because Mr. Frazee's report is remarkably shallow in

6    terms of the foundation on which his data is based.  For the

7    most part he was a mechanic.  He took figures given to him

8    by others and just simply put them in a composite.  Anyhow,

9    I think that is as much as I can say now.

10         **MR. McINTYRE:**  I would also note just for

11   informational purposes that I think Mr. Frazee was more

12   involved than Mr. Thacker.  There may not be as much time

13   needed for Mr. Thacker.  Mr. Vetter.  There may be more time

14   needed for Mr. Vetter.

15         **THE COURT:**  That's up to you, folks.

16         **MR. McINTYRE:**  Very good.

17         **THE COURT:**  We are in recess.

18         **MR. McINTYRE:**  Thank you, Your Honor.

19       (Proceedings adjourned at 3:22 p.m.)

20                     -   -   -

21           **C E R T I F I C A T I O N**

22         I, Sheri K. Ward, official court reporter for the

23   United States District Court, Eastern District of

24   Michigan, Southern Division, appointed pursuant to the

25   provisions of Title 28, United States Code, Section 753,

1          do hereby certify that the foregoing is a correct

2      transcript of the proceedings in the above-entitled cause

3      on the date hereinbefore set forth.

4              I do further certify that the foregoing

5      transcript has been prepared by me or under my direction.

6

7      *Sheri Ward*                         March 5, 2008

8      Sheri K. Ward                        Date Completed
       Official Court Reporter

9                                 -   -   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25