UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


**SNAPP SYSTEMS, INCORPORATED,**

          Plaintiff,

   v.

**FORD MOTOR COMPANY, et al.,**

          Defendants.
_____/

                **HONORABLE AVERN COHN**

                **No. 03-74357**


**DEPOSITION OF THOMAS FRAZEE
IN OPEN COURT**

**Thursday, January 17, 2008, Volume 1**

–   –   –

Appearances:

| | |
|---|---|
| E. Powell Miller | Kenneth J. McIntyre |
| David H. Fink | Michelle Alamo |
| Melissa Raycraft | L. Pahl Zinn |
| The Miller Law Firm | Dickinson Wright, PLLC |
| 950 W. University Drive | 500 Woodward Avenue, #4000 |
| Rochester, Michigan 48307 | Detroit, Michigan 48226 |
| (248) 841-2200 | (313) 223-3500 |
| Attorneys for Plaintiff | Attorneys for Defendants |


–   –   –

*To Obtain a Certified Transcript, Contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 219*
*Detroit, Michigan 48226*
*(313) 965-4401*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

*Deposition of Thomas Frazee*
*Thursday, January 17, 2008*

# I N D E X

Deposition                                              Page    Vol.

   **Thomas Frazee**

      Direct Examination By Mr. Fink:              7      1

      Cross-Examination By Mr. McIntyre:          50      1

Certification of Reporter ......................194

                        -   -   -


Exhibits

        Number                               Referred  Vol.
          1         ..................................7    1
          2         .................................48    1
          4         .................................70    1
          5         ................................123    1

          6         ................................145    1
          7         ................................145    1
          8         ................................145    1
          9         ................................147    1

         10         ................................151    1
         11         ................................159    1
         12         ................................166    1
         13         ................................166    1

                        -   -   -

1                                    Detroit, Michigan

2                                    Thursday, January 17, 2008

3                                    10:11 a.m.

4                          -    -    -

5          **THE CLERK:**  Case Number 03-74357, *SNAPP v. Ford*.

6          **THE COURT:**  Be seated.  Give your appearances to

7    the reporter.

8          **MR. FINK:**  David Fink appearing on behalf of SNAPP

9    Systems, Inc., and with me at counsel table is

10   Powell Miller, my partner, and Mr. Thacker, the client.

11         **MR. McINTYRE:**  Good morning, Your Honor.  My name

12   is Ken McIntyre.  I'm one of the lawyers for defendant Ford

13   Motor Company.  With me are my colleagues Michelle Alamo and

14   Paul Zinn.

15         **THE COURT:**  All right.  One of the issues in this

16   case pretrial is the admissibility of the testimony of

17   Thomas A. Frazee as an expert relating to the damages

18   allegedly suffered by SNAPP.  Mr. Frazee has filed an expert

19   report which purports to describe in a comprehensive fashion

20   the damages suffered by SNAPP as a consequence of Ford's

21   alleged breaches of various agreements, et cetera, as found

22   in Exhibit B of his report.

23                 I'm not sure Mr. Frazee's qualifications have

24   been challenged in Ford's Motion to Strike SNAPP's Final

25   Damage Report, but given the complexity of the report, the

*Deposition of Thomas Frazee*
*Thursday, January 17, 2008*

4

1    analysis of the report by Ford and the response by SNAPP,

2    the Court has scheduled this as a *Daubert* hearing at which

3    Mr. Frazee can be examined and perhaps Ford's -- perhaps

4    that way there will be some clarity as to his damage

5    analysis in the cross-examination, Ford's objections to it

6    as being inconsistent, et cetera.

7                    SNAPP can call Mr. Frazee and will have

8    one hour of direct to allow him to give a broad view of his

9    analysis.

10                   Mr. McIntyre, do you challenge his

11   qualifications as an expert?  Not his methodology, but that

12   he has some expertise in financial analysis and damage

13   analysis?

14        **MR. McINTYRE:**  I guess the answer is at this point

15   I don't know and if I might explain that.

16        **THE COURT:**  Very briefly.

17        **MR. McINTYRE:**  I'll try and be very brief.  I'm

18   here today under the assumption that we were ordered to come

19   and take a deposition of Mr. Frazee.  I have not yet filed a

20   *Daubert* motion.  I did file a motion to strike their damages

21   for failure to comport with the Court's orders to provide me

22   with information.  So what I'm saying is I haven't

23   approached this as a *Daubert* hearing, and I haven't

24   considered his credentials at this point.

25        **THE COURT:**  All right.  Let's pass that.  Let's

*Deposition of Thomas Frazee*
*Thursday, January 17, 2008*                                    5

1    just go to his report.

2              **MR. McINTYRE:**  Very good.

3              **THE COURT:**  All right.  Do you want call

4    Mr. Frazee?

5              **MR. FINK:**  Yes, Your Honor.  At this point we do

6    want to call to the stand Mr. Thomas Frazee.

7              **THE COURT:**  As I read your motion, by the way, you

8    go much farther than simply saying you want the report

9    stricken because there wasn't full compliance with

10   discovery.  There is a lot of substantive analysis of that

11   report as not being consistent with the agreement or the

12   methodology by which the parties computed --

13             **MR. McINTYRE:**  That's true, Your Honor.  Our

14   motion has at least two prongs.  We said, number one,

15   because they haven't provided us with the information

16   pursuant to the Court's order it should be stricken and also

17   we noted that even if you look at the analysis certain parts

18   of it weren't pled and then we also said that the analysis

19   doesn't comport with the damages which flow from the

20   contract and are speculative and not reasonably related to

21   the contract.  So we did get into the analysis in that

22   regard.

23             **THE COURT:**  You got into it rather fully.

24             **MR. McINTYRE:**  That's fair, that's fair.

25             **THE COURT:**  Let's go ahead.

1          All right.  Raise your right hand.

2                        -   -   -

3                   **THOMAS FRAZEE,**

4          being first duly sworn by the Court to tell

5          the truth, was examined and testified upon his

6          oath as follows:

7              **THE COURT:**  Go ahead.

8              **MR. FINK:**  Your Honor, may we ask questions from

9     counsel table if we speak loud enough?

10             **THE COURT:**  Sure.

11             **MR. FINK:**  And, Your Honor, at the outset of

12    course we want to thank the Court for scheduling this

13    hearing, but --

14             **THE COURT:**  Just go ahead, Mr. Fink.

15             **MR. FINK:**  I appreciate that, Your Honor.  I want

16    to say one thing that's substantive at the outset to avoid

17    confusion for counsel and the Court, and that is that in

18    presenting -- in preparing for this proceeding we took the

19    Court's admonition under consideration about striking

20    certain aspects of the damages and we will not be pursuing

21    what is identified as Component Number 4 in the report,

22    which is damages related to Ford's late payments.

23             **MR. McINTYRE:**  That's 3, David.

24             **MR. FINK:**  It's number 3?  I'm sorry, Component

25    Number 3.

*Deposition of Thomas Frazee*
*Thursday, January 17, 2008*

7

1      **THE COURT:**  That's the interest on late payments?

2      **MR. FINK:**  Yes.  I'm sorry, it is Component Number

3  3.

4      May I approach the witness with the exhibit,

5  Your Honor?

6      **THE COURT:**  Yeah.  But you are pursuing the late

7  charges on payments under the master equipment lease

8  agreement and loss interest income from bonus program

9  agreement?

10     **MR. FINK:**  Yes, Your Honor.  Those are

11  contractually quite a bit different.

12               **-   -   -**

13            **DIRECT EXAMINATION**

14  BY MR. FINK:

15  **Q.**   Would you state your name for the record.

16  **A.**    Yes.  Thomas Frazee.

17  **Q.**   Mr. Frazee, I have handed you a document that's marked

18  Exhibit 1.  Can you identify that for the Court?

19  **A.**    Yes.  This is my expert report dated September 10th,

20  2007.

21      **MR. FINK:**  Your Honor, I assume that the Court has

22  a copy of the report before it, and we don't need --

23      **THE COURT:**  Go ahead, Mr. Fink.

24      **MR. FINK:**  I just want to make sure.

25      **THE COURT:**  Go ahead, Mr. Fink.

*03-74357; SNAPP v. Ford Motor, et al.*

1         **MR. FINK:**  Your Honor, I had several questions

2    related to the witness' qualifications.  Shall we skip

3    through those?

4         **THE COURT:**  You have one hour, sir, and you have

5    heard what's already been said.

6    **BY MR. FINK:**

7    **Q.**   Mr. Frazee, Exhibit A of the expert damages summary is

8    your curriculum vitae.  Is that information accurate and

9    current to the best of your knowledge?

10   **A.**   No, it is accurate, to the best of my knowledge.  The

11   only substantive addition that I would add to this is that I

12   did in fact publish an article in November of 2007 after the

13   date of this report, it may actually be in October, and that

14   would be added to the final page of this CV.

15   **Q.**   And we are only going to be spending an hour this

16   morning on direct examination.  I'm just going to ask you a

17   few questions.  So just tell us do you hold any formal

18   professional designations that are relevant to your

19   qualifications as an expert in this case?

20   **A.**   Yes, I do.

21   **Q.**   And what are those?

22   **A.**   I hold the Chartered Financial Analyst Designation,

23   abbreviated as the CFA designation.  I also hold a

24   designation referred to as Accreditation in Business

25   Valuation summarized as ABV, and I'm also a CPA.

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*

9

 1       **THE COURT:**  Bring the mike a little closer to you.

 2             Go ahead.

 3   **BY MR. FINK:**

 4   **Q.**   Quickly, with respect to CFA, what is that designation

 5   related to?  What did you have to do to get that

 6   designation?

 7   **A.**   That designation is the culmination of several exams

 8   taken over a series of years that cover topics in

 9   accounting, finance, economics, statistics, the study of

10   public securities, and the markets for those, investment

11   management and evaluation of different assets.

12   **Q.**   And the ABV designation, where does that come from and

13   what does it relate to.

14   **A.**   The ABV is a designation administered by the American

15   Institute of CPA's.  It relates to a demonstration of

16   experience, number one, and expertise, two, in the areas of

17   business valuation and the valuation of assets including

18   businesses and other types.

19   **Q.**   And are you currently a licensed certified public

20   accountant?

21   **A.**   I'm a certified public accountant licensed in the State

22   of Illinois.

23   **Q.**   Mr. Frazee, are you active in professional associations

24   related to the materials that you will be discussing today?

25   **A.**   Yes, I am.

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                                    10

1     **Q.**   And can you give us any specific examples of any
2     committees that you serve on that pertain directly to
3     economic damages?
4     **A.**   I sit on the economic damages task force for the
5     American Institute of CPA's.  This is a group of about
6     six people pulled from a national stage that edit and
7     publish topics, publish on topics that relate to economic
8     damages measurement, which is then shared with the entire
9     membership of the ASCPA.
10    **Q.**   And without getting into the details, have you ever
11    been qualified as an expert by any court or tribunal
12    regarding lost profits, regarding testimony pertaining to
13    lost profits?
14    **A.**   Yes, on several occasions.
15    **Q.**   Okay.  Mr. Frazee, in this case, I want to talk
16    specifically about this matter, when were you first
17    retained?
18    **A.**   My recollection is it was the midsummer of 2005.
19    **Q.**   And over time has the nature of your assignment changed
20    in any significant way regarding this matter?
21    **A.**   I would say yes.
22    **Q.**   And in what way was that?
23    **A.**   I believe that my, my role has evolved at some level
24    from providing expert testimony and opinions to also now
25    encompassing a role as summarizer or summarization of some

1    of the facts that will be presented by SNAPP.

2    **Q.**   Mr. Frazee, in preparing your expert damages study and

3    in conducting your analysis of these issues, what special

4    training or expertise, don't tell us where you got your

5    education, I'm not looking for that kind of detail, but what

6    category of training and expertise have you relied upon?

7    **A.**   Well, in a general sense it's the familiarity and

8    experience with reading and understanding financial

9    documents, which include accounting documents, and the

10   language, the financial language of contracts, those kinds

11   of things.  It also comes from my experience in providing

12   these types of service over the years.

13   **Q.**   Mr. Frazee, are you personally familiar with the

14   methodologies commonly used in your professional to

15   determine lost profits?

16   **A.**   Yes, I am.

17   **Q.**   To the extent that your report contains opinions, are

18   those opinions based upon standard methodologies accepted in

19   your profession?

20   **A.**   I believe so, yes.

21   **Q.**   And was the data that you relied upon in your report

22   the type of data commonly relied upon in your profession?

23   **A.**   Yes.

24   **Q.**   Could you tell us approximately how many hours you

25   personally have spent on this assignment before today?

1    **A.**   Since the beginning of the engagement, I'm going to

2    estimate that at around 300 hours personally.

3    **Q.**   300 hours?

4    **A.**   300 hours personally, yes.

5    **Q.**   Thank you.  I want to talk to you now about issues of

6    methodology in your report.  In your expert damages study

7    you offer factual background regarding SNAPP's damage claims

8    as well as opinions regarding how those damages should be

9    calculated.  What type of data did you use to support the

10   findings in your study?  What type of data?

11   **A.**   Well, I would characterize that or describe the type as

12   basically be documents, first documents that would have been

13   part of the business relationship, in other words, these

14   were documents exchanged by the parties during the course of

15   their relationship, reviewed, commented on, but prepared as

16   part of that relationship and during that relationship.

17          The second I guess I would call it type of

18   category would be those documents that summarized

19   information that was essentially prepared or was produced in

20   some situations to SNAPP after the course of the litigation

21   or after the litigation began.

22   **Q.**   I want to focus for a moment on what I think you called

23   the shared documents, documents that were shared by the

24   parties during the course of the relationship.  Do you know

25   whether the data contained in those documents was accepted

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                              13

1    by or questioned by Ford during the course of the

2    relationship?

3              **MR. McINTYRE:**  I'm going to object, Your Honor.

4    Lack of foundation.  I understand --

5              **THE COURT:**  Wait a minute.

6                    Well, rephrase it.  Did anything come to your

7    attention in the examination of the documents to suggest

8    that Ford challenged the accuracy or the authenticity of any

9    of the documents?

10   **BY MR. FINK:**

11   **Q.**   Could you answer the judge's question?

12   **A.**   I'll try to.  Excuse me.  I'm sorry, I'm coming down

13   with a cold.

14                    Just to be clear, the types of documents we are

15   talking about, these would be the type of documents that

16   would have summarized hundreds or thousands of transactions,

17   and based on the documents I have reviewed, I have no reason

18   to believe that Ford challenged the authenticity or the

19   accuracy of the documents.

20   **Q.**   To the extent that you were aware of any challenged by

21   Ford, is that reflected in your report?

22   **A.**   Yes, and that's a good clarifier.  Again, my previous

23   answer really related more to during the course of the

24   relationship and so on.  There are, as I note in my report,

25   several areas where Ford, as I understand it, has disputed

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                          14

1    the numbers or the calculations that, that were contained in

2    those documents.

3               THE COURT:  Well, wait a second.  There's two sets

4    of documents you saw.  One, documents produced in the

5    ordinary course of business, right?

6               THE WITNESS:  Yes, sir.

7               THE COURT:  And, two, documents produced by SNAPP

8    or people working for SNAPP that were not part of the

9    ordinary course of business between Ford but were intended

10   to summarize or analyze data from the business relationship,

11   right?

12              THE WITNESS:  Actually, Your Honor, I think I was

13   trying to make a different distinction.  The first category

14   of documents would be those that were exchanged during the

15   course of the relationship, many of which were summaries.

16              THE COURT:  I understand that.

17              THE WITNESS:  The second category -- I'm sorry.

18              THE COURT:  And the second set of documents were

19   sort of produced unilaterally.

20              THE WITNESS:  The second set of documents are

21   those that would have been produced after litigation not

22   just by SNAPP but also by Ford.

23              THE COURT:  Okay.  Could have been produced by

24   Ford?

25              THE WITNESS:  Yes.

1      **THE COURT:**  Okay.  Go ahead.

2    **BY MR. FINK:**

3    **Q.**   Just to clarify that, were you provided with any

4    documents, were you given any documents that you were told

5    were in fact produced by Ford during the course of the

6    litigation during discovery?

7    **A.**   Yes, absolutely.

8    **Q.**   And when you talk about the shared documents, the

9    documents shared during the course of the relationship, are

10   you aware whether any of those documents or financial

11   summaries were audited by any party?

12   **A.**   Yes.  My understanding is that there were a number of

13   documents that were audited, and I'll give you some quick

14   examples.  One, my understanding is that SNAPP regularly

15   provided its audited financial statements as part of the

16   relationship.  In this case that was audited by an outside

17   CPA firm for SNAPP's -- for SNAPP.

18         Second, there were additional audited statements

19   that were exchanged between the parties where, for example,

20   an external auditor was hired to come in and look at

21   specific transactions, not a whole financial statement, but

22   a set of specific transactions to determine if, for example,

23   markups were being charged in a manner consistent with the

24   contract.

25         And, third, as I understand it, there were also

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                              16

1    internal Ford auditors, members of the internal audit staff

2    at Ford who also examined some of the summaries to verify

3    their accuracy as well.  So those are three examples.

4    **Q.**   Now, what was the primary role of SNAPP's business

5    witnesses in working with you in preparing you for this

6    task?

7    **A.**   In terms of the task of preparing this report, the

8    role, as I see it, was to, number one, provide me with

9    information relevant to the damages analysis.  So, for

10   example, to provide me with documents that were relevant to

11   the claim.  This would include things like contracts.  It

12   would also include things that summarized information that

13   had already been prepared or exchanged between the parties.

14   So it's, it's really to provide me with the information

15   necessary to complete my opinions and to provide me with an

16   adequate basis for those.

17   **Q.**   Now, to the extent that the business witnesses provided

18   you with documentary information, spreadsheets, data,

19   numbers, do you have some understanding of when those SNAPP

20   witnesses obtained that information they shared with you?

21   **A.**   Well, again, I would say it somewhat breaks down into

22   the two categories I mentioned earlier.  There were some

23   documents that I believe were received through course of

24   discovery in this lawsuit and so would have been received

25   let's say since, let's say since 2000, early 2000.

1           The second category would be those types of

2    documents again that were maintained in the course of

3    business for SNAPP and would have been in their possession

4    during the course of the relationship.  That's my general

5    understanding of that.

6    Q.   And I apologize because I may not have heard this.  Did

7    you also indicate whether any documents that you reviewed or

8    that were provided to you by SNAPP witnesses were obtained

9    during discovery?

10   A.   Yes, I -- yes.

11   Q.   All right.  In your professional opinion was the data

12   that you relied upon for your report reliable enough to use

13   as the basis for your study?

14   A.   Yes.

15   Q.   The data we just talked about?

16   A.   Yes.

17   Q.   On what do you base your professional opinion that this

18   data could be relied upon for your study?

19   A.   I'm sorry, could you repeat that?

20   Q.   On what do you base your professional opinion that this

21   data could be properly relied upon for your study?

22   A.   I base it on my experience, and the fact is is that

23   this is the type of data that I'm typically examining and

24   relying upon in the preparation of a study of damages.

25   Q.   Did you take any steps to verify the data that you

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*

1    relied upon?

2    **A.**   Yes, I did.

3    **Q.**   I want to talk to you now about some issues related to

4    the substance of your report, the actual information

5    provided and conclusions reached.  In your study at the

6    outset you say the amount of damages for each component

7    reflects the net amount due to SNAPP.  What did you mean by

8    that?

9    **A.**   When I use the term net, what I mean by that is that

10   there is a requirement or a need in my view to analyze

11   damages on a net basis because what you are trying to do is

12   compare essentially what was owed versus what was actually

13   received by the plaintiff and so the difference between

14   those two numbers or the net number is what is appropriately

15   considered for damages purposes.  And so that is the reason

16   I use that phrase, and that's why it is included in my

17   report.

18   **Q.**   And how does that approach to net damages relate to the

19   fact that early in your report you discuss the allocation of

20   Ford payments?

21   **A.**   The, the determination of a net number for the

22   two claims that are affected by the allocation is one,

23   again, like I said before, that requires an understanding of

24   what was owed under each claim and what was paid under each

25   claim.  So the allocation that is discussed in my report is

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                    19

```
 1    basically a process used to take Ford's actual payments and
 2    to allocate them between the two claims, as presented in my
 3    report, to then yield net numbers for each claim on an
 4    individual basis.
 5              THE COURT:  Wait a second.  I want to hear
 6    that . . .
 7                    Take Ford's actual payments and allocate
 8    between two claims.  What two claims?
 9              THE WITNESS:  The two claims that are utilized or
10    I should say incorporated into that allocation or the claim
11    for the 1.75 percent profit, and the second claim is related
12    to the cost savings claim.
13              THE COURT:  So that's items 1 and 2.
14              THE WITNESS:  Are you referring, Your Honor, to
15    Exhibit B?
16              THE COURT:  To Exhibit B.
17              THE WITNESS:  This would be an allocation
18    basically affecting items 1 and 2, yes.
19              THE COURT:  You did the allocation between the
20    two, right?
21              THE WITNESS:  Yes, sir.
22              THE COURT:  Okay.  Because Ford payments don't
23    show which two?
24              THE WITNESS:  Ford, Ford, if your question is did
25    Ford's payment receipts show the difference between the two?
```

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*

20

1      **THE COURT:**  Did a Ford check reflect whether it

2   was paid against the 1.75 percent profit or against the

3   saving?

4      **THE WITNESS:**  My understanding, Your Honor, is

5   that those checks did not indicate the difference between

6   the two and that Ford has stated that it didn't.

7      **THE COURT:**  Okay.  Was Ford supposed to pay SNAPP

8   the saving that SNAPP allegedly got for Ford?  Was that

9   supposed to be a cash payment by Ford?

10      **THE WITNESS:**  My, my -- the simple answer to that

11   is yes, and the issue is whether that was to be done on a

12   daily basis or at some point, at a single point in time.

13      **THE COURT:**  But it's your understanding that if

14   SNAPP obtained an item for Ford that ordinarily would cost

15   $100 and SNAPP got it for Ford for $50, SNAPP was supposed

16   to get a check for $25, which is 50 percent of the savings?

17      **THE WITNESS:**  At some point there would be a need

18   to do that calculation you just described.

19      **THE COURT:**  Pardon?

20      **THE WITNESS:**  I'm sorry, I said at some point

21   there would need to be a calculation along the lines you

22   just described, and there would need to have a check

23   basically cut.

24      **THE COURT:**  That's your understanding of what

25   that -- that that was the arrangement under the

1    1966 Amendment in Paragraph 4.1 and Paragraph 1.3 of the

2    framework agreement, savings due to price negotiations, more

3    or less.

4              **THE WITNESS:**  More or less.  Again, it's a 1996

5    agreement and --

6              **THE COURT:**  Thank you.  Go ahead.

7    **BY MR. FINK:**

8    **Q.**  Your allocation takes whatever total payments were

9    received by Ford and allocates them to these two components,

10   savings sharing and 1.75 percent, which includes what

11   components?  Is it just the profit or is there something

12   else in there?

13   **A.**  I'm sorry, I didn't -- are you asking me whether there

14   was something else in the --

15   **Q.**  Let me ask the question a different way.  SNAPP

16   advances funds to purchase products or services?

17   **A.**  Yes.

18   **Q.**  SNAPP has operating costs?

19   **A.**  Yes.

20   **Q.**  Where do those show up in your allocation?  Are they on

21   the savings sharing side?  I'm sorry.

22   **A.**  The allocation is based on essentially two components.

23   One is a component that focuses on Ford's payments, i.e.,

24   the dollars actually received from Ford during the course of

25   the relationship.  The second aspect of the allocation is to

1    say what were the -- what would the revenues have been

2    associated with each of the two claims, the 1.75 percent

3    claim and the cost sharing claim.

4    **Q.**   If Ford had paid some part of savings sharing in the

5    price of a component, in the price it paid for a component,

6    would that invariably be credited to Ford in your

7    calculations?

8    **A.**   Yes.

9    **Q.**   Now, the allocation itself describes what percentage

10   goes to each of these components, but does your allocation

11   affect the total net damages that SNAPP is claiming?

12   **A.**   No, not in any material way.  To be very clear, the

13   allocation simply allows the calculation of two net numbers,

14   a separate net number for the 1.75 percent claim and a

15   separate net number for the cost sharing claim.  There is,

16   there is no, there is no change in the overall damage number

17   as a result of using the allocation.

18   **Q.**   Now, is that because if the allocation changes the net

19   may go down for one, but it goes up by the same amount for

20   the other claim?

21   **A.**   That is correct.

22   **Q.**   Up or down?

23   **A.**   Essentially, yes.

24   **Q.**   As an expert did you consider alternative methods of

25   determining this allocation?

1    **A.**   Yes.

2    **Q.**   I would like to now ask you a few questions about how

3    you approach damages related to the 1.75 percent profit

4    target.  Now, we have been talking quite a bit about the

5    data that you used.   In approaching this particular category

6    of damages, did you use the two types of data that you

7    discussed before, that is, the data received by Ford --

8    shared by the parties during the relationship and the data

9    that was received after the relationship?

10   **A.**   Excuse me.   The answer to that is yes.

11   **Q.**   Can you explain for the Court the methodology that you

12   used for determining damages related to the 1.75 percent

13   profit target?

14   **A.**   Yes.  The methodology is essentially a two-step one.

15   As I said before, the first step is to determine the amount

16   that should have been received by Ford, and the second step

17   is to determine the amount of the payments that were

18   actually made.  The second step is --

19          **THE COURT:**  Wait a second.  The first step is to

20   determine the amount that should have been received by Ford?

21          **THE WITNESS:**  If I said that, I misspoke.  It

22   should have been from Ford.

23          **MR. FINK:**  Thank you, Your Honor.

24          **THE COURT:**  Okay.

25

1    **BY MR. FINK:**

2    **Q.**   So you meant to say the first step was to determine the

3    amount that was actually received by SNAPP, and the

4    second step was to compare that to the amount actually paid

5    by Ford, correct?

6    **A.**   The amount that should have been received by SNAPP and

7    the second step, yes, being the amount that was actually

8    received.  The second step was covered or calculated in the

9    allocation process that we have talked about already today.

10   The first step was calculated by estimating the revenues

11   that should have been processed through SNAPP or the

12   activities that should have gone through SNAPP and

13   multiplying that by the 1.75 percent.

14   **Q.**   Okay.  I want to take you more slowly through that step

15   you described of determining how much SNAPP should have

16   received.  You said you looked to see how much they should

17   have received for products and services that should have

18   been processed through SNAPP.  I want to break that down

19   with you if we can.  In your analysis what did you first

20   look at in building the number to get to the 1.75 percent

21   net number?

22   **A.**   The first thing we looked at were the project summary

23   forms, I'm sorry, project summaries that again I have

24   described previously as having been exchanged by the parties

25   during the course of their relationship.

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                                25

**Q.**   And what would those project summaries tell you that's
necessary for building this total number?

**A.**   Those project summaries are going to reflect the --
certain of the activities that were involved in the
Ford/SNAPP relationship.  Specifically the document I'm
talking about at the moment are summaries essentially of
SNAPP activities of IT commodities acquisitions or
procurement.

**Q.**   Were those actually hard dollar numbers of actual
transactions that occurred and were processed through SNAPP?

**A.**   That's my understanding, yes.

**Q.**   That's your first building block?

**A.**   Yes.

**Q.**   Now you have another building block, which is something
I think you referred to as leaked IT volume?

**A.**   Yes, in my report I mention that on several occasions.
Yes.

**Q.**   Briefly can you explain to the Court what do you mean
by leaked IT volume?

**A.**   Leaked IT volume is essentially -- when I say IT volume
because it related to IT commodities.  The leaked revenues
associated with those IT commodities essentially relate to
the fact that Ford did not acquire all of its IT commodities
through SNAPP, and the amount that was not acquired through
SNAPP was calculated and included as part of this damage

1    analysis under this component.

2    **Q.**   And the number that you used for leaked IT volume, was

3    that a number that was based upon some estimate that you did

4    or was that based upon hard dollar data from Ford?

5    **A.**   The primary document to support that calculation was a

6    document produced by Ford in the course of the discovery or

7    the litigation.

8    **Q.**   And are you aware of a contractual provision that

9    explains that all of this IT volume was supposed to be

10   processed by SNAPP?

11   **A.**   I don't, I don't have a paragraph number, but my

12   understanding and recollection is that the amendment of the

13   framework agreement contained a provision that described the

14   fact that Ford was not to desource SNAPP.

15          **THE COURT:**  Pardon?  Ford was what?

16          **THE WITNESS:**  Ford was not to desource SNAPP on

17   those commodities.

18   **BY MR. FINK:**

19   **Q.**   And when you say those commodities, your analysis was

20   limited or what happens -- I should ask this a different

21   way.

22          Was your analysis and your calculations regarding

23   IT volume limited to the 15 specific commodity codes

24   identified by Ford contemporaneous with the 1996 agreement?

25   **A.**   I don't recall if it was 15 or 14 or 13, but some, some

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                                    27

1    number close to that, and this would have been commodity

2    codes that were indicated contemporaneously in '96 and/or in

3    1999 at the close of that amendment agreement.

4    **Q.**   You did not then include -- did you, excuse me, did you

5    include data for other Ford IT purchases that were not

6    covered by those commodity codes as you understood the work

7    that you were doing?

8    **A.**   We did not include anything other than for those codes

9    that we just talked about.

10   **Q.**   There is another category of commodities with which I

11   believe you are familiar referred to as MRO supplies,

12   maintenance, repair and operations supplies.  Do you recall

13   that?

14   **A.**   Yes, I do.

15   **Q.**   And did you do the same type of analysis with respect

16   to MRO commodities in coming to the 1.75 percent damage

17   figures?

18   **A.**   Yes.  It's the same general process.

19   **Q.**   We'll talk some more about MRO in a few minutes so we

20   don't need to go into more detail about that, but again, to

21   conclude the 1.75 calculus, have we identified all of the

22   building blocks?

23   **A.**   I believe we have, and I think we talked about each of

24   the individual items that were used to calculate the revenue

25   and the 1.75.

1   **Q.**   In doing the gross, that gross revenue number first,

2   did you also look at volume related to I-Ra-MPP or raw

3   materials purchases?  I said I-Ra-MPP and I shouldn't have

4   because I-Ra-MPP really relates to a contract.  I'm speaking

5   more directly about the transactions that were processed.

6   **A.**   Well, in terms of, in terms of the --

7           **MR. FINK:**  Your Honor, forgive me.  I'm going to

8   withdraw that question because I'm confusing two different

9   issues and I'm going to confuse the witness and the Court

10  and I apologize.  That's an issue for good faith, and I'll

11  come to that later.  I apologize.

12  **BY MR. FINK:**

13  **Q.**   Mr. Frazee, after you took the building blocks we

14  talked about, IT volume, IT leaked volume --

15          **THE COURT:**  Hold on.

16              Go ahead.

17  **BY MR. FINK:**

18  **Q.**   We have your basic building blocks, the IT volume, IT

19  leaked volume, MRO volume, MRO leaked volume.  That gives

20  you a total number.  What did you do with that total gross

21  number?

22  **A.**   Those numbers are added and then multiplied by

23  1.75 percent to determine the amount of profit that would

24  have been or that should have been received under that,

25  excuse me, aspect of the contracts.

1   **Q.**   There is in Exhibit B a number for 1.75 percent profit

2   of nearly $845 million.  Is that entire number the

3   1.75 percent profit?

4   **A.**   No.  Again, it's a net number.  So you have to start

5   with the 1.75 percent profit, which I have just described in

6   terms of the calculation, and subtract from that the amount

7   of money that was actually paid by Ford related to, to, to

8   this, to the activities associated with this.  So

9   specifically Exhibit E to my report, down towards the bottom

10  of that calculation it shows the amount of expenditures that

11  SNAPP made for Ford-related activity and the amount of

12  payments that it received associated with that activity,

13  which I described earlier is how that was calculated, and

14  the difference --

15           **THE COURT:**  Where is that found?

16           **THE WITNESS:**  I'm sorry, which, which number,

17  Your Honor?

18           **THE COURT:**  Well, you said the 844 million is a

19  net figure.  That's the difference between what SNAPP got

20  and what it should have gotten, right?

21           **THE WITNESS:**  Yes.

22           **THE COURT:**  And where is that reflected?

23           **THE WITNESS:**  That number is at the bottom of

24  Exhibit E.

25           **THE COURT:**  At the bottom of Exhibit B?

1          **THE WITNESS:**  E as in Edgar.

2          **THE COURT:**  Pardon?

3          **THE WITNESS:**  E as in Edgar.

4          **THE COURT:**  E, okay.  Wait a minute.

5          Okay.  Well, what, what, just out of

6     curiosity, what did Ford -- what did SNAPP actually get

7     against the 1.75 percent?

8          **MR. FINK:**  Are you asking me, Your Honor?

9          **THE COURT:**  I'm asking the witness.  If I

10    understand your theory.

11         **THE WITNESS:**  Well, the answer to that is that we

12    know the total amount of cash that SNAPP received from Ford.

13    The allocation process was what I described earlier.

14         **THE COURT:**  All right.  How much did you allocate

15    to what SNAPP received from Ford on this item?

16         **THE WITNESS:**  $2.833 billion.

17         **THE COURT:**  2.833.  That's what SNAPP got?

18         **THE WITNESS:**  Related to this item.

19         **MR. FINK:**  Your Honor, I think I know where the

20    confusion is.

21         **THE COURT:**  No, please.

22         So this is what SNAPP got.  Does that reflect

23    the total purchases or what?

24         **THE WITNESS:**  It is a subset of the total

25    purchases.  So, Your Honor, if you look at Exhibit E in

1    Row 9.

2              **THE COURT:**  No, wait.  So SNAPP actually got

3    2.833 billion.  What should it have gotten according to you?

4              **THE WITNESS:**  It should have received

5    3.449 billion in reimbursement for expenditures it had

6    already made plus the 228 million that I testified to a few

7    minutes ago.

8              **THE COURT:**  So the difference is what?

9              **THE WITNESS:**  The difference is $844,938,000.

10             **THE COURT:**  That's profit.  Is that profit?

11             **THE WITNESS:**  That is the damage.

12             **MR. FINK:**  Your Honor?

13             **THE COURT:**  Please, Mr. Fink.

14             **MR. FINK:**  I'm sorry.

15             **THE COURT:**  Mr. Fink, you don't interrupt the

16   Court.

17             **MR. FINK:**  I didn't mean to.  I thought you were

18   done.

19             **THE COURT:**  So is that $845 million lost profit to

20   SNAPP?

21             **THE WITNESS:**  It is SNAPP's net damage, yes.

22             **THE COURT:**  It's SNAPP's net.  Well, then if you

23   multiply --

24              Well, then what's the aggregate figure on

25   which the 1.75 is based?  The 845 million is 1.75 percent of

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                                    32

1    what?

2              **THE WITNESS:**  It's not 1.75 percent of anything.

3    It's a two-step calculation.  So the first step is

4    1.75 percent multiplied by the revenues that should be

5    considered.  This is laid out in Exhibit E, Row 8.

6              **THE COURT:**  What's the revenue that should be

7    considered that they get 1.75 percent net of?

8              **THE WITNESS:**  It is the sum of four numbers, the

9    actual IT commodity volumes, the --

10             **THE COURT:**  What do the four numbers total?

11             **THE WITNESS:**  The four numbers total the

12   $13 billion, just over that.

13             **THE COURT:**  You multiply 1.75 percent against

14   13 billion?

15             **THE WITNESS:**  Yes, sir.

16             **THE COURT:**  And you get 800?

17             **THE WITNESS:**  No, you get $228 million.  That's

18   the profit that SNAPP should have earned.

19             **THE COURT:**  But you are asking here for

20   845 million.

21             **THE WITNESS:**  Yes, because essentially,

22   Your Honor, the way that the calculation is shown here on

23   Exhibit E is that there was a --

24             **THE COURT:**  Pardon?  What?

25             **THE WITNESS:**  I said the way that this calculation

1     is shown on Exhibit E -- and essentially let me try to

2     describe it a little differently.  It should have made

3     228 million.  They were in fact shortchanged by 616 million,

4     and if you --

5            **THE COURT:**  Well, if they should have made, if

6     they should have made 228 million, they were shortchanged by

7     616, they were shorted three times the amount that they

8     should have made?  Is that what you just told me?

9            **THE WITNESS:**  Yes, Your Honor.

10           **THE COURT:**  You just said they should have made

11    228 million.

12           **THE WITNESS:**  On this component, yes.

13           **THE COURT:**  And they were shortchanged

14    600 million?

15           **THE WITNESS:**  Correct.  They in fact --

16           **THE COURT:**  How can you be shortchanged in excess

17    of 100 percent of what you should have made?

18                  Let's go on, Mr. Fink.

19    **BY MR. FINK:**

20    **Q.**   Mr. Frazee, there are two components to the

21    $844,900,000 number, correct?

22    **A.**   Yes, there are.

23    **Q.**   And is one of those components the amount of payments

24    by SNAPP to suppliers and operating expenses by SNAPP that

25    were not reimbursed by Ford?

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                    34

1    **A.**   That's correct.

2    **Q.**   When you talk about $616 million in shortfall, is that

3    $616 million in failure to reimburse SNAPP for the expenses

4    made, expenditures made by SNAPP for supplies and operating

5    expenses, payments out of pocket by SNAPP that according to

6    the allocation were not reimbursed?

7    **A.**   That's correct.

8    **Q.**   And if they were reimbursed in full, if that

9    $616 million was reimbursed in full by Ford, how much net

10   profit in this component would that provide to SNAPP?

11   **A.**   It would have provided them with a $228 million profit

12   after consideration of these -- I'm not sure if you are

13   asking me two aspects of it or not.  I'm not clear on your

14   question.

15   **Q.**   I need to ask it as two questions.

16   **A.**   Okay.

17   **Q.**   With the payment of the $616 million more by Ford, does

18   that get SNAPP to zero profit?

19   **A.**   Yes.

20   **Q.**   Okay.  And then when you talk about the profit of

21   $228 million, is that the amount of profit that you are

22   saying SNAPP should have gotten above and beyond

23   reimbursement for operating expenses and supplies paid,

24   commodities paid for out of pocket by SNAPP?

25   **A.**   That's correct.

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*

1   **Q.**   So -- okay.  I want to move on to savings sharing, and

2   I want to save some time because we have taken a little

3   longer than I anticipated there.  Some of the stuff is

4   duplicative.  Can you explain your methodology in

5   determining SNAPP's damages related to savings sharing?

6   **A.**   Yes.  It follows the language presented in the

7   agreements between the parties.  It's essentially an equal

8   division of the difference between the base price, which is

9   a defined term in the contract, and SNAPP's cost.

10  **Q.**   Now, to do the calculation, to do the analysis of

11  savings sharing, once again you needed to start with the

12  building blocks of the transactions that occurred; is that

13  correct?

14  **A.**   Yes.

15  **Q.**   So for IT purchases and leaked IT volume did you do the

16  same assessment that you did to get the gross numbers, did

17  you do the same assessment that you did under the

18  1.75 percent equation?

19  **A.**   We, we began -- well, to make those two separate

20  answers, for the actual IT commodities again we relied on

21  the project summaries and the data that's presented in my

22  report in Exhibit C to determine the amount of dollars that

23  are associated with the actual IT commodities.  With regard

24  to the leaked commodities, we would have utilized the same

25  types of Ford-provided information.  Again, this is

1    information provided after the start of the litigation and

2    that would have been used in calculating the base prices.

3    **Q.**   Now, unlike the 1.75 percentage equation where you

4    multiply a percentage by a gross dollars, with savings

5    sharing you had to find out how much savings was actually

6    accomplished by SNAPP in each of these components or how

7    much would have been; is that correct?

8    **A.**   Correct.

9    **Q.**   So for the actually processed IT volume, the actually

10   processed, that is, the IT volume processed through SNAPP,

11   how did you determine for your report the amount of savings

12   that would then lead to that savings sharing calculation?

13   **A.**   The determination of the savings related to the actual

14   IT commodity volumes is based on a supplier-by-supplier

15   analysis of the savings that were generated and using the

16   contractual language I mentioned earlier, and that

17   information is summarized in my report in Exhibit H.

18   **Q.**   And where did you get that information?  Who provided

19   that information to you?

20   **A.**   That summarized information was provided to me by, by

21   the SNAPP business witnesses.

22   **Q.**   And did they explain to you the original source of that

23   data and whether that data was in fact based on information

24   exchanged by the parties?

25   **A.**   Yes, they did, and that is the -- this would have been

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                                    37

1   based on the information maintained during the course of the

2   relationship and exchanged between the parties to the extent

3   that SNAPP was aware of during the course of the

4   relationship.

5   **Q.**   Now, even dealing for now with the IT commodities that

6   were processed through SNAPP, during the time of the

7   relationship at the time of each transaction could SNAPP

8   always identify the exact amount of cost savings that it was

9   entitled to?

10  **A.**   Not on a transaction-by-transaction basis.  It would

11  have been -- it would not have been doable at that point.

12          **MR. McINTYRE:**  Excuse me.  Could you read that

13  answer back for me, please.

14       (The last answer was read.)

15  **BY MR. FINK:**

16  **Q.**   Now, you explained to us under the 1.75 percent

17  analysis that you found the number for leaked IT volume from

18  Ford documents, correct?

19  **A.**   Yes.

20  **Q.**   But how did you determine in your analysis how much

21  savings SNAPP would have obtained if SNAPP had in fact

22  processed that IT leaked volume?

23  **A.**   The, the, the support for that calculation comes

24  primarily from an email that was exchanged between one of

25  the senior Ford purchasing individuals and the CEO of Ford

1    at the time in which he quantified the significant amount of

2    cost savings that SNAPP had generated for Ford for a

3    specific type of PC.

4    **Q.**   Was that a memo from Mr. Honecker?

5    **A.**   Yes.

6    **Q.**   Ford at times has suggested that the only way to

7    evaluate damages for savings sharing is to look at each

8    transaction and to consider the possibility that there may

9    have been some form of an agreement, an oral agreement to

10   change the percentage of savings sharing in that

11   transaction.  Did you factor in the possibility that SNAPP

12   and Ford entered into some form of or a series of oral

13   agreements to modify the savings sharing percentage for each

14   transaction?

15   **A.**   I did not, and I guess I'm saying that based on, as I

16   understand it, there are no -- there is to be no

17   consideration of any oral agreement.

18   **Q.**   Now, I want to talk to you about the savings for the

19   volume of MRO supplies actually purchased through SNAPP.

20   What methodology did you use to determine that number?

21   **A.**   The, the savings sharing for MRO -- the expected MRO

22   volumes is based on the knowledge that, that the SNAPP

23   business witnesses possess and based on their experience in

24   this type of business.

25   **Q.**   Now, the numbers you did are not based on actual

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                          39

1    savings that were achieved for Ford related to MRO, are

2    they?

3    **A.**    The MRO, again, when we're talking about leaked MRO

4    revenue, they clearly didn't have the opportunity to

5    actually recognize and achieve the savings so that has to be

6    an estimate.

7    **Q.**    With respect to the MRO leaked volume, that is the

8    volume of MRO transactions that weren't processed through

9    SNAPP, did you follow the same methodology?

10   **A.**    Yes.

11   **Q.**    I want to move now to a different category of damages,

12   the damages related to SNAPP's claim that there was a breach

13   of the good faith duty in the contract to negotiate a

14   contract renewal.  You are familiar with that provision?

15   **A.**    Yes, I am.

16   **Q.**    Is it your expert opinion that Ford breached its

17   contractual duty to negotiate the contract renewal in good

18   faith?  Is that part of your opinion?

19   **A.**    No, it is not.

20   **Q.**    Were you asked to render an opinion on the subject of

21   whether Ford did or didn't breach its contract in good

22   faith?

23   **A.**    No, I haven't been asked that.

24   **Q.**    So what were or are the components of your opinions

25   regarding the good faith, the alleged good faith breach?

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*

40

1    **A.**   Well, I'm operating, again, under the assumption that

2    someone else or the trier of fact will determine that

3    question of whether in fact there has been breach of a duty.

4    So I am operating under the assumption that there is a

5    breach that has been found to have occurred.  The opinion

6    that I'm offering relates to the economic terms of such a

7    contract had it been entered into by essentially a willing,

8    two willing parties functioning in an arm's length and

9    informed manner.

10   **Q.**   Can you give us just a little more deal about what you

11   mean when you refer to an arm's length transaction?

12   **A.**   I guess in an economic sense it's a situation where you

13   have an informed buyer and an informed seller.  In this case

14   the buyer would be Ford and SNAPP would be the seller, and

15   both parties are really looking to maximize their economic I

16   guess you would call it utility, but in plain English it's

17   the economic benefits and at some point they will come to an

18   agreement on that.

19   **Q.**   In your report do you reach a conclusion then as to

20   what certain key contract terms would have been if the

21   parties had in fact come to an agreement based on arm's

22   length negotiations?

23   **A.**   Yes, I do.

24   **Q.**   And are those three terms the length of the contract,

25   the profit target, and the savings sharing component?

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                                41

1    **A.**   Essentially, yes.

2    **Q.**   I would like to take you quickly through each of those.

3    Talk to us first, please, about the length of the contract.

4    What conclusions did you come to and on what did you base

5    the conclusions you reached regarding what in your expert

6    opinion the length of the contract would be?

7    **A.**   Well, with regard to that element, first of all, my

8    conclusion was three years.  I'm sorry, your question was

9    about the, the reasoning for it?

10   **Q.**   Yes.  You came to a conclusion.  I would like the Court

11   to know at least something, it will be examined later, but

12   at least something about the basis for you coming to that

13   conclusion.

14   **A.**   Yes.  I believe that some of the things that are

15   relevant to consider in forming that conclusion are, for

16   example, number one, the length of the parties' historic

17   relationships and the fact that the contract that began in

18   1996 was also for a three-year term.  I think it's also

19   relevant to consider the economic aspects of a relationship

20   and the economics of how a company like SNAPP would work.

21   So, for example, just the length of some of the transaction

22   cycles were such that it's not something that happens and

23   ends in a day or two days or a couple of weeks.  These are

24   longer term transactions.  So there's a need to consider

25   that in terms of evaluating a contract length.

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*                                    42

1              Additionally, there is a significant financial

2       risk and assumption and, frankly, investment as well that's

3       being made by a party like SNAPP to enter into such a

4       transaction, and there needs to be enough time in the

5       transaction term to not only recover the, the, the

6       investment that's being made, to earn a return on it, but

7       also to ensure that risk is not assumed unnecessarily for

8       something short term.  So those are just some examples.

9       **Q.**   Now, you came to a conclusion, you said, in your report

10      as relates to this regarding the profit target that the

11      parties would have agreed on had they reached agreement.

12      What was your conclusion and what was the basis for that

13      conclusion?

14      **A.**   The conclusion was that a 1.75 percent profit and

15      before consideration of cost savings is a reasonable, is a

16      reasonable consideration there.  The thought process

17      includes consideration of, number one, again, the terms of

18      the contract that existed in 1996.  I think it's relevant to

19      consider the evolution of the parties' agreements related to

20      the amount of markup that would be allowed on the services

21      that were being provided to Ford.  I think it's also

22      relevant to consider the substantial amount of investment

23      that Ford was requesting SNAPP make to provide the services

24      that were being offered.  Those are things that impact the

25      profit percentage.

1    **Q.**   Did you consider at all the scope of services, that is,

2    that Ford was asking for the same scope of services that had

3    occurred during the previous time?

4    **A.**   Yes, if you assume that a similar level was being

5    requested.

6    **Q.**   Finally, in terms of the assumptions and conclusions

7    that you reached regarding what a new contract would have

8    looked like if it had been negotiated, you reach a

9    conclusion regarding profit sharing, I'm sorry, savings

10   sharing components.  What conclusion did you each and on

11   what basis?  And you can be brief because we need to move

12   along.

13   **A.**   Yes.  The conclusion was an equal division of the cost

14   sharings.  Again, I think it's relevant to consider the fact

15   that such a provision would align and incentivize both

16   parties to work together as both would receive a benefit.  I

17   also think it's relevant to consider the historic

18   contractual terms and also to consider and evaluate the

19   amount of risk in an SNAPP was assuming by accepting a very,

20   frankly, low profit margin on a guaranteed basis.

21   **Q.**   And you believe the 50 percent number that you used

22   there would align the parties' interest for the mutual

23   benefit of both parties?

24   **A.**   I think so, and I believe it's consistent with the way

25   they looked at it over the years.

*Thomas Frazee - Direct*
*Thursday/January 17, 2008*

44

1    **Q.**   Now, starting with these three components of what you

2    believe the contract would look like, you did some analysis

3    of what profit would come out of that three-year contract;

4    is that correct?

5    **A.**   That's correct.

6    **Q.**   In doing that analysis, what assumption did you make

7    about the volumes of in particular IT commodities that would

8    have been processed?

9    **A.**   We essentially assumed the continuation of basically no

10   growth scenario in terms of the comparison of the future to

11   what had actually happened in '99.

12   **Q.**   I want to talk very briefly with you with about an item

13   that does not involve that much money in this dispute, the

14   Master Equipment Lease Agreement and the Lease Program

15   Agreement component of damages.  Just tell us, if you will,

16   what role you played in analyzing the damages presented in

17   your study related to those two agreements?

18   **A.**   The underlying transactional detail was received from

19   SNAPP.  I analyzed the accumulation of that and also the

20   formula that was used to calculate the resulting interest.

21   I looked at the appropriate terms within the contracts

22   dealing with those two issues and confirmed that the

23   contractual terms were being, were being utilized properly

24   to perform the calculation.

25   **Q.**   Enough on that.  The transition agreement.  The

1    transition agreement is -- the 1999 transition agreement has

2    several components of damages that you identify in your

3    study.  What did you do in preparing your study regarding

4    the transition agreement claims?

5    **A.**   Again, I would have examined documents that had been

6    exchanged between the parties in roughly early 2000 that

7    discussed the underlying supporting detail that SNAPP

8    provided to Ford.  I reviewed those.  I reviewed the actual

9    agreement itself.  I reviewed transcripts associated with

10   the finding of the special master on this question, and I

11   performed a calculation that was based on and consistent

12   with those earlier documents.

13   **Q.**   Are the calculations that you summarized in your report

14   consistent with methodologies that you would, and others

15   would, use in your profession?

16   **A.**   Yes.

17   **Q.**   And the documents that you reviewed regarding this

18   particular claim, just regarding the transition agreement

19   claim, were those documents exchanged by the parties during

20   the time of the relationship consistent with the

21   requirements of the transition agreement?

22   **A.**   The overwhelming majority, yes.

23   **Q.**   Now, just one question on an issue in there, the

24   2 percent.  In the transition agreement there's a special

25   provision for calculating 2 percent in an oddly drafted

1   paragraph.  Do you believe that SNAPP's interpretation of

2   the formula for calculating the 2 percent component of

3   compensation in the transition agreement is logically

4   consistent in a business sense?

5   **A.**   I do.

6   **Q.**   You know there are two different interpretations,

7   correct?  Ford has one view of how to calculate the

8   2 percent.  SNAPP has a different view.  Are you familiar

9   with that?

10  **A.**   Yes, I understand it at some level.

11  **Q.**   And to the extent that you understand it, the business

12  logic, does it drive you to one or the other of the

13  interpretations?

14  **A.**   I think that SNAPP's interpretation makes a lot of

15  sense to me.

16  **Q.**   Now, I have got a couple of overall questions regarding

17  the report you did.  Are you satisfied that your study

18  reflects an analysis consistent with your expertise?

19  **A.**   Yes, I do.

20  **Q.**   And do you have with you -- I don't if you have them

21  physically with you -- a separate list of documents

22  supportive of each component of damages identified in

23  Exhibit B?  This is something that the Court had requested

24  and has been requested in the subpoena duces tecum.

25  **A.**   I do.  I don't have it here with me, but I'll find it.

1    **Q.**   You have it in the courtroom?

2    **A.**   Yes.

3    **Q.**   I just want to make sure that you have it before you

4    testify on cross examination.

5    **A.**   Yes.

6    **Q.**   Finally, in the first paragraph of your report, in the

7    very first paragraph of your report you say that your study,

8    and I quote accurately, is not intended to embody all of

9    SNAPP's proofs at trial.  What do you mean by that?

10   **A.**   I mean that the fact of the matter is that other -- I

11   wasn't there in 1997 or 1993 and 1999.  The parties that

12   have knowledge of what was going on at those points in times

13   or have knowledge of the other facts that are intended to be

14   offered at trial will offer those.  I am not offering those.

15           **MR. FINK:**   Your Honor, at this point the only

16   thing remaining that I would like to do is I would like to

17   offer the report to be admitted into evidence.  I don't know

18   if that's necessary.

19           **THE COURT:**   There is nothing admitted into

20   evidence.  The only thing missing -- I'll take a short

21   recess while you find the document that you just referred to

22   that lists all of the documents that underline what you

23   looked at.  Isn't that what he said?

24           **MR. FINK:**   Yes.

25           **THE COURT:**   We'll take a five-minute recess.

1              **MR. FINK:**  Thank you, Your Honor.

2              **THE COURT:**  Then you can cross-examine.

3                    We'll recess at 12:30 for lunch and resume at

4      a quarter after 1:00.

5          (Recess from 11:22 a.m. until 11:27 a.m.)

6              **MR. McINTYRE:**  Your Honor, Powell is not here, but

7      this is just a housekeeping question.  I brought some of the

8      attachments, schedule attachments by way of blowups.  I

9      don't know how you feel about using those or not.

10             **THE COURT:**  It's up to you.

11             **MR. McINTYRE:**  I think it might be helpful.

12             **THE COURT:**  Whatever you want.  It's your case,

13     not mine.

14             **MR. McINTYRE:**  Thank you, Your Honor.

15             **THE COURT:**  Do you need an easel?

16             **MR. McINTYRE:**  We've got them.

17             **THE COURT:**  Proceed.

18                   Do you want to ask him one more question to

19     identify this list of documents?

20             **MR. McINTYRE:**  That was going to be my first

21     question, Your Honor.

22             **THE COURT:**  No, Mr. Fink.  Exhibit 1 to this

23     hearing will be the report, and I assume Exhibit 2 will be

24     the list of documents.

25                   All right.  Let's go.  Do you have the list?

1    **BY MR. FINK:**

2    **Q.**   Mr. Frazee, do you have with you a set of lists of

3    documents for each item identified on Exhibit B of your

4    report?

5    **A.**   Yes, I do.

6    **Q.**   And tell us, if you will, briefly the form that it's

7    in, how many files?

8              **THE COURT:**  No, just give me the list.  That's

9    all.

10             **MR. FINK:**  Okay.

11             **THE COURT:**  Mr. Fink, you go up and get the list

12   and hand them to me.

13            **MR. McINTYRE:**  More importantly, did you bring the

14   documents?

15             **THE COURT:**  Please, sir.  It's not your turn yet.

16                  Do you have a copy of this, Mr. McIntyre?

17            **MR. FINK:**  Your Honor, I am handing Mr. McIntyre a

18   set of them right now.

19             **THE COURT:**  Okay.  That will be Exhibit 2, A, B,

20   C, D, E, F --

21                  Well, here, Exhibit 2 is court filings.

22   Exhibit 2A --

23                  Well, all right.  They are marked.  Let's do

24   this.  Exhibit A is the report.  Exhibit B is Line 1.

25   Exhibit C is Line 2.  Exhibit --

1          Well, these aren't marked really.  All right.

2    BL is Line 1.  Exhibit BL -- BL1.  There's BL1, Exhibit BL2,

3    Exhibit BL4, Exhibit BL6, Exhibit BL7, Exhibit BL8.  No,

4    Exhibit BL9, Exhibit BL10, Exhibit BL11, Exhibit BL12,

5    Exhibit BL13, and Exhibit C is the court filings.

6                Okay.  Go ahead, Mr. McIntyre.

7          **MR. McINTYRE:**  Your Honor, I would note for the

8    record that I have not seen BL1 through whatever before.

9          **THE COURT:**  Well, that's okay.

10         **MR. McINTYRE:**  And I'll try to look at them over

11   the break.

12                       **-   -   -**

13                   **CROSS-EXAMINATION**

14   BY MR. McINTYRE:

15   **Q.**   Mr. Frazee, I'm Ken McIntyre.  I'm one of the lawyers

16   for Ford.  We have not met before, have we?

17   **A.**   I don't believe so.

18   **Q.**   Good morning to you, sir.

19   **A.**   Good morning.

20   **Q.**   What I'm going to do is I'm going to take you through

21   your entire report including the schedules, but I'm going to

22   start out with some overall questions.  During your direct

23   examination, if I understood you correctly, you said there

24   came a time when your role --

25         **THE COURT:**  You've got to stand up.

1          **MR. McINTYRE:**  I'm sorry?

2          **THE COURT:**  You must stand up.

3     BY MR. McINTYRE:

4     **Q.**   During your examination I believe you said there came a

5     time when your role changed and you took on, in addition to

6     acting as an expert, the capacity as acting as a summary

7     witness; is that correct?

8     **A.**   As a summary of certain facts, as a summarizer of

9     certain facts.

10    **Q.**   And when did that change in your role occur?

11    **A.**   I would -- this is me characterizing it, but I would

12    say that that would be probably within the last several

13    months, a couple of months.

14    **Q.**   And was there an additional retainer agreement

15    reflecting your capacity as a summarizer as contrasted with

16    a Rule 26 witness?

17    **A.**   I have a single engagement letter.

18    **Q.**   So that is the single Rule 26 expert engagement letter?

19    **A.**   I'm not going to characterize it as that.  I'm saying I

20    have a single engagement letter.

21    **Q.**   You mentioned in your opening statement that you were a

22    CPA; is that correct?

23    **A.**   I'm licensed -- I'm a licensed CPA in the state of

24    Illinois, yes.

25    **Q.**   Thank you.  Looking at your report and also your

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                    52

1   testimony, you are basically testifying as to the damages

2   that flow from Ford's alleged breaches of contract that

3   caused injury to SNAPP, correct?

4   **A.**   Yes.

5   **Q.**   Okay.  Now, if you look at the Exhibit B, this exhibit

6   summarizes kind of an overall description of the various

7   categories of damages, correct?

8   **A.**   It's a summary exhibit.  Is that your question?

9   **Q.**   Yeah, it's a summary.  Let me ask you this.  You are

10  computing damages for breach of a 1.75 profit agreement

11  provision for $844,000.

12          **THE COURT:**  Thousand?

13  **BY MR. McINTYRE:**

14  **Q.**   Or is that million?

15  **A.**   I'm sorry?

16  **Q.**   Is that 844 million or thousand?

17  **A.**   Yeah, that's million.

18  **Q.**   Okay.  I'm not used to numbers that big.

19          Let me ask you this just off the cuff.  It is your

20  understanding that there was a binding commitment to achieve

21  a profit of 1.75 after tax plus another 2.5 for a roundoff

22  of approximately 2.0 percent guaranteed profit over the life

23  of the relationship; is that correct?

24  **A.**   I didn't understand your question.

25  **Q.**   Did you understand that it was the position of SNAPP

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    53

1    that it was entitled to a guaranteed profit of 1.75 percent

2    minimum?

3    **A.**   My understanding is that the parties agreed to operate

4    in a way that would result in a targeted profit before taxes

5    and before consideration of cost savings at 1.75.

6    **Q.**   Okay.  Do you have any idea what the profit percentage

7    is based on the calculations in your report?  How do they

8    net out?  How well do they do?

9    **A.**   You are going to have to give me more information.  I'm

10   not sure what you are asking.

11   **Q.**   You can't tell me if overall they are making 2 percent,

12   10 percent, 20 percent return on your damage calculation?

13   **A.**   I, I can't tell you based upon the way you are phrasing

14   that.

15   **Q.**   The 1.75 profit agreement, that's from what period of

16   time, 1991 through 1999?

17   **A.**   The calculation represents a cumulative calculation

18   which reflects the activities of the parties since 1991.

19   **Q.**   Okay.  Now, are you familiar that the last contract

20   executed in this case was the 1995 framework agreement?  You

21   said you reviewed the contracts.

22   **A.**   That's not my understanding.

23   **Q.**   That's not.  Are you aware that the Court ruled in

24   April that the three contracts at issue in this case are,

25   number one, the Framework Agreement as amended in 1996,

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                             54

1    number two, the 1999 Transition Agreement, and Number three,

2    the MLA Agreement.  Are you aware of that?

3    **A.**   I'm not specifically aware of that.

4    **Q.**   Are you seeking -- when I say you, is your report

5    seeking damages under Line 1 of Exhibit B for the period of

6    1991 to 1996?

7    **A.**   No.  The damages are associated with the Framework

8    Agreement and its amendment.

9    **Q.**   But the calculation, doesn't it go back to 1991 in your

10   underlying calculations?

11   **A.**   The calculation of the number in exhibit, or, sorry, in

12   Line 1 of Exhibit B reflects a cumulative result of

13   operations since 1991.

14   **Q.**   Okay.  Can or have you in your report in any way

15   differentiated what portion of the cumulative amount relates

16   to transactions that occurred between 1991 and July 23,

17   1996?

18   **A.**   Yes.

19   **Q.**   What portion?

20   **A.**   Exhibit C contains a series of columns which shows the

21   division of the performance between those two periods.

22   **Q.**   How much of the 884 million that you claim relates to

23   transactions occurred before July of 1996?

24   **A.**   I can't, I can't tell you that as I sit here right now.

25   **Q.**   But you say that's in what exhibit?

1    **A.**   Exhibit C --

2    **Q.**   Okay.

3    **A.**   -- reflects --

4    **Q.**   Same, same question.  As to the 1.3 billion --

5            **MR. FINK:**  Your Honor, I just want to object.  He

6    didn't let the witness finish the answer, and I don't know

7    what --

8            **THE COURT:**  Did you finish your answer, sir?

9            **THE WITNESS:**  I did not.

10           **THE COURT:**  Go ahead.

11   **BY MR. McINTYRE:**

12   **Q.**   Please.

13   **A.**   I'm trying to answer the question of basically

14   Exhibit C reflects the cumulative and the individual years

15   of performance representing the Ford/SNAPP relationship.

16   **Q.**   Isn't it true that Exhibit C does not break down the

17   844 number but merely breaks down the underlying finances?

18   **A.**   Yes, that's correct.

19           **THE COURT:**  Exhibit C?

20           **THE WITNESS:**  Exhibit C, yes.

21           **MR. McINTYRE:**  Exhibit C, yes.

22   **BY MR. McINTYRE:**

23   **Q.**   My question is a simple one.

24           **THE COURT:**  Wait a minute.

25                Go ahead.

1    **BY MR. McINTYRE:**

2    **Q.**   My next question is the same question as to the savings

3    that SNAPP is seeking of $1.3 billion, again, that's savings

4    on transactions that go from 1991 through 1996 and

5    thereafter through 1999 and continuing thereafter for

6    three more years into the future, correct?

7    **A.**   That's incorrect.

8    **Q.**   Okay.  What period of time are you looking for as

9    covered by the 1.3 billion?

10   **A.**   If you are referring to Line 2, Line 2 reflects the

11   savings that, that are occurring between -- I should say

12   over the period beginning in 1991 and --

13   **Q.**   Through the end of the framework agreement, which

14   occurred in 1999, correct?

15   **A.**   Through the end of the amendment period, which was

16   September '99.

17   **Q.**   Again, can you tell us in your report where you lay

18   out, if you do, what portion of the $1.3 billion in savings

19   relates to transactions which occurred between 1991 and

20   July 1996?

21   **A.**   There is --

22   **Q.**   So that I can determine, you know, what part is prior

23   to '96 and what part is after.

24   **A.**   There is not a description of that calculation in my

25   report.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                              57

1    **Q.**    Okay.  As an expert witness have you ever heard of the

2    term statute of limitations?

3    **A.**    I have.

4    **Q.**    Are you aware of what Ford claims the statute of

5    limitations date bar is in this case?

6    **A.**    I am not.

7    **Q.**    You have reviewed a number of Ford motions and briefs

8    that are in your file, correct?

9    **A.**    Yes.

10   **Q.**    Did you review a Ford motion to dismiss based on

11   statute of limitations?

12   **A.**    I don't recall.

13   **Q.**    Have you formed any opinion as to what portion of

14   SNAPP's alleged damages are within or without the statute of

15   limitations period as averred by Ford?

16   **A.**    I have not performed that calculation or included it in

17   my report.

18   **Q.**    The interest on late payments from Ford, Line 3, for

19   8,379,755, I take it you have heard Mr. Fink say this

20   morning to the Court that that claim has been deleted?

21   **A.**    That's my understanding.

22   **Q.**    So that line item we can delete for purposes of our

23   discussion, correct?

24   **A.**    You would have to ask Mr. Fink that, and you would

25   probably have to decide that for yourself.

1    **Q.**   Let me ask you this.  Did you give Mr. Fink or his

2    client any advice within the scope of your duties as an

3    expert as to whether they should or should not delete the

4    $8.3 million interest claim?

5    **A.**   No.

6    **Q.**   Do you have any personal knowledge based on your work

7    as to why that claim is being deleted?

8    **A.**   No.

9    **Q.**   It's true that in connection with the computation of

10   the interest on late payments from Ford that the schedule

11   provided you actually tracked transactions from 1991 through

12   the future to determine the amount of late payments,

13   correct?

14   **A.**   I -- what do you mean by in the future?

15   **Q.**   What I mean by this is there is a schedule that tracks

16   the identity of the purchase order or PN, the date it was

17   issued and the date it was paid and the interim amount

18   between paid and issued and then comparing it to 30 days or

19   5 days and then the total amount, correct?

20   **A.**   The spreadsheet is comprehensive.  It includes I

21   believe that information as well as some additional.

22   **Q.**   Out of fairness to you, I'll agree the spreadsheet says

23   what it says, but for purposes of my crude point, it does

24   cover those factors, correct?

25   **A.**   I believe so.  I don't have it in front of me.

1    **Q.**    Now, it's true that when they did that spreadsheet

2    someone actually sat down and reviewed underlying purchase

3    orders, correct?

4    **A.**    I am not aware that that's a fair or a truthful

5    statement.

6    **Q.**    Do you know how that schedule was prepared and whether

7    or not they reviewed the underlying data pertaining to

8    specific transactions?

9               **MR. FINK:**   Your Honor --

10              **THE COURT:**   What's the objection to the question?

11              **MR. FINK:**   This is a matter that's not at issue in

12   the --

13              **THE COURT:**   No, it goes to the credibility now.

14              **MR. McINTYRE:**   It goes to what type of information

15   is available.

16              **THE COURT:**   It's not substantive.  It goes to the

17   credibility and the extent of -- it's cross-examination.  I

18   know where it's going.  I think I know where it's going.

19              **THE WITNESS:**   I'm sorry, Mr. McIntyre, could you

20   repeat --

21   **BY MR. McINTYRE:**

22   **Q.**    My question is didn't someone at SNAPP, probably

23   Mr. Vetter or someone at his direction, review underlying

24   transactional data to come up with a schedule that showed

25   the number of days late on a purchase order by purchase

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                60

1    order basis from 1991 to the present?

2    **A.**   I don't know whether that was done under Mr. Vetter's

3    direction or by him.  Clearly that kind of information would

4    be a part of SNAPP's typical business records.

5    **Q.**   Was it a typical business record to prepare a document

6    for litigation which summarized that information?

7    **A.**   I don't know.

8    **Q.**   Now, you have testified that as an expert you have

9    certain duties to review and check the work provided by your

10   client, correct?

11   **A.**   I have certain duties, but I am not required to verify

12   everything that a client gives me as being accurate.

13   **Q.**   Let mu ask you this.  How many summaries, financial

14   summaries that you used in your report for purposes of your

15   evaluation and calculation did you receive just from

16   Mr. Vetter?

17   **A.**   Off the top of my head I couldn't tell you.

18   **Q.**   Well, is it fair to say it's more than 20?

19   **A.**   That's probably fair.

20   **Q.**   By like token, how many calculations that you

21   incorporated in your report did you receive from Mr. Vetter?

22   **A.**   I don't know the answer to that.

23   **Q.**   Is it fair to say it's more than 20?

24   **A.**   I don't know.  I don't know.

25   **Q.**   How many instructions did you receive from Mr. Vetter

1    as to how to apply certain calculations?

2    **A.**   Well, I would have received Mr. Vetter's thoughts on

3    issues and how to perform certain calculations.  I wouldn't

4    characterize those as instructions.

5    **Q.**   When you received a summary from Mr. Vetter, what, if

6    anything, did you do to check out the data set forth in the

7    summary?

8    **A.**   I spent time to determine whether or not the data set

9    forth in the summary was supported by other documents that I

10   was aware of that had been contemporaneously exchanged.  I

11   spent time asking the questions of how the data was compiled

12   or prepared if I could.  I spent time examining whether

13   different summaries were consistent with each other in the

14   sense of showing numbers that, again, were consistent.  So

15   there were a lot of things that I did to try to understand

16   the --

17   **Q.**   Isn't it -- are you finished?  I'm sorry.

18   **A.**   No.  To understand the numbers that were being

19   provided.

20   **Q.**   Isn't it true that of the 20 summaries sent by

21   Mr. Vetter to you you used them all and didn't reject any of

22   them?

23   **A.**   That's false.

24   **Q.**   Okay.  Which summaries did you reject?

25   **A.**   I don't, I can't point you to a specific one, but there

1   were documents that Mr. Vetter sent me that I noted problems

2   with and asked him to send me a corrected version.

3   **Q.**   I'm going to take you through all of the exhibits

4   attached to your report, and we can talk about each of the

5   summaries that pertain thereto.  Is there any way in looking

6   at your report that we can ascertain when you were

7   testifying as a Rule -- pardon me -- when you are speaking

8   in this report as a Rule 26 expert versus when you are

9   acting in your recently acquired role as a summary witness?

10  **A.**   I'm sorry, what was the first part of your question?

11  **Q.**   My question is in going through your report how do I

12  know whether you are talking as a Rule 26 expert or as a

13  summary witness?

14          **THE COURT:**  What's the difference between the two,

15  Mr. McIntyre?  As a summary witness he has to have some

16  expertise.  He's their damages witness.  I don't know what

17  you mean by summary witness.

18          **MR. McINTYRE:**  Well, as I understand it -- well,

19  I'll let David speak for himself as to how they intend to

20  use this witness, but as I understand it, there are

21  differing duties under Rule 26 versus a summary witness

22  under FRE1006, including the tax cases that Your Honor

23  mentioned, and all I'm trying to do is to figure out where

24  are you talking as a summary witness and where are you

25  talking as an expert because a summary witness, all they are

1    doing is saying I have received information and I am setting

2    forth information that I have received.

3            **THE COURT:**  No, a summary witness is a witness who

4    listens to all of the testimony in the courtroom and then

5    summarizes that.  This witness is certainly more than that.

6    I think the question can be, can we tell from your report

7    which of the, which of the information is information you

8    calculated and which is information you simply took a

9    schedule or a statement, et cetera, from someone else and

10   incorporated?  Isn't that what you are really looking for?

11           **MR. McINTYRE:**  I think, you know, we have been

12   reading about summary witnesses, Your Honor, and what they

13   can do and what their responsibilities are, and I believe a

14   summary witness has certain duties not just to accept the

15   information blindly but to engage in due diligence, to check

16   it, verify it, make sure it's admissible and that sort of

17   thing.

18           **THE COURT:**  No, no, we are not going to get into

19   that.  My understanding is that this witness will be

20   proffered to give the calculation of damages.  In part, some

21   of these figures that he has will come from others, but

22   anyhow, we'll pass that for the minute.  You go ahead.  I

23   didn't mean to interrupt you.

24   **BY MR. McINTYRE:**

25   **Q.**   Let's move on to another attachment to your report and

1   we'll come back to this again later on in detail, but I want

2   to reflect on a couple of things in light of your statements

3   in your opening remarks.

4          **THE COURT:**  What exhibit is this?

5          **MR. McINTYRE:**  This is Attachment F to the, to the

6   report.

7          **THE COURT:**  Go ahead.

8   **BY MR. McINTYRE:**

9   **Q.**   Before we get to Exhibit F I want to interject this

10  question.  You testified that there were two categories of

11  information you reviewed.  One was contemporaneous

12  documents, contracts and the like; is that correct?

13         And what was the second one?  Why don't you say it

14  to make sure I've got it right.

15  **A.**   Well, it would have to be in whatever context the

16  question was earlier, but I think what I said is that the

17  two categories I was describing at that point related to

18  those that were essentially prepared during the course of

19  the relationship between the parties and the second category

20  being those that were exchanged or obtained after.

21  **Q.**   Well, didn't you rely on a third category, and those

22  are the calculations and summaries provided by SNAPP to you,

23  including the various schedules and summaries that

24  Mr. Vetter sent to you?

25  **A.**   The answer to that is that the summaries, to the extent

1    they were provided to me, were based on documents that fall

2    into the other two categories.

3    **Q.**   I see.

4    **A.**   If I'm answering your question.

5    **Q.**   Let's look at one of the summaries that he provided to

6    you, and it's in the context of Exhibit F.  I'll show them

7    to you.  You spoke in terms of MRO.  What does MRO stand

8    for?

9    **A.**   It stands for maintenance, repairs, and I just drew a

10   blank.

11   **Q.**   What does I-Ra-MPP stand for?

12            **THE COURT:**  Wait.  Maintenance, repairs and what?

13            **THE WITNESS:**  I think it's offices, but I'm

14   drawing a blank on that, Your Honor.

15            **THE COURT:**  And the other word is I-Ra-MPP?

16   **BY MR. McINTYRE:**

17   **Q.**   Yeah.  You talked about I-Ra-MPP damages, too.  What

18   does I-Ra-MPP stand for?

19   **A.**   It's an acronym, and as I recall, it stands for

20   something along the line of raw materials purchasing or

21   purchases program.

22   **Q.**   Now, you have in your schedules included leaked

23   revenue.  You are claiming that there were certain

24   I-Ra-MPP -- strike that -- there were certain MRO purchases

25   made during the relationship that SNAPP was entitled to

1   exclusively purchase, correct?

2   **A.**   I'm sorry, what are you referring to?

3   **Q.**   Isn't one of the claims, as you understand it, that

4   SNAPP claims that under the 1996 First Amendment to the

5   framework agreement it had under the scope of the paragraph

6   that pertained to "desourcing" that that desourcing was

7   tantamount or meant that they had an exclusive contract for

8   those commodities that SNAPP was buying as of the beginning

9   of the 1996 contract, correct?

10  **A.**   Okay.  I'm sorry, I wasn't connecting your question.

11  **Q.**   My question is you are claiming or SNAPP is claiming a

12  breach of the 1996 agreement in that it wasn't provided with

13  all of the MRO that it should have purchased, correct?

14  **A.**   It wasn't provided with the opportunity to purchase.

15  **Q.**   Yeah, the opportunity to buy.  Now, you also said you

16  reviewed the contracts at issue in this case, correct?

17  **A.**   I have reviewed the ones I testified to earlier.

18  **Q.**   All right.  It's true, isn't it, that MRO is not

19  included under the 1996 First Amendment to the framework

20  agreement?

21  **A.**   Well, as I understand it, it's an amendment to the '95

22  agreement, and as I understand it, the '95 agreement

23  contains provisions that were consistent with what SNAPP was

24  actually doing, which was purchasing MRO commodities.

25  **Q.**   Well, are you aware that in 1995 Ford and SNAPP entered

1    into a separate and distinct IMPACT purchase order with a

2    separate and distinct document?

3    **A.**   Are you asking me am I aware of that?

4    **Q.**   Yeah, are you aware of that.

5    **A.**   I may be generally familiar with it.  I am not aware of

6    that document.

7    **Q.**   My question to you is under a claim for MRO under the

8    1996 contract and the damages you calculated one has to

9    assume that Ford had a contractual obligation under the 1996

10   agreement and/or the '95 agreement to purchase MRO from

11   SNAPP, correct?

12   **A.**   Well, I'm assuming SNAPP has a legal basis for making

13   that claim.  I'm not opining on it.

14   **Q.**   Now, the same question under leaked revenue.  You as to

15   MRO from 1994 and '95, you calculate that actually, don't

16   you?

17           **MR. FINK:**   I didn't hear a word there, I

18   apologize.  You calculate that, and then I apologize, you

19   said a word.  I just didn't hear the word.

20   **BY MR. McINTYRE:**

21   **Q.**   Well, you've got -- oh, this, here we go.  I'm saying

22   that from 1996 through 1999 you have leaked revenue of -- is

23   this the 3.3 billion chart?

24           Under D, if you look at Exhibit D, I have A here,

25   you calculate leaked MRO revenue and you calculate it, it

1    comes out to --

2             Where is the footnote that says based upon this

3    memo --

4         **MR. McINTYRE:**  I'm sorry for my disorganization,

5    Your Honor.

6    **BY MR. McINTYRE:**

7    **Q.**  With the help of my colleagues, I finally figured this

8    out, and I apologize to you, sir, for the delay.

9         **THE COURT:**  Go ahead.

10   **BY MR. McINTYRE:**

11   **Q.**  If you look at Exhibit F, this sets forth the leaked

12   revenue from 1996 through 1999, and you show it, leaked

13   revenue for MRO, in Footnote D.  Do you see that, sir?

14   **A.**  Yes, I do.

15   **Q.**  And you are claiming leaked revenue for MRO from '95

16   through '99, and you've got, for example, the years of '97,

17   3.3 billion, '98, 3.3 billion, '96, 2.2, and it comes out

18   11 billion in MRO that you claim was leaked that SNAPP

19   should have purchased, correct?

20   **A.**  Well, the calculation on Row 9 is 11.2 billion.

21   **Q.**  Well, where did -- and it says down at the bottom -- it

22   doesn't say where you got that information from on the

23   3.3 billion a year approximate lost revenue.  Where did you

24   get that from?

25   **A.**  The calculation shown in Exhibit D is based on a

1    presentation that was made by a Ford purchasing executive by

2    the name of Jeffrey Collins to I believe a group of

3    suppliers in which he discussed the amount of MRO activity,

4    purchasing activity that he expected to be a part of a new

5    program that was launching, and this, the numbers presented

6    here in Exhibit D are actually lower than what Ford actually

7    did, but --

8            **MR. McINTYRE:**  Could I have this document marked

9    as our next --

10           **THE COURT:**  You mark them yourself.

11           **MR. McINTYRE:**  Let me show you what we are going

12   to have marked as what?

13           **THE COURT:**  You just mark it yourself.

14           **MR. McINTYRE:**  Frazee D1.

15           **THE COURT:**  No, mark it 4.

16           **MR. McINTYRE:**  Let me hand this to you, and if

17   it's okay, maybe you can hand this to the Court.

18           **THE WITNESS:**  Sure.

19           **MR. McINTYRE:**  Thank you.

20           **THE COURT:**  Do you have a copy for me?  You hand

21   it to me, Mr. McIntyre.  I'll put the marking on it.  Just

22   give me a copy.

23                   All right.  Go ahead.

24           **MR. McINTYRE:**  Is this the document that you are

25   talking about?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

70

1          THE WITNESS:  Do you need this other one?

2          MR. McINTYRE:  No.

3          THE WITNESS:  You want me hold them both, okay.

4          THE COURT:  What is Exhibit 4?

5     BY MR. McINTYRE:

6     Q.   Mr. Frazee, is this the document that supports the

7     estimated lost MRO leaked revenue of 11.4 billion?

8     A.   I believe it is.

9     Q.   So Exhibit 4 is the document that Mr. Vetter provided

10    to you to support the contention in your report that SNAPP

11    is entitled to MRO leaked revenues estimated at

12    $11.475 billion?

13    A.   Well, it's a document, first of all, that was provided

14    to me, so that part is true.  It is the support for the

15    numbers presented in the calculation, but it's, it is not

16    necessarily the entire.

17    Q.   Well, what else did you use to support?

18    A.   This is the document that I used, as I said, to support

19    the calculation.  I also mentioned that Ford's actual

20    purchases during this time period were in fact greater

21    than --

22          THE COURT:  Keep your voice up.

23          THE WITNESS:  I'm sorry, Your Honor.  I moved my

24    mike there.

25                I also noted that the actual purchases from

1    the Ford documents that I have reviewed actually exceed the

2    amount shown in this document that you marked.

3    **BY MR. McINTYRE:**

4    **Q.**   Now, if you look at Exhibit F -- you mentioned actual

5    purchases of MRO.  You indicate on Exhibit F, which is Tab F

6    to the report, that there is a loss of 436,484,383 of MRO

7    that was during -- that was actual, correct?

8    **A.**   That's incorrect.

9    **Q.**   Okay.  What does it show, if I misstated it?

10   **A.**   Are you referring to Footnote A?

11   **Q.**   No, I'm referring to this right here, the lines that

12   show the actual MRO, and it says "Source:  Ford's Commodity

13   Purchase Document."

14   **A.**   I think you misunderstood the schedules.  Exhibit A,

15   which is where that footnote relates to --

16   **Q.**   Uh-huh.

17   **A.**   -- is related to IT commodities.

18   **Q.**   So what about Line 8, "Less:  Actual IMPACT Volume"?

19   **A.**   And what's your question there?

20   **Q.**   Is Line 8 actual IMPACT volume, what you constitute to

21   be the actual IMPACT volume purchases made?

22   **A.**   No, that's the actual IMPACT -- that's the actual MRO

23   purchases that Ford actually made from SNAPP.

24   **Q.**   My point is this.  You had available to you

25   documentation showing the actual MRO purchased by Ford from

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*
72

1    SNAPP during the relevant time, correct?

2    **A.**   Yes.

3    **Q.**   And what that involved was someone went through all of

4    the Ford commodity codes -- do you understand that's how

5    those numbers were picked up and arrived at?

6    **A.**   That's also incorrect.

7    **Q.**   Well, isn't it true you went through the Ford commodity

8    code document information and then applied the commodity

9    code numbers that were contained in Exhibit R and Exhibit S

10   to your report?

11   **A.**   In the context of which you are asking, no.

12   **Q.**   All right.  How did you -- how was the actual MRO

13   indicated if the context of my question is incorrect?

14   **A.**   The actual MRO volume is taken from the project

15   summaries which were contemporaneously shared with Ford and

16   exchanged, and it's a simple summation of what was actually

17   reported and agreed to by Ford.

18   **Q.**   Isn't it true that leaked MRO could have been derived

19   from using actual Ford documentation?

20   **A.**   Yes, and the numbers would be greater than what is

21   presented here.

22   **Q.**   Instead you used this estimate based upon Exhibit 4?

23   **A.**   Again, the numbers, if they had been used, the actual

24   numbers of Ford's buys would have been greater than

25   Exhibit 4 indicates.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

1   **Q.**   Is there a report or summary in your report that shows

2   that?

3   **A.**   No.  This was from a document that Ford would have

4   produced in discovery.

5   **Q.**   Where is that document?  Do you have it here with you

6   today?

7   **A.**   I'm sure I have it.  It's in the folder that was marked

8   as Exhibit 2.

9   **Q.**   Is it discussed in your report?

10  **A.**   I don't believe that it was discussed in the report.

11  **Q.**   Okay.  Now, the 3.3 billion number that we are talking

12  about, looking at Exhibit 4, it says -- this is an email

13  from Mr. Vetter to you, correct?

14  **A.**   The first page?

15  **Q.**   Yeah.

16  **A.**   Yes, this is an email from him.

17  **Q.**   And this is September 2, and your report was dated

18  September 10th, correct?

19  **A.**   That is correct.

20  **Q.**   And it says, "IMPACT.  PXo53 covers the 3.3 billion

21  number for the volume and alludes to potential savings."

22  Without getting into it, was it your understanding that this

23  report, "Industrial Materials, N.A. Suppliers' Meeting

24  report, is that the PX53 that's referenced in the memo?

25  **A.**   I believe they are the same documents, but I'm not

1    certain.

2    **Q.**   All right.  And this document from whence the

3    foundation for $3.3 billion in annual leaked MRO comes from

4    was a slide show, correct?

5    **A.**   Well, again, your premise there is a little faulty.

6    This document, first of all, Exhibit 4 looks to be, at least

7    to me, to be elements of a slide show along with notes that

8    the speaker intended to use to present to the suppliers, but

9    again, this is not the only document that may be in

10   existence to support the calculation.

11   **Q.**   Okay.  And at Page 010812 at Slide 19 the document

12   says, "On an annual buy base of 3.3 billion and total

13   inventory of over $800 million, the Team has set an,

14   arguably aggressive, Total Cost Reduction Target of

15   1.4 billion . . ."

16           **THE COURT:**  What page?

17           **MR. McINTYRE:**  Page 010812, which is Page 19 of

18   the document itself.

19           **THE COURT:**  Okay.  Go ahead.

20   **BY MR. McINTYRE:**

21   **Q.**   So this says that on an annual buy base of

22   1.3 billion --

23   **A.**   3.3 billion.

24   **Q.**   Yeah, and a total inventory of over 800 million the

25   team has set an arguably aggressive total cost reduction

1    target.  Would you agree with me that this is a hypothetical

2    statement pertaining to an estimate?

3    **A.**   I don't know if it's a hypothetical or not.

4    **Q.**   Did you see anything in Exhibit 4 are where Ford makes

5    a statement that it is going to buy certain types of MRO

6    from SNAPP?

7    **A.**   I'm sorry, your question is do what?

8    **Q.**   Do you see anything in Exhibit 4 whereby Ford committed

9    itself to buy MRO from SNAPP?

10   **A.**   Not that I recall.

11   **Q.**   The name SNAPP doesn't appear in the document, does it?

12   **A.**   I thought it did actually, but . . .

13   **Q.**   It says on the front of it that this is an N.A.

14   Suppliers' Meeting on December 14th, 1994.  How many

15   suppliers attended the N.A. Suppliers' Meeting; do you know?

16   **A.**   I don't.

17   **Q.**   Was this a meeting just between Ford and SNAPP?

18        **THE COURT:**  Ask your next question.  Ask your next

19   question.

20   **BY MR. McINTYRE:**

21   **Q.**   What, if any, steps as an expert did you take to vet

22   this report to determine if it was a proper and reasonable

23   basis to make the statement in your report at Exhibit F with

24   respect to estimated leaked revenues of MRO volumes for

25   3.3 billion in '97 and in '98?

 1   **A.**   I don't understand your question.  What are you asking

 2   me to --

 3   **Q.**   Okay.  You got this report from Mr. Vetter on Sunday,

 4   September 2, according to the face of Exhibit 4, correct?

 5   **A.**   That's what Exhibit 4 says.

 6   **Q.**   You rendered your report on September 10.  He's sending

 7   you a document that you say supports the MRO leaked revenue

 8   estimate of leaked revenue of 3.3 billion in '97 and

 9   3.3 billion in '98, and my question is between September 2

10   and September 10 what, if anything, did you do to verify the

11   numbers contained in this N.A. Suppliers' Meeting slide

12   schedule outline?

13   **A.**   Well, your question implies a few things.  First, this

14   isn't, this email --

15           **THE COURT:**  No.  Sir, you got this document,

16   correct?

17           **THE WITNESS:**  Yes.

18           **THE COURT:**  You have these figures at Footnote D,

19   right?

20           **THE WITNESS:**  Yes, sir.

21           **THE COURT:**  These figures at Footnote D are

22   derived from this exhibit, are they not?

23           **THE WITNESS:**  Yes, they are derived from the

24   exhibit and consistent with other documents that I talked

25   about.

1        **THE COURT:**  I didn't ask you if they are

2    consistent.  They are derived from this exhibit, right?

3        **THE WITNESS:**  Yes.

4        **THE COURT:**  Did you do anything to verify the

5    accuracy or the relevancy or the credibility of this exhibit

6    so that it could be used in your report or did you just

7    accept the exhibit and go on?

8        **THE WITNESS:**  The simple answer to that is I did

9    not just accept the exhibit.

10        **THE COURT:**  Did you do anything to verify the

11    credibility of the exhibit?

12        **THE WITNESS:**  I'm sorry, in terms of authenticity

13    or --

14        **THE COURT:**  No, the fact that it was accurate or

15    that it -- it was accurate, it was anything more than an

16    estimate or a figure in a Powerpoint presentation?

17        **THE WITNESS:**  I did spend some time talking with

18    SNAPP's business witnesses about this document and --

19        **THE COURT:**  Did you do anything more than talk to

20    SNAPP about the document?

21        **THE WITNESS:**  About this specific document, no.

22        **THE COURT:**  Yeah.  What?

23        **THE WITNESS:**  About this specific document, no.

24        **THE COURT:**  Okay.  Go ahead.

25

1     **BY MR. McINTYRE:**

2     **Q.**   Let me move to another item in your damage calculation.

3     In your calculation of lost future profits under the

4     three-year contract calculation you seek damages for

5     I-Ra-MPP purchases that you say would have been made going

6     into the future from 1999 through the year 2002, correct?

7     **A.**   The, the analysis of damages associated with the breach

8     of good faith issue do include damages associated with the

9     I-Ra-MPP program.

10    **Q.**   Okay.  And you have included in Exhibit O, that sets

11    forth the damages caused by Ford's failure to negotiate in

12    good faith, and for the record when I say Exhibit O I mean

13    Exhibit O which is Attachment O to Mr. Frazee's report.

14              Exhibit O to your report is where you calculate

15    the lost revenues attributable to Ford's failure to

16    negotiate in good faith, right?

17    **A.**   Yes.

18    **Q.**   Okay.  Now, let's go down to MRO commodities.  You

19    below that have a line that says committed

20    Volume 3.3 billion, and we have talked about MRO.  Now we're

21    talking about the I-Ra-MPP program, and under Line 10 of

22    Exhibit O to your report it says "Committed volume - No

23    Savings Sharing Assumed," 2.269,000 billion, correct?

24    **A.**   Yes, 2.269.

25    **Q.**   All right.  Now, are you aware that I-Ra-MPP is not

1    mentioned in the 1996, 1995 or 1999 contracts at issue in

2    this case?

3    **A.**    I don't believe that that word appears in those

4    contracts, but I don't recall specifically.

5    **Q.**    Well, is it fair to say that in order to recoup damages

6    going on into the future for not renewing the 1996 contract,

7    in order to get I-Ra-MPP damages going three years into the

8    future I-Ra-MPP should be part of the 1996 contract,

9    correct?

10   **A.**    I don't agree with that.

11   **Q.**    You don't agree with that.  Where, if anywhere, is

12   there a document whereby Ford made any commitment to buy

13   I-Ra-MPP goods, raw materials from SNAPP?  Did you do any

14   due diligence to find out if there was any contractual basis

15   for the assertion that there was an obligation to buy

16   I-Ra-MPP goods and that that obligation should continue for

17   three years into the future to the tune of $2.2 billion?

18   **A.**    First of all, you would have to remember the document

19   you are on right now, which is associated with the renewal

20   of the '96 agreement.  So this isn't, doesn't require in my

21   view that phrase, for example, to be in the '96 agreement.

22   This is under a new document or contract.  That's the

23   underlying premise for this calculation.

24   **Q.**    Did you review the July 1999 draft I-Ra-MPP contract?

25   **A.**    I don't believe so.  I may have, but I don't believe

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    80

1    so.

2    **Q.**   Are you aware that the draft I-Ra-MPP contract prepared

3    in July of 1999, which was -- which provided that it would

4    be, if there ever was a contract, between Ford and DSSI, not

5    SNAPP?  Are you aware of that?

6    **A.**   I'm assuming you are just talking that there is only

7    one draft, is that your --

8    **Q.**   This is the final draft that we have been able to find

9    in this case.

10   **A.**   I am not aware of that.

11   **Q.**   Are you aware that SNAPP witnesses have testified that

12   the I-Ra-MPP deal was to be carried out by DSSI and not by

13   SNAPP?

14   **A.**   I'm not aware of that testimony.

15   **Q.**   In your documents you have a copy of the I-Ra-MPP

16   release.  It's called the I-Ra-MPP Software Development

17   Agreement and Release dated May 2000 between Ford and DSSI.

18   That was in your documents, and I have it as Frazee Number

19   3015.  Do you believe reviewing that I-Ra-MPP agreement?

20          **MR. FINK:**  Objection.

21          **THE COURT:**  What's the objection?

22          **MR. FINK:**  The objection is that counsel is

23   focusing on and addressing liability issues.  We are not

24   calling him as a liability witness.

25          **THE COURT:**  No.  Excuse me, the objection is

1    overruled.

2              **MR. McINTYRE:**  My question is --

3              **THE COURT:**  The figure is included, and the

4    cross examination is going to the basis for including this

5    in Schedule -- in Exhibit O, which is the schedule which

6    relates to the damages for failure to negotiate renewal in

7    good faith.

8              Go ahead, Mr. McIntyre.

9    **BY MR. McINTYRE:**

10   **Q.**   Do you recognize this final executed version of the

11   I-Ra-MPP Software Agreement and Release.  It was in your

12   file.  I'll show you a copy, if you would like, just to

13   refresh your recollection.

14   **A.**   I would appreciate that.

15             **MR. McINTYRE:**  At this point I'm just going to

16   show it to the witness for the purpose of refreshing his

17   recollection.  I would also note for the record the bottom

18   number that says Frazee Number 3015, that's my Bates stamp

19   number from reviewing your files.

20   **BY MR. McINTYRE:**

21   **Q.**   Do you remember looking at that document in your due

22   diligence?

23   **A.**   I do.

24   **Q.**   Okay.  Did you read the first paragraph under I that

25   says, "DSSI owns the I-Ra-MPP software"?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

82

1    **A.**    Yes.

2    **Q.**    Did you make any determination as to whether or not the

3    fact that DSSI owned the I-RaMPP software impacted the

4    assumption contained in your damage analysis that SNAPP was

5    entitled to I-Ra-MPP lost profit damages to the tune of

6    $2.269 billion?

7    **A.**    Well, you are really, you are really missing an

8    important point here on the dates.  This is an agreement

9    dated May 15 of 2000, and at that point in time DSSI, I'm

10   sorry, Direct Sourcing Solutions, Inc. apparently owned this

11   software.  At the point in time in which this renewal was to

12   have commenced which in the discussion we presented earlier

13   was at the end of the original amendment, which would have

14   been in September of '99, at that point, as I understand it,

15   SNAPP did own the software that's the function and basis for

16   this contract.

17   **Q.**    And do you have an understanding that there was some

18   written commitment or agreement signed between the parties

19   that Ford had made a contractual commitment to buy I-Ra-MPP

20   materials from SNAPP?

21   **A.**    I understand that there was an agreement.  I can't tell

22   you what the nature of that was in all of its forms.

23   **Q.**    In your report at Page 4 you discuss the failure to

24   negotiate the renewal of the amendment in good faith,

25   correct?  It's Page 4 of Exhibit 4.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

1    **A.**   Page 4 of Exhibit 4?

2    **Q.**   Correct.  Actually it's Page 13 of Exhibit 4.  I

3    misspoke.

4            **MR. FINK:**  Exhibit 4?

5    **BY MR. McINTYRE:**

6    **Q.**   It's Page 13 of your report.

7    **A.**   Okay.  I'm there.

8    **Q.**   You say, "In my opinion -- under Financial Elements of

9    Contract, you say, "In my opinion, the key financial

10   elements (and relevant considerations) of a SNAPP-Ford

11   contract would have addressed:"

12           And then you've got:  "1, Duration of the

13   contract," and you say the duration of the most recent

14   contracts are one of the relevant considerations, correct?

15   **A.**   It says the duration of the most recent contract,

16   singular.

17   **Q.**   Well, what about the duration of the contracts before

18   1996, would those be relevant?

19   **A.**   I think so.

20   **Q.**   Did you consider the fact that the 1991 contract was a

21   one-year contract?

22   **A.**   Yes.

23   **Q.**   Did you consider the fact that the '92, '93 and '95

24   contracts were all one-year contracts?

25   **A.**   Yes, I did.

---

1   **Q.**   Why then do you just say the duration of the most

2   recent contract in your opinion?

3   **A.**   I think that's one of the factors.  I think the other

4   point that's important to remember is that the most recent

5   contract was three times the length of the original ones.

6   **Q.**   And it's true, isn't it, if you reviewed the most

7   recent contract, that it provides that SNAPP was given a

8   three-year contract in the 1996 contract as a result of

9   negotiations in the context of settling a lawsuit, Midwest,

10  correct?

11  **A.**   I understand that was some of the background for that,

12  for that agreement.

13  **Q.**   And do you recollect that, according to SNAPP, the

14  purpose for giving SNAPP a three-year contract in the

15  context of the 1996 First Amendment to the Framework

16  Agreement was so that it would have the benefit of a

17  three-year string of cash flow in order to carry out its

18  obligations under the settlement agreement, to give it the

19  wherewithal to do that; do you remember that?

20  **A.**   I'm not sure what you are referring to.

21  **Q.**   Isn't it true that there were unique circumstances

22  leading up to giving SNAPP the three-year contract?

23  **A.**   I don't know.

24  **Q.**   You don't know.  You don't know if --

25  **A.**   I don't know.  I wasn't there in 1996.

1   **Q.**   Did you interview your client as to the antecedents of

2   the decision to give SNAPP a three-year contract and the

3   underlying correspondence which says it was given to them in

4   a unique situation in order to give them the wherewithal to

5   pay off the Midwest settlement?

6   **A.**   What was your question?

7   **Q.**   My question is in your due diligence did you make any

8   inquiry as to the underlying circumstances and history for

9   entering into the three-year July 1996 First Amendment to

10  the Framework Agreement?

11  **A.**   Yes, I did.

12  **Q.**   And did that inquiry include asking your client about

13  the impact of the Midwest settlement on the agreement?

14  **A.**   Yes, I did.

15  **Q.**   And did you learn that the reason the three-year

16  provision was in there was because SNAPP, pursuant to

17  agreements, undertook the payment of $10 million and as a

18  condition to that SNAPP wanted the three-year contract?

19  **A.**   I'm not sure how to answer your question other than to

20  say that I understand that that Midwest lawsuit and its

21  settlement was part of the precursor to the amendment

22  agreement and the execution of that.

23  **Q.**   Did you undertake any independent study of the average

24  length of contracts issued by Ford Motor Company to its

25  suppliers in, say, 1996, '97, '98?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

1    **A.**   No, I did not.

2    **Q.**   Did you undertake any study or verification to

3    determine whether or not it was common for Ford to issue

4    three-year contracts to suppliers?

5    **A.**   I did not conduct any independent --

6    **Q.**   Have you reviewed automotive, particularly Ford Motor

7    Company, purchase orders and the language and terms

8    contained therein?

9    **A.**   I have.

10   **Q.**   And isn't it true that typically those purchase orders

11   provide that it's terminable on notice and it doesn't

12   contain any length of time?

13   **A.**   Well, you are assuming that there is only one kind of

14   purchase order.  I don't think that that's a true statement.

15   **Q.**   How many purchase -- okay.  Let me ask you this.  Did

16   you make any inquiry as to the length of contract term

17   provided in contracts with other suppliers of commodities to

18   Ford during the relevant period of time?

19   **A.**   I may have made some inquiry on that point.

20   **Q.**   Do you have any notes on those inquiries?

21   **A.**   I don't have any, no.

22   **Q.**   Did you make any determination as to what the average

23   length of a contract was at Ford and/or in the auto industry

24   during the relevant period of time?

25   **A.**   I did not do an independent study of that.  Again, I

1    think it's relevant to consider the fact that there was an

2    actual agreement in place, among other things.

3              **MR. McINTYRE:**  Your Honor, I note that it's 12:30.

4    If this is a convenient time to break for lunch, I'm willing

5    to abide by it.

6              **THE COURT:**  Yeah, 1:15.  Thank you.

7         (Recess from 12:32 p.m. until 1:31 p.m.)

8              **THE COURT:**  Thank you.  Let's continue.

9              **MR. McINTYRE:**  Your Honor, I know it's not

10   consistent with the general court decorum, but I'm wondering

11   if for purposes of this portion of Mr. Frazee's exam I can

12   do it sitting down so I can read my copy of his documents.

13             **THE COURT:**  Okay.  A foolish consistency is the

14   hobgoblin of a little mind.  Okay?  Go ahead.

15             **MR. FINK:**  He was saying yes.

16             **THE COURT:**  It's one of my standard rules that if

17   a lawyer asking a witness a question, he or she stands up

18   because I figure if they are not willing to stand up they

19   are not much interested in what they are doing, but since

20   you have asked for it, it's okay with me.  It's probably the

21   first time in 28 years that I have allowed a lawyer who is

22   not a crippled to do it.

23             **MR. McINTYRE:**  No, I'll tell you what, I'm going

24   to use the podium.

25             **THE COURT:**  Go ahead.

1          **MR. McINTYRE:**  No, I'll use the podium.

2          **THE COURT:**  Go ahead.

3          **MR. McINTYRE:**  Before I thought I was flitting

4     around a little bit.

5          **THE COURT:**  That's all right.  Go forward.

6     BY MR. McINTYRE:

7     **Q.**   Mr. Frazee, I would like to turn your attention to the

8     portion of your report pertaining to "Component 2:  Savings

9     Sharing" at beginning at Page 10 of your report.

10         **THE COURT:**  Page 10?

11         **MR. McINTYRE:**  Yes.

12    BY MR. McINTYRE:

13    **Q.**   And the other relevant thing that I'm going to refer to

14    is Exhibit G entitled, "Savings Sharing - Cumulative through

15    9-30-99."

16         **THE COURT:**  Okay.  Go ahead.

17    BY MR. McINTYRE:

18    **Q.**   Could you just briefly summarize for us again the

19    calculation that you did, the methodology for unpaid cost

20    savings?

21    **A.**   Yes.  It's basically an equal division of the savings

22    generated where savings are defined in the contract as

23    basically the base price minus SNAPP's cost.  I should be

24    clear.  Ford's base price minus SNAPP's cost.

25    **Q.**   And you quote the contract language at Page 10 of your

1    report, correct, Paragraph 4.3?

2    **A.**   I included that, yes, within the report.

3    **Q.**   And is it your understanding that the parties, as they

4    say in Paragraph 4.3, calculated cost savings on an

5    item-by-item basis?

6    **A.**   My understanding is that that's what SNAPP was doing.

7    **Q.**   And also at the beginning of your discussion you state

8    under "Basis for Claim" that, "SNAPP's damages under this

9    component flow from alleged breaches of various contractual

10   provisions, including requirements that Ford:  1) make best

11   efforts to obtain savings; 2) follow the contractual

12   terms . . .," and then you have, "3) review SNAPP-submitted

13   claims and provide approval of valid claims;" and then you

14   have, "4) allow SNAPP to purchase the contractual commodity

15   volumes."

16           I would like to draw your attention to point three

17   of those four points.  Is it your understanding that in

18   connection with each transaction SNAPP would submit a bill

19   for cost savings?

20   **A.**   No, that's not my understanding.

21   **Q.**   Is it your understanding that they generally submitted

22   a claim for cost savings?

23   **A.**   Generally in what time frame?

24   **Q.**   More times than not in 1991 through 1996.

25   **A.**   Again, are you asking in the sense of a specific

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                          90

1    transaction?

2    **Q.**   Isn't it true -- let's go at it this way.

3              **THE COURT:**  Well, ask it this way, Mr. McIntyre,

4    if you would.

5              **MR. McINTYRE:**  Okay.

6              **THE COURT:**  Isn't it true that SNAPP and Ford

7    established a protocol for the submission of claims on a

8    claim-by-claim basis?

9              **THE WITNESS:**  The answer to that question, my

10   understanding is that --

11             **THE COURT:**  No, you answer that question yes, no,

12   I can't answer the question yes or no, or I don't understand

13   the question.

14             **THE WITNESS:**   I believe the answer is yes with

15   one caveat and that is that there wasn't a single protocol.

16   That's the only modification.

17             **THE COURT:**  Thank you.

18   **BY MR. McINTYRE:**

19   **Q.**   From examining your file you received and apparently

20   reviewed sample costs of the Cost Savings Approval Form that

21   SNAPP and Ford used in connection with submitting claims for

22   cost savings?

23   **A.**   I did review that, and again, I want to be clear that

24   is one of several versions of forms that would reflect cost

25   savings, one of.

1    **Q.**   And another form was a similar form entitled SNAPP Cost

2    Savings Approval Form.  Did you also review that?

3    **A.**   It was also I believe part of my file as well.

4    **Q.**   And then there was another form they later used in the

5    late '90's entitled Facilities, Materials and Service

6    Purchasing, Computer and Communications Cost Savings Form?

7    **A.**   I, I'm sure that is the one that was in my file.  I

8    can't see it from here, so . . .

9    **Q.**   Now, you in your report say one of the breaches was

10   alleged failure to review "SNAPP's submitted claims."

11            **THE COURT:**  Where is that?

12            **MR. McINTYRE:**  That's at Page 10 of 19 under

13   Component Number 2, Savings Sharing, where you list --

14            **THE COURT:**  Wait a minute.

15            **MR. McINTYRE:**  Yeah, Page 10.

16   **BY MR. McINTYRE:**

17   **Q.**   You say, "SNAPP's damages under this Component flow

18   from alleged breaches of various contractual provisions,

19   including requirements that Ford:"  And then you've got 1,

20   2, and I'm skipping to 3.

21            **THE COURT:**  This is on Page 10?

22            **MR. McINTYRE:**  Yes, Page 10 of 19 of this report.

23            **THE COURT:**  I've got Page 10 in front of me.

24   Where are you reading from?

25            **MR. McINTYRE:**  Do you see the middle section that

1    says "Component 2:  Savings Sharing"?

2            **THE COURT:**  Yeah, okay.

3            **MR. McINTYRE:**  And then you see under the basis.

4            **THE COURT:**  I see, "Basis for claim."

5            **MR. McINTYRE:**  "Basis for claim," and one of the

6    basis for the claim under parenthetical 3 was that they

7    failed to "review SNAPP-submitted claims and provide

8    approval of valid claims."

9    **BY MR. McINTYRE:**

10   **Q.**   Did I read that correct, sir?

11           **THE COURT:**  Just "review SNAPP-submitted claims

12   and provide approval of valid claims."

13   **BY MR. McINTYRE:**

14   **Q.**   I would like to ask you specifically what claims are

15   you talking about that were submitted and they refused to

16   review?

17   **A.**   Again, you are, actually you are dividing this

18   language.  There is a review and approval of valid claims

19   element, but the answer is that, as I understand it, SNAPP

20   did provide a number of reports on a regular basis,

21   different forms and formats, but that they did provide those

22   to Ford and that the breach in part goes to the fact that

23   valid claims were not approved.  In other words, simply

24   review of the claim doesn't constitute, you know, executing

25   the duty under the contract.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                         93

1    **Q.**   Going back to your report, going back to Page 4 of your

2    report, please.  This relates I believe to Component 2.  You

3    will see at Page 4 of 19 the section entitled Allocation of

4    Ford's Payments?

5    **A.**   Yes.

6    **Q.**   And then you list four elements, and the last element

7    was 4, "SNAPP's 50 percent share of Savings"?

8    **A.**   Yes.

9    **Q.**   And then below that you have the statement, "Allocation

10   of Ford's payments - Limitations on Contemporaneous

11   Designation," and then you say, "Due to the nature of the

12   contractual mechanism, contemporaneous designation of each

13   of the four elements was not possible or practical on a

14   transaction-by-transaction basis."

15              I take it that statement pertains to the assertion

16   you made in your opening testimony that it was not practical

17   or feasible or possible to compute cost savings on a

18   transaction basis and that's why did you the allocation the

19   way you did.

20   **A.**   I don't think -- I think you are drawing an

21   inappropriate connection between those statements.

22   **Q.**   Well, did you conclude that you had to use the formula

23   that you have set forth for cost savings rather than doing

24   it on a transactional basis to determine the amount of cost

25   savings claimed in connection with each item or each

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                               94

1    transaction?

2    **A.**   I think it's six of one, half a dozen of the other.

3    The formulas are the same, whether it's calculated on a

4    transaction-by-transaction basis or on an item-by-item basis

5    or supplier-by-supplier basis.  It's the same formula.

6    **Q.**   It's true you did not calculate it on a

7    transaction-by-transaction basis?

8    **A.**   That's correct.

9    **Q.**   And you testified during your direct that calculating

10   it on a transaction-by-transaction basis was "not doable at

11   that time."  Did you mean the time contemporaneous to the

12   dealings of the parties?

13   **A.**   Just it follows the language exactly of my report, and

14   that is at the point when a transaction would conclude you

15   would not be able to calculate the cost savings at that

16   point in time.

17   **Q.**   How about now.  Now could you do it on a transactional

18   basis?

19   **A.**   I don't know the answer to that.  I don't think it

20   would be well advised in the sense that it creates I think a

21   much more difficult equation than you need to make it.

22   **Q.**   In connection with the calculation of cost savings, I

23   would like to turn your attention to Exhibit G.

24           Looking at Exhibit G, this is entitled "Savings

25   Sharing - Cumulative through 9-30-99," correct?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                      95

1     **A.**    Yes.

2     **Q.**    And starting when?

3     **A.**    Are you asking what's the first date --

4     **Q.**    Yeah.

5     **A.**    -- from which it would be covered.  It would be at the

6     beginning of the Ford-SNAPP relationship.

7     **Q.**    And when was that?

8     **A.**    In 1991.

9     **Q.**    So this covers damages from 1991 through 1999?

10    **A.**    This covers calculations which cover results and

11    performance since 1991.

12    **Q.**    Looking at the first line of Exhibit G, you have Base

13    Price, IT Commodity Actual Volumes, and then you've got

14    4.2 billion, correct?

15    **A.**    Correct.

16    **Q.**    And there you say under Footnote A, "See Exhibit H,"

17    correct?

18    **A.**    Correct.

19    **Q.**    Now, let's look and draw your attention to Exhibit H,

20    H-1.  Looking under Exhibit H, that exhibit is entitled

21    "Actual Savings by Supplier," and then it shows a tabular

22    column for Supplier, Base Price, SNAPP's Cost, Total Cost

23    Savings, correct?

24    **A.**    Yes, it does.

25    **Q.**    Did you prepare Exhibit H?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                    96

1    **A.**   I prepared Exhibit H based on information that was

2    provided to me by SNAPP on a supplier-by-supplier basis for

3    this calculation.

4    **Q.**   In what form was that information supplied to you?

5    **A.**   It was supplied to me in a spreadsheet which has been

6    produced as part of my file to you.

7    **Q.**   And doesn't the spreadsheet basically have all of the

8    information contained on Exhibit H and you just basically

9    took the spreadsheet and put all of the information on

10   Exhibit H?

11   **A.**   I believe it was in a slightly different form, but all

12   of the numbers that are presented here came from SNAPP.

13   **Q.**   And who at SNAPP derived the numbers that are on

14   Exhibit H?

15   **A.**   I don't know who derived them.  I know that Mr. Vetter

16   provided me with the underlying detail on Exhibit H.

17   **Q.**   Who is Mr. Vetter and what position does he hold at

18   SNAPP?

19   **A.**   Mr. Vetter is, as I understand it, a consultant to

20   SNAPP.

21   **Q.**   Do you know his compensation arrangement as a

22   consultant and whether or not he derives any income from the

23   outcome of this lawsuit?

24   **A.**   I don't know that, no.

25   **Q.**   Do you know whether Mr. Vetter is a member or

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

1    participant in an ESOP, which is a party to this lawsuit

2    that will indirectly obtain funds through any recovery in

3    this suit?

4    **A.**    You have two questions there.  I don't know whether he

5    or anyone else will recover funds from the ESOP, and second,

6    I don't know if he is currently a member.  I believe at

7    one point he was based on some factual declaration that was

8    made at some point.

9    **Q.**    Hasn't he been the only remaining director of SNAPP

10    since approximately 2000?

11    **A.**    I don't know.

12    **Q.**    Hasn't he been the treasurer of SNAPP since 2000?

13    **A.**    I don't know.

14    **Q.**    Hasn't he been retained by SNAPP as a consultant for

15    purposes of advising SNAPP on its relationship with Ford

16    since 1998?

17    **A.**    I don't know what the nature of his relationship is and

18    since --

19    **Q.**    Did you make any due diligence or inquiry as to whether

20    Mr. Vetter had any interest or bias in the outcome of this

21    lawsuit personally?

22    **A.**    I did not make an inquiry in the sense of asking him

23    whether he has bias.  I understand that he works for SNAPP

24    or on SNAPP's behalf and so I expected him to provide me

25    information that he, he would have available to him.

1    **Q.**   Okay.  Now, who prepared this information for

2    Mr. Vetter if it was someone else?

3    **A.**   I don't know, I don't know if it was Mr. Vetter or

4    someone else so I can't answer your question.

5    **Q.**   What files or records did they derive the information

6    from, if you know?

7    **A.**   My understanding is that they derived, or not derived,

8    but used, used the records that have been produced in the

9    course of this discovery which were maintained in the

10   ordinary course of business during the parties' relationship

11   as well as some additional information that has been

12   received in the process of the litigation, the discovery

13   aspect of it.

14   **Q.**   What's the additional information that was received in

15   the process of the litigation?

16   **A.**   I believe I'm thinking of at least one example, that I

17   am aware of at least, and that is some information from Ford

18   regarding the costs that Ford saves as a result of

19   eliminating certain administrative expenses associated with

20   spot buys and other types of purchasing documents.

21   **Q.**   Isn't it true that you have included administrative

22   cost savings as a portion of the cost savings that you were

23   seeking under Component 2?

24   **A.**   Under the cost savings component?

25   **Q.**   Yes.

1    A.    Yes.

2    Q.    Where in the contract does it say that SNAPP is

3    entitled to recover administrative cost savings over and

4    above the 50 percent cost savings on an item-by-item basis?

5    A.    Well, you are drawing a distinction that they are

6    somehow different.  I think the contract says base price

7    minus SNAPP costs, and there's a description of what the

8    base price is and that is what it would cost Ford.

9    Q.    So it's your position that the administrative cost

10   savings are part of the costs contained in the formula under

11   the cost sharings provision of the contract, i.e.,

12   Paragraph 4.3?

13   A.    My understanding is that SNAPP's position is that the

14   definition of cost savings should include the total cost

15   savings that Ford realized as a result of SNAPP's

16   activities, which they believe is consistent with the terms

17   of the contract.

18   Q.    I understand that that is SNAPP's understanding of the

19   contract.  Did you do anything to verify that or any due

20   diligence on your own as to whether or not administrative

21   cost savings should be included under the 50 percent

22   item-by-item cost savings?

23   A.    I'm not, I'm not sure I understand your question

24   actually.

25   Q.    Okay.  Let me ask a different question.  Base price on

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    100

1    Exhibit H means what?

2    **A.**    Base price means the -- it's consistent with the

3    contractual term.  Let me turn to make sure.

4    **Q.**    Does that make up the base price of purchase orders

5    attributable to these suppliers referenced on Exhibit H?

6    **A.**    I believe the answer to your question is no.

7    **Q.**    Didn't someone go through, for example, top line, ABB

8    Robotics, don't you understand that in order to come up with

9    these numbers these are numbers by actual savings by

10   supplier, so what they did was they took total numbers for

11   the supplier, correct?

12   **A.**    You are going to have to finish your question.  I'm not

13   following you.

14   **Q.**    Is base price the base price for ABB Robotics, it

15   doesn't pertain to a specific P.O., but a combination of

16   reviewing all of the P.O.'s and that was the base price for

17   the P.O.'s through ABC?

18   **A.**    No.

19   **Q.**    No?  What does that number reflect, 34,470?

20   **A.**    That base price number reflects what the contract says,

21   which it shall be defined as the estimated cost for the item

22   or service as provided by the Ford requisitioner  or shall

23   be the first official quote from the supplier where the

24   estimated cost is not provided by Ford.

25   **Q.**    So this is the base price that comes from the quote

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                        101

1    that you have just referenced?

2    **A.**    Yes.   It is measured consistent with the language I

3    just read to you.

4    **Q.**    But it's not a base price for a specific quote, it's a

5    base price for a number of quotes that were combined in

6    connection with this number for ABB Robotics?

7    **A.**    The number is reflective of two things, just to be

8    clear.   The definition as laid out in the contract --

9    **Q.**    Understood.

10   **A.**    -- and, number two, the items that would have been

11   purchased from that supplier or acquired through that

12   supplier.

13   **Q.**    So that's total items from that supplier?

14   **A.**    Yes.

15   **Q.**    Then somebody would have to go through each item and

16   each base price in order to add them all up and get the

17   total?

18   **A.**    I don't know.   I would believe that there was a process

19   to do that.

20   **Q.**    If someone went through a process of going through all

21   of the individual documents reflecting base price and they

22   added them up to get a total, couldn't they have gone to

23   specific items relevant to specific transactions where SNAPP

24   says it wasn't paid what it was to be paid on that

25   transaction?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                      102

1    **A.**    If I'm understanding your question correctly, I think

2    the answer is no, but I'm not sure I'm following.

3    **Q.**    Why not?  If I go to the ABC file and I pull out all of

4    the documents reflecting the base price?

5    **A.**    Yes.

6    **Q.**    On all of the commodities that they purchased pursuant

7    to the 50/50 cost savings thing, and I pull those all out

8    and I add them all up and we say the total base price on all

9    of that stuff is 34,470, shouldn't I have the ability to

10   look through those documents individually to determine what

11   the specific base price was on the underlying specific

12   portions of the total?

13   **A.**    I believe you are accurate in that with the exception

14   that there is also administrative items that would be

15   considered, in other words, Ford costs that are

16   administrative is what I have termed them that would also

17   need to be considered in terms of defining the base price

18   per the contract.

19   **Q.**    My next question is couldn't someone have done the same

20   thing for the total cost of SNAPP for actual savings by

21   supplier?  If they were going to get the total cost savings

22   for a given supplier, they could have gone into the same

23   document base and gotten the individual cost savings for

24   each transaction subject to your caveat about, well, it

25   doesn't include these administrative cost savings that we

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                          103

1    talked about earlier?

2    **A.**   So your question is what?

3    **Q.**   My question is in order to -- there's a total cost

4    savings for ABB Robotics or their total cost savings by

5    getting there by adding up all of the individual documents

6    pertaining to it, and they could have gone through and

7    looked at each individual document separately if they had

8    desired to undertake that exercise, correct?

9    **A.**   I don't, I don't know the answer to your question

10   fully.  I understand that the SNAPP cost number could be

11   determined by looking at the individual --

12   **Q.**   Who would know?

13   **A.**   Let me finish my answer actually.  I believe you can

14   determine it by looking at the documents or the electronic

15   data that would have been exchanged by the parties during

16   the relationship.

17   **Q.**   So as we sit here and now, there is a record base in

18   order to determine SNAPP's costs on a transactional by

19   transactional basis as contrasted to adding them up in total

20   for a given supplier, as they did here in Exhibit H?  It

21   could be done, correct?

22   **A.**   Your question is asking me to contrast two things.  Let

23   me be clear that the source of those calculations are the

24   documents that have been produced in this discovery process

25   in litigation.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    104

1    **Q.**   What documents are those?

2    **A.**   The documents that -- there are I think close to

3    900 boxes of documents that have been produced.  I

4    specifically referenced in my report an Exhibit --

5    **Q.**   O.

6    **A.**   No, I don't think it was O.

7    **Q.**   Q, I'm sorry.

8    **A.**   Exhibit Q a number of specific documents and/or boxes

9    of information relevant to this individual component of

10   damages.

11   **Q.**   Is it your understanding somebody pawed through all of

12   the documents in Exhibit Q to come up with the numbers

13   reflected on Exhibit H?

14   **A.**   That's my general understanding.  I don't know

15   specifically.

16   **Q.**   Who did it, when did they do it, and how?

17            **THE COURT:**  That's three questions.

18            **MR. McINTYRE:**  It's compound.  I'll withdraw it.

19   **BY MR. McINTYRE:**

20   **Q.**   Who undertook that, if it occurred?

21   **A.**   I don't know.

22   **Q.**   When did they do it if it occurred?

23   **A.**   I don't know that either.

24   **Q.**   What documents did they actually look it if it

25   occurred?

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    105

1    **A.**   The answer to that, again, is the document is either

2    noted specifically here or documents within the boxes noted

3    specifically here.

4    **Q.**   Do you have any knowledge as to whether the information

5    that the SNAPP person reviewed to create Exhibit H was

6    actually in the form of some electronically kept

7    information?

8    **A.**   Do I know?  No, I don't.

9    **Q.**   Did you ask?

10   **A.**   I believe I did ask as to the process by which the data

11   was accumulated, and my understanding is that it was done

12   originally with the documents that are noted here in

13   Exhibit Q and that that was the basis for the calculation.

14   **Q.**   Well, done originally, then did they take that

15   information from Exhibit Q and is it now available somewhere

16   in electronic form and is that what was reviewed for the

17   preparation of Exhibit Q and H?

18   **A.**   I don't know the answer to that.  Clearly the

19   components that are presented in Exhibit H-1 are electronic.

20   I mean it's an electronic spreadsheet.

21   **Q.**   So the components in Exhibit H-1 are electronic.  How

22   do you know that?

23   **A.**   Because I received it electronically, and I provided it

24   to you electronically.

25   **Q.**   My question is the underlying documentation that was

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

106

1   reviewed to prepare the schedule that led up to Exhibit H,

2   is that underlying documentation electronically kept if you

3   know?

4   **A.**   I don't know.

5   **Q.**   Do you know whose responsibility it was between Ford

6   and SNAPP to keep all of the records under the terms of

7   their contracts?

8   **A.**   Well, keep all records is a very broad statement.  I

9   understand that SNAPP was required to keep records

10  associated with its purchasing functions.

11  **Q.**   Did you ask any questions about the circumstances of

12  SNAPP unplugging its computer before the commencement of

13  this litigation?

14  **A.**   No.

15  **Q.**   Since you mentioned Exhibit Q, I was going to do this

16  later, but why don't we take a brief look at it right now.

17  Can you briefly look at Exhibit Q and tell me which of these

18  entries pertain to the preparation of Exhibit H-1?

19  **A.**   If your question was which documents on Exhibit Q

20  support that, I think I noted this in my report at Page 11,

21  that these are the primary documents supporting the

22  calculation of damages under this component.

23  **Q.**   So do all of the documents in Exhibit Q pertain to

24  Exhibit H-1?

25  **A.**   They all relate to the calculation of cost savings.

1          **THE COURT:**  How do we know that?  Is there a

2     cross-index identifying Exhibit Q?

3          **THE WITNESS:**  Your Honor, it's noted -- there is

4     not actually a cross-index other than to indicate that it's

5     a sentence on Page 11 that points to it.

6          **THE COURT:**  Pardon?

7          **THE WITNESS:**  There is a sentence on Page 11 that

8     tells the reader to go to Exhibit Q for the primary

9     documents supporting the damages here.

10         **THE COURT:**  Oh, I see.  All right.

11    **BY MR. McINTYRE:**

12    **Q.**   How do you know that all of the documents support H-1?

13    **A.**   Again, just to, I'm not trying to mince the issue here,

14    but some of the damages -- or the damages on H-1 are those

15    that would have occurred prior to September of '99.  There

16    are some additional documents noted on Q that relate to

17    other claims.  So the vast majority of Exhibit Q relates to

18    Exhibit H-1, but not all documents.

19    **Q.**   As to the documents listed on Exhibit Q, are you going

20    to act as a summarizer at trial pertaining to all of these

21    documents?

22    **A.**   I am, I am going to act as a summarizer of whatever

23    SNAPP's proofs may be on this point, whether the documents

24    that are indicated here or whether it's testimony.  That

25    obviously will be a part of cross-examination at trial, and

1    I don't know how that will go.  So I will summarize what I

2    am able to.

3    **Q.**   Are you able to tell me now which of the documents set

4    forth in Exhibit Q are going to be offered as exhibits at

5    trial which you will then summarize?

6    **A.**   No, I can't tell you that.

7    **Q.**   It's premature to do that?

8    **A.**   I just can't tell you.  I'm not saying it's premature.

9    **Q.**   Looking at Page 5 where it says "Ford-SNAPP Accounting

10   - Supplier Invoices" and then you reference boxes of

11   documents, 001 all the way through 727.  I won't count them,

12   but it looks like there are hundreds of documents there.

13          **THE COURT:**  Where are you reading from?

14          **MR. McINTYRE:**  I'm looking at Page 5 of Exhibit Q

15   to his report.

16          **THE COURT:**  Wait a minute.

17          Yeah.

18   **BY MR. McINTYRE:**

19   **Q.**   My question is can you tell me which documents or at

20   least which boxes of documents are going to be offered as

21   documents in support of Exhibit H-1 through you as a summary

22   witness?

23   **A.**   Well, they are not being offered through me, first of

24   all.  Second, I don't know what SNAPP intends to present at

25   trial or as trial exhibits.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                    109

1   **Q.**   At Page 5 of your report you state that Ford could not

2   unilaterally -- that SNAPP, pardon me, could not

3   unilaterally invoice Ford for claimed cost savings because

4   of the need for a purchase order.  Can you tell me where it

5   says you have to have a purchase order in order to make a

6   claim for cost savings under the formula contained in the

7   agreement?

8   **A.**   I'm sorry, you are on Page 5?

9   **Q.**   Uh-huh.

10  **A.**   Which part?  Oh, I'm sorry, third bullet.  Okay.

11  Please repeat your question.

12  **Q.**   My question was where in the agreement does it say you

13  have to have a purchase order in order to claim cost

14  savings?

15  **A.**   I don't think it does.

16  **Q.**   On Page 10 of your report pertaining to cost savings I

17  have another question.  You say under Background, which is

18  in like the second paragraph under "Component 2:  Savings

19  Sharing"?

20  **A.**   Yes.

21  **Q.**   You say in that paragraph that "Paragraph 4.3 of the

22  Framework Agreement described the mechanism for calculating

23  savings under the contract (i.e., Base Price less SNAPP's

24  cost), obtaining Ford's approval of the Base Price, and

25  actually sharing in the Savings created by the efforts of

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    110

1    <u>either</u> of the parties, as indicated below:"

2            And then you underline the word either.  Why did

3    you underline the word either?

4    **A.**   Just to make sure that that was understood, that that's

5    an important word to focus on.  It's not a one-sided

6    contract that just required SNAPP's efforts but one that

7    required consideration of both Ford and SNAPP when

8    determining the amount of the savings.

9    **Q.**   Do you know of anything in the language in

10   Paragraph 4.3 that substantiates your assertion that cost

11   savings applies to savings generated by either of the

12   parties?  That is, that SNAPP is entitled to cost savings if

13   Ford generated cost savings through its efforts?

14   **A.**   Your question was specific to Section 4.3 only?

15   **Q.**   Yes.  Anywhere in the contract that says in connection

16   with calculating the amount of cost savings due to SNAPP

17   from Ford you include amounts of cost savings attributable

18   to the cost savings efforts of Ford.

19   **A.**   I believe the answer is yes, but --

20   **Q.**   It's in the ESOP?  What?  I couldn't hear you.  What

21   did you say?

22   **A.**   I'm sorry, I said I'm not recalling the specific

23   provision that deals with that point.  I will note that my

24   report states Section 4.1 of the amendment further provides

25   that both parties agree to use best efforts and to work

1   together to target total cost savings of 5 percent of the

2   revenue.  I think there is another element that would be

3   responsive to your question, but I'm drawing a blank on that

4   right now.

5   **Q.**   Can you tell me by looking at your report as to the

6   amount of money that you say Ford owed to SNAPP for cost

7   savings what percentage is attributable to an amount owed

8   because SNAPP is supposedly entitled to 50 percent of any

9   cost savings generated by Ford through its efforts?  What's

10  the price tag on that?

11  **A.**   I can't tell you that right now.

12  **Q.**   Is it contained in the analysis somewhere?

13  **A.**   It's not a specific calculation in the analysis.

14  **Q.**   All right.  It's kind of tucked in somehow?

15          **THE COURT:**  That's argumentive, Mr. McIntyre.

16  **BY MR. McINTYRE:**

17  **Q.**   It was kind of included somehow?

18  **A.**   You are drawing a distinction that in fact there was

19  two separate calculations that might have been added

20  together.  There wasn't.  It was one calculation so I

21  haven't attempted to do what you are asking.

22  **Q.**   Looking at Exhibit H again, the document entitled

23  actual -- the cost savings by supplier, Exhibit H that we

24  were talking about before?

25  **A.**   I'm sorry, you said turn to Exhibit H?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    112

1    **Q.**   I want to draw your attention back to Exhibit H-1.

2    **A.**   Yes, yes.

3    **Q.**   And I want to draw your attention to Page 6 of H-1, and

4    I want to draw your attention to Line 1 on Page 6 of H-1

5    where it includes as cost savings "Midwest Business," base

6    price 56,926,605, SNAPP's cost 10 million, total cost

7    46,926,605.  Does this reference the so-called Midwest legal

8    settlement whereby SNAPP paid $10 million on the Midwest

9    settlement?

10   **A.**   I don't know specifically whether it does or not.

11   **Q.**   Well, let me ask you this specifically.  Why do you

12   include a cost savings of $46,926,605 as a cost savings to

13   Ford to which SNAPP is entitled to a portion of or all of

14   it?  Why is it in there?

15              **THE COURT:**  Which one are you looking at?

16              **MR. McINTYRE:**  Page 6 of Exhibit H, Line 1, where

17   among the cost savings they say we owe --

18              **THE COURT:**  6?

19              **MR. McINTYRE:**  -- under the 50 percent.

20              **THE COURT:**  Midwest Business.  Yeah, yeah, okay.

21   BY MR. McINTYRE:

22   **Q.**   My question is why is that entry included?

23   **A.**   Again, I didn't, I didn't do this specific calculation

24   for this, but my understanding is that the savings that are

25   shown in that line are consistent with the language of the

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                    113

1    contract, which places that difference or places that

2    savings amount as the difference between SNAPP's cost and

3    Ford's base price.

4    **Q.**   Well, under Paragraph 4.3 you lay out the formula for

5    cost savings here and you take base price less costs equal

6    cost savings on a transactional basis, correct?

7    **A.**   Again, you keep using the word transaction, and I'll

8    keep saying that that's not the case.

9    **Q.**   All right.  Base cost -- base costs, actual cost

10   savings, correct?

11   **A.**   Base price minus SNAPP's cost equals cost savings.

12   **Q.**   That comes from Paragraph 4.3 of the agreement,

13   correct?

14   **A.**   Yes.

15   **Q.**   And does 4.3 of the agreement say anything that costs

16   include or savings include the settlement of a lawsuit?

17   **A.**   It doesn't state that specifically, nor does it state

18   any specific commodity purchase, but it lays out the formula

19   for the calculation.

20   **Q.**   Did you do any due diligence in asking the folks at

21   SNAPP what was their basis for including the Midwest lawsuit

22   of $10 million and suggesting that that was a $46 million

23   savings to Ford that falls within the terms of a commodity

24   supply contract?

25   **A.**   Again, I think I said this before.  I don't have

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    114

1   specific knowledge on that specific calculation, but my

2   understanding is, based on my inquiry, that the numbers

3   presented in Exhibit H-1 are consistent with SNAPP's

4   interpretation of Paragraph 4.3.

5   **Q.**   Who told you what SNAPP's interpretation was and that

6   it was consistent?  I'm sorry.

7            **THE COURT:**  No, go ahead.

8   **BY MR. McINTYRE:**

9   **Q.**   Who at SNAPP told you the inclusion of the Midwest

10  settlement as a cost for which they are seeking damages --

11           **THE COURT:**  Well, you haven't established who

12  Midwest Business was and what the base price was and what

13  the SNAPP cost was or that this witness had any familiarity

14  with this particular item.

15           **MR. McINTYRE:**  Do you --

16           **THE COURT:**  You have made some assumptions in your

17  questions and moved right on.

18           **MR. McINTYRE:**  Well, the reason I did, Your Honor,

19  I thought we all knew what the Midwest matter was.

20           **THE COURT:**  Do we?  I don't know what it was.

21           **MR. McINTYRE:**  Let me do a little voir dire with

22  the witness.

23  **BY MR. McINTYRE:**

24  **Q.**   You understand that the reference to Midwest here was

25  the payment by SNAPP of $10 million to Midwest Systems in

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                          115

1    connection with the settlement of litigation brought by

2    Midwest Systems against Ford and SNAPP?

3    **A.**    Again, when you say the word "here", are you referring

4    to Exhibit H-1 or are you referring in a general sense?

5    **Q.**    Here in H-1.

6    **A.**    I do not know that to be the fact.

7    **Q.**    Do you have a general awareness that there was a

8    lawsuit brought by Midwest Systems against SNAPP and Ford

9    claiming that there were alleged breaches of contract and an

10   interference with contractual relationships?

11   **A.**    I do have that general knowledge.

12   **Q.**    Do you have general knowledge that SNAPP settled that

13   case for $10 million?

14   **A.**    I have knowledge that SNAPP and Ford settled it.

15   **Q.**    Do you have knowledge as to how that somehow relates,

16   if it does, to a cost savings to be included under H-1?

17   **A.**    Again, I don't -- I can't tell you whether that has

18   been specifically included or excluded.

19   **Q.**    Can you tell me when you look down H-1 why in a number

20   of instances there is a reflection in the base price and

21   then nothing for SNAPP's costs and then an amount for total

22   cost savings?

23           I'll give you some examples.  On Page 1 about

24   12 lines down for a company called Altair, A-l-t-a-i-r, it

25   shows a base price of 20,329,562 -- actually it's the

1   one below that, American Power Conversion.  It shows a base

2   price of 10,067, then it shows no SNAPP costs, then it shows

3   total cost savings of 10,067.  Why is there no SNAPP costs

4   in that instance?

5   **A.**   I can't tell you specifically in that instance for that

6   line item why that's the case.

7   **Q.**   Well, if there is no SNAPP cost, as that seems to

8   suggest, how does then SNAPP get total cost savings of

9   10,067 when there was no SNAPP cost at all?

10  **A.**   Well, to be clear, the column that's entitled Total

11  Cost Savings is the difference between the other

12  two columns, so mathematically that's how it works.

13  **Q.**   But the point is there is no difference here because

14  there is only one column.

15          **THE COURT:**  Mr. McIntyre, I think it's clear that

16  this witness has no person familiarity with any specific

17  item on H-1 so I don't know why you continue to examine him.

18  He testified that he got this from SNAPP and reformulated it

19  into this tabular form from a spreadsheet.

20  **BY MR. McINTYRE:**

21  **Q.**   In your --

22          **THE COURT:**  Is anything inaccurate from what I

23  just said?

24          **THE WITNESS:**  I think that's a pretty fair

25  summarization.  I do have knowledge of some of the

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                117

1    background, but I don't have any knowledge --

2              **THE COURT:**  But it's just general.

3              **THE WITNESS:**  -- of the specific lines.

4          **MR. McINTYRE:**  I won't belabor it, Your Honor.

5          **THE COURT:**  Thank you.

6          **MR. McINTYRE:**  If I could consult a moment with my

7    colleagues.

8    **BY MR. McINTYRE:**

9    **Q.**   Is it fair to say, Mr. Frazee, that has to Exhibit G

10   entitled "Savings Sharing - Cumulative Through 9-30-99" you

11   obtained the information reflected on that Exhibit G from

12   the businesspersons at SNAPP?

13   **A.**   The simple answer to your question is all of the

14   documents I have obtained in this case are the result of my

15   client providing them to me.  That's because I don't have

16   access to Ford's document, and I'm not going to get it from

17   you.  So all of these came from SNAPP's businesspeople or

18   attorneys.

19   **Q.**   Well, let's, let's look at a couple of these then.

20   You, for purposes of the IT Commodity Actual Volume, at

21   Line 1 you had the Base Price of 4, 240-985,876; do you see

22   that?

23   **A.**   Yes.

24   **Q.**   And the Footnote A says that's from Exhibit H, correct?

25   **A.**   That's one place you can find that number, yes.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                    118

1   **Q.**   And Exhibit H was prepared by the good folks at SNAPP?

2   **A.**   No, Exhibit H was --

3   **Q.**   I'll take that back.  This was prepared by SNAPP

4   businesspeople, right?

5   **A.**   This is my expert report.  Exhibit H is my exhibit.

6   It's based on information that was provided to me by the

7   SNAPP business witnesses.

8          **THE COURT:**  Let me ask you a question, Witness, on

9   Exhibit H.  Does Exhibit H reflect any intellectual input by

10  you or cognitive input by you in contrast to mechanical

11  input by you?

12          Do you understand the question?

13          **THE WITNESS:**  I'm trying, Your Honor.  The

14  cognitive aspect of it is limited to two general areas:

15  One, an understanding of the calculations, and two, the

16  confirmation that the base price numbers presented in

17  Exhibit H are consistent with the summaries that the parties

18  exchanged during their relationship, which are, by the way,

19  also summarized in Exhibit C.  So it's in those two areas.

20  **BY MR. McINTYRE:**

21  **Q.**   But in the second area you didn't personally examine or

22  even sample examine the underlying documents; you accepted

23  the statements of the SNAPP persons who were involved in the

24  preparation of the data, correct?

25  **A.**   What was the first part of your question?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                          119

1    **Q.**   I said in connection with your saying you relied on the

2    SNAPP personnel with respect to the accuracy of the

3    documents, it isn't like you went in and examined their work

4    or examined the underling data, you accepted their

5    explanations, correct?

6    **A.**   Well, that's not true.

7    **Q.**   Okay.  What did you do by way of examining any of the

8    underlying documents under Exhibit O?  Or Q, pardon me.

9    **A.**   Exhibit Q?

10   **Q.**   Yeah, that's the list of all of the documents that

11   relate to H, and I thought you earlier testified that you

12   didn't go in and look at the underlying documents

13   themselves.

14   **A.**   I don't think that's how my testimony reads, but let me

15   try to answer.

16         **THE COURT:**  Let me try it this way, Mr. McIntyre.

17         **MR. McINTYRE:**  Okay.

18         **THE COURT:**  Did you sample any of the documents as

19   a test for their accuracy?

20         **THE WITNESS:**  Your Honor, you are referring to

21   documents in Exhibit Q?

22         **THE COURT:**  In O, I guess.

23         **MR. McINTYRE:**  H and Q.

24         **THE COURT:**  Did you sample any of them?

25         **THE WITNESS:**  Okay.  Exhibit Q, I didn't sample

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                              120

1    them.  I looked at them.  It's not a sampling basis.  I

2    examined, for example, the first document.  I looked at the

3    second document.  I have looked at the third document.  I

4    have looked at the fourth document.  I have looked at and

5    examined batch supplier invoices.  I have looked at a number

6    of these on the second page as well.

7               So is that answering your question?

8    **BY MR. McINTYRE:**

9    **Q.**   How about Page 4.  Didn't I earlier ask you if you had

10   examined any of the documents in the several hundred boxes

11   referenced there?

12   **A.**   You did ask me that question.  It was in a different

13   context.  Actually it was on Page 6 and Page 5, but in any

14   event, the point is that I did not go through those boxes

15   myself to examine documents within those.  However, that

16   doesn't mean that there weren't some of those documents

17   which were provided to me, for example, on Page 1 or 2.

18   **Q.**   Let's look at Page 11 of your report where you are

19   talking about the calculations of the savings sharing, and

20   that kind of goes along with Exhibit G.  You say under

21   calculations under 1, "Reported IT commodities and actual

22   IMPACT activity:  As indicated in Exhibit H, SNAPP's

23   analysis indicates that it generated Savings equal to

24   approximately 41.5 percent of SNAPP's Cost."

25               How does Exhibit H reflect savings of an average

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                          121

1    of 41.5?

2    **A.**    If you turn to Exhibit H --

3    **Q.**    Uh-huh.

4    **A.**    -- 1, and you go to Page 9, which is the final page of

5    that exhibit, you will see in the lower right corner

6    something that's labeled as the percentage savings as a

7    percentage of total SNAPP cost, and that's 41.5 percent.

8    It's the cumulation of the savings shown in the preceding

9    nine pages.

10              **THE COURT:**  It's just 2,997,382,280 is

11   41.49 percent of 4,240,000,000, et cetera, right?

12              **THE WITNESS:**  Actually, Your Honor, the

13   calculation is 1.243 billion divided by 2.997 billion.

14              **THE COURT:**  Oh, I see.  Okay.

15   **BY MR. McINTYRE:**

16   **Q.**    That percentage is a percentage based upon reviewing

17   the listed actual savings by supplier on Exhibit H from,

18   what, 1991 to 1999?

19   **A.**    It's the, yeah, it's the cumulation of the preceding

20   nine pages covering the periods between '91 and September of

21   '99.

22   **Q.**    Are you aware that in the ordinary course of business

23   there were cost savings reports prepared by month?

24   **A.**    I am aware of the fact that reports were prepared.  I

25   know that it changed over the course of the relationship as

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                        122

1    to the frequency and as to the format.

2    **Q.**   You made no attempt to try to determine the variation

3    in cost savings by month to month from '91 to '99?

4    **A.**   Is your question did I break my analysis down into a

5    month-by-month analysis?

6    **Q.**   Yes.

7    **A.**   No.

8    **Q.**   And you didn't break it down into an item-by-item

9    basis?

10   **A.**   No, it's aggregated on a supplier-level basis on each

11   one.

12   **Q.**   Let's look at the next one, which is leaked revenue,

13   and Point 2 on Page 11, you say "IT commodities included as

14   Leaked Revenue:  The calculated Savings for this element are

15   based on the Leaked Revenue calculated in Exhibit G and a

16   savings percentage equal to the 38.4 percent (indicated in

17   an email from Ford Executive Rich Honecker to Jack Nasser of

18   Ford). (2.51 million)."

19              That Nasser memo is at H-2; is that correct?

20              **THE COURT:**  Where, H-2?

21              **MR. McINTYRE:**  H-2.

22              **THE WITNESS:**  Yes, that's the caption to

23   Exhibit H-2.

24   **BY MR. McINTYRE:**

25   **Q.**   Where in H-2 --

1          **THE COURT:** Wait a minute.

2                  Go ahead.

3     **BY MR. McINTYRE:**

4     **Q.**   Where in H-2 is there a reference to 38.4 percent?

5     **A.**   If you go to the bottom section of the second page of

6     that exhibit.

7     **Q.**   Where it says Overall Assessment?

8     **A.**   Yeah, under Overall Assessment.  The first bullet point

9     indicates -- I'll read the second sentence.  "Through

10    benchmarking, SNAPP's prices are considered to be

11    competitive for comparably specified equipment - including

12    their fees.  As an example of their negotiations

13    performance, PC prices have been reduced from 'best' dealer

14    price plus 20 percent, which was in the fourth quarter 1991,

15    to 'best' dealer price less 22 percent, which was in the

16    first quarter of '97."

17                And so that, that bullet describes the calculation

18    that would be used to determine the amount of discount that

19    was referenced in the body of my report.

20    **Q.**   So it's fair to say the 38.4 percent isn't in the

21    document, but there's a calculation that comes to

22    38.4 percent based upon the information you just read to us?

23    **A.**   Yeah.  A very straightforward computation consistent

24    with the contract terms.

25    **Q.**   I'll hand to opposing counsel, to the Court, and you

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    124

1    what we have marked as Exhibit 5.  Is that the calculation

2    you are talking about?

3    **A.**    This is an example of how you would, yes, calculate the

4    amount of the savings number.

5    **Q.**    It says, "Attached is the Nasser memo.  Note that the

6    calculation of 38.39 percent assumes that they included

7    SNAPP's markup in computing SNAPP's cost.  Therefore, the

8    calculation is:" and then there's steps 1 through 6.

9              The Nasser memo, is that Exhibit H-2 that you just

10   read to us from?

11   **A.**    Yes, it is.

12   **Q.**    So you got the Nasser memo, Exhibit H-2, on

13   September 9th with this email?

14   **A.**    I believe I did receive it then.  I think I may have

15   had it before as well.

16   **Q.**    Is there an email in the materials that you produced to

17   us where it was forwarded to you prior to September 9?

18   **A.**    I don't know.  I, for some reason, recollect having

19   received it maybe as early as 2005.

20   **Q.**    And then this email not only provides you with the

21   Nasser report on September 9th, but it gives you the

22   calculation, correct?

23   **A.**    It presents an example calculation, yes.

24   **Q.**    Did you utilize this example of a calculation in

25   preparing your report dated September 10th?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

125

1    **A.**   Did I utilize the calculation?

2    **Q.**   Yes.

3    **A.**   I utilized the conclusion of the calculation, which was

4    the 38 roughly percent number.

5    **Q.**   Now, this 38 percent number, explain how you take

6    38 percent and you multiply it times what to get what, just

7    to summarize briefly?

8    **A.**   Well, in this context it's 38 percent of the base, the

9    base price to get the amount of cost savings.

10   **Q.**   So this is an estimate as to the -- that's used in

11   connection with calculating lost cost savings on leaked

12   revenue, correct?

13   **A.**   This percentage is used to calculate the cost savings

14   on the leaked IT commodity revenue.

15   **Q.**   My point is it's an estimate based on the Honecker memo

16   to Mr. Nasser?

17   **A.**   It's not an estimate.  It's what Mr. Honecker told the

18   CEO was the --

19   **Q.**   All right.  You are extrapolating the amount that you

20   calculated off the Honecker memo to all of the purchases

21   involved, correct?

22   **A.**   I am not saying that there is any sort of extrapolation

23   here.  I am using this discount indicated in this memo, and

24   I'm applying that to the leaked IT commodity volumes.

25   **Q.**   Did you make any attempt to go through the IT volumes

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

126

1    that were purchased by SNAPP and determine what the savings

2    were and then use that same ratio as to the leaked?

3    **A.**    We did quantify the amount of, of savings based on the

4    information that SNAPP does have, and that's what's

5    presented in Exhibit H-1.

6    **Q.**    Which is the Honecker report applied to H-1, correct?

7    **A.**    No.

8    **Q.**    Applied to -- the Honecker report is H-2, correct?

9    **A.**    The Honecker memo is H-2.

10   **Q.**    Now, looking at the Honecker memo, it says -- where is

11   it here, H-2?  It says this is an example.  Was it your

12   understanding this was one example?

13   **A.**    Yes.

14   **Q.**    And this was in 1994?

15   **A.**    No, this would have been in 1997, I believe.

16   **Q.**    Okay.  Did you take any steps to determine whether or

17   not this one example was more broadly applicable to the

18   relationship between Ford and SNAPP in general?

19   **A.**    I think it's very consistent, I'm sorry, I think it's

20   very consistent with the actual experience that SNAPP had

21   with Ford.

22   **Q.**    This says, ". . . PC prices have been reduced from

23   'best' dealer price plus 20 percent (fourth quarter, 1991)

24   to 'best' dealer price less 22 percent (first quarter,

25   1997)."  What is the PC price they are talking about?  What

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                              127

1    PC items?  What commodities, if you know?

2    **A.**   Which of your questions do you want me to try?

3    **Q.**   Take the last one.  What does PC price reference?

4    **A.**   My understanding is that it represents the price or

5    the, I'll say it's the price of a PC, which stands for

6    personal computer.

7    **Q.**   Okay.  Does that decrease in the price on a personal

8    computer equate to the entire leaked IT revenues?

9    **A.**   I don't think they have any connection.

10   **Q.**   Now, it involves the decrease between 1991 and 1997 and

11   has no relationship to the actual cost savings on PC's that

12   SNAPP obtained in 1997, does it?

13   **A.**   I don't, I don't understand your question.

14   **Q.**   Well, it doesn't have anything to do with what was

15   going on in 1996 or 1996 [sic], it only has to do with the

16   phenomena involving one PC over a period of time; isn't that

17   correct?

18   **A.**   I don't know that to be true.

19   **Q.**   And I gather you don't know that it is or is not true?

20   **A.**   I don't, I don't have information beyond what's

21   presented here on this topic.

22   **Q.**   Did you undertake any analysis or inquiry to determine

23   whether the 38.4 percent cost savings figure was properly

24   applicable to commodities other than PC's which are

25   referenced in the Honecker memo?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

128

1    **A.**    Again, I think that the actual experience that SNAPP

2    and Ford had, which covered a wide variety of commodities

3    beyond just the PC, if that's what this is referring to

4    here, only would be very consistent with this type of cost

5    savings calculation.

6    **Q.**    My question was more narrow.  My question was did you

7    personally undertake any due diligence or analysis to

8    determine whether the 38.4 percent cost savings figure in

9    the Honecker memo was applicable to commodities other than

10   PC's?

11   **A.**    The extent of my independent work on that was to talk

12   with my client about their experience with other

13   commodities.

14   **Q.**    Did you have any discussion as to whether or not the

15   38.4 percent cost savings figure was properly applicable to

16   software, computerized software?

17   **A.**    I'll give you the same answer.

18   **Q.**    So who did you talk with at SNAPP?

19   **A.**    I spoke with Mr. Vetter, and I believe I spoke with

20   Mr. Thacker on that topic.

21   **Q.**    What did they tell you?

22   **A.**    That this was, that this type of cost savings number as

23   shown in the Honecker memo was very consistent with their

24   experience in a wide variety of other commodities, IT

25   commodities.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                        129

1    **Q.**   Did they provide you with any documentation regarding

2    their supposed experience with a wide variety of other IT

3    commodities?

4    **A.**   It's the information, for example, summarized in

5    Exhibit H-1.

6    **Q.**   And, again, H-1, you were not involved in collecting

7    the underlying information and undertook no activity to

8    personally verify the accuracy of this information?

9    **A.**   I disagree with you.  The other thing I'm going to

10   mention is that there were specific examples of cost savings

11   generated in other commodities that have been attached, for

12   example, to briefs that have been filed by SNAPP.  I have

13   reviewed those examples as well.

14   **Q.**   Well, if you have examined individual cost savings, did

15   you see documents where the cost savings were perhaps lower

16   than 10 percent?

17   **A.**   I don't remember specifically off the top of my head.

18   **Q.**   Did you see any of the future planning documents that

19   SNAPP submitted to Ford where it projected what it thought

20   cost savings would be into the future and what percentages

21   they were projecting?

22   **A.**   I may have.  If you can show me something more

23   specific, I can --

24   **Q.**   I don't have them with me, but do you recollect that

25   some of those cost savings were less than 10 percent?

1    **A.**    I don't recollect that specifically.

2    **Q.**    Did you ever see any documents reflecting projected

3    cost savings where it was projected at less than 10 percent

4    per year?

5    **A.**    I don't, but, gain, I don't recall specifically.

6    **Q.**    Now, you have reviewed individual cost savings request

7    forms used by SNAPP, correct?

8    **A.**    Yes.

9    **Q.**    And you have reviewed cost savings approval forms

10   submitted by SNAPP, correct?

11   **A.**    Some, yes.

12   **Q.**    It's true, isn't it, that many of those reflect cost

13   savings well under 38.4 percent?

14   **A.**    I don't remember specifically, but I'm not disagreeing

15   with you.

16   **Q.**    Did you perform any analysis to determine what

17   percentage of IT commodity leaked volumes related to PC's?

18   **A.**    I have, I have looked at that issue, but I don't

19   remember what the answer is as I sit here right now.

20   **Q.**    I didn't see any work product.  Is there a schedule or

21   analysis or work product in your file where you attempted to

22   quantify the percentage of IT commodity leaked volumes that

23   related to PC akin to those contained in the Honecker

24   report?

25   **A.**    There is a spreadsheet.  It's in my file.  It has been

1   produced to you.  It contains a breakdown of the sales by

2   commodity code, and it includes the amount that's associated

3   with the PC's.  I don't remember what it says specifically.

4   **Q.**   Isn't it possible that you could have looked at the

5   actual commodity codes and determined what the cost savings

6   were?

7   **A.**   Are you referring to SNAPP's actual activities?

8   **Q.**   I'm referring to this.  Do you understand that SNAPP

9   during the course of discovery asked for access to all of

10  Ford's commodity code reports?

11  **A.**   I don't know the specific term, but I understand that

12  that was asked for in a general sense.  I don't know what

13  the name of it was.

14  **Q.**   That's why I asked Ms. Alamo because she knows these

15  names and I forget them.

16       Do you understand that SNAPP reviewed the

17  commodity code reports and then applied the commodity code

18  numbers contained in Exhibits R and S to come up with the

19  actual leaked commodity code leaks for IT?

20  **A.**   Can you try that question again, please?

21  **Q.**   Exhibit R, Exhibit R is the email from Schmitt to

22  Buckley and it lists certain commodities, and Exhibit S is a

23  memo from Sue Kobet and it lists certain commodities, and

24  SNAPP in your report asserts that if you take those

25  commodity numbers that those are the commodity numbers that

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    132

1    supposedly SNAPP had an exclusive on, and you take those

2    exclusives and you apply it to the commodity numbers

3    reflected in the commodity code reports and they came up

4    with the total volume of leaked commodity for actual IT.  Do

5    you get my drift?

6    **A.**    I think so.

7    **Q.**    Okay.  My question is couldn't you have done the same

8    thing for the IT commodities included as leaked revenue,

9    which you had to estimate by going to the Honecker report,

10   couldn't you have taken the commodity code reports and then

11   you go through the actual documents reflecting what

12   commodities, including MRO, that SNAPP bought for Ford and

13   you get the actual MRO commodity numbers and you apply those

14   actual MRO commodity numbers to the commodity reports and

15   you could actually figure out what MRO was leaked?  And I

16   recognize I'm shifting a little bit here away from the

17   percentage, but to the way that you can create the volume

18   for MRO.

19   **A.**    Mr. McIntyre, you just went from IT commodities to MRO

20   commodities.

21   **Q.**    Yeah, I did.

22   **A.**    What are you asking me to address?

23   **Q.**    At this point let's address -- I am getting ahead of --

24   should I come back to MRO later?  Yeah, I'll come back to

25   MRO because I think I have made a mess out of this, okay?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                   133

1    **A.**   Okay.

2    **Q.**   Looking some more at Exhibit G, there is a line that

3    has SNAPP's cost, Line 2 on Exhibit G?

4    **A.**   Yes.

5    **Q.**   For IMPACT Actual Volume.  Do you see that?

6    **A.**   Yes, I do.

7    **Q.**   And that line is 257,853,623, and you base that on

8    Exhibit F, and then go down to the next line -- I have to

9    take my glasses off here -- where you have, down below we

10   are talking about MRO Commodity Leaked Volume in the

11   second portion of it in the middle; do you see that?

12   **A.**   Okay.  You said MRO?

13   **Q.**   Commodity Leaked Volume.

14   **A.**   Yes, I see it.

15   **Q.**   On Exhibit G.

16   **A.**   Okay.

17   **Q.**   And you show the base price and then you show the cost,

18   and then you come to your savings, just like you told us in

19   the formula before, correct?

20   **A.**   Yes.

21   **Q.**   And then for the savings, Footnote D says that that is

22   "Based on SNAPP's industry knowledge indicating 19 percent

23   Savings."  Did I read that correctly?

24   **A.**   Yes, you did.

25   **Q.**   Where does the -- what is the SNAPP industry knowledge

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    134

1    indicating 19 percent savings that you rely on?

2    **A.**   I'm relying on the existence of that knowledge.

3    **Q.**   Who conveyed the existence of that knowledge to you so

4    that you could incorporate it in your report?

5    **A.**   I believe it was Mr. Thacker.

6    **Q.**   Now, are you setting forth this information in your

7    report as a Rule 26 expert or as a mere summarizer under

8    Rule 2006 of the Federal Rules of Evidence?

9             **MR. FINK:**   Your Honor, I'm going to object to the

10   legal conclusion he's asking from the witness.

11            **MR. McINTYRE:**   I think David's point is fair, and

12   I'll withdraw the question.

13   **BY MR. McINTYRE:**

14   **Q.**   Did you receive any written documents from SNAPP,

15   including Mr. Thacker, to support Footnote D that cost

16   savings are 9,086,000,000 based on SNAPP's industry

17   knowledge?

18   **A.**   I don't know where you came up with that number, but I

19   don't have a document to support the 19 percent savings

20   other than the fact that I'm trying to make sure that it's

21   disclosed appropriately in this exhibit.

22   **Q.**   All right.  By like token, if you go back up to the top

23   part where we're not dealing with leaked --

24            **THE COURT:**   You are referring to Rule 2006 in the

25   Federal Rules of --

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                          135

1          **MR. McINTYRE:**  1006.  Isn't that summary

2    testimony?

3          **THE COURT:**  You said 2006.

4          **MR. McINTYRE:**  I misspoke.  Thank you for

5    correcting me, Your Honor.

6          **THE COURT:**  Thank you.

7    **BY MR. McINTYRE:**

8    **Q.**   I draw your attention in Exhibit G to the top part that

9    relates to cost savings on IT Commodity Actual and IMPACT

10   Actual.  We just spoke earlier about the bottom part that

11   pertained to leaked and the cost savings on leaked.  Looking

12   at the section reflecting cost savings for IMPACT Actual

13   Volume, you show a base price of 257,853,623, correct?

14   **A.**   Yes.

15   **Q.**   And then you show SNAPP costs of 85,247,965 correct?

16   **A.**   Yes.

17   **Q.**   And then you show total savings on IMPACT Actual Volume

18   of 172,605,658, correct?

19   **A.**   That's correct.

20   **Q.**   Then on the SNAPP costs that is contained in your

21   report, you have Footnote E that says that is "Based on

22   SNAPP's industry knowledge."  Well, what industry knowledge

23   from SNAPP was conveyed to you to support that calculation

24   in Exhibit G?

25   **A.**   The element that relates to SNAPP's industry knowledge

---

*03-74357; SNAPP v. Ford Motor, et al.*

1    is that same 19 percent which relates to the MRO activity.

2    **Q.**   And that relates to what Mr. Thacker conveyed to you in

3    some form of anecdotal information?

4    **A.**   It's the information that I described in my previous

5    testimony, yes.

6    **Q.**   Yeah.  And you said you didn't know where Mr. Thacker

7    got that from; isn't that what you said?

8    **A.**   No, that's not what I said.

9    **Q.**   Well, the record will bear.

10          Okay.  If it's the same as the 19 percent -- let's

11   go back to that.  Where did the 19 percent information come

12   from?

13   **A.**   The 19 percent came from my discussions with

14   Mr. Thacker regarding his knowledge of savings on and

15   experience with.

16   **Q.**   Okay.  So this one discussion pertained to both the

17   support for Footnote D and Footnote E, correct?

18   **A.**   That same discussion and conversation, et cetera,

19   relates to Footnote D.  It also relates to at least some

20   portion of Footnote E.

21   **Q.**   Okay.  Did you take any notes?

22   **A.**   No, I didn't.

23   **Q.**   Who else was at that discussion?

24   **A.**   I don't, I don't recall anybody in particular.

25   **Q.**   What did he tell you?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

137

1    **A.**   That this 19 percent was his experience, his industry

2    experience with generating savings in a similar type MRO

3    environment.

4            I'm paraphrasing, just to be clear.

5    **Q.**   Did you do any -- well, did he provide you with any

6    documentation?

7    **A.**   No.

8    **Q.**   Did you undertake any independent analysis or due

9    diligence to determine whether or not Mr. Thacker was

10   providing you with reliable information?

11   **A.**   On this specific point I did not do any other

12   independent analysis of what the number should be.

13   **Q.**   Okay.  Did you make any inquiry as to what

14   Mr. Thacker's experience was with respect to the supply of

15   IMPACT and MRO to an automotive supplier?

16   **A.**   Please read that question back.

17   **Q.**   Did you make any inquiry as to what his experience was

18   in the area of supplying the commodities relating to IMPACT

19   and MRO?

20   **A.**   Okay.  Yes, I did make some inquiry on that.  I know, I

21   know that he's participated in several businesses where

22   that's been part of the activities.

23   **Q.**   Is it your understanding that he's had other businesses

24   supplying IMPACT and MRO type supplies?

25   **A.**   Again, you are using those two terms.  Just to be

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                         138

1    clear, they are a general type of commodity, and my

2    understanding is that he has experience with, for example,

3    serving Ford at a minimum.  General Motors was being

4    provided with those services, and there were a couple of

5    other customers.

6    **Q.**   This is an aside.  I saw in your notes that you made

7    reference to DSSI and/or DSSI, L.L.C.?

8              **MR. FINK:**  Is that a question, Your Honor?

9    **BY MR. McINTYRE:**

10   **Q.**   Did you have discussions with Mr. Thacker and others

11   about DSSI and/or DSSI, L.L.C.?

12   **A.**   I may have, if you can give me some sort of time frame

13   of those notes.

14   **Q.**   I will.  Can you define DSSI for me?  Was is it?

15   **A.**   Well, I can answer what I know now.  If you are asking

16   me to talk about my notes, you will have to provide those

17   notes for me.

18   **Q.**   What does DSSI stand for?

19   **A.**   What does DSSI stand for?  My understanding is that

20   one thing it stands for is Direct Sourcing Solutions, Inc. I

21   believe that's the --

22   **Q.**   In connection with the opinions that you have rendered

23   about future lost profits flowing from breach of the alleged

24   duty to negotiate in good faith, did you give any

25   consideration as to how the business by DSSI would impact

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                    139

1    your evaluation?

2    **A.**    Could you narrow your question?

3    **Q.**    Well, let's do it this way.  Are you familiar that all

4    of SNAPP's business was transferred to DSSI with the

5    exception of collection against Ford?

6    **A.**    I don't think that's a factually true statement.

7    **Q.**    Are you familiar that all of SNAPP's employees were

8    reassigned to BPT Systems, which, in turn, assigned them all

9    to DSSI?

10   **A.**    I don't think that that's factually true either, but I

11   don't have the documents in front of me.

12   **Q.**    Well, are you familiar with the fact that all of

13   SNAPP's intellectual property allowing them to conduct the

14   business of a procurement company were sold to DSSI?

15   **A.**    What time frame are you referring to?

16   **Q.**    December 31, 1999?

17   **A.**    So after the termination of --

18   **Q.**    Yes.

19          **MR. FINK:**  Your Honor?

20          **THE COURT:**  Wait, do you have an objection?

21          **MR. FINK:**  The objection, I allowed it a few

22   times, but counsel continually, repeatedly states facts that

23   are not in evidence and won't be in evidence in the case and

24   simply are not true regarding the transaction from DSSI.

25          **THE COURT:**  I don't know.  The witness --

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    140

1        **MR. FINK:**  I was trying not to interrupt the

2    witness, but, Your Honor, there's a point at which counsel

3    repeats it enough time times I think I have to comment on

4    the record.

5        **MR. McINTYRE:**  I'll represent as an officer of the

6    Court that all of the matters that I have referenced are

7    substantiated by documents that are already in the record

8    before this Court.

9        **THE COURT:**  Let's go forward.

10   **BY MR. McINTYRE:**

11   **Q.**   My question is a simple one.  In looking at the

12   profitability that you say SNAPP would have had if it had

13   continued in business for another three years, did you look

14   at the profit achieved by DSSI?

15   **A.**   Please repeat your question.  I want to make sure I

16   heard it correctly.

17   **Q.**   My question was in considering the lost profits

18   sustained by SNAPP going into the future did you consider

19   what the level of profitability was at DSSI?

20   **A.**   In terms of, to be specific, in terms of determining

21   damages under the element that deals with failure to

22   negotiate in good faith --

23   **Q.**   Exactly.

24   **A.**   -- there is not a consideration of profits made by

25   Direct Sourcing Solutions, Inc., which is not a party to

1    this suit.

2    **Q.**   You didn't think that was relevant?

3    **A.**   I didn't think it was an appropriate calculation given

4    that it's not a party.

5    **Q.**   Did you determine -- are you aware in the cost savings

6    area the formula says that if SNAPP achieves cost savings in

7    excess of 50 percent it then must remit the remainder of the

8    cost savings back to Ford either in the form of additional

9    services or reduced prices?  Are you familiar with that?

10   **A.**   I don't think it says that anywhere.

11        **MR. FINK:**  Your Honor, I'm sorry, I really

12   apologize, but I have to either have that question read back

13   or repeated.  I don't think it was an accurate reflection of

14   the contract.  It might have been.  It didn't sound right to

15   me.

16   **BY MR. McINTYRE:**

17   **Q.**   Well, my only question is did you consider whether

18   there were any savings owed to Ford under Paragraph 4.3 that

19   should have been reduced from the savings that you say Ford

20   owes SNAPP?

21   **A.**   No, I think Ford still has the savings.  That's the

22   point of the damages calculation.

23        **MR. McINTYRE:**  Can I take a two-minute break,

24   Your Honor?

25        **THE COURT:**  We'll take a ten-minute break.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    142

1          **MR. McINTYRE:**  Thank you.

2          **MR. FINK:**  Your Honor, may I ask a procedural

3     question?  Does the Court have a schedule in terms of how

4     long we will go and whether I will have an opportunity for

5     redirect?

6          **THE COURT:**  We'll see.  We'll go to 4:30.

7          **MR. FINK:**  Thank you.

8        (Recess from 2:59 p.m. until 3:11 p.m.)

9          **THE COURT:**  Let's go.  Where is the witness?

10             Are you going to go until 4:30?

11         **MR. McINTYRE:**  I think so.

12         **THE COURT:**  All right.

13         **MR. McINTYRE:**  One thing that I would like to do,

14    Your Honor, to maybe expedite matters, when we get to the

15    one component involving the 1999 agreement, my colleague,

16    Michelle Alamo, will do that one.

17         **THE COURT:**  All right.

18         **MR. McINTYRE:**  It will go quicker.

19         **THE COURT:**  All right.  The witness should get

20    back up there.

21         **MR. McINTYRE:**  I'm sorry?

22         **THE COURT:**  That's fine.  If we don't finish

23    today, we'll continue.  It's been an illuminating day.

24             Go ahead.

25         **MR. McINTYRE:**  Okay.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                            143

1           **THE COURT:**  Out of curiosity, in the long history

2    of this case has there ever been a substantive motion

3    directed to the obligation to commence negotiations in good

4    faith?

5               **MR. McINTYRE:**  No, sir.

6           **THE COURT:**  I didn't think so.

7               **MR. McINTYRE:**  Nor has there been a substantive

8    motion -- you know, I'll take that back.  There was.  I'm

9    going to take that back.  I think we included that along

10   with the one on --

11              **MS. ALAMO:**  I think SNAPP filed the motion.

12              **MR. McINTYRE:**  The one on the meaning of the word

13   target.

14              **MS. ALAMO:**  We didn't file the motion.  SNAPP did.

15              **MR. MILLER:**  It was part of the Rule 56 process

16   and adjudicated as an issue of fact for trial.

17          **THE COURT:**  I wrote an opinion on it or I dealt

18   with it peremptorily?

19              **MR. McINTYRE:**  I think it was peremptorily, but

20   you are testing my recollection.

21          **THE COURT:**  Well, you will let me know.

22              That may have been one that Special Master

23   Levy ruled on.

24              **MR. McINTYRE:**  You've got it.  I think.

25              **MR. MILLER:**  Then we had a full hearing, and I

1   remember in relation to that specific issue you used the

2   word percatory, which was a term I had never heard before.

3           **THE COURT:**  Purgatory?

4           **MS. ALAMO:**  Precatory.

5           **MR. McINTYRE:**  That's in the context of the word

6   target.  The target was precatory.

7           **THE COURT:**  I will ask the defendant only to

8   collate the record about what happened on that particular

9   one.

10          Let's go.

11  **BY MR. McINTYRE:**

12  **Q.**   Mr. Frazee, earlier in your deposition I made reference

13  to certain SNAPP Cost Savings Approval Forms, Cost Saving

14  Approval Forms and another form, and what I want to do is

15  mark them just for the record so there's no confusion and

16  ask you if these are the forms that came out of your file

17  that I referenced.

18  **A.**   Okay.  I'll do my best.

19          **MR. McINTYRE:**  Let me start out with providing a

20  copy of what I'm marking as Exhibit 6 to Mr. Fink.

21          **THE COURT:**  Why don't you mark them all now.

22          **MR. McINTYRE:**  All right.

23          **THE COURT:**  How many are there?

24          **MR. McINTYRE:**  There are three.

25          **THE COURT:**  Exhibits 6 to 9, cost savings forms.

1          **MR. McINTYRE:**  Your Honor, I have put a sticky on

2     the court reporter's copy, but I have just put a handwritten

3     number on the others.

4          **THE COURT:**  That's fine.

5          **MR. McINTYRE:**  And I will fix it up later, if

6     that's okay with the Court.  Let me give Mr. Fink his copy.

7          **THE COURT:**  Do you have a set for me?

8          **MR. McINTYRE:**  I do, Your Honor.  I want to see if

9     I could give the witness the one with the sticky on it.

10    **BY MR. McINTYRE:**

11    **Q.**   Mr. Frazee, I'll show you what's been marked as

12    Exhibits 6, 7 and 8.  You will note that each of them has

13    down in the bottom right-hand corner a Bates stamp that says

14    Frazee Number -- 6 has 1723, Number 7 says 1706, and Number

15    8 says 1743.  These are Bates number that I have placed on

16    documents that we received from counsel from SNAPP when they

17    produced to us certain of your files.  Were these in fact

18    documents that were in your files?

19    **A.**   I'll take your word for it.

20    **Q.**   Okay.  And when we earlier spoke on the record about

21    Cost Savings Approval and Cost Savings Approval Form and a

22    cost savings document, in looking at these documents is

23    there anything you want to add to your earlier testimony?  I

24    just didn't want to be in a position where it looked like I

25    hadn't given you the benefit of looking at the things we had

1    mentioned.

2    **A.**   I don't know if I would add anything, but I'm not

3    sure -- I don't remember, frankly.

4    **Q.**   This was a housekeeping exercise just to make sure

5    everything is in the record.

6           I now want to move to some other documents that

7    came out of your file.

8           **THE COURT:**  Well, one question.  You were familiar

9    with these forms, were you not?

10          **THE WITNESS:**  Yes, Your Honor.  I don't remember

11   specifically if it was this document or something that

12   looked a lot like it.

13          **THE COURT:**  One more question.  Do you remember

14   having any substantive conversation in the course of your

15   work with anyone at SNAPP regarding the use of these forms

16   or the protocols to be followed relating to the use of these

17   forms?

18          **THE WITNESS:**  I had some, some conversation on

19   that topic as well as reviewed some documents that described

20   how these forms basically fit into the process of what was

21   supposed to happen.

22          **THE COURT:**  Was it a long conversation or a short

23   conversation?

24          **THE WITNESS:**  It probably wasn't more than an

25   hour.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*
                                                              147

1          **THE COURT:**  Thank you.

2              Go ahead.

3          **MR. McINTYRE:**  If I could approach the bench near

4    the witness, Your Honor.

5          **THE COURT:**  Go ahead.

6          **MR. McINTYRE:**  I have several other emails.

7          **THE COURT:**  Just don't get in the seat with him.

8    **BY MR. McINTYRE:**

9    **Q.**   Let me show you Exhibit 9.  Unfortunately I don't

10   have -- well, I'm not going to keep a copy for myself.  I'll

11   give --

12         **THE COURT:**  You don't have to have an extra copy

13   for the reporter because the copies that you are giving him

14   he'll give back to you.

15         **MR. McINTYRE:**  All right.  Exhibit 9 for you,

16   Exhibit 9 for you, and Exhibit 9 for the Court.

17   Unfortunately these have some yellow highlighter on

18   Exhibit --

19         **THE COURT:**  We'll forget that.  We'll ignore that.

20   **BY MR. McINTYRE:**

21   **Q.**   Is this an email, Exhibit 9, that you got from SNAPP?

22   **A.**   It looks to be, yes.

23         **MR. McINTYRE:**  Your Honor, may I stand near the

24   witness --

25         **THE COURT:**  Sure.

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                148

1              **MR. McINTYRE:**  -- so that we can look at the copy

2      together because I only have one?

3              **THE COURT:**  Sure.

4      **BY MR. McINTYRE:**

5      **Q.**   And you received this, as it indicates, September 5?

6      **A.**   Yes.

7      **Q.**   And it says, "Please use the revised attachment instead

8      of the one from earlier today.  The change is to incorporate

9      the administrative savings into the amounts by supplier so

10     that it does not need to be shown separately."

11     **A.**   Yes.

12     **Q.**   Did you use this summary that was attached to

13     Exhibit 9?

14     **A.**   Specifically we would -- I don't remember specifically,

15     although we would have likely used -- actually, no, this

16     wouldn't have been used.

17     **Q.**   Well, does this relate to the administrative cost

18     savings that were incorporated into Attachment H?

19     **A.**   I'm sorry, does it relate to it?

20     **Q.**   Does it relate to the administrative cost savings that

21     were incorporated into Attachment H under the term of other

22     suppliers?

23     **A.**   It sort of relates.

24     **Q.**   Okay.

25     **A.**   Just to be clear though, this is just, Exhibit 9 is

1    just a very, very high-level summary number.  It's not

2    actually the back-up in Exhibit H.

3    **Q.**   And this high-level summary number was provided to you

4    by Mr. Vetter?

5    **A.**   Yes.  Again, this wasn't, this second page of this

6    exhibit was not used.

7           **THE COURT:**  Wait.  Exhibit H is the list of

8    venders.

9           **MR. McINTYRE:**  Yes, and toward the end of

10   Exhibit H under the list for other venders there's a number,

11   and the other venders list is actually an inclusion for

12   administrative cost savings.

13          **THE COURT:**  Wait a minute.

14          **MR. McINTYRE:**  As I understand it.  Let me go back

15   and clean this up.

16          **THE COURT:**  Other suppliers.  Oh, I see.  So this

17   is supposed to be --

18          **MR. McINTYRE:**  If you look at H, Your Honor.

19          **THE COURT:**  Yeah, I've got it, H-1, Page 6.

20          **MR. McINTYRE:**  H-1, Page --

21          **THE COURT:**  6.

22          **MR. McINTYRE:**  6 under other suppliers.

23          **THE COURT:**  Yeah.

24   BY MR. McINTYRE:

25   **Q.**   Isn't that where you have included savings attributable

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

1    to administrative cost savings?

2    **A.**   No.

3    **Q.**   Well, what are the other suppliers referenced then in

4    Exhibit H?

5    **A.**   I mean it's a category that's broad.  It's others not

6    listed in the other lines in the exhibit.

7    **Q.**   This says please use -- I'm looking now at Exhibit 9

8    that I sent you or submitted to you.  It says, "Please use

9    the revised attachment instead of the one from earlier

10   yesterday.  The changes incorporate the administrative

11   savings into the amount by supplier so that it does not need

12   to be shown separately."

13           Was that speaking in terms of incorporating

14   something into the amount shown by supplier on Exhibit H?

15   **A.**   Yes.

16   **Q.**   Okay.  And did you utilize the summary along with --

17   that you received along with Exhibit 9 in connection with

18   the preparing of your report?

19   **A.**   No.  Again, Exhibit 9 is two pages, and the second page

20   of it is a high-level analysis, in other words, when I say

21   high level, is a summary number.  It doesn't correspond with

22   Exhibit H-1, which is detailed on a supplier-level basis.

23   **Q.**   What's it correspond with?

24   **A.**   I'm not --

25   **Q.**   How did you use it?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                         151

1    **A.**   I don't -- I think I already testified.  I didn't use

2    the second page of Exhibit 9.

3              **THE COURT:**  Louder, please.

4              **THE WITNESS:**  I think I already testified that I

5    didn't use the second page of Exhibit 9.

6              **THE COURT:**  So there's no correlation between

7    these figures as reflected in Exhibit 9 and any of the

8    schedules in your report; is that a fair statement?

9              **THE WITNESS:**  Judge, there may be some

10   correlation, but the bottom line is Exhibit 9 is not part of

11   my report and it's not feeding into my report.

12   **BY MR. McINTYRE:**

13   **Q.**   Let me show you what we've marked as Exhibit 10.

14   Exhibit 10, sir, purports to be a Thursday, September 6

15   email from Doug Vetter to you.  It says, "Subject:  Good

16   faith renewal damages," and then it says, "Attached is a

17   spreadsheet for the good faith renewal piece," and attached

18   to that is an attachment that says, "Good Faith Renewal

19   damages 9-8," correct?

20   **A.**   In the header, yes.

21   **Q.**   Yeah.  And then also --

22   **A.**   Actually, I'm sorry, it says 9-6.

23   **Q.**   9-6.

24              **MR. FINK:**  The copy of the exhibit that I have

25   doesn't have an attachment.  Should I have an attachment?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    152

1          **MR. McINTYRE:**  Well, you should have, David.  Why

2     don't we stand next to each other and you can use mine.

3     Now, I know, I want to ask a question --

4          **MR. FINK:**  Do you have another copy?

5          **MR. McINTYRE:**  No, I don't.

6          **MR. FINK:**  Your Honor, because of the small print

7     and the numbers involved, it really is necessary, if we can

8     do something quickly, find out what the document is, we may

9     have a copy of it.

10          **MR. McINTYRE:**  Take mine.  I'll just stand within

11     the proximity of the witness without skulking and lurking.

12     **BY MR. McINTYRE:**

13     **Q.**   Did you receive this email Exhibit 10?

14     **A.**   Yes.

15     **Q.**   Now, you will note the email has a Frazee Bates Stamp

16     2432 on it.  I will note that that is my number.

17          You will recollect that when we were preparing for

18     these proceedings, maybe you know this or not, but are you

19     aware that the -- all of the emails between you and the

20     SNAPP personnel were produced to us and then we weren't

21     given attached to the emails the attachments, but those came

22     either in other subsequent productions, including on a CD.

23          **THE COURT:**  If you know.

24     **BY MR. McINTYRE:**

25     **Q.**   If you know.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                        153

1          **MS. ALAMO:**  I think we should clarify for the

2    record.

3          **MR. McINTYRE:**  Yeah, go ahead.

4          **MS. ALAMO:**  Would you like to clarify, David?

5          **MR. FINK:**  They were all produced at the same

6    time.  They were physically separate just as we provided you

7    with -- because the attachments weren't always kept with the

8    emails, but you did get every attachment.  So every

9    attachment was produced at the same time, and if you are

10   having a problem identifying one, we can help you find it.

11         **THE COURT:**  Let's go forward, please.

12   **BY MR. McINTYRE:**

13   **Q.**   My only point is, is this the attachment that goes with

14   that email?

15   **A.**   I think so.  I don't know for certain, but I think so.

16   **Q.**   Did you utilize the attachment from Mr. Vetter entitled

17   "Good Faith Renewal Damages 9-8" in connection with

18   preparing your report?

19   **A.**   There are elements of it, and just to be clear, it is

20   9-6.

21   **Q.**   9-6.

22   **A.**   Yes.

23   **Q.**   And did you do any independent review of any documents

24   to verify the calculations contained in the calculation

25   "Good Faith Renewal Damages 9-6"?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                        154

1    **A.**    Yes.

2    **Q.**    What did you do?

3    **A.**    Well, to answer that you have to understand what the

4    different elements of it are, but, for example, the first

5    line in the spreadsheet has a number of $565 million.  That

6    number was traced to the information contained in Exhibit C

7    to my report.

8           The next line item is $156 million and some.  That

9    corresponds with another spreadsheet that I believe provides

10   the supporting detail for that number, which I looked at and

11   compared.

12   **Q.**    Who prepared that other spreadsheet?

13   **A.**    This would have been I believe part of the, the

14   submission to Ford back in May 2000 or something along those

15   lines, and so I don't know who at that point would have

16   prepared it.

17   **Q.**    You don't know who at SNAPP prepared it?

18   **A.**    I don't for sure.  I think it was Mr. Vetter, but it

19   was five or six years ago that that happened, I think, if my

20   recollection is right.  So that those are two examples.

21   **Q.**    You will note on this it has IMPACT commodity volumes

22   average per year 2.268.  Did you do anything to personally

23   verify that figure that he includes in his calculation?

24   **A.**    Actually, I think you are referring to I-Ra-MPP.

25   **Q.**    Yeah.

---

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    155

1    **A.**    And I-Ra-MPP is supported by a subcalculation, which is

2    on the third page of the exhibit.

3    **Q.**    Uh-huh.

4    **A.**    And this, that footnote basically breaks down the

5    subcomponents there.

6    **Q.**    Who did the calculation on the subcomponents on the

7    third page?

8    **A.**    It's really a straightforward average calculation, so I

9    guess technically in this email Mr. Vetter did it, but it's

10   a pretty straightforward --

11   **Q.**   Do you know what underlying documents he looked at when

12   he did it?

13          **MR. FINK:**   I don't know if he intended to do it,

14   but he spoke over the witness when the witness was finishing

15   the answer.

16          **THE COURT:**   Before you go there, let me ask you

17   something, Witness.   IT is intellectual what?   What does

18   that stand for?

19          **THE WITNESS:**   IT is information technology, like

20   software, personal computers.

21          **THE COURT:**   What, software?

22          **THE WITNESS:**   I'm just giving you examples.

23          **THE COURT:**   What?   Okay.   What's it again,

24   intellectual?

25          **THE WITNESS:**   Information technology.

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    156

1          **THE COURT:**  Information technology.  What's

2    IMPACT?

3          **THE WITNESS:**  IMPACT is a program that's a, you

4    know, it's one of these labels that Ford puts on a program,

5    but it basically deals with MRO commodities, which are

6    maintenance and repair, and that last O I can't remember.

7          **THE COURT:**  What?

8          **THE WITNESS:**  Maintenance is the M, R is repair,

9    and O is orders, I believe, but I don't remember.  It's

10   basically the commodities that are used --

11         **THE COURT:**  This is hardware?

12         **THE WITNESS:**  This would be smaller items not

13   associated with IT, not computer stuff.

14         **THE COURT:**  All right.  And what's I-Ra-MPP?

15         **THE WITNESS:**  I-Ra-MPP is another acronym that

16   stands for essentially raw materials purchases; in other

17   words, the purchase of things like steel, plastic resin,

18   ferrous and nonferrous metals.

19         **THE COURT:**  And let me ask you this.  No one has

20   asked you yet.  The volume of purchases of information

21   technology --

22              IMPACT again is what?

23         **THE WITNESS:**  Impact is MRO purchases.

24         **THE COURT:**  MRO purchases, and the I-Ra-MPP, which

25   is the raw materials purchases, all of those directly relate

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    157

1      to the production at Ford, right?  The volume of work,

2      output from the Ford Motor Company, right?

3                  **THE WITNESS:**  The raw materials do and the --

4                  **THE COURT:**  All three of these do.

5                  **THE WITNESS:**  They do in a sense, but the IT

6      purchases are more connected with I'll call it the office as

7      opposed to --

8                  **THE COURT:**  Yeah, but they all relate to the

9      number of automobiles and things that Ford produces, right?

10                 **THE WITNESS:**  At some level, yes.

11                 **THE COURT:**  Right?  And between 1991 and 2003 Ford

12     was steadily declining, right?

13                 **THE WITNESS:**  How do you, how do you look at that?

14     You mean in terms of profits?

15                 **THE COURT:**  Profitability, volume, everything.

16     Ford was not setting the world on fire?

17                 **THE WITNESS:**  That's charitable.

18                 **THE COURT:**  Okay.  Within the privacy of this

19     courtroom, all right?

20                       Did you in this projection for this

21     three years of what business SNAPP would have gotten from

22     Ford take into consideration the possibility that each of

23     these three years Ford's demand for any of this stuff would

24     be reduced each year because it was not being, it was not

25     very successful in the automobile industry?

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    158

1          **THE WITNESS:**  Yes, sir, I did consider that, and

2    actually it's a little surprising that the volume of

3    purchases in those categories we are talking about were

4    actually either staying flat or increasing.

5          **THE COURT:**  That's historical, but when you were

6    projecting it.

7          **THE WITNESS:**  No, I have the benefit of actually

8    knowing now what did happen.

9          **THE COURT:**  Looking back, but when you were

10   projecting it, was that one of the considerations you took

11   into account?

12         **THE WITNESS:**  The simple answer is yes.

13         **THE COURT:**  Well, as a matter of fact, this

14   document, you got this document, right?

15         **THE WITNESS:**  Yes.  Exhibit 10?

16         **THE COURT:**  Yeah.

17         **THE WITNESS:**  Yes.

18         **THE COURT:**  And you incorporated this into your

19   study?

20         **THE WITNESS:**  Yes.

21         **THE COURT:**  So you had no intellectual input into

22   the preparation of this document, did you?

23         **THE WITNESS:**  No.  Exhibit 10 is from Mr. Vetter.

24   I'm not saying that this --

25         **THE COURT:**  So what you did in your report is

1    really recycle what Mr. Vetter gave you?

2            **THE WITNESS:**  Let me be clear.  Exhibit 10 is

3    Mr. Vetter's spreadsheet.

4            **THE COURT:**  Yeah.

5            **THE WITNESS:**  I took pieces of Mr. Vetter's

6    spreadsheet and put them in my report, but not all of them.

7            **THE COURT:**  Most of them?

8            **THE WITNESS:**  In terms of this question, the raw

9    materials, the answer is yes.

10           **THE COURT:**  All right.  Just go ahead.

11   **BY MR. McINTYRE:**

12   **Q.**   One last question on what I will show you as

13   Exhibit 10.

14           **MR. FINK:**  Again?

15           **MR. McINTYRE:**  Did we have one 10?  Let's go for

16   11.

17           **THE COURT:**  Exhibit 10 is an email of September 6,

18   1:32 p.m.

19   **BY MR. McINTYRE:**

20   **Q.**   I'll show you Exhibit 11, which is a Friday,

21   September 7th email from Mr. Vetter to you.  I'll hand a

22   copy to the Court, and again, Mr. Frazee, I'm going to look

23   over your shoulder.  And this email, you will see it bears

24   down in the right-hand corner my Frazee Bates stamp.  Do you

25   recognize this as something that came out of your files?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    160

1    **A.**    Can I take just a minute?

2    **Q.**    Sure.

3    **A.**    Yes.

4    **Q.**    And this email to you from Mr. Vetter is dated

5    September 7, 2007, correct?

6    **A.**    Yes.

7    **Q.**    Is that about when you received it?

8    **A.**    That sounds right.

9    **Q.**    And your report, the final edition, was submitted to

10   the Court on September 10, three days later, correct?

11   **A.**    I believe so.

12   **Q.**    And this is a summary where Mr. Vetter says the subject

13   is "Allocating Ford's payments," and it says "Ford's

14   payments to SNAPP can be summarized as follows:"  And then

15   below he has a summary that continues over to Page 2,

16   correct?

17   **A.**    Yes.

18   **Q.**    Did you use that information reflected on Exhibit 11 in

19   preparing your September 11th report?

20   **A.**    September 10th.

21   **Q.**    Yes.

22   **A.**    And the answer is yes, but I want to be clear that this

23   email followed a conversation that I had with Mr. Vetter

24   that -- where I proposed to him the methodology and the way

25   to do the calculation, so this was an email that followed

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    161

1    that.

2    **Q.**    So he did the calculation; is that correct?

3    **A.**    He put in the numbers, as you can see, on the exhibit,

4    but it was in response to a conversation I had with him

5    about the methodology and calculation I thought appropriate.

6    **Q.**    And you assume that the numbers that he put in were

7    true and accurate?

8    **A.**    I didn't assume that.  I did check that and compare it

9    to the information he had already calculated.

10   **Q.**    Did you review underlying documentation with respect to

11   SNAPP's payments for operating expenses?

12   **A.**    Yes.

13   **Q.**    And then at the end you will see he says, "Therefore,

14   83.2 percent of all Ford payments, a total of 2.833,

15   et cetera, billion, are allocable to the 1.75 percent profit

16   claim."  Is this the same 83.2 percent number that came out

17   of the Honecker report?

18   **A.**    No.

19   **Q.**    Where does this 83 percent number come from?

20   **A.**    First of all, the reference to the Honecker report was

21   for a number that was closer to 39 percent and on a totally

22   different issue.

23   **Q.**    It was 38.4, you are right.

24   **A.**    And it was related to cost savings.

25   **Q.**    Uh-huh.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                     162

1    **A.**   This is a number that is the result of doing the

2    allocation that's described in the email.

3    **Q.**   Very good.  Thank you.

4          I would like to refer you -- excuse me.

5    **A.**   Actually you walked off with all of my exhibits, if you

6    don't mind.

7          Thank you.

8    **Q.**   At least I didn't take your coat.  Did I give them all

9    to you?

10   **A.**   I think so.

11   **Q.**   I say the business about the coat.  I was once in trial

12   with Mr. Saylor from Miller Canfield, who at end of the

13   trial put on my coat and left.

14         Let's go to, back to your report, and I'll try and

15   get through it here with some dispatch.  I would like to

16   draw your attention to Schedule D in your report -- or

17   actually Schedule C, I'm sorry.

18         And the text of your report relating to Schedule C

19   is generally included on Pages 3, 4 and 5, just for

20   reference.  I'm going to have to use a magnifying glass for

21   some of these numbers so please don't let me put you off.

22         Okay.  Looking at Attachment C, you will see it's

23   entitled "SNAPP v. Ford Motor Company, SNAPP's Accounting

24   for Receipts and Disbursements From 1992 to September 1999

25   Including Reconciliation to Original Project Summaries."

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                               163

1           What does that part mean, including reconciliation

2    to original project summaries?

3    **A.**   It really relates more to the format of the report.

4    What I was endeavoring to do is to present the information

5    and to make it very clear about the numbers that were and

6    were not on the project summaries, summary forms, and that's

7    a formal document, but to try to reconcile to those forms so

8    that someone could look at them and understand the

9    differences.

10   **Q.**   You will see at the top you have Grand Total - All

11   Managed Commodities, North American, European Grand, IMPACT

12   Grand, and IPAS Grand.  You include expenses for IMPACT, and

13   my question is did you make a determination on your own to

14   include the IMPACT expenses or was that done in connection

15   with discussions with SNAPP?

16   **A.**   I don't know that I would characterize it as either.  I

17   think it certainly was provided to me, the numbers

18   themselves.  I have seen project summary forms that support

19   them, but their inclusion on this document is for the

20   purpose of making sure we accomplish the goal in the heading

21   of the document, which is to provide an accounting for

22   receipts and disbursements.  So that's the reason for the

23   inclusion.

24   **Q.**   As to the time period for IMPACT expenses, I know that

25   you have not included any for 1994, '93 or '92, which would

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

164

1    be on the pages as you get toward the back of Attachment C.

2    Why is that?

3    **A.**   My understanding is that there wasn't, there weren't

4    any activities under that category or at least specifically

5    broken out in that category in those years, so . . .

6    **Q.**   Was it your understanding that IMPACT commodities were

7    only purchased as of 1995 pursuant to an IMPACT purchase

8    order and document prepared in 1995?

9    **A.**   You know, I -- let me make sure I was being clear

10   because I don't think I was.  IMPACT, just to be clear,

11   really refers to a category of product.  It's not IT.  It's

12   the MRO products that are the subject of that.  The actual

13   name IMPACT, however, doesn't come into being I want to say

14   until maybe '94 or '95, if I remember correctly.  So prior

15   to that date if MRO commodities had been purchased they

16   simply -- they may be included in the other columns of this

17   report as opposed to being broken down and treated as if

18   they were under the IMPACT program.  That's my recollection.

19   **Q.**   You are saying you understood that MRO was the same

20   thing as IMPACT?

21   **A.**   My understanding is that IMPACT covers MRO commodities.

22   **Q.**   Uh-huh.

23   **A.**   They are not synonymous terms.

24   **Q.**   Well, if that's true, why does there have to be an

25   estimate of leaked MRO commodities when all you had to do

---

1   was to take the reports from Ford, take the MRO numbers

2   bought by SNAPP under the IMPACT program, and make an actual

3   determination of the level of IMPACT purchases?

4   **A.**   I think that's exactly what Exhibit C does is it shows

5   the actual IMPACT purchases, but I think you are confusing

6   the two issues.  There is a separate calculation for leaked

7   revenue, which by definition could not have been purchased

8   by SNAPP, and so we used Ford documents to quantify the

9   amount of product that SNAPP was unable to purchase for

10  Ford.

11  **Q.**   Were you aware that IMPACT had a different compensation

12  formula and markup than the IT commodities under the

13  agreements from '91 through '96?

14  **A.**   From '91 to '96?

15  **Q.**   Yeah.

16  **A.**   I know that there was a different mechanism for paying

17  SNAPP for the MRO commodities that it did purchase.  I

18  understand that there are different terms within the

19  contract that deal with markups, and they differ based upon

20  the type of commodity.

21  **Q.**   It's true, isn't it, IMPACT stands for Industrial

22  Materials Procurement and Communications Technology?

23  **A.**   That sounds right.

24  **Q.**   Does that ring a bell?

25          Have you seen the 1995 IMPACT blank purchase

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                  166

1   order?

2   **A.**   I think you asked me that earlier.  I don't remember if

3   I have seen that specific document.

4   **Q.**   Or the Partnership in Word Processing - Impact,

5   January 1, 1995?

6   **A.**   If you could show me that.

7   **Q.**   I will.  I'm going to mark them here.

8           I'm going to do this a little out of order.  I'm

9   going to hand you 12 and 13 so you can look at them while

10  I'm distributing copies to counsel and the Court.

11          Did you review Exhibits 12 and 13 in connection

12  with the preparation of your report?

13  **A.**   I don't recall seeing these two documents.

14  **Q.**   Okay.  You will recollect that the 1996 First Amendment

15  to the Framework Agreement amended only the 1995 Framework

16  Agreement; do you remember that, sir?

17  **A.**   I'm sorry, I was --

18  **Q.**   Would you agree with me that the 1996 First Amendment

19  to the Framework Agreement only amended the Framework

20  Agreement, which was dated in 1995?

21  **A.**   To the extent that calls for a legal opinion, I don't

22  know.

23  **Q.**   Well, earlier you said you reviewed the contracts at

24  issue in this matter?

25  **A.**   Yes.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                        167

1    **Q.**   And the reason I ask it is this.  Are you aware of any

2    provision in the 1996 First Amendment to the Framework

3    Agreement that amends the IMPACT via purchase order and/or

4    the IMPACT agreement that I have handed to you?

5    **A.**   I don't recall specifically anything on that topic,

6    but . . .

7    **Q.**   The reason I ask this is isn't it true that the 1.75

8    profit sharing guarantee alleged by SNAPP, there's not --

9    there's no such language like that contained in the IMPACT

10   agreement, is there?

11   **A.**   Wait a minute.  1.75 percent profit sharing?  What do

12   you mean by that?

13   **Q.**   What I mean by this is what is your basis for including

14   the IMPACT numbers in your calculation of 1.75 due and owing

15   to Ford where you include IMPACT or MRO?  Where do you get

16   the basis to include MRO or IMPACT under the 1.75 analysis

17   because, as I read it, there is not a peep in the IMPACT

18   contract about a 1.75 "guarantee."  So how did you get off

19   including IMPACT in your analysis under 1.75?

20   **A.**   Well, I can't speak to the legal position that SNAPP

21   might have on that point, but I think that, and my

22   understanding is that, this arrangement to provide services

23   related to the IMPACT program falls under the amendment or

24   the, I'm sorry, the framework agreement or the amendment to

25   it.

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                    168

1     **Q.**   Are you aware of any exclusivity provision alleged

2     exclusivity provision or "no desourcing" provision contained

3     in the IMPACT contract?

4            **THE COURT:**  Mr. McIntyre, I don't want to delay

5     you.

6            **MR. McINTYRE:**  Okay.

7            **THE COURT:**  But we're talking about an agreement

8     between SNAPP and Ford, and now you are bringing in IMPACT,

9     which is apparently a separate entity and I'm not sure how

10    they relate to one another.

11           **MR. McINTYRE:**  Very well, Your Honor.  I'll move

12    on to a different point.

13    **BY MR. McINTYRE:**

14    **Q.**   Looking at your Exhibit C, you have made some

15    adjustments, and I think you said at one point that you made

16    an adjustment to include -- it would be the one, two, three,

17    fourth line down -- under Adjustment it says, "Equipment

18    Value - other than PC Renewal."  What is that?

19    **A.**   There are two ways that SNAPP would assist Ford in

20    procuring goods and services.  One, it could purchase a

21    product and then sell it to Ford or, second, it could

22    acquire the good and lease it to Ford or cause it to be

23    leased to Ford.  The programs in which SNAPP provided the

24    leased services are really, are reflected in Lines 2 and 4

25    of Exhibit C.  So Line 2 reflects leased products associated

1   with a program called PC Renewal and Line 4 reflects leased

2   products associated with other programs.

3   **Q.**   I want to go back and clarify something in Exhibit I

4   think it was -- what was our number for the partnership and

5   order processing?

6              **MR. FINK:**  13.

7   **BY MR. McINTYRE:**

8   **Q.**   13.  If you look at that document in the beginning of

9   it under conflict of interest it says, "DSSI agrees to avoid

10  conflict of interest with suppliers of industrial materials

11  or services --

12  **A.**   I'm sorry, I don't know where you are.

13  **Q.**   I'm looking at Exhibit 13.

14  **A.**   13.

15  **Q.**   First section, Lines 1 and 2.

16  **A.**   Okay.  You are on the third page, right?

17  **Q.**   I want to try and clarify the point.

18             **MR. FINK:**  Your Honor, I have to object.  Since we

19  passed these documents, I wasn't going to address this, but

20  I don't understand what counsel is doing bringing these

21  contracts in.  Counsel has already argued, and successfully

22  argued, to this Court that there is an integration clause

23  that integrates all contracts and all relationships related

24  to the parties as of 2005.  I mean, I'm sorry, 1995, and

25  then 1996 with the amendment.  This, by the way, which is

1    not signed, is a document that would be inconsistent with

2    this Court's ruling if they are going to try to suggest that

3    somehow this modifies the subsequent agreement.

4              **THE COURT:**  Well, first of all, the IMPACT seems

5    to be with DSSI.

6              **MR. McINTYRE:**  That's the point I was going to

7    address.

8              **THE COURT:**  What?

9              **MR. McINTYRE:**  That is the point I was going to

10   address, Your Honor.

11             **THE COURT:**  It's not a SNAPP agreement, and I

12   don't know how they relate to one another, but he apparently

13   included financial data arising under this agreement with

14   his financial data relating to his damages study.  I'm a

15   little confused about all of this.

16             Mr. McIntyre?

17             **MR. McINTYRE:**  If I could make a pro offer.  I

18   reason my questions are relevant is this.

19             The framework agreement dated 1995 is between

20   SNAPP, a registered name of Dearborn Systems, and SNAPP,

21   L.L.C. and Ford.  DSSI, the corporation, was not

22   incorporated until July of 1999, and it became kind of a

23   subsequent company.  But when SNAPP was supplying Ford under

24   the commodity agreements, they did not have IMPACT under

25   those agreements, and IMPACT was low-end things like brooms,

1    goggles, et cetera, and the IMPACT operation was through a

2    different division of Ford.  And within SNAPP -- they also

3    sometimes called SNAPP DSSI, and there's some confusion in

4    the case because from 1991 until the incorporation of DSSI

5    the company in July of '99, you have documents referring to

6    SNAPP and to DSSI.  Then in July of 1999 they took the

7    acronym DSSI and they made a new corporation.

8                      So the reference to DSSI in the IMPACT

9    agreement in 1995 was during the period of time that DSSI

10   was kind of like a d/b/a of SNAPP.  So this is an agreement

11   or document at least that pertained to SNAPP, not the

12   subsequent DSSI that was incorporated in 1999.

13             **THE COURT:**  All right.

14             **MR. McINTYRE:**  I know that's a long rambling pro

15   offer.

16             **THE COURT:**  So I don't understand what you are now

17   asking him.  I don't even understand what the arguable

18   relevance of Exhibit C is to his damage study.  Is there a

19   reference in his text --

20             **MR. McINTYRE:**  Exhibit C is kind of his overview

21   of, as I understand it, it's kind of reconstructing the

22   balance sheet of SNAPP.

23   **BY MR. McINTYRE:**

24   **Q.**   Is that fair, Mr. Frazee?

25   **A.**   No, it's not.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

172

1   **Q.**   How would you fairly say?

2   **A.**   It is a summary of the activity between SNAPP and Ford

3   for the relevant period.  It's cumulative accounting, and it

4   has nothing to do with the balance sheet.

5   **Q.**   All right.  Let me get to one of the adjustments that

6   you make therein.  Down toward the bottom of it there is a

7   reference to -- Line 31 under expenses.  You add PCS,

8   $64,678,086; do you see that?

9   **A.**   Yes.

10  **Q.**   What was PCS?

11  **A.**   PCS was a company that -- pardon me?

12  **Q.**   I was speaking to my colleague.

13  **A.**   I'm sorry.  PCS was a company that provided several

14  different types of resources to SNAPP, including capital or

15  access to capital, management services, and various

16  intellectual property.

17  **Q.**   Did you read Mr. Conway's expert report?

18  **A.**   Yes, I did.

19  **Q.**   And did you read the portion where Mr. Conway said that

20  he thought the payments from SNAPP to PCS were actually the

21  diversion of income and profit to Mr. Thacker, and when it

22  was added back in, SNAPP was a profitable company that

23  exceeded the 1.75 percent revenue commitment, as you call

24  it, as of the bill that SNAPP submitted in the year 1998?

25          Did you read that?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    173

1    **A.**   Well, I read Mr. Conway's report.  I'm not sure that it

2    said what you just said, but I did read it.

3    **Q.**   Well, number one, didn't he say that he thought the

4    payments made to SNAPP were nothing more than undeserved

5    income that was being distributed to Mr. Thacker or in words

6    to that effect?

7    **A.**   You know, I don't think he really opined whether it was

8    deserved or undeserved.  I think he noted that it was a

9    related party, agreed it was a related party.

10   **Q.**   His point was that it was money that should be

11   considered as attributable to income and profit to SNAPP in

12   determining whether or not it breached the 1.75 percent

13   profitability commitment, as you use that term; is that

14   fair?

15   **A.**   I think what his opinion was is that this expense

16   should not be considered as part of any damage calculation

17   by SNAPP.

18   **Q.**   And you differ with him in that regard, don't you?

19   **A.**   Yes, I do.

20   **Q.**   Did you do any independent analysis in that regard?

21   **A.**   Any independent analysis of what?

22   **Q.**   Of the propriety of his conclusions and the propriety

23   of treating the approximate $72 million liable to PCS as a

24   bona fide legitimate expense?

25   **A.**   Yes.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                          174

1    **Q.**   What did you do?

2    **A.**   Well, I think, first of all, that the opinion he

3    offered was, bottom line is it didn't refer at all to the

4    language in the contract or try to make any consideration of

5    that.  I think, second, the fact is that it was an expense

6    that SNAPP incurred, that it was an expense that related to

7    its business with Ford.

8    **Q.**   Okay.  Now, I'm sorry, I didn't mean to cut you off.

9    **A.**   There are other elements, but go ahead.

10   **Q.**   Just by way of background, did you understand that

11   Mr. Thacker was the CEO and sole shareholder of SNAPP during

12   the relevant time period in the case?

13   **A.**   I don't know his titles, so I can't say I know that or

14   don't.

15   **Q.**   Did you understand from 1991 until late 1999 he was the

16   sole shareholder of SNAPP?

17   **A.**   I have a general understanding that he was a

18   shareholder in SNAPP.  I don't recall if during that entire

19   time period he was the sole shareholder.

20   **Q.**   Do you know if he was the chief executive officer?

21   **A.**   I don't.

22   **Q.**   You do not know?

23   **A.**   Like I said, I don't really know his titles during that

24   time period.

25   **Q.**   Do you know whether he was employed directly by SNAPP

1    from '91 to '99?

2    **A.**   I don't know that he was.

3    **Q.**   Do you know what salary or compensation from 1991 to

4    1999 he received?

5    **A.**   I know that for several years he received no salary.  I

6    don't know.  I haven't calculated a specific number.

7            **THE COURT:**  Who is PCS?

8    **BY MR. McINTYRE:**

9    **Q.**   PCS, what does it stand for, sir.

10   **A.**   I don't know what it stands for, but it is a company

11   that was a signator, for example, to the first Framework

12   Agreement, the second Framework Agreement.

13           **THE COURT:**  Wait.  What?

14           **THE WITNESS:**  It was a signator to the initial

15   contract back in 1991 and 1992.  I don't remember if it's

16   spelled out.

17           **THE COURT:**  What did it do?

18           **THE WITNESS:**  It provided really three things.  It

19   provided management at that time.

20           **THE COURT:**  To who?

21           **THE WITNESS:**  To SNAPP.

22           **THE COURT:**  So the item there, the expense item of

23   SNAPP to PCS was for management services?

24           **THE WITNESS:**  No, Your Honor.  Actually there are

25   four different elements.

1          THE COURT:  What?

2          THE WITNESS:  Number one, PCS provided capital to

3     SNAPP, so it provided assurances, for example, with lines of

4     credit.  It also loaned money to SNAPP for which it received

5     interest.  Number three, it provided certain intellectual

6     property, knowledge and know-how, and number four it

7     provided management expertise and consulting.

8     BY MR. McINTYRE:

9     Q.   Who was the sole shareholder of PCS?

10    A.   I don't know that there was a sole or not.  I know that

11    it was largely owned, if not wholly owned, by Mr. Thacker.

12    Q.   Well, wasn't Mr. Thacker also the only employee of PCS?

13    A.   I don't know that to be the case.

14    Q.   Mr. Conway in his report notes that Mr. Conway has

15    determined that Mr. Thacker was the sole shareholder and

16    sole employee of PCS.  Did you note that?

17    A.   He very well may have noted that.  I just don't

18    remember that statement.

19    Q.   Mr. Conway also noted in his report that he found no

20    documents pertaining to any services rendered by Mr. Thacker

21    by PCS to SNAPP.  He said he found no statements, no bills,

22    no W-2 forms, no internal documents reflecting the nature of

23    goods and amounts of services rendered by PCS to SNAPP.

24    Have you found any W-2 forms?

25    A.   No.  You wouldn't have a W-2 associated with services

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                177

1    provided between two corporations.

2    **Q.**   Well, would you have a statement --

3             **THE COURT:**  Well, ask this question.  We are

4    getting late.  SNAPP apparently paid PCS $72 million in the

5    aggregate, right, or more?

6             **THE WITNESS:**  In the aggregate, yes, just a little

7    bit over 72 million.

8             **THE COURT:**  Well, wait a minute.

9             **THE WITNESS:**  I'm sorry, Your Honor.  I misspoke.

10   Just under, just over $70 million.  Sorry.

11            **THE COURT:**  70 million?

12            **THE WITNESS:**  Yes.

13            **THE COURT:**  Did you in the course of your work

14   find any data or information which legitimized the payment

15   by SNAPP to PCS as a business expense?

16            **THE WITNESS:**  Yes.

17            **THE COURT:**  That's what you are driving at, isn't

18   it?

19   **BY MR. McINTYRE:**

20   **Q.**   What did you find?

21   **A.**   There are a series of agreements that are a part of the

22   files that I produced to you.

23            **THE COURT:**  No, not agreements.  I'm talking about

24   substantive services.

25            **THE WITNESS:**  Your Honor, the only reason that I

1    was mentioning the agreements was that --

2              THE COURT:  What?

3              THE WITNESS:  I said the only reason I am

4    mentioning the agreements was because they contain a

5    description of the services as well as the formula.

6              THE COURT:  But did you find that the services

7    were in fact delivered substantively?

8              THE WITNESS:  I have been told that they were

9    delivered.

10             THE COURT:  No, did you find personally that they

11   were in fact delivered?

12                  Sit down.

13             THE WITNESS:  I'm sorry, Your Honor.  I'm not

14   understanding how I could do that.

15             THE COURT:  Well, Mr. McIntyre is suggesting that

16   PCS was used as a device by Thacker to take money out of

17   SNAPP for his personal account, and if that -- over and

18   above salary or anything else and, therefore, SNAPP's

19   expenses were overstated.

20                  Is that a fair statement, Mr. McIntyre?

21             MR. McINTYRE:  That is, Your Honor.

22             THE COURT:  What?

23             MR. McINTYRE:  That is, Your Honor.

24             THE COURT:  And if you add back the money that

25   Mr. Thacker, according to Mr. McIntyre, took out of SNAPP,

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                179

1   SNAPP would have been a profitable operation.  It was like

2   one of these offshore partnerships that we hear so much

3   about these days.

4            Now, did you find anything in your work to

5   suggest that the relationship with SNAPP and PCS was at

6   arm's length?

7            **THE WITNESS:**  Yes.

8            **THE COURT:**  Aside from the agreements.

9            **THE WITNESS:**  I can't point you, Your Honor, to

10  another document that would go to that question.

11           **THE COURT:**  Let's go on, Mr. McIntyre.

12           **MR. McINTYRE:**  I am prepared to talk about those

13  agreements if the Court would like to hear about them.

14           **THE COURT:**  It's your case.  Sometimes there's a

15  certain obscurity that my questions are designed to inform

16  me so I better understand what you all are talking about.

17  **BY MR. McINTYRE:**

18  **Q.**  When you mentioned the agreement between SNAPP and PCS,

19  it's true, isn't it, that there's only been one agreement

20  relating to the provision of services by PCS to SNAPP?

21  **A.**  That's not true.

22  **Q.**  That's not true.  I know of one agreement dated 1997,

23  and that agreement states, and we're trying to find it --

24  are you familiar with the one I'm talking about?

25  **A.**  Yes.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    180

1     **Q.**   It was in your files.  It's a 1997 agreement that says

2     there was an earlier executed agreement years ago that they

3     cannot find so they have re-executed the agreement effective

4     1997 nunc pro tunc back to 1991.  Is that the agreement you

5     recollect?

6     **A.**   I don't know that you are accurately quoting, but I am

7     familiar with the 1997 agreement.

8     **Q.**   Isn't it true that agreement was signed by PCS by

9     Mr. Thacker, correct?

10    **A.**   Yes.

11    **Q.**   And it was signed by SNAPP by Mr. Thacker, correct?

12    **A.**   I'm not sure.  You will have to show me.

13    **Q.**   Are you aware that Mr. Thacker during this period of

14    time was, A, getting a salary from a company called Answers

15    that was renting him out to SNAPP to act as an executive and

16    provide executive services to SNAPP?

17             Are you aware of Answers?

18    **A.**   I'm aware of that entity, yes.

19    **Q.**   Do you know how much money Mr. Thacker got out of

20    Answers?

21    **A.**   In what time period?

22    **Q.**   1991 through 1999?

23    **A.**   No, I'm not.

24    **Q.**   Do you know how much money Mr. Thacker got directly by

25    way of salary from SNAPP from 1991 to 1999?

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                     181

1    **A.**   No, I haven't calculated that.

2    **Q.**   Okay.  Do you know how much money ended up in

3    Mr. Thacker's accounts out of, out of PCS?

4    **A.**   No.

5    **Q.**   Are you aware of the National Bank of Detroit document

6    appended to Mr. Conway's report regarding PCS?

7    **A.**   I remember reading that, yes.

8    **Q.**   And that document essentially said that the bank

9    understood that SNAPP had little revenue or income because

10   the income was being taken out of SNAPP and paid to PCS so

11   that it could protect Mr. Thacker in the event that Ford was

12   unable to pay obligations or something to that effect?

13           **MR. FINK:**  Your Honor, if I may, I'm actually

14   going to object to the hearsay nature of that because the

15   document is not here.

16           **MR. McINTYRE:**  It is hearsay.

17   **BY MR. McINTYRE:**

18   **Q.**   But are you aware of that portion of Mr. Conway's

19   report where he appends this NBD memo explaining how the

20   monies were being sent out of SNAPP to PCS and that they

21   were really SNAPP income but they were giving it to

22   Thacker's other company?

23           **MR. FINK:**  Your Honor, he said he was withdrawing

24   the question.  I object to the question.

25           **THE COURT:**  Mr. Fink, this is cross-examination.

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    182

1    The witness can say I don't know and we can move on.

2    **BY MR. McINTYRE:**

3    **Q.**   Do you remember that generally?

4    **A.**   I remember the section of his report that references

5    that document.

6    **Q.**   In light of the all of these points made by Mr. Conway,

7    what due diligence did you do vis-a-vis your client in

8    determining, you know, the relationship between PCS and

9    SNAPP and that Mr. Thacker, here he is, he's rendering

10   services as a CEO but he's also pursuant to the PCS

11   agreement going to be rendering management services, so did

12   you make any inquiry as to what different services he would

13   render with his PCS hat on from his Answers or SNAPP chief

14   executive officer hat?

15   **A.**   I did talk about this topic in a general sense, but you

16   have to -- I think you are drawing this narrow box around

17   just one aspect of the relationship, and it's not just did

18   Mr. Thacker do something for SNAPP or did he do it for PCS.

19   I have already testified that there are a number of

20   different aspects of that contractual relationship that

21   drive and determine a fee that would be payable to PCS.

22   Some of it relates to the volume of activity going on.  Some

23   of it relates to the amount of working capital that's being

24   provided.  It's just like think of it as a loan.  You have

25   interest just like with any other party.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

183

1    **Q.**   You received the audited financial statements of SNAPP,

2    also known as Dearborn Systems and Services, Inc.?

3    **A.**   I did.

4    **Q.**   And I recollect you went -- you or somebody on your

5    staff went through these and reviewed them, but not only

6    that you highlighted certain portions of them; do you

7    remember that?

8    **A.**   I remember that, number one, I did receive them; number

9    two, I did review them; and I don't remember if I put

10   highlighting on it.

11   **Q.**   Let's go back to when this relationship first started.

12   I will draw your attention to the 1992 Financial Statement,

13   Note C, Related Party Transactions, "In addition,

14   commissions totaling 525,000 were paid to this company in

15   1992.  These payments have been expensed on the income

16   statement of SNAPP and reported as income on the income

17   statement of the sister company."

18        Did you make any due diligence inquiry as to who

19   was the sister company alluded thereto?

20   **A.**   You know, you are pulling a footnote from a single

21   document.  I believe I did ask questions about that.  I

22   don't remember the specific answer to your specific

23   question.

24   **Q.**   Isn't this footnote or a slightly altered version

25   thereof in every financial statement of SNAPP?

*03-74357; SNAPP v. Ford Motor, et al.*

1    **MR. FINK:**  Your Honor, could I simply ask, he's

2    saying this footnote.  Could he show the witness?

3             **THE COURT:**  The witness hasn't asked for it.

4    Thank you.

5    **BY MR. McINTYRE:**

6    **Q.**   Isn't it true that every one of the certified financial

7    statements of SNAPP had a footnote in it Other Related Party

8    Transactions in which they noted that income of SNAPP was

9    being paid to PCS and reflected as an expense at SNAPP and

10   an income at PCS?

11   **A.**   I believe that -- this is based on my recollection and

12   we are talking about eight or nine different documents, but

13   there was a footnote in each financial statement that talked

14   about related party transactions.  It described the amount

15   of borrowing that was being done by SNAPP from PCS.  They

16   were borrowing money.  They were paying interest on it.  It

17   talked about the amount of that expenditure, and it was a

18   disclosure that would have been viewed by Ford during the

19   course of the relationship as one of SNAPP's expenses.

20   **Q.**   Was the PCS expense included in the relationship --

21   what's it called on the summary sheets?  Yeah.

22            Was the PCS expense contained in any of the

23   project summaries submitted by SNAPP to Ford?

24   **A.**   Yes.

25   **Q.**   Would you show me a project summary that contained PCS

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                185

1    as an expense?

2    **A.**    There were, again, this is why you are overgeneralizing

3    when you just say PCS.  There is an interest component and

4    there are these other components that we talked about.  The

5    interest component that relates to PCS is included in the

6    line that says interest expense on project summaries.

7    **Q.**    Well, you made an adjustment --

8    **A.**    Yes.

9    **Q.**    -- in Exhibit C to include PCS?

10   **A.**    Well, again, a portion of the PCS fees are included as

11   adjustments on Exhibit C.

12   **Q.**    Yes, 64,678,086?

13   **A.**    Yes.

14   **Q.**    These are for fees.  There is a different line item for

15   the interest, right?

16   **A.**    Yes.  That was my point.

17   **Q.**    So you included, of the 70 or 80 million paid out to

18   Thacker through PCS, you included 64 million as fees, not

19   the entire amount as fee expenses, right?

20   **A.**    Let's be clear.  There's $70 million, just over

21   $70 million on this project summary accounting, or I'm

22   sorry, on Schedule C that relates to PCS.  Of that, roughly

23   6 million of it relates to interest on loans from PCS, and

24   the balance is associated with the fees which are shown on

25   Line 31 of the exhibit.

---

*03-74357; SNAPP v. Ford Motor, et al.*

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

186

1    **Q.**   Now, Mr. Conway, you have his report, opines that the

2    interest paid to PCS made sense when it first started up in

3    the first few years, but he's concluded that approximately

4    after 1994 there was no good business justification for

5    including interest at that level as an expense.  Do you

6    recollect that?

7    **A.**   I recollect his general comments on the topic.

8    **Q.**   What did you do by way of independent verification, due

9    diligence, to determine the propriety of including all of

10   that interest expense after 1994?

11   **A.**   Again, there are a couple of aspect to that question.

12   One is there is an assumption on Mr. Conway's part that his

13   analysis matters, that there is some, that there is some

14   provision in the contract that makes that analysis relevant.

15   So one of the things that I did was to talk with the client

16   about that assumption.

17        The second thing is, in terms of looking at the

18   actual documents, which, for example, a footnote, you just

19   described a footnote that contains a recent description of

20   the provisions associated with the cost of the financing,

21   and I also did an analysis separate from those two things

22   that relates to whether the cash levels and the marketable

23   securities levels that were at SNAPP were relevant and

24   helpful to it in generating, you know, generating profits

25   and/or generating cost savings for Ford.

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*

187

1        So, very specifically, when you do have working
2    capital, it allows you to take advantage of certain
3    purchases, which generate cost savings for Ford's benefit.
4    **Q.**   Well, I saw in your file a reference to some work done
5    by somebody in reviewing some SIC numbers.  Can you tell me
6    what that was about?
7    **A.**   Yes.  There is some, there is a spreadsheet that was
8    prepared by one of my staff.  The spreadsheet looks at the
9    amount of cash on the balance sheet of SNAPP at the end of
10   any calendar year and compares that to the size of the
11   business as measured by sales and a few other metrics, and
12   it calculates whether that cash amount relative to the size
13   of the business is increasing or not.
14   **Q.**   What SIC number did you use?
15   **A.**   Let me finish my answer.
16   **Q.**   I'm sorry.
17   **A.**   It also compares those numbers for SNAPP to some
18   information available from a statistical source that I use.
19   **Q.**   Let me ask you this.  SNAPP has alleged that SNAPP was
20   in the business of being an IP services provider.  When you
21   did your SIC analysis, did you use a number for an IP
22   services provider?
23   **A.**   You said IP?
24   **Q.**   IP as in palm.
25   **A.**   I don't remember the exact title for the SIC code that

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                    188

1    was used.  I believe it was something along the lines of

2    computer equipment distributers or something along those

3    lines.  You would have to show me the document though.

4    Q.   Did you do any evaluation to determine the propriety of

5    equating SIC numbers for a computer equipment distributer to

6    the business of SNAPP?

7    A.   Did I do any analysis of that?

8    Q.   Yeah.  How do you know those SIC numbers -- the

9    assumption was that you could use data relating to a

10   computer equipment distributer to SNAPP, right?

11   A.   The, the information that was used is trying to match

12   up one of the characteristics of SNAPP.  In other words,

13   one of the things it does in terms of at least this revenue

14   line item is going to be sales associated with computer and

15   IT equipment, and from that perspective it is comparable to

16   the SIC code that was collected and the statistics for the

17   Court associated with that SIC code.

18   Q.   Do you know what facet that has accounted for in

19   SNAPP's business as an IT service provider?

20   A.   Off the top of my head I don't.  The vast majority.

21   Q.   So you think the vast majority of SNAPP's business

22   practice would fall within the definition of a computer

23   equipment distributer, as reflected under the SIC number you

24   used?

25   A.   No --

1      **MR. FINK:**  Your Honor, I just want some

2   clarification of the question.  What time period is he

3   talking about?

4      **THE COURT:**  What's SIC number?  What's its

5   significance?

6      **MR. McINTYRE:**  Well, as I understand it, in trying

7   to justify the PCS expense, they did an analysis of some

8   form of overall expense ratios, and they used something

9   called an R --

10

11  **BY MR. McINTYRE:**

12  **Q.**   Is it RMA, sir?

13  **A.**   Yes.

14  **Q.**   What's that stand for?

15  **A.**   It stands for Risk Management & Associates.

16  **Q.**   They used some RMA, Risk Management & Associates

17  numbers, and they said we have looked at these numbers and

18  so the amount of the expense that SNAPP has encountered,

19  including the PCS fees, are reasonable, and the SIC numbers

20  are federal numbers as to various financial attributes of a

21  company kept by SIC number in this database.

22         Was that fair, Mr. Frazee, in a general way?

23  **A.**   No offense.  It's not close.

24  **Q.**   All right.  Why don't you explain it?

25  **A.**   Okay.  There is a private company that maintains a

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                              190

1     database of statistical information on a lot of different

2     companies.  They take the statistical information and they

3     segregate it by SIC code, which is a federal -- a way that

4     the federal government keeps track of businesses by type.

5     So it will say there is one SIC code for companies that sell

6     gas.  There is another one that sells --

7                 **THE COURT:**  What does SIC stand for?

8                 **THE WITNESS:**  Standard Industrial Code or

9     Classification.

10                 **THE COURT:**  Okay.  Go ahead.  I understand.

11                 **MR. McINTYRE:**  Okay.

12    **BY MR. McINTYRE:**

13    **Q.**   To finish up the PCS and the inclusion of expenses, in

14    your due diligence did you have any information that came

15    your way from SNAPP regarding the Empowerment Foundation?

16    **A.**   Yes, there is some information that came on that topic.

17    **Q.**   By way of background, SNAPP, according to the financial

18    statement and its periodics, was always maintaining that it

19    was not able to achieve the 1.75 percent profit commitment,

20    as they called it.  You saw documents to that effect?

21    **A.**   I'm sorry, are you on a different topic?  I just want

22    to make sure.

23    **Q.**   Well, I'm coming back to Empowerment Foundation, but by

24    way of preface, I assume that you agree with me that from,

25    oh, 1996 until '99 SNAPP maintained that it was unable to

1   achieve the net profit target goal of 1.75?

2   **A.**   I don't remember every single document, but I think

3   that's a generally fair characterization.

4   **Q.**   Do you know how close SNAPP came, if they didn't make

5   the 1.75 in '96, how close did they come?

6   **A.**   Off the top of my head, I don't know.

7   **Q.**   The same question for '98, '99.

8   **A.**   Again, it's so specific of a question I just don't know

9   the answer.

10  **Q.**   Okay.  Have you seen the so-called DSSI-SNAPP opening

11  position statement that SNAPP presented to Ford when they

12  commenced their renewal negotiations?

13  **A.**   I have seen a document entitled -- with a similar

14  title.  I believe it was in May of '99, but I don't think

15  that's when they commenced their negotiations.

16  **Q.**   I think you are right on the date and the negotiations

17  were commenced prior to that, but you recollect that in that

18  opening position SNAPP took the position that the gap or

19  shortfall from 1991 on was $26,699,622?

20  **A.**   If you could show me a document, that would be really

21  helpful.

22  **Q.**   Well, it was your Frazee 1746.  I can only show you, if

23  it's okay with David, this marked-up copy.

24         **THE COURT:**   Is it in his report?

25         **MR. McINTYRE:**   No.  I pasted it on a page in his

1    report.

2    **BY MR. McINTYRE:**

3    **Q.**   I'll show you this for purposes just to refresh your

4    recollection.

5            **MR. FINK:**  It's okay, Your Honor.

6            **THE WITNESS:**  Okay.

7    **BY MR. McINTYRE:**

8    **Q.**   This was, by the way, marked as Mr. Buckley's Dep.

9    Exhibit 7, and it's SNAPP Exhibit 59.

10   **A.**   And your question was related to this part?

11   **Q.**   Yeah.  You will see this says Frazee 1746.  Does that

12   suggest you got this?

13   **A.**   Yes, I have seen it.

14   **Q.**   But my point is that in the terms of talking about

15   SNAPP's then current position on the 1.75 percent gap they

16   said that the gap was approximately how much, 11 million

17   plus the 10 million Midwest settlement figure?

18   **A.**   Well, I mean I'll read it.  It says SNAPP is owed the

19   pre-amendment shortfall of just $11.776 million, plus the

20   current shortfall of just under 15 million.

21   **Q.**   Okay.  My point is that that totals out to about

22   26,699,622, correct?

23   **A.**   It sounds like it, yes.

24   **Q.**   Yeah.  And if Mr. Conway is correct and the $70 million

25   paid out to Mr. Thacker's other company, PCS, should have

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                                    193

1    been included as income in SNAPP, well then would SNAPP have

2    covered the 26,699,677 that it has in its opening statement?

3    **A.**    You are mixing a lot of different things here.  The

4    26 million, or whatever that number is, is as of a certain

5    date, whereas the money we have been talking about that was

6    paid to SNAPP was paid also in periods subsequent to that

7    document.

8    **Q.**    Go ahead.  I'm sorry.

9    **A.**    Second, again, the calculation of the gap or whatever

10   that number was at that point would not have included, for

11   example, any profits that it should have been receiving for

12   things like, for example, leaked revenue.  So the actual gap

13   would have been much larger, but at the point in time that

14   was being done SNAPP may not have been aware of the extent

15   of what it was missing out on.

16         **THE COURT:**  That's a suitable end for today's

17   session.  You will talk to Ms. Owens about resuming this

18   hearing.  I'm starting a trial next Tuesday.  It should last

19   until the middle of the following week, and then I think

20   there's time available to continue this hearing.  I think it

21   probably takes another full day.  Thank you.

22         **MR. McINTYRE:**  Thank you, Your Honor.

23         **THE COURT:**  You will tell her that I think it

24   takes a full day.

25         (Proceedings adjourned at 4:32 p.m.)

*Thomas Frazee - Cross*
*Thursday/January 17, 2008*                    194

1                         -   -   -

2                    **C E R T I F I C A T I O N**

3            I, Sheri K. Ward, official court reporter for the

4       United States District Court, Eastern District of

5       Michigan, Southern Division, appointed pursuant to the

6       provisions of Title 28, United States Code, Section 753,

7       do hereby certify that the foregoing is a correct

8       transcript of the proceedings in the above-entitled cause

9       on the date hereinbefore set forth.

10           I do further certify that the foregoing

11      transcript has been prepared by me or under my direction.

12

13      _____          January 21, 2008
14      Sheri K. Ward                    Date Completed
        Official Court Reporter
15                            -   -   -

16

17

18

19

20

21

22

23

24

25